UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

JEAN LIN,                                          07-CV-3218 (RJH)

            Plaintiff,

- against –

METROPOLITAN LIFE INSURANCE
COMPANY,

            Defendant.

----------------------------------------------------------------x


## **DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**


Dated: July 3, 2008          METROPOLITAN LIFE INSURANCE
       Long Island City, NY   COMPANY

                              By: /s/ Tomasita Sherer (TH 6072)
                                  Alvin Pasternak
                                  Tomasita Sherer, of Counsel
                                  Attorneys for Defendant
                                  One MetLife Plaza
                                  27-01 Queens Plaza North
                                  Long Island City, NY 11101
                                  (212) 578-3102 (Tel)

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ...................................................................................... A-i

I.    PRELIMINARY STATEMENT ........................................................................1

II.   STATEMENT OF FACTS ................................................................................2

      A.    The Application, Paramedical Examination And The Policy......................2

      B.    The Claim..................................................................................................6

      C.    Misrepresentations In The Application And Paramedical Examination......7

      D.    Denial Of The Claim...............................................................................10

      E.    Plaintiff's Claims ....................................................................................11

III.  ARGUMENT...................................................................................................14

      A.    California Law Applies To This Case ......................................................14

      B.    Summary Judgment Is Appropriate As There Are No Genuine
            Issues Of Material Fact And Defendant Is Entitled To Judgment As
            A Matter Of Law.....................................................................................15

      C.    MetLife Is Entitled To Rescission Of The Policy As A Matter
            Of Law ....................................................................................................17

            1.    The Insured Died Within The Two Year Contestable
                  Period And Thus MetLife Is Entitled To Rescind The Policy
                  Based On His Material Misrepresentations .....................................17

            2.    The Decedent Misrepresented His Hepatitis History And Said
                  Misrepresentations Were Material To The Risk Assumed By
                  MetLife ...........................................................................................18

                  (a)    The Decedent's Misrepresentations In The Application
                        And Paramedical Examination ..........................................19

                    (b)    The Decedent's Misrepresentations Were Material...........20

            3.    If The Decedent Had Disclosed His Hepatitis History,
                  MetLife Would Not Have Issued The Policy As It Did.................21

IV.   CONCLUSION.................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Aguilar v. United States Life Insurance Company,* 162 A.D.2d 209 (N.Y. App. Div. 1990) ...... 21

*American Gen. Life Ins. Co. v. Green*, No. 2:06-CV-02048-MCE-KJM, 2008 U.S. Dist. LEXIS 39985 (E.D. Cal. May 16, 2008) ................................................................................. 18, 19, 20

*Anaheim Builders Supply v. Lincoln Nat'l Life Ins. Co.*, 233 Cal. App. 2d 400 (1965) .............. 24

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ................................................................ 16

*Andre v. Pomeroy,* 35 N.Y.2d 361 (1974) ................................................................................... 16

*Barrett v. State Mut. Life Assurance Co.,* 49 A.D.2d 856 (N.Y. App. Div. 1990), *aff'd,* 378 N.E.2d 1047 (1978) ...................................................................................................................... 21

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................ 16

*Cohen v. Mut. Benefit Life Ins. Co.*, 638 F. Supp. 695 (E.D.N.Y. 1986) ....................................... 20

*Cohen v. Penn Mut. Life Ins. Co.*, 312 P.2d 241 (Cal. 1957) ................................................. 18, 19

*Imperial Cas. & Indem. Co. v. Sogomonian*, 243 Cal. Rptr. 639 (1988) .......................... 17, 20, 21

*Ingram v. Old Line Ins. Co. of Am.*, No. C98-2422 FMS, 1999 U.S. Dist. LEXIS 9346 (N.D. Cal. June 21, 1999) ....................................................................................................... 19, 24

*Kerr v. Metro. Life Ins. Co.*, No. C-94-2440 SI, 1995 U.S. Dist. LEXIS 19129 (N.D. Cal. Dec. 7, 1995) ....................................................................................................................... 15, 16, 17

*Lunardi v. Great-West Life Assurance Co.*, 44 Cal. Rptr. 2d 56 (Cal. 1995) ............................... 19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .................................... 16

*Mut. Benefit Life Ins. Co. v. JMR Elecs. Corp.,* 848 F.2d 30 (2d Cir. 1988) .......................... 20, 21

*Mut. Life Ins. Co. v. Simon*, 151 F. Supp. 408 (S.D.N.Y. 1957) .................................................. 15

*New England Mut. Life Ins. Co. v. Lauffer*, 215 F. Supp. 91 (S.D. Cal. 1963) ............................ 15

*Nw. Mut. Life Ins. Co. v. Buffalino*, 1991 U.S. Dist. LEXIS 12650 (S.D.N.Y. Sept. 6, 1991) ..... 25

*Nw. Mut. Life Ins. Co. v. McCue,* 223 U.S. 234 (1912) ............................................................... 14

*Old Line Life Ins. Co. v. Imogene S. Silvera Trust*, 281 Cal. Rptr. 15 (1991) ........................ 19, 21

*Saint Calle v. Prudential Ins. Co.,* 815 F. Supp. 679 (S.D.N.Y. 1993) .................................. 17, 18

*Taylor v. Sentry Life Ins. Co.*, 729 F.2d 652 (9th Cir. 1984) ........................................... 21

*Trinh v. Metro. Life Ins. Co.*, 894 F. Supp. 1368 (N.D. Cal. 1995) ............................................... 20

*Wilson v. W. Nat'l Life Ins. Co.*, 1 Cal. Rptr. 2d 157 ...................................................... 20

## Statutes

42 U.S.C. § 1981 ............................................................................................................. 24

Cal. Ins. Code § 10113.5 ........................................................................................... 17, 18

Cal. Ins. Code § 10140 .................................................................................................. 24

Cal. Ins. Code § 330 ................................................................................................. 18, 19

Cal. Ins. Code § 334 ...................................................................................................... 21

Cal. Ins. Code § 359 ...................................................................................................... 18

N.Y. Ins. Law § 3105 ..................................................................................................... 18

N.Y. Ins. Law § 3203 ..................................................................................................... 17

## Other Authorities

12f-258f Appleman on Insurance § 7085 ...................................................................... 15

Restatement of the Law, Second, Conflict of Laws, § 192 ....................................... 14, 15

## I.    PRELIMINARY STATEMENT

This memorandum of law is submitted in support of Defendant Metropolitan Life Insurance Company's ("MetLife's" or "Defendant's") motion for an Order, pursuant to Federal Rule of Civil Procedure ("FRCP") Rule 56, dismissing Plaintiff's Complaint in its entirety with prejudice, and granting Defendant summary judgment on its Counterclaim seeking a declaration that Policy No. 204 126 416 ET (the "Policy") issued by MetLife on the life of Mr. Bang Lin ("Decedent" or "Insured") is void *ab initio*.

In this action, Plaintiff seeks to recover the proceeds of the Policy, which was issued on the life of Decedent on August 31, 2004, in the face amount of one million dollars ($1,000,000). Plaintiff Jean Lin is the owner and beneficiary of the Policy. The Decedent died on August 11, 2006, within the two year contestability provision of the Policy. Because the Insured died within the two year contestable period, MetLife conducted its usual inquiries and discovered that the Insured failed to disclose material health information in the application and paramedical examination for the Policy.

This motion is premised on the grounds that MetLife is entitled to judgment as a matter of law as a result of the material misrepresentations made by Decedent in response to Questions 21 and 22 of the application for the Policy and Questions 5, 6, 7, and 8 of Part II: Paramedical/Medical Exam for the Policy, concerning his failure to disclose his history of hepatitis B. Of particular note, when asked on two separate occasions whether Decedent had "EVER received treatment, attention, or advice from any physician, practitioner or health facility for, or been told by any physician, practitioner or health facility" that he had "Ulcers; colitis; *hepatitis*; cirrhosis; or any other disease or disorder of the liver...," Decedent stated that he had

not.[1]  In fact, MetLife's subsequent investigation revealed that Decedent likely had a lifelong history of hepatitis B, he received treatment, attention and/or advice (including but not limited to being prescribed Interferon) for hepatitis B from September 1998 to December 2005, and was diagnosed with chronic hepatitis B on March 27, 2004.  If MetLife had known the truth of these misrepresentations, it would have not have issued the Policy as it did.

Accordingly, for the reasons set forth above and below, Defendant's Motion for Summary Judgment on its Counterclaim should be granted with prejudice, and Plaintiff's Complaint should be dismissed in its entirety.

## II.    STATEMENT OF FACTS

The relevant facts in support of this motion are fully set forth in the accompanying Affirmation of Tomasita L. Sherer, sworn to July 3, 2008 (the *"Sherer Aff."*), Affidavit of Regina Solomon-Stowe, dated July 1, 2008 (the *"Stowe Aff."*), the Affidavit of Dr. Daniel Zamarripa, sworn to June 27, 2008 (the *"Zamarripa Aff."*), the Affidavit of Peggy Chou, sworn to April 21, 2008 (the *"Chou Aff."*), and will be stated in pertinent part below.

## A.    The Application, Paramedical Examination And The Policy

On or about August 5, 2004, Decedent applied to MetLife for a life insurance policy by answering certain questions contained in a MetLife application form (the "Application"). *Stowe Aff.,* ¶ 5, Exh. A, pp. ML LIN 00394-400.

Question 21(d) of the Application states, "Has any person proposed for insurance EVER received treatment, attention, or advice from any physician, practitioner or health facility for, or been told by any physician, practitioner or health facility that he/she had," among other liver ailments, "hepatitis?" (emphasis in original).  In response to Question 21(d), the Decedent checked, "No." *Stowe Aff.,* ¶ 6, Exh. A, p. ML LIN 00398.

---

[1] Decedent responded to this question on the application (Question 21(d)) before a MetLife Sales Representative, Judy Huang, on August 5, 2004; and then on Part II: Paramedical/Medical Exam of the Policy (Question 5(d))

Questions 22(a)-(c) of the Application state, "Has any person proposed for insurance: a) In the past six months, taken any medication or been under observation or treatment? b) Scheduled any: doctor's visits; medical care; or surgery for the next six months? c) During the past five years had any: checkup; health condition; or hospitalization not revealed above?" In response to Questions 22(a)-(c), the Decedent checked, "No." *Stowe Aff.,* ¶ 7, Exh. A, p. ML LIN 00398.

Page 10 of the Application provides, just above the signature lines on which the Decedent executed his signature on this part of the Application, the following:

### AGREEMENT/DISCLOSURE

I have read this application for life insurance including any amendments and supplements and to the best of my knowledge and belief, all statements are true and complete. I also agree that:

My statements in this application and any amendment(s), paramedical/medical exam and supplement(s) are the basis of any policy issued.

\* \* \*

This application and any: amendment(s); paramedical/medical exam and supplement(s) that become part of the application, will be attached to and become part of the new policy.

Only the Company's President, Secretary or Vice-President may: (a) make or change any contract of insurance; (b) make a binding promise about insurance; or (c) change or waive any term of an application, receipt, or policy.

No information will be deemed to have been given to the Company unless it is stated in this application and its supplement(s), paramedical/medical exam and amendment(s).

\* \* \*

*Stowe Aff.,* ¶ 8, Exh. A, p. ML LIN 00400.

The Application was taken by MetLife Sales Representative, Judy Huang, who was deposed in this case on February 19, 2008. *Sherer Aff.,* Exh. I. Ms. Huang testified that she personally met with Decedent on August 5, 2004, and asked Decedent all of the abovementioned

---

before a MetLife approved paramedical examiner, Peggy Chou, on August 18, 2004.

questions in Chinese (generally using English terms for the diseases) and that he responded in Chinese. *Id.* at pp. 31, 34, 36-37. In addition, Ms. Huang testified that she recorded his answers exactly as given. *Id.* at p. 36; *see also Sherer Aff.,* Exh. L, pp. ML LIN 00264-265; ML 00163-164 (agent's statement). Finally, Ms. Huang testified that Decedent was aware that he was required to answer all of the questions truthfully and that he appeared to be honest and forthright. *Sherer Aff.,* Exh. I, p. 36.

On or about August 18, 2004, Decedent completed Part II: Paramedical/Medical Exam for the Policy by answering certain questions and submitting to a paramedical examination. *Stowe Aff.,* ¶ 9, Exh. A, pp. ML LIN 00392-393; *Chou Aff.,* ¶ 4. The paramedical examination included standard testing of urine and blood.[2] *Stowe Aff.,* ¶ 9, Exh. B, ML LIN 00340-341.

Question 5(d) of Part II: Paramedical/Medical Exam states, "Have you EVER received treatment, attention, or advice from any physician, practitioner or health facility for, or been told by any physician, practitioner or health facility that you had," among other liver ailments, "hepatitis?" (emphasis in original). In response to Question 5(d), the Decedent checked, "No." *Stowe Aff.,* ¶ 10, Exh. A, p. ML LIN 00392; *Chou Aff.,* ¶¶ 5,6.

Questions 6 through 8 of Part II: Paramedical/Medical Exam state the following:

> 6. Are you now, or within the last six months, under observation or taking medication or treatment (Including over the counter medications, vitamins, herbal supplements, etc.)?
> 7. Do you have any doctor's visits, medical care, or surgery scheduled?
> 8. Other than the above, during the past five years have you had any
>     a) Checkup; electrocardiogram; chest x-ray or medical test?
>     b) Illness; injury; or health condition not revealed above; or have been recommended to have any: treatment, hospitalization; surgery; medical test; or medication?

---

[2] Despite Plaintiff's anticipated arguments to the contrary, these blood tests do not show elevated liver enzymes, which would have been an indication of hepatitis B. Although there was an indication of slightly elevated triglycerides and bilirubin in the paramedical blood test results, neither of these results relate to Mr. Lin's hepatitis B. *See, e.g., Sherer Aff.,* Exh. E (Deposition of Dr. Zamarripa, p. 50) ("Total bilirubin is not a measure of liver enzymes"); *Sherer Aff.,* Exh. H (Deposition of Dr. Kam, p. 29) ("…elevated bilirubin has nothing to do with the [h]epatitis"); *Sherer Aff.,* Exh. J (Deposition of Dr. Clain, pp. 115-116) ("…the answer is no, it doesn't have anything to do with hepatitis B").

In response to Questions 6 through 8, the Decedent checked, "No." *Stowe Aff.,* ¶ 11, Exh. A, p. ML LIN 00393; *Chou Aff.,* ¶¶ 7-12.

Page 2 of Part II: Paramedical/Medical Exam further provides, just above the line on which the Decedent executed his signature, the following:

> I have read the answers to questions 2-14 before signing. They have been correctly written, as given by me, and are true and complete to the best of my knowledge and belief. There are no exceptions to any such answers other than as written.

*Stowe Aff.,* ¶ 12, Exh. A, p. ML LIN 00393.

Part II: Paramedical/Medical Exam was taken by a MetLife approved paramedical examiner, Peggy Chou, who personally met with Decedent on August 18, 2004. Ms. Chou has stated that she asked Decedent all of the above questions in Chinese and that he responded in Chinese. *Chou Aff.,* ¶ 4. In addition, Ms. Chou has stated that she recorded his answers as given. *Id.* at ¶¶ 6, 8, 10, 12. Finally, Ms. Chou has stated that Decedent was aware that he was required to answer all of the questions truthfully and to the best of his ability. *Id.* at ¶ 13.

In reliance upon the representations made by the Decedent in the Application and Part II: Paramedical/Medical Exam, on or about August 31, 2004, MetLife issued the Policy as a Select Preferred Nonsmoker policy on the life of Decedent in the amount of one million dollars ($1,000,000). The Policy is a 15-Year Term Plan of Insurance with Disability Waiver of Premium Rider. Plaintiff Jean Lin, the Decedent's wife, was the named owner and beneficiary of the Policy. A copy of the Application, and Part II: Paramedical/Medical Exam containing the statements, representations and answers of the Decedent, and the terms of the Policy, was attached to and made a part of the Policy. *Stowe Aff.,* ¶ 13, Exh. A.

As quoted above, in executing the Application and Part II: Paramedical/Medical Exam, the Decedent agreed to having read it and that all statements were true and complete. In addition, the Decedent acknowledged that his statements were the basis of any policy issued and

that no insurance would take effect unless: "(a) the condition of health of each person to be insured is the same as stated in the application; and (b) no person to be insured has received any medical advice or treatment from a medical practitioner since the date of the application." *Stowe Aff.,* ¶ 14, Exh. A, p. ML LIN 00400.

**B.      The Claim**

On November 29, 2005, Decedent allegedly became disabled and commenced a contestable claim for disability waiver of premium benefits.  Decedent subsequently died on August 11, 2006, prior to the conclusion and evaluation of our usual inquiries on a contestable disability claim.  *Stowe Aff.,* ¶ 15.

On or about September 19, 2006, MetLife received an Individual Life Death Claim Form from Plaintiff.  Plaintiff sought payment of five hundred thousand dollars ($500,000) under Policy No. 993 001 679 PR-R (the "'99 Policy"), and one million dollars ($1,000,000) under the Policy at issue based upon the death of the Decedent.  The Individual Life Death Claim Form states the Insured's date of death is August 11, 2006.  MetLife also received a death certificate for the Insured which confirms his date of death is August 11, 2006.  *Stowe Aff.,* ¶ 16, Exh. C, p. ML LIN 00270-271.

The Policy provides, in relevant part, as follows:

> **Not Contestable After Two Years**
> Insurance is issued by the Company in reliance on the statements made in the Application for the insurance.  ...   The insurance issued under this Policy will not be contestable after it has been in force during the life of the Insured for two years from the Date of Issue, except for nonpayment of premiums.

*Stowe Aff.,* ¶ 17, Exh. A, p. ML LIN 00381.

Since the Insured's death occurred before the Policy was in force for two years, MetLife conducted its usual inquiries concerning the truth of the representations made by the Insured in the Application for the Policy.  *Stowe Aff.,* ¶ 18.

6

C.    **Misrepresentations in the Application And Paramedical Examination**

MetLife's investigation revealed that Decedent's representations in response to Questions 21 and 22 of the application for the Policy and Questions 5, 6, 7, and 8 of Part II: Paramedical/Medical Exam for the Policy were materially false with respect to his history of hepatitis B. The investigation further revealed the same material misrepresentations in the application for the '99 Policy, which was issued on June 10, 1999. *Stowe Aff.,* ¶¶ 19-20, Exh. D, pp. ML LIN 00702-707. Despite the knowledge of the material misrepresentations in the '99 Policy, MetLife paid the five hundred thousand dollar ($500,000) claim given that the death occurred after the contestable period expired. *Stowe Aff.,* ¶ 21, Exh. C, p. ML LIN 00271.

As part of its usual inquiries, MetLife ordered Decedent's medical records. Upon receipt, MetLife learned that Decedent was seen from September 1998 until December 2005 by Dr. Sam Kam, a gastroenterologist, for treatment, attention and/or advice for his history of hepatitis B. *See, e.g., Stowe Aff.,* ¶ 22, Exh. E, pp. ML LIN 00092-155; *see also Sherer Aff.,* Exh H (Exhs. B-F marked at the deposition of Dr. Kam). Most notably, MetLife learned that Decedent likely had a lifelong history of hepatitis B,[3] he received treatment, attention and/or advice (including but not limited to being prescribed Interferon) for hepatitis B from September 1998 to December 2005, and was diagnosed with chronic hepatitis B on March 27, 2004. *Id.* Interferon injections were prescribed and taken by Decedent for four months in 1998 through 1999 for a flare up of active E antigen hepatitis B virus. *Stowe Aff.,* ¶ 23, Exh. E, pp. ML LIN 00092-155.

The intentional omission of this material information is obvious considering the fact that Decedent's medical records show that he had visited Dr. Kam two days after signing the Application for the Policy, and eleven days before he signed Part II: Paramedical/Medical Exam for the Policy. *Id.* Indeed, during the past six years of his treatment with Dr. Kam, prior to the

---

[3] As Decedent was born in Taiwan, Dr. Clain stated that he probably contracted the hepatitis B infection prenatally from his mother, which is the usual mode of transmission in Asian families. *See Sherer Aff.,* Exh. M.

7

Application for the Policy, Decedent visited with Dr. Kam at least once every six months for testing, advice, and follow up.  *Id.*  The only medical issue during these visits was Decedent's chronic hepatitis B.  *Id.*

The fact that Decedent did not even indicate that Dr. Kam was his doctor on the Application or Part II: Paramedical/Medical Exam for the Policy is in itself telling.  *Stowe Aff.,* Exh. A, pp. ML LIN 00392, 397.  Instead, he listed Dr. James Huang, who MetLife learned was a pediatrician, who also apparently saw Decedent once or twice (in addition to seeing his children).  *Id.; see also Sherer Aff.,* Exh. I (Deposition of Judy Huang, pp. 28-29).  To date, MetLife has received no medical records regarding Decedent's health history from Dr. Huang.

It is undisputed that Decedent at all times remained at least a hepatitis B carrier (he carried the surface antigen of hepatitis B) and even though he received successful treatment for a flare up of active E antigen hepatitis B virus with Interferon for four months in 1998 through 1999,[4] he continued to be monitored for active flare ups, which did in fact occur in 2003 and 2004.  *Stowe Aff.,* Exh. E, pp. ML LIN 00110, 117.  As explained by Dr. David Clain, MetLife's expert in this matter,[5] the reason for close monitoring is that successful treatment does not eradicate the virus.  *Sherer Aff.,* Exh. J, p. 3.  Even Dr. Louis Aledort, Plaintiff's expert in this matter,[6] acknowledges this fact.  *Sherer Aff.,* Exh. K, pp. 131.  And, if recurrence is not monitored, active disease may lead to further liver damage or liver cancer.  *Sherer Aff.,* Exh. M, p. 3.  It is key that Decedent's blood test results never showed loss of the hepatitis B surface antigen, and as such, it is irrefutable that the virus persisted in his liver.[7]  *Sherer Aff., ¶* Exh. M,

---

[4] Plaintiff makes much of this successful treatment and argues that because the virus was under control, Decedent was "cured."  As explained in further detail below, however, this play on words misconstrues the questions asked on the application, the medical records, and is contrary to MetLife's underwriting guidelines.

[5] Dr. Clain is a highly experienced hepatologist, a specialist with liver disease, who is currently a Professor of Clinical Medicine at the Albert Einstein College of Medicine.  *Sherer Aff.,* Exh. N.

[6] Dr. Aledort is a *hema*tologist – not a hepatologist – who does not treat patients with liver disease and has never written about the treatment of liver disease.  *Sherer Aff.,* Exh. O; *see also Sherer Aff.,* Exh. K, pp. 43-45, 55.

[7] Dr. Aledort acknowledges this fact several times throughout his deposition.  *Sherer Aff.,* Exh. K, pp. 75-76, 82-84, 87, 113-114, 145.

p. 3. For this reason, Dr. Kam measured a liver cancer marker, alpha-feto-protein, at intervals from 1998 to 2005. *Id.*

After MetLife received Decedent's medical records, the matter was referred to Daniel Zamarripa, M.D., Vice President in the Life Underwriting Division at MetLife, for his opinion regarding the materiality of Decedent's misrepresentations. Dr. Zamarripa's duties as a Vice President in Life Underwriting include the review of MetLife's underwriting and claims files. Dr. Zamarripa received his medical degree in 1985, specialized in cardiology in 1990, and worked in private practice for ten years prior to his eight years of relevant underwriting experience. *Stowe Aff.,* ¶ 24. Dr. Zamarripa's conclusions regarding the materiality of Decedent's misrepresentations are contained in a Contestable Death Claim Memo that was received by MetLife's Claims Department on or about January 23, 2007. *Stowe Aff.,* ¶ 24, Exh. F; *Zamarripa Aff.,* ¶ 4, Exh. A.

Upon reviewing MetLife's underwriting guidelines, Dr. Zamarripa stated that, had MetLife known of this information, it would have declined the Policy as issued. *Id.* Specifically, Dr. Zamarripa indicated that according to MetLife's underwriting guidelines in effect at the time of the Application, MetLife would have issued a policy at a different rating. *Id.* During his deposition, Dr. Zamarripa testified that hepatitis B always affects mortality, that Decedent never completely "recovered," as he always maintained the surface antigen, and that as such, the best policy rating he would have received would have been standard (and not preferred as he was given). *Stowe Aff.,* ¶ 25; *Sherer Aff.,* Exh. E, pp. 17, 28, 95-97. In reality, Dr. Zamarripa noted, taking into account Decedent's medical history and reputable literature on the subject, the Decedent clearly had a below normal life expectancy. *Sherer Aff.,* Exh. E, pp. 81-84; *Zamarripa Aff.,* ¶ 7, Exh. C, ML LIN 00915-940.

9

In addition, Dr. Zamarripa indicated that as per MetLife's underwriting guidelines, at a minimum, where a liver biopsy was not performed and the liver enzyme levels (*i.e.*, ALT/AST) were consistently normal, Decedent would have been rated as a hepatitis B carrier. *Zamarripa Aff.*, ¶ 6, Exh. B, ML LIN 00710-718. As per the guidelines, the premium charged for a hepatitis B carrier would have been +50 debits or 50% more premium. *Id.* The guidelines state:

> **Hepatitis B Carrier**
> - Hepatitis B carriers do not completely clear the virus but liver inflammation has subsided and ALT/AST levels are normal.
> - Hepatitis B carrier state is associated with increased risk of hepatocellular carcinoma.
> - Some patients will be followed with serial liver ultrasounds and/or serum alpha-fetoprotein levels to look for evidence of hepatocellular carcinoma.

*Id.* The fact that Decedent was – at all times – a hepatitis B carrier is undisputed. *See, e.g., Sherer Aff.,* Exh. E (Deposition of Dr. Zamarripa, p. 91) ("Basically in this case, if he has E antigen positive and normal liver enzymes, he would treat it as Hepatitis B carrier, as I mentioned before"); *Sherer Aff.,* Exh. H (Deposition of Dr. Kam, p. 64) ("He is a carrier."); *Sherer Aff.,* Exh. K (Deposition of Dr. Aledort, pp. 113) ("...he cured him of his acute infection, that he did do, but he turned him into a carrier."). Had MetLife known this information, the Decedent would not have received the preferred policy he was given. *Zamarripa Aff.,* ¶¶ 5,6, Exhs. A, B.

## D.    Denial of the Claim

Based on the information received in the medical records and Dr. Zamarripa's conclusion as to their effect on the underwriting, MetLife informed Plaintiff by letter dated February 5, 2007, that MetLife was denying liability on the Policy. *Stowe Aff.,* ¶ 26, Exh. G, ML LIN 00029-30. The letter informed Plaintiff that:

> We have learned, in addition to other relevant facts, that your husband was seen by his attending physician on several occasions from September 5,

1998 to August 7, 2004[8] for a condition which is serious from an underwriting standpoint. If your husband had disclosed his treatment for this condition, which was material to our acceptance of the risk, his application would not have been approved as issued.

*Stowe Aff.,* ¶ 27, Exh. G. In addition, the letter enclosed a full premium refund check (which included applicable interest). *Id.*

By letter dated May 4, 2007, Ms. Stowe, a Senior Technical Claims Advisor at MetLife, wrote to Plaintiff and enclosed a copy of the application for the Policy. In Ms. Stowe's letter, she referred to some of the specific application questions quoted above and advised Plaintiff that although she thoroughly reviewed this matter, there was no basis for a change in the decision. Ms. Stowe referred to the reasons given in the earlier letter and explained that the information developed through the medical records supported the decision to void the contract and refund the premiums. *Stowe Aff.,* ¶ 28, Exh. H.

### E.    **Plaintiff's Claims**

On or about April 23, 2007, Plaintiff commenced the instant action by serving a Summons and Complaint. The Complaint asserts a cause of action for breach of contract. *Stowe Aff.,* ¶ 29, Exh. I; *Sherer Aff.,* ¶ 3.

On or about August 14, 2007, MetLife timely served its Amended Answer, Affirmative Defenses and Counterclaim. As noted, MetLife's Counterclaim seeks rescission of the Policy based upon Decedent's material misrepresentations in response to Questions 21 and 22 of the application for the Policy and Questions 5, 6, 7, and 8 of Part II: Paramedical/Medical Exam for the Policy, concerning his failure to disclose his history of hepatitis B. *Stowe Aff.,* ¶ 30, and *Sherer Aff.,* ¶ 4, Exh. A. Plaintiff replied to the counterclaim on or about August 16, 2007. *Sherer Aff.,* ¶ 5, Exh. B.

---

[8] In fact, Decedent continued to see Dr. Kam through December 2005. *See Sherer Aff.,* Exh. H (Exhs. B-F marked at the deposition of Dr. Kam).

Subsequent to the filing of MetLife's Answer, all discovery was conducted, including the exchange of documents, interrogatory requests and answers, and multiple depositions, including expert depositions. Among the discovery requested, MetLife propounded interrogatories on or about October 26, 2007. *Sherer Aff.,* ¶ 6, Exh. C. Question 14 of those interrogatories asks Plaintiff directly about Decedent's treatment for hepatitis B as follows:

> 14. State whether the Decedent was diagnosed with Hepatitis B, received treatment for Hepatitis B, including but not limited to prescription medication treatment and/or was diagnosed with a history of chronic Hepatitis B, and if so set forth:
>
> > (a) when the diagnosis was made and/or when the treatment was given;
> > (b) who gave the diagnosis and/or prescribed the medication; and
> > (c) whether Decedent was ever told that he cleared Hepatitis from his system.

*Sherer Aff.,* ¶ 7, Exh. C (Defendant's First Set of Interrogatories to Plaintiff).

Plaintiff responded to these interrogatories on or about December 3, 2007. Tellingly, in response to these questions, Plaintiff refuses to answer and instead generally refers to her Rule 26 automatic disclosure. *Sherer Aff.,* ¶ 8, Exh. C (Plaintiff's Responses to Defendant's First Set of Interrogatories). This is presumably because Plaintiff has no way of refuting that Decedent was in fact diagnosed and treated with hepatitis B during the relevant period. Again, it is undisputed that no evidence has been provided that contradicts these facts.

Questions 8, 9, and 10 of MetLife's interrogatories ask about other life insurance policies applied for on the life of Decedent. *Sherer Aff.,* ¶ 9, Exh. C (Defendant's First Set of Interrogatories to Plaintiff). In Plaintiff's responses, Plaintiff admits that other than the MetLife policies, there was an additional one million dollar ($1,000,000) policy applied for on the life of Decedent in 2004. *Sherer Aff.,* ¶ 9, Exh. C (Plaintiff's Responses to Defendant's First Set of Interrogatories). This policy was with John Hancock Life Insurance Company and was applied for after the Policy at issue in this case. *Sherer Aff.,* Exh. P, JH 0152-173. Plaintiff has brought

a law suit against John Hancock in Massachusetts State court alleging breach of contract in that case as well.[9] *Sherer Aff.*, Exh. Q.

Depositions in this case have taken place as follows:

| Date | Deponent | Requested by |
|------|----------|--------------|
| 12/14/07 | Regina Solomon Stowe | Plaintiff |
| 12/14/07 | Daniel Zamarripa, M.D. | Plaintiff |
| 01/02/08 | Jean Lin | MetLife |
| 02/19/08 | Judy Huang | Plaintiff |
| 02/19/08 | Sam Kam, M.D. | MetLife |
| 02/22/08 | Dennis Westman | Plaintiff |
| 05/28/08 | David Clain, M.D. | Plaintiff |
| 06/02/08 | Louis Aledort, M.D. | MetLife |

*Sherer Aff.*, Exhs. D - K.

Although Plaintiff now essentially seeks to create a fact issue as to whether Plaintiff or Decedent was aware of the severity of his diagnosis and/or whether MetLife should have known that Decedent had hepatitis B virus because he was Asian[10] or because he had slightly elevated bilirubin results,[11] the fact is that no one has contradicted (and no evidence has been presented to contradict) MetLife's original good faith findings on this claim and that is: (1) the Application

---

[9] John Hancock has refused payment on that policy based upon the same material misrepresentations discussed above. *Id.* Notably, on another two separate occasions, dealing with two parts of the John Hancock application before two different individuals, Decedent again neglected to mention his history of hepatitis B.

[10] Based on Plaintiff's counsel's questioning during MetLife's witnesses' depositions, MetLife anticipates that Plaintiff will argue that because a large number of Asians test positive for hepatitis B, and MetLife allegedly "knew" that Decedent was Asian, MetLife should have tested Decedent for hepatitis B and/or should have known that Decedent was likely to test positive for hepatitis B. In fact, MetLife was not aware that Decedent was Asian as MetLife cannot inquire as to the race of applicants, and MetLife cannot treat applicants differently on the basis of race.

[11] *See* footnote 2.

materially misrepresented the truth; and (2) had MetLife known the truth, the Policy would not have been issued as it was.

Accordingly, for the reasons set forth above and below, Defendant's Motion for Summary Judgment on its Counterclaim should be granted, and Plaintiff's Complaint should be dismissed in its entirety.

## III.    ARGUMENT

### A.    California Law Applies To This Case

As an initial matter, California law applies to this case under black letter conflict of law rules. Restatement of the Law, Second, Conflict of Laws, § 192 (1971). Consistent with choice of law principles favoring justified expectations of the parties, the validity of a life insurance contract will almost always be interpreted by the local law of the State where the insured was domiciled at the time the policy was applied for. *Id.*

There are several reasons for this general rule. First, due to the extensive statutory regulation of life insurance by a great majority of states, issues arising under a life insurance policy have been interpreted in accordance with the state which has the dominant interest in the insured. *Id.* (comment c). Also, a major purpose of life insurance legislation is to protect insureds and the courts have sought to assist in the achievement of this purpose by presenting insureds with the protection afforded by the local law of their domicile. *Id.; see also Nw. Mut. Life Ins. Co. v. McCue,* 223 U.S. 234 (1912) (holding it is a general rule that the construction of an insurance contract is governed by the law of the state where the contract was made).

An exception to this general rule will only be made where another state has a more significant relationship to the contract of insurance and the parties. Restatement of the Law, Second, Conflict of Laws, § 192 (1971) (comment c). For example, in a situation where the relationship of the insured to the state of his domicile is a slight one, as may be in the case of

14

military personnel. *Id.* Another example might be where the contract (such as a variable annuity) would be invalid under the local law where the insured was domiciled at the time the policy was issued, but is valid under another local law that has a close relation to the transaction. *Id.* In such cases, the local law of the other state should be applied. *Id.* Finally, another example might be where there is a change of domicile by the insured and in such cases it *may* be that the state of the insured's new domicile will have the dominant interest. *Id.*

None of those examples exist here. In our case, it is clear that Plaintiff and Insured were always domiciled in California, applied for the Policy in California, paid the premium in California, and received delivery of the Policy in California. There is no connection between Plaintiff or Decedent to New York. California law clearly applies to this case.[12] *See, e.g., New England Mut. Life Ins. Co. v. Lauffer*, 215 F. Supp. 91 (S.D. Cal. 1963) (applying the local law of the insured's domicile at the time of contracting); *Mut. Life Ins. Co. v. Simon*, 151 F. Supp. 408 (S.D.N.Y. 1957) (same).[13]

**B.    Summary Judgment Is Appropriate As There Are No Genuine Issues of Material Fact And Defendant Is Entitled To Judgment As A Matter Of Law**

Summary judgment is appropriate in this case because there is no genuine issue of material fact and Defendant is entitled to judgment as a matter of law. A motion for summary judgment is warranted against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Kerr v. Metro. Life Ins. Co.*, No. C-94-2440 SI, 1995 U.S. Dist. LEXIS

---

[12] Although California law clearly applies to this case, and Plaintiff's counsel has indicated at the pre-motion conference that he agrees that California law applies, MetLife will include some New York citations herein as well in the event that Plaintiff should argue that New York law applies. In any event, New York and California law are substantially the same on these issues.

[13] *See also* 12f-258f Appleman on Insurance § 7085 (2007) ("It has been held that a contract of insurance is completed at the place where the policy is delivered and the first premium collected, particularly where the policy itself requires payment of the first premium before the policy will be considered to be in force and effect. If, in addition to this showing, it appears also that the application was made in that state, an even stronger case is made. *Nor would it be material that all of the actual acts of execution and issuance occurred in another state*, or that the policy was made payable in another state.") (emphasis added).

19129, at \*1-\*2 (N.D. Cal. Dec. 7, 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  There is no issue for trial unless there is sufficient evidence for a jury to return a verdict favoring the nonmoving party.  *Id.* at \*2 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)).

In opposing a summary judgment motion, the nonmoving party must come forward with specific facts demonstrating a genuine issue of fact for trial.  *Id.* (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  Thus, an opposition which fails to identify and reference triable facts is insufficient to preclude the grant of summary judgment. *Id.*; *see also Andre v. Pomeroy,* 35 N.Y.2d 361, 364 (1974) ("When there is no genuine issue to be resolved at trial, [a] case should be summarily decided, and an unfounded reluctance to employ the remedy will only serve to swell the Trial Calendar and thus deny to other litigants the right to have their claims promptly adjudicated.").

Where, as in this matter, the central facts are not disputed by Plaintiff, summary judgment is appropriate as it only remains for the Court to determine the issue of law: whether MetLife is entitled to judgment as a matter of law declaring the Policy void *ab initio* as a result of Decedent's misrepresentations in response to Questions 21 and 22 of the application for the Policy and Questions 5, 6, 7, and 8 of Part II: Paramedical/Medical Exam for the Policy, concerning his failure to disclose his history of hepatitis B.

*Kerr* is a recent instructive case on point.  *Kerr*, 1995 U.S. Dist. LEXIS 19129.  In *Kerr*, the decedent, who applied for life insurance and did not disclose that he had chronic hepatitis B, died within the contestable period.  *Id.* at \*1.  Plaintiff requested payment of benefits and defendant denied the request.  *Id.*  Plaintiff then filed a breach of contract action and the parties filed cross-motions for summary judgment.  *Id.*  Plaintiff argued that decedent never appreciated the seriousness of his liver disease, which was generally asymptomatic, and that he believed it

16

was a minor ailment. *Id.* at \*8-\*9. Defendant argued that decedent knew that his liver condition was serious and that it would have denied the policy if it had been informed of his true medical history. *Id.* at \*1. The court granted defendant's summary judgment motion and denied plaintiff's summary judgment motion holding "although [decedent] did not have any surgery, he clearly had gone to a hospital for 'observation, examination, and/or treatment' of his liver problems."[14] *Id.* at \*11. Thus, "[decedent] was obliged to answer 'yes' regardless whether he subjectively believed his liver problems to be minor." *Id.* at \*11-\*12. Conclusory allegations unsupported by factual data – as is the case here – cannot raise a genuine issue for trial. *Id.* at \*12 (entering summary judgment for MetLife and finding that no evidence was presented to rebut the underwriter's declaration).

Accordingly, for all of the reasons set forth above and below, summary judgment must be granted on Defendant's Counterclaim seeking dismissal of the Complaint and rescission of the Policy, and Plaintiff's claims must likewise be dismissed with prejudice. *Id.* at \*4 (citing *Imperial Cas. & Indem. Co. v. Sogomonian*, 243 Cal. Rptr. 639, 643 (1988)).[15]

## C.    MetLife Is Entitled To Rescission Of The Policy As A Matter Of Law

### 1.    *The Insured Died Within The Two Year Contestable Period And Thus MetLife Is Entitled To Rescind The Policy Based on His Material Misrepresentations*

Section 10113.5 of the California Insurance Code provides, in relevant part:

> (a)    An individual life insurance policy delivered or issued for delivery in this state shall contain a provision that it is incontestable after it has been in force, during the lifetime of the insured, for a period of not more than two years after its date of issue, except for nonpayment of premiums....

Cal. Ins. Code § 10113.5 (2007).[16]

---

[14] The court specifically noted plaintiff's "frequent periodic blood work," as evidence that decedent was informed as to the seriousness of his liver problems. *Id.* at \*10.

[15] *See also Saint Calle v. Prudential Ins. Co.,* 815 F. Supp. 679, 686 (S.D.N.Y. 1993) ("[i]t is well-settled New York law that an insurer is entitled to rescind any policy issued in reliance on a material misrepresentation, and that summary judgment in favor of an insurer is both available and appropriate when an insurance application contains such a material misrepresentation").

[16] The rule is substantially the same in New York. N.Y. Ins. Law § 3203.

In accordance with § 10113.5, the Policy provides that MetLife will not contest the validity of the Policy after it has been in force during the insured's lifetime for two years from the date of policy, except for nonpayment of premiums.    *Stowe Aff.,* ¶ 16, Exh. A, p. ML LIN 00381.    Accordingly, as the Decedent died fewer than two years after the Policy was issued, the Policy is contestable.    *Stowe Aff.,* ¶ 17.

### 2.    **The    Decedent    Misrepresented    His    Hepatitis    History    And    Said    Misrepresentations Were Material To The Risk Assumed By MetLife**

The California Insurance Code provides, in relevant part:

> Neglect to communicate that which a party knows, and ought to communicate, is concealment.

Cal. Ins. Code § 330 (2007).    "Concealment, whether intentional or unintentional, entitles the injured party to rescind insurance."    *Id.* at § 331.    Each party to an insurance contract is required to disclose in good faith, "all facts within his knowledge *which are* or which he believes to be material to the contract."    *Id.* at § 332 (emphasis added).    "Materiality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due, in forming his estimate of the disadvantages of the proposed contract, or in making his inquiries."    *Id.* at § 334.[17]    Materiality is a subjective inquiry. *American Gen. Life Ins. Co. v. Green,* No. 2:06-CV-02048-MCE-KJM, 2008 U.S. Dist. LEXIS 39985, at \*20 (E.D. Cal. May 16, 2008).

"If a representation is false in a material point, whether affirmative or promissory, the injured party is entitled to rescind the contract from the time the representation becomes false." Cal. Ins. Code § 359 (2007).    An actual intent to deceive need not be shown.    *Cohen v. Penn Mut. Life Ins. Co.,* 312 P.2d 241, 243 (Cal. 1957).    The fact that the insurer has demanded answers to specific questions in an application for insurance is in itself usually sufficient to

---

[17] The rule is substantially the same in New York.  N.Y. Ins. Law § 3105.

establish materiality as a matter of law. *See id.* at 244; *see also Lunardi v. Great-West Life Assurance Co.*, 44 Cal. Rptr. 2d 56, 57 (Cal. 1995).

The law is well settled in California, under California Insurance Code § 330 *et seq.*, that even an innocent misrepresentation, if material, is sufficient to allow an insurer to avoid the contract of insurance. *See, e.g., Ingram v. Old Line Ins. Co. of Am.*, No. C98-2422 FMS, 1999 U.S. Dist. LEXIS 9346, at *9 (N.D. Cal. June 21, 1999) (granting summary judgment for insurer where insured suffered from and did not disclose on the application: (1) high blood pressure; (2) chest pains; (3) persistent cough; and (4) depression, among other perceived minor ailments); *American General*, 2008 U.S. Dist. LEXIS 39985 at *21-*22 (granting summary judgment for insurer where insured failed to disclose illicit drug use and claimed that he did not know that his incorrect responses on the application misrepresented the truth).[18]

California law dictates that summary judgment is appropriate for an insurer where a fact misrepresented in an application for insurance is material to the risk. *Old Line Life Ins. Co. v. Imogene S. Silvera Trust*, 281 Cal. Rptr. 15, 18-20 (1991). That the insurance company "might not have refused the risk on *any* terms had it known the undisclosed facts is irrelevant. Most risks are insurable at some price. The purpose of the materiality inquiry is not to permit the jury to rewrite the terms of the insurance agreement to conform to the newly disclosed facts but to make certain that the risk insured was the risk covered by the policy agreed upon." *Id.* (emphasis in original).

### (a)   The Decedent's Misrepresentations In The Application And Paramedical Exam

In the case at bar, the Decedent made false statements in response to Questions 21 and 22 of the application for the Policy and Questions 5, 6, 7, and 8 of Part II: Paramedical/Medical Exam for the Policy, concerning his history of hepatitis B. With regard to the direct questions

19

concerning his hepatitis history, Question 21 of the application and Question 5 of Part II: Paramedical/Medical Exam asks, "has the proposed insured EVER received treatment, attention, or advice" for among other liver ailments, "hepatitis?" *Stowe Aff.,* Exh. A, p. ML LIN 00398 (emphasis in original).    Decedent stated that he had not.    In fact, MetLife's subsequent investigation revealed that Decedent likely had a lifelong history of hepatitis B, he received treatment, attention and/or advice (including but not limited to being prescribed Interferon) for hepatitis B for approximately seven years from September 1998 – *through the date of the Application/Paramedical in August 2004* – to December 2005, and was diagnosed with chronic hepatitis B on March 27, 2004. These facts are undisputed. *See Stowe Aff.,* ¶¶ 21-22; *see also Sherer Aff.,* Exh H (Exhs. B-F marked at the deposition of Dr. Kam).

Accordingly, it is firmly established that the Decedent made misrepresentations in the Application.

### (b)    The Decedent's Misrepresentations Were Material

Under California law, "Materiality is determined by the probable and reasonable effect that truthful disclosure would have had on the insurer in determining the advantages of the proposed contract." *American Gen.*, 2008 U.S. Dist. LEXIS 39985 at *21 (*citing Trinh v. Metro. Life Ins. Co.*, 894 F. Supp. 1368, 1372 (N.D. Cal. 1995)).[19]

With respect to the materiality inquiry, the District Court, interpreting California law, has explicitly stated that where the insurance company proves that the misrepresentation was material to it, no further inquiry is required. *Id.; see also Wilson v. W. Nat'l Life Ins. Co.*, 1 Cal. Rptr. 2d 157, 163 ("the critical question is the effect truthful answers would have had on [the insurer] not on some 'average reasonable' insurer") (quoting *Imperial Cas. & Indem. Co. v.*

---

[18] The law is substantially the same in New York. *See Mut. Benefit Life Ins. Co. v. JMR Elecs. Corp.,* 848 F.2d 30, 32 (2d Cir. 1988) (holding same).

[19] The law is substantially the same in New York. *See Cohen v. Mut. Benefit Life Ins. Co.*, 638 F. Supp. 695, 697 (E.D.N.Y. 1986).

*Sogomonian*, 243 Cal. Rptr. 639, 644 (1988)). This is the case whether or not the parties may have agreed to some other contractual arrangement had the critical fact been disclosed. *Old Line Life Ins. Co. v. Imogene S. Silvera Trust*, 281 Cal. Rptr. 15, 19 (1991).[20]

In determining materiality, as stated above and pursuant to Cal. Ins. Code § 334, the test is the effect which truthful answers would have had upon the insurer and evidence of the practice of the insurer with respect to similar risks is the appropriate manner in which to determine materiality. *Taylor v. Sentry Life Ins. Co.*, 729 F.2d 652, 655 (9th Cir. 1984).

In *Taylor*, the insurance company submitted uncontradicted affidavits to the effect that it would not have issued the policy in question had it known the insured's actual medical condition. *Id.* Using a debit system (as MetLife does), the insurance company in *Taylor* explained that had it known the insured's actual weight, it would have added 200 debits to her eligibility rating. *Id.* Her diabetes would have added 100 more debits. *Id.* Thus, because the misrepresentations were obviously material, the insurance company was entitled to rescind the policy. *Id.*; *see also Old Line Life Ins. Co.*, 281 Cal. Rptr. 15 at 19 ("A contrary result would reward the practice of misrepresenting the facts critical to the underwriter's task because the unscrupulous (or merely negligent) applicant 'would have everything to gain and nothing to lose' from making material misrepresentations in his application for insurance.") (quoting *Mut. Benefit Life Ins. Co. v. JMR Elecs. Corp.*, 848 F.2d 30, 34 (2d Cir. 1988)).

### 3.    *If The Decedent Had Disclosed His Hepatitis History, MetLife Would Not Have Issued The Policy As It Did*

Had the Decedent truthfully answered Questions 21 and 22 of the application for the Policy and Questions 5, 6, 7, and 8 of Part II: Paramedical/Medical Exam for the Policy,

---

[20] The law is substantially the same in New York. *See, e.g., Aguilar v. United States Life Insurance Company*, 162 A.D.2d 209, 211 (N.Y. App. Div. 1990) ("'The question . . . is not whether the company might have issued the policy even if the information had been furnished"); *Barrett v. State Mut. Life Assurance Co.*, 49 A.D.2d 856 (N.Y. App. Div. 1990), *aff'd*, 378 N.E.2d 1047 (1978), *cert. denied*, 440 U.S. 912 (1979) (a misrepresentation is material if the insurer would have issued a different policy at a higher premium rate).

concerning his history of hepatitis B, MetLife, pursuant to its relevant underwriting guidelines, would not have issued the Policy as it did. *Zamarripa Aff.*, ¶ 5, Exh. A.

As is more fully explained by Dr. Zamarripa at his deposition, hepatitis B is a viral disease that affects the liver. *Sherer Aff.*, Exh. E, p. 16. Once you have the infection, you almost always have it forever, and it will always affect your mortality. *Id.* at p. 17, 75. Reputable medical literature supports this conclusion. *Zamarripa Aff.*, ¶ 8, Exh. C, ML LIN 00915-940; *Sherer Aff.*, Exh. M. A person who has hepatitis B will always be at a greater risk of death than the general population. *Sherer Aff.*, Exh. E, p. 28. Specifically, a person who has hepatitis B, even at just a carrier stage, would be at a greater risk of developing liver cancer than the general population.[21] *Sherer Aff.*, Exh. M.

During Dr. Zamarripa's deposition he testified that Decedent never completely "recovered," as he always maintained the surface antigen, and that as such, the best policy rating he would have received would have been standard (and not Select Preferred as he was given). *Sherer Aff.,* Exh. E, pp. 86-97. This is because as per MetLife's underwriting guidelines, at a minimum, where there was an indication of hepatitis B surface antigen, a liver biopsy was not performed, and the liver enzyme levels (*i.e.*, ALT/AST) were consistently normal – as was the case here - Decedent would have been rated as a hepatitis B carrier. *Id.* at pp. 91-92; *Zamarripa Aff.*, ¶ 10. The status of Decedent as a hepatitis B carrier would have qualified him for, at best, a premium charge of +50 debits or 50% more premium than he was charged. *Zamarripa Aff.*, ¶ 10, Exh. B, ML LIN 00710-718; *Sherer Aff.,* Exh. E, p. 86.

Plaintiff has provided no evidence to contradict this fact. Instead, Plaintiff argues that because Decedent thought he was "cured" – and indeed his treating physician apparently

---

[21] This risk is substantially increased with a young patient – such as Decedent – as there is more time for the patient to develop cirrhosis of the liver or liver cancer. *Sherer Aff.*, Exh. E, p. 82.

informed him of such – MetLife was not entitled to know his hepatitis history.[22] In other words, Plaintiff apparently believes that if he was cured of hepatitis B, which he was not, he did not have to inform MetLife that he ever had it.[23]

In fact, although Plaintiff was *successfully treated* from an active flare up of active E antigen hepatitis B virus, he was never cured of hepatitis B. *See, e.g., Sherer Aff.*, Exh. M, p.5; *Sherer Aff.,* Exh. K (Deposition of Dr. Aledort, pp. 113) ("…he cured him of his acute infection, that he did do, but he turned him into a carrier."). Indeed, he suffered from additional active flare ups in 2003 and 2004.[24] *Stowe Aff.*, Exh. E, pp. ML LIN 00110, 117. As a hepatitis B carrier, Decedent always remained at a greater risk of obtaining liver cancer than the general public, and the fact that he did not actually develop liver cancer does not change this fact. *Sherer Aff.,* Exh. M, pp. 4-5; *Zamarripa Aff.,* ¶ 11, Exh. C.

In any event, the questions in the Application and Part II: Paramedical/Medical Exam do not ask whether Decedent had and was cured of hepatitis B. They ask instead, rather plainly, whether he "EVER" had it, because of its direct impact on morbidity. *Stowe Aff.,* Exh. A. If MetLife had known the truth, Decedent would never have received the Policy and, at best, would have paid different premiums on a different policy. *Zamarripa Aff.,* Exh. A.

Alternatively, as noted above, Plaintiff advances a waiver argument stating in essence that MetLife should have known that Decedent had hepatitis B because: (1) he was Asian; and (2) he had slightly elevated bilirubin results. Both of these arguments fail as a matter of fact and law. First, at the time the Policy was applied for, MetLife "was not aware" that Decedent was

---

[22] Dr. Clain explains in his expert report that while Decedent was successfully treated, "[t]he linking of 'success' and 'cure' is misleading and biologically false. It also indicates a misunderstanding of the goals and limitations of treatment in chronic hepatitis B. The goals are to suppress viral activity, …. This was "successful" in Mr. Lin, but was not accompanied by eradication of virus or a 'cure.'" *Sherer Aff.,* Exh. M, p. 5.

[23] Plaintiff's logic in this respect is grossly flawed. As an analogy, what Plaintiff suggests would be akin to an insured having had breast cancer, and having had the cancer successfully removed, deciding that her having had it at all was irrelevant to an insurance company.

Asian as MetLife cannot inquire as to the race of applicants, and in any event, MetLife cannot treat applicants differently on the basis of race. Cal. Ins. Code § 10140(a) (Identification of race, ethnicity, or creed) ("No application for insurance ... for use in determining the insurability of the applicant shall carry any identification, or any requirement therefore, of the applicant's race, color, religion, ancestry, or national origin."); Cal. Ins. Code § 10140 (Discrimination prohibited; violations) ("No admitted insurer, ... shall ... issue or cancel that insurance, under conditions less favorable to the insured than in other comparable cases, except for reasons applicable alike to persons of every race); 42 U.S.C. § 1981 (2008) (Equal rights under the law) ("All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... to the full and equal benefit of all laws and proceedings ... as is enjoyed by white citizens ...."). Second, as discussed above, the elevated bilirubin results clearly have nothing to do with Decedent's hepatitis B.[25]

Furthermore, "There can be no waiver of a right to charge fraud or misrepresentation, except when there is an intention to relinquish a known right." *Ingram v. Old Line Ins. Co.*, 1999 U.S. Dist. LEXIS at *6 (quoting *Anaheim Builders Supply v. Lincoln Nat'l Life Ins. Co.*, 233 Cal. App. 2d 400, 411 (1965)). For waiver to apply, Plaintiff must show that MetLife had "actual knowledge sufficient to lead a reasonably prudent person to inquire further relative to representations made by a proposed insured." *Id.* Given the flat denial of *any* history of hepatitis B, the omission of Dr. Kam as Decedent's treating physician, and the fact that no material medical history of any kind was admitted on the application for the Policy, it is clear that MetLife had no actual knowledge that Decedent's representations were false.

---

[24] Plaintiff argues (with no proof) that the lab results showing active flare ups are "lab errors," however, Dr. Clain has stated that these fluctuations are " not 'lab errors,' as suggested by Dr. Kam in his deposition, but well-known occurrences in the course of treated (or untreated) patients with chronic hepatitis B." *See Sherer Aff.*, Ex. M, p. 3.
[25] *See* footnote 2.

Thus, it is unmistakable that in our case, the fact that the Decedent failed to disclose his history of hepatitis B was material to MetLife's decision to issue the Policy.[26]  The Decedent's failure to disclose this information precluded MetLife from properly estimating the degree and character of the risk it was assuming, and, accordingly, resulted in MetLife issuing a policy and charging a premium that did not reflect the risk that was assumed. *Zamarripa Aff.,* ¶ 13.

Accordingly, summary judgment must be granted to Defendant dismissing Plaintiff's cause of action, and on Defendant's Counterclaim seeking dismissal of the Complaint and a declaration that the Policy is void *ab initio.*

## IV.    CONCLUSION

WHEREFORE, Defendant MetLife respectfully requests that this Court grant its motion for an Order pursuant to FRCP Rule 56 for summary judgment on Defendant's Counterclaim seeking dismissal of the Complaint in its entirety and for a declaration that the Policy is void *ab initio*, together with such other and further relief as the Court deems just and proper.

---

[26] *See Nw. Mut. Life Ins. Co. v. Buffalino*, 1991 U.S. Dist. LEXIS 12650, at *11 (S.D.N.Y. Sept. 6, 1991) (holding "[e]ven if his misrepresentations … were made without fraudulent intent, they were clearly material and, as such, grounds for rescission of the Pol[i]cy.").