*Exhibit D*

```
 1

 2    UNITED STATES DISTRICT COURT

 3    SOUTHERN DISTRICT OF NEW YORK

 4    ----------------------------------------X

 5    JEAN LIN,                          07-CV-3218

 6                    Plaintiff(s),

 7                  -against-

 8    METROPOLITAN LIFE INSURANCE.

 9                    Defendant(s).

10    ----------------------------------------X

11                         150 East 58th Street

12                         New York, NY   10155

13                         December 14, 2007

14                         10:10 A.M.

15

16        EXAMINATION BEFORE TRIAL OF REGINA

17    SOLOMON-STOWE, a witness on behalf of the Defendant

18    herein, taken by the Attorneys for Plaintiff, held

19    at 150 East 58th Street, New York, New York, 10155,

20    on Friday, December 14, 2007, at 10:00 O'clock A.M.

21

22

23

24

25
```

**2**

APPEARANCES:

TRIEF & OLK
Attorneys for Plaintiff
150 E. 58th Street
34th Floor
New York, NY 10155
BY: Ted Trief
BY: Eric Dinnocenzo, Esq.

TOMASITA SHERER, ESQ.
METROPOLITAN LIFE INSURANCE COMPANY
Attorneys for Defendant
One Metlife Plaza
27-01 Queens Plaza North
Long Island City, NY 11101

*   *   *

**3**

IT IS HEREBY STIPULATED AND AGREED by and between(among) counsel for the respective parties hereto, that:

All rights provided by the C.P.L.R., including the right to object to any question, except as to form, or to move to strike any testimony at this(these) examination(s), are reserved, and, in addition, the failure to object to any question or to move to strike any testimony at this(these) examination(s) shall not be a bar or waiver to make such motion at, and is reserved for the trial of this action;

IT IS FURTHER STIPULATED AND AGREED by and between(among) counsel for the respective parties hereto, that this(these) examination(s) may be sworn to by the witness(es) being examined, before a Notary Public other than the Notary Public before whom this(these) examination(s) was (were)

**4**

begun; but the failure to do so, or to return the original of this (these) examination(s) to counsel, shall not be deemed a waiver of the rights provided by Rules 3116 and 3117 of the C.P.L.R., and shall be controlled thereby;

IT IS FURTHER STIPULATED AND AGREED by and between(among) counsel for the respective parties hereto, that this(these) examination(s) may be utilized for all purposes as provided by the C.P.L.R.;

IT IS FURTHER STIPULATED AND AGREED by and between(among) counsel for the respective parties here, that the filing and certification of the original of this(these) examination(s) shall be and the same hereby are waived;

IT IS FURTHER STIPULATED AND AGREED by and between(among) counsel for the respective parties hereto, that a copy of the

Regina Solomon-Stowe **5**

within examination(s) shall be furnished to counsel representing the witness(es) testifying, without charge.

IT IS FURTHER STIPULATED AND AGREED by and between(among) counsel for the respective parties hereto, that all rights provided by the C.P.L.R., and Part 221 of the Uniform Rules for the Conduct of Depositions, including the right to object to any question, except as to form, or to move to strike any testimony at this examination is reserved; and in addition, the failure to object to any question or to move to strike any testimony at this examination shall not be a bar or waiver to make such motion at, and is reserved to, the trial of this action.

*   *   *

| | |
|---|---|
| Regina Solomon-Stowe 6 | Regina Solomon-Stowe 8 |

Regina Solomon-Stowe 6

1
2     COURT REPORTER: Counselors, please note
3  your appearances.
4     MR. TRIEF: Ted Trief and Olk, and I
5  represent the Plaintiff.
6     MR. DINNOCENZO: Eric Dinnocenzo, Trief &
7  Olk, also representing the Plaintiff.
8     MS. SHERER: Tomasita Sheer, from
9  Metropolitan Life.
10     COURT REPORTER: Raise your right hand.
11     Do you swear or affirm to tell the truth
12  in all matters?
13     THE WITNESS: Yes, I do.
14     COURT REPORTER: State your name and
15  address for the record.
16     THE WITNESS: Regina Solomon-Stowe, and my
17     address is 11-74 Reeves Terrace, Union New
18     Jersey, 07083.
19  REGINA SOLOMON-STOWE, after having first been duly
20     sworn by Raquel Torres, a Notary Public in and
21     for the State of New York, was examined and
22     testified as follows:
23  EXAMINATION BY
24  MR. TRIEF:
25     Q.  Good morning.

Regina Solomon-Stowe 8

1
2     A.  No.
3     Q.  What is the business of Met Life; can I
4  call it "Met Life"?
5     A.  Sure.
6     Q.  What is the business of Met Life?
7     A.  Selling insurance, and also other
8  financial products.
9     Q.  And what is your position with Met Life?
10     A.  I'm the Senior Technical Claims Advisor.
11     Q.  What does that mean?
12     A.  I work and provide information to the
13  claims, for death and disabilities claim unit.  I
14  review payments that have been made, and I also
15  review rescissions for denial of benefits to make
16  sure that they are abiding by company policy and
17  procedure.
18     Q.  So you're reviewing benefits that have
19  already been denied?
20     A.  In addition to reviewing other claims that
21  might be unusual circumstances, yes.
22     Q.  So besides reviewing claims that have been
23  denied and unusual circumstances, is there anything
24  else that you do as a Senior Technical Claims
25  Advisor?

Regina Solomon-Stowe 7

1
2     A.  Good morning.
3     Q.  I represent the Lin family and as you
4  heard, my name is Ted Trief.
5     I'll be asking you some questions here
6  this morning.  If you don't understand the question,
7  let me know, and I'll be happy to rephrase it.  If
8  you do answer it, I'll assume you understand it,
9  okay?
10     A.  Okay.
11     Q.  If you intend to answer a question "yes"
12  or "no," would you actually say the word "yes" or
13  "no" as opposed to shaking your head?
14     A.  Yes.
15     Q.  Many times you will understand the
16  question before I complete it, still allow me the
17  opportunity to complete it before you answer it, so
18  the record is clear.
19     A.  Correct.
20     Q.  By whom are you employed?
21     A.  Metropolitan Life Insurance Company.
22     Q.  Is that the correct legal name?
23     A.  Yes.
24     Q.  And are you employed by any subsidiaries
25  or sister or brother companies?

Regina Solomon-Stowe 9

1
2     A.  I work with the Law Department in
3  litigation matters.
4     Q.  Like this?
5     A.  Yes.
6     Q.  And you said, "the Law Department," the
7  in-house Law Department of Metropolitan Life?
8     A.  Correct.
9     Q.  How many times have you testified?
10     A.  When you say, "testify," you mean
11  deposition or you mean trial?
12     Q.  We'll do both.  We're in a deposition in
13  my office today, correct?
14     A.  Correct.
15     Q.  And how many times have you done something
16  like that?
17     A.  This would be the seventh time.
18     Q.  And have they all been claims in which
19  Metropolitan Life company has refused to pay death
20  benefits in a claim?
21     A.  Not all, no.
22     Q.  How many of them?
23     A.  Maybe five out of the seven.
24     Q.  What were the other two?
25     A.  Adverse claims.  When we get a claim from

Regina Solomon-Stowe 10

1
2 another beneficiary.
3    Q.  When there's competition between two
4 beneficiaries for the same policy?
5    A.  Yes.
6    Q.  Have you ever testified at trial?
7    A.  No.
8    Q.  When a death claim is made during the
9 contestability period, is it treated differently
10 than a death claim that is made outside of the
11 contestability period by Met Life?
12    A.  Yes.
13    Q.  Can you explain the differences in how
14 they're treated?
15    A.  With a contestable death claim, as
16 provided under the policy, we have the right to
17 interview the claimant, and just to make sure that
18 all the questions, the responses given on the
19 application are accurate at the time.  So there's an
20 interview, there's a gathering of medical records,
21 there may be an interview with the claimant, there
22 could be an interview with the employee, where as if
23 the claim is not contestable, once we get the proof
24 of death along with the claim form, then we can make
25 the accurate payment.  If there's no -- if it's just

Regina Solomon-Stowe 11

1
2 a regular death, not accidental or anything like
3 that.
4    Q.  So, if a person dies beyond the
5 contestability period, under the policy, you make
6 sure the forms are in, the person submitted a death
7 certificate, and the claim is paid, correct?
8    A.  And it's the correct beneficiary.
9    Q.  And if the person dies within the
10 contestability period, you investigate to see if
11 there are any inaccuracies in the application and
12 the policy, correct?
13    A.  In the application, yes.
14    Q.  The application is part of the policy?
15    A.  Correct.
16    Q.  And tell me what steps Met Life takes to
17 investigate a claim during the contestability
18 period?
19    A.  The steps that we take is --
20    Q.  You can list them.
21    A.  When we receive the claim, we contact the
22 claimant or the beneficiary, because we have to
23 obtain an interview and also to get authorization in
24 order to obtain the medical records for the
25 insured.

Regina Solomon-Stowe 12

1
2    Q.  So that's two things.  You try to
3 interview somebody and you try get authorization,
4 correct; what else?
5    A.  Once the medical records are received,
6 then they are reviewed by the claims unit and then
7 forwarded to our underwriting unit for further
8 review to see if there was any material
9 misrepresentation in the application, versus what we
10 have in our records.  Once that decision is
11 documented, the file is then sent back to the claims
12 unit, and they would notify the claimant letting
13 them know whether or not we would proceed with the
14 payment.  Once that letter is sent, then the file is
15 then forwarded to claims advisory for further review
16 to determine if we agree with their decision to
17 rescind the coverage or to make payment and for
18 recording purposes also.
19    Q.  Are you in claims advisory?
20    A.  Yes, I am.
21    Q.  So you're the final step in the process?
22    A.  Correct.
23    Q.  And so let me see if I understand the
24 steps.
25    A.  Okay.

Regina Solomon-Stowe 13

1
2    Q.  There's an interview of somebody,
3 correct?
4    A.  Correct.
5    Q.  Is that usually the beneficiary?
6    A.  Usually the beneficiary.
7    Q.  And there's a request for authorizations
8 to obtain records?
9    A.  Yes.
10    Q.  Those are medical records?
11    A.  Yes.
12    Q.  And then the medical records are reviewed
13 by somebody in claims?
14    A.  Correct.
15    Q.  The medical records are reviewed by
16 someone in underwriting?
17    A.  Correct.
18    Q.  Claims and Underwriting then reports their
19 point of view, correct, "pay" or "no pay"?
20    A.  Right.
21    Q.  The claimant is then notified first?
22    A.  Yes.
23    Q.  And then after the claimant is notified
24 what the review has determined, then a claims
25 advisory also does another review?

Regina Solomon-Stowe                    14

2   A.   Correct.

3   Q.   Have I gotten it right?

4   A.   Yes.

5   Q.   When the process begins during the

6  contestability period, does -- withdrawn.

7       You're here as a --

8       Do you know what a 30B6 witness is; do you

9  know what a witness on behalf of the corporation

10 is?

11  A.   A witness who has knowledge of the

12 facts.

13  Q.   They're two kinds of witnesses that you

14 can have in Court. One witness is testifying based

15 upon their own personal knowledge only, and another

16 witness is testifying on their own personal

17 knowledge plus the knowledge that they have gotten

18 by talking to people and then testifying on behalf

19 of the corporation generally?

20      Do you know on what basis you're here?

21      MS. SHERER:  I can just state for the

22      record, that she's here on the basis of her

23      personal knowledge, and on behalf of the

24      company as a 30B6 witness.

25  Q.   Okay. So as you heard what your Counsel

Regina Solomon-Stowe                    15

2  just said, what have you done to educate yourself as

3  to the knowledge of the corporation on behalf of

4  this claim?

5   A.   I have reviewed the claim file. I also

6  corresponded with the beneficiary in providing a

7  more detail of why the claim was denied. I've

8  reviewed what the underwriter responded to as far as

9  material and misrepresentation, and I also looked at

10 the policy as far as the contestable period, reading

11 all those provisions to make sure the decision was

12 the correct decision.

13  Q.   So I want to talk to you generally about

14 what the corporation, that is what Met Life knows or

15 knew?

16  A.   Okay.

17  Q.   So it's beyond just what you might know,

18 it's information that the corporation itself might

19 know, follow?

20  A.   Okay.

21  Q.   Did the corporation know that if they

22 reviewed this claim during the contestability period

23 and said that there was a material misrepresentation

24 that the benefits would not be paid? You can

25      MS. SHERER:  Objection to form. You can

Regina Solomon-Stowe                    16

2  answer.

3   A.   Sorry, can you just say it again?

4       MS. SHERER:  It's confusing for me.

5   Q.   Sure. Was Met Life aware that if they

6  came to the conclusion that there was a material

7  misrepresentation, that none of the benefits would

8  be paid?

9   A.   They were aware that the premium refund

10 would be refunded.

11  Q.   But the benefits wouldn't be paid?

12  A.   Correct.

13  Q.   And what is a material

14 misrepresentation?

15  A.   A material misrepresentation is something

16 that was not answered completely or accurately in

17 the application, which would have resulted in not

18 issuing that particular policy.

19  Q.   So, it would require two things, right;

20 some inaccuracy and the inaccuracy would have caused

21 Met Life to act differently than they did?

22  A.   Correct.

23  Q.   And if you didn't have both, it wouldn't

24 be a material misrepresentation, correct?

25  A.   If -- they would not have changed what --

Regina Solomon-Stowe                    17

2  the policy that we issued, yes, it would not have

3  been material.

4   Q.   Now, policies are written with the help of

5  an agent; is that correct?

6   A.   Correct.

7   Q.   And the agent is supposed to be answering

8  the questions -- sorry, withdrawn.

9       The agent is supposed to be asking the

10 questions, correct?

11  A.   The agent asks the questions.

12  Q.   And the agent is supposed to be asking the

13 questions to the insured, correct?

14  A.   The applicant at the time, yes.

15  Q.   And the agent is not supposed to be

16 answering the questions without talking to the

17 insured, correct?

18  A.   Right...

19      MS. SHERER:  It seems like you haven't

20      finished your answer.

21  A.   Because they also have teller

22 underwriting, in which the insured applicant can

23 call in, and they would just answer the questions as

24 given on a recorded line.

25  Q.   But that didn't apply here in this case?

```
 1          Regina Solomon-Stowe        18
 2      A.  No.
 3      Q.  So we'll leave it aside.  It's
 4  interesting, but we might as well stay with what
 5  matters, correct?
 6      A.  Right.
 7      Q.  In this case, as in many cases, there's an
 8  interview, there's supposed to be an interview by an
 9  agent, correct?
10      A.  Correct.
11      Q.  What is Met Life's position if the agent
12  did not ask the questions on the application?
13          MS. SHERER:  Objection to form.
14      A.  There is an agreement disclosure on the
15  application which states when the insured applicant
16  signs the application, that they are attesting to
17  the fact that they read the questions and that the
18  agent did not provide any additional information
19  that was not documented.  They're attesting to the
20  truth and all the questions that were answered.
21  They said they reviewed the responses and they
22  agreed to how everything is worded.
23      Q.  And what language is that in?
24      A.  That's in English.
25      Q.  And does Met Life inquire as to the
```

```
 1          Regina Solomon-Stowe        20
 2  regards to the taking of the application and that
 3  should be included in the claim file.
 4      Q.  And was that a standard statement?
 5      A.  Yes.
 6      Q.  Was the agent actually interviewed or just
 7  asked to fill out the statement?
 8      A.  Asked to complete the statement.
 9      Q.  But never actually interviewed?
10          MS. SHERER:  Objection to the form.
11      A.  I'm not aware of the agent being
12  interviewed, no.
13      Q.  Now, was Mrs. Lin interviewed in this
14  case?
15      A.  This is an interesting case, because the
16  claim came in for the disability first.  So,
17  according to the claim file, when the insured was
18  interviewed, he was alive at the time, when they
19  went to interview him in regard to the disability
20  claim that he made.
21      Q.  Let me clear that up for the record.
22          What happens in life insurance cases is
23  that if you're disabled you may not have to pay a
24  premium, correct?
25      A.  Correct.
```

```
 1          Regina Solomon-Stowe        19
 2  English proficiency of the person who signs the
 3  application?
 4      A.  I'm not aware of that, no.
 5      Q.  And so if an agent spoke the language of
 6  the applicant and filled out the form without asking
 7  the questions and told the applicant, to sign, is
 8  there anything that Met Life does to make sure that
 9  the applicant even knew what representations were
10  being made?
11          MS. SHERER:  Objection to form.
12      A.  I'm not aware of that.
13      Q.  Okay, do you know what language the
14  applicant spoke here in this particular case?
15      A.  No.
16      Q.  Did Met Life ever inquire?
17      A.  I'm not aware of that, no.
18      Q.  Do you know what language the agent
19  spoke?
20      A.  No.
21      Q.  Did Met Life ever inquire?
22      A.  I'm not aware of that.
23      Q.  Did Met Life ever do an investigation to
24  determine how the application was taken?
25      A.  We asked for a statement from the agent in
```

```
 1          Regina Solomon-Stowe        21
 2      Q.  And so Mr. Lin was suffering from Cancer,
 3  correct?
 4      A.  Correct.
 5      Q.  And he asked to be relieved of having to
 6  pay the premium because he was dying of Cancer,
 7  correct?
 8      A.  He had a claim for the waiver of
 9  premium.
10      Q.  Because of his Cancer?
11      A.  Correct.
12      Q.  Which he ultimately died of, correct?
13      A.  Correct.
14      Q.  And so he was first interviewed when he
15  asked to have the premium's waived?
16      A.  Correct.
17      Q.  And was that interview provided to us as
18  far as you know?
19      A.  Yes.
20      Q.  And was there anything about that
21  interview that caused you or Met Life any concern?
22      A.  No, because again, he was coming in for
23  waiver of premium for the gastric Cancer.  He
24  provided the doctors, the physicians that he was
25  seeing at that time, and there was an authorization
```

Regina Solomon-Stowe 22

2 signed and the home office investigator, that's the
3 person that does the investigation, was able to try
4 to obtain those records for the medical, so that it
5 could be reviewed as far as allowing the waiver of
6 the premium.
7 Q. And were those records obtained?
8 A. Some were obtained, but I don't think all
9 of them were obtained before he deceased.
10 Q. Were any records obtained which would show
11 either elevated levels that would effect the liver,
12 Hepatitis B or anything of that nature?
13 A. I'm not aware of that.
14 Q. Are you familiar with "Hepatitis B"?
15 A. No more than knowing that it has to do
16 with the liver, it's a disease.
17 Q. Is that your knowledge of it?
18 A. That's my knowledge of it.
19 Q. Well, do you know whether it affects
20 Asians at a much greater number than it affects
21 other populations of this country?
22 A. No, not...
23 Q. Isn't Met Life aware of it?
24 A. I'm not sure.
25 Q. You know that was part, in our complaint,

Regina Solomon-Stowe 23

2 we alleged that; are you aware of that?
3 A. Yes.
4 Q. Did Met Life do anything to investigate
5 that allegation?
6 A. I'm not aware of that.
7 Q. Do people clear the Hepatitis B virus?
8 A. I couldn't answer that either I'm not
9 sure.
10 MS. SHERER: I think that's beyond the
11 scope of her knowledge, whether people clear
12 the Hepatitis B virus.
13 MR. TRIEF: She's a 30B6 witness.
14 MS. SHERER: Yeah, but that'a medical
15 question. You can probably ask the doctor that
16 question.
17 MR. TRIEF: Well, I don't think so. I think
18 there's nothing wrong with the question. I
19 think that's what her job is.
20 MS. SHERER: She's not an underwriter.
21 MR. TRIEF: She's here as a Met Life --
22 MS. SHERER: She's here as a claims
23 person, and 30B6 witness.
24 MR. TRIEF: I don't want to argue about it.
25 She claims advisory is suppose to review what

Regina Solomon-Stowe 24

2 underwriting --
3 MS. SHERER: Objection to the form.
4 MR. TRIEF: She just told me claim
5 advisories are suppose to review underwriting
6 and claims, so I have no idea how anybody can
7 reviewing anything without understanding
8 anything, that's hard for me to understand, but
9 I'll ask the questions.
10 Q. Do you or have you ever inquired whether
11 people have cleared the Hepatitis B virus?
12 A. No, I have not.
13 Q. Do you know if people clear the Hepatitis
14 B virus, whether they're at no greater risk of dying
15 than anybody else?
16 A. No.
17 Q. Well, if you don't know those questions,
18 how do you review what claims said and what
19 underwriting said; how do you make a review if you
20 don't understand any of the medicine?
21 MS. SHERER: Objection to the form.
22 A. That's not my position in my title. The
23 underwriting is responsible for the medical. They
24 review as far as the medical information is
25 concerned.

Regina Solomon-Stowe 25

2 Q. So when you say as a claims advisory you
3 look to see whether you agree with claims and
4 underwriting, that's not necessarily completely
5 accurate, because you're not reviewing anything
6 underwriting is doing?
7 MS. SHERER: Objection to the form.
8 A. I'm reviewing what underwriting stated in
9 their review of the medical records under their
10 claim.
11 Q. For what purpose are you reviewing what
12 they stated?
13 A. To see if there was a material -- if they
14 believe there was a material misrep.
15 Q. So, if underwriting believed there was a
16 material misrepresentation, you're not reviewing
17 that, you're taking it as the gospel or the truth,
18 correct?
19 A. I'm -- yes, if they say it's a material
20 misrep, it's a material misrep.
21 Q. Right that's what I'm asking. If they say
22 it is, it must be so, correct?
23 A. Based on the underwriting guidelines, yes.
24 Q. So what I'm saying is, there's no
25 independent review from you to see if underwriting

Regina Solomon-Stowe                     26

1   is accurate, knowledgeable, correct, or anything
2   else like that?
3       A.   No, because I'm not an underwriter.
4       Q.   Okay.  And the only reason this claim has
5   been denied, is because of Met Life's claim that
6   there was a material misrepresentation concerning
7   Hepatitis B, am I correct?
8           MS. SHERER:  Objection to form.
9       A.   There's other questions in the application
10  that were not accurate also.
11      Q.   List those.
12      A.   If you show me the application.
13      Q.   Well, you don't recall from -- off-hand?
14      A.   No.
15          MR. TRIEF:  Okay, we'll show you the
16  application.
17      A.   Do you want to do it as an exhibit?
18      Q.   Tell me if that's useful for you, and I'll
19  mark it.  If that helps, I'll be happy to mark it.
20      A.   Yes.
21          MR. TRIEF: So we can mark it as an
22  exhibit.
23      Q.   And I guess it's the policy and
24  application, correct?

Regina Solomon-Stowe                     27

1       A.   Yes, it is.
2           MR. DINNOCENZO:  I have another one to
3   work off of.
4           (MARKED FOR ID:  Plaintiff's 1.)
5       Q.   All right.
6       A.   I'm looking at Exhibit 1, bates stamp is
7   "00392."
8       Q.   Uh-huh.
9       A.   Question Number 5, (Indicating,) on Part
10  II of the paramedical, "5D" as in "David."
11          "Have you ever received treatment,
12  attention or advise from any physician, practitioner
13  or health facility for or been told by any physician
14  practitioner or health facility, that you had" --
15          -- it says, "D" ulcer, colitis Hepatitis,
16  cirrhosis or any other disease or disorder of the
17  liver, gallbladder, stomach or intestine.
18      Q.   Well, maybe I made a mistake in my
19  question, but that sounds like a Hepatitis B
20  problem?
21      A.   It just says, "Hepatitis."
22      Q.   Right, okay, but Hepatitis is Hepatitis B,
23  it's not A, and C, correct?
24      A.   But the question doesn't distinguish

Regina Solomon-Stowe                     28

1   between "A.B.C."
2       Q.   I'm not asking you about the questions,
3   I'm asking you about whether the material
4   misrepresentation, the only material
5   misrepresentation that Met Life is claiming, is that
6   he didn't disclose that he had Hepatitis B.
7           MS. SHERER:  Objection to the form.
8       A.   And I said they're other questions in
9   here.  I'm not finished.
10      Q.   Okay, but again material
11  misrepresentation, not misrepresentation, but
12  material misrepresentation, because it's a two part
13  process, am I correct?
14      A.   Material misrepresentation.
15      Q.   Am I correct that the reason the policy is
16  not paid is Met Life is claiming that not only is
17  there a misrepresentation, but a material one,
18  correct?
19      A.   Correct.
20      Q.   And the only material misrepresentation
21  that Met Life is claiming, is that he didn't
22  disclose that he had Hepatitis B, am I correct?
23          MS. SHERER:  Objection.  Asked and
24  answered.

Regina Solomon-Stowe                     29

1       A.   They're other questions in here that he
2   did not answer.
3       Q.   I didn't ask whether there are any other
4   questions.  I'm asking whether they're any other
5   material misrepresentations?
6       A.   The conditions and also the visits to the
7   doctor, those are material as well.
8       Q.   If you visited a doctor and the doctors
9   visit was normal --
10      A.   It's what are in the records of the
11  doctor.
12      Q.   Is it my understanding, it's my
13  understanding -- should I call you Ms. Stowe, what
14  would you like to be called?
15      A.   You could call me "Ms. Stowe."
16      Q.   Because I know it's a hyphenated name?
17          Ms. Solomon, or Ms. Solomon-Stowe?
18      A.   "Stowe" is good.
19      Q.   Okay, Ms. Stowe.
20          I understand that the only thing material
21  that Met Life is claiming, is that he had Hepatitis
22  B, and that was not disclosed, am I wrong?
23      A.   I'm disagreeing with what you're saying,
24  because it's not only the Hepatitis, it's the

Regina Solomon-Stowe 30

1
2 medical records that were obtained which show that
3 he was visiting the doctors, which he did not answer
4 these questions on the application correctly.
5     Q.  What is the material about not disclosing
6 that you visited a doctor?
7     I understand the misrepresentation part of
8 it, but what's material about not disclosing that
9 you went to a doctor?
10     A.  It's the records, what's indicated on the
11 medical records.
12     Q.  What is it in those records
13 that's material?
14     A.  That he had Hepatitis B.
15     Q.  So the only thing that's material, that he
16 didn't disclose in Met Life's view, is the Hepatitis
17 B, correct?
18     A.  That's the condition, yes.
19     Q.  So no matter what answer you can point to
20 in the application, it all comes back to whether
21 Hepatitis B is material or not, would you agree?
22     MS. SHERER:  Objection to the form.
23     A.  Yes, I would agree with that.
24     Q.  And, in fact, I have the Answers to
25 Plaintiff's Interrogatories, which I believe were

Regina Solomon-Stowe 31

1
2 signed by you, and I'd like to mark that as "2."
3     I believe it says the same thing that you
4 just said now, and take a look at it and tell me.
5     (MARKED FOR ID:  Plaintiff's 2.)
6     Q.  Okay, take a look at that, please.
7     (Handing.)
8     A.  Yes.
9     Q.  Would you agree that if the Hepatitis B
10 was not material, then the policy should have been
11 paid?
12     MS. SHERER:  Objection to form.
13     A.  If the Hepatitis B was not considered
14 material from the underwriting prospective, yes.
15     Q.  So the underwriting issues here, is the
16 essence of the dispute, would you agree?
17     A.  I agree.
18     Q.  And you know no other reason, why Met Life
19 has not paid, other than that it's Met Life's
20 position that Mr. Lin's Hepatitis B was material to
21 underwriting?
22     A.  Correct.
23     Q.  Are you aware of what science was looked
24 at by Met Life when they made their underwriting
25 review of the claim?

Regina Solomon-Stowe 32

1
2     A.  No, I'm not.
3     Q.  Did Met Life consult with any hematologies
4 or doctors who are experienced with either blood
5 disease, Hepatitis B, or liver disease concerning
6 Mr. Lin?
7     A.  I'm not aware of that, no.
8     Q.  How much before the end of the
9 contestability period did Mr. Lin die?
10     A.  I would need the death certificate,
11 sorry.
12     Q.  Let's say he died on "8-11-06"?
13     A.  Okay, 8-11, that would have been 20
14 days.
15     Q.  So if he died 20 days later, the policy
16 would have been paid without review?
17     A.  Correct.
18     Q.  How do you --
19     How was the 11-31-04 date as the issuance
20 date determined?
21     A.  The August 31st?
22     Q.  Yes.
23     A.  It's determined based on when the policy
24 was placed, which means that the underwriting, the
25 initial review underwriting was fine and everything,

Regina Solomon-Stowe 33

1
2 and we were ready to issue the contract.
3     Q.  So what is the application date?
4     A.  The application date is August 8th --
5 August 5th.
6     Q.  So he died two years after the application
7 date?
8     A.  I'm sorry, August 5th on the application
9 Part I, and August 18th on the application, on the
10 Part II of the application.
11     Q.  What's the difference between the two
12 applications?
13     A.  The first is just, like I would say it's
14 just -- you're indicating where you live and your
15 employee status, whereas Part II, is a Paramedical.
16 If the underwriting decides that a Paramedical needs
17 to be conducted, then this is done by usually a
18 third party, that part of the application, so they
19 have to take the urine and the blood and they would
20 have a date set up for the person to come in for
21 that.
22     Q.  And Met Life is claiming there's a
23 misrepresentation, is that in the first part, the
24 one that was done first or the second part, the one
25 that was done second or both?

Regina Solomon-Stowe                    34

2      A.   Both.
3      Q.   What is the misrepresentation in the
4   second part?
5      A.   It has to do with the Hepatitis also.
6      Q.   There's a question of Hepatitis there as
7   well, correct?
8      A.   Correct.
9      Q.   And a blood test was done, correct?
10     A.   Yes.
11     Q.   And the blood test -- withdrawn.
12          Met Life had the ability when they took
13   the blood to test for Hepatitis, correct?
14     A.   Yes, they had the blood.
15     Q.   And did they test for Hepatitis?
16     A.   No, because he did not indicate he had
17   Hepatitis.
18     Q.   Was that the reason?
19     A.   You can ask underwriting, but...
20     Q.   No, I'll ask underwriting also, but if you
21   know, or you're guessing, if you're guessing --
22     A.   I'm guessing that he didn't respond to
23   Hepatitis question.
24     Q.   Then I'll ask underwriting. If you knew,
25   I would ask you.

Regina Solomon-Stowe                    35

2          So for claims advisory, what did you do
3   to -- withdrawn, I'm sorry.
4          When you reviewed this file, as a claims
5   advisor, had you already, at that point, known that
6   Met Life intended not to pay the death benefit
7   because of the Hepatitis B?
8      A.   When it was referred, there was -- they
9   had already rejected the benefit due to the
10   Hepatitis B.
11     Q.   And you knew that, correct?
12     A.   Yes.
13     Q.   And so what did you do as a claims advisor
14   once that was sent to you?
15     A.   I reviewed the records that we had, the
16   medical records, looking at the decision that was
17   made by the underwriters as far as whether or not it
18   was a material misrepresentation, and looking at the
19   interview to see if there was any other doctors or
20   anything that were not obtained during that time,
21   just making sure the file is complete, and based on
22   our procedures and policies, whether or not I agreed
23   with the decision to deny the claim.
24     Q.   If underwriting said it was material to
25   us, is there anything that you, in your review,

Regina Solomon-Stowe                    36

2   could ever cause you to overturn that?
3      A.   There have been certain circumstances that
4   may have us change, you know, change the position,
5   reconsider.
6      Q.   What percentage of time as a claims
7   advisor, have you gotten a recommendation from
8   underwriting that a claim should be rejected for a
9   material misrepresentation, that you have said, "No,
10   you're wrong, it has to be changed"?
11     A.   It's a percentage, but I wouldn't know
12   like the number.
13     Q.   Approximately? 10 percent, a hundred, 1
14   percent, .5 percent, I don't know.
15     A.   I would say probably like maybe 2 percent,
16   I would question it.
17     Q.   And what would be the basis for those
18   questions; what would be the standard that you would
19   be looking at?
20     A.   I would look at was the person aware,
21   because sometimes people are not aware of
22   conditions. You would look at the doctor's note to
23   see, you know, if the doctor told the person about
24   the condition. There's just other circumstances
25   that may, you know...

Regina Solomon-Stowe                    37

2      Q.   You listed two things that dealt for the
3   misrepresentation portion of it, correct, not
4   neither example dealt with the material portion of
5   it?
6          MS. SHERER:   Objection to form.
7          MR. TRIEF: I'll rephrase it.
8      Q.   In order for Met Life not to pay, there
9   has to be a misrepresentation and it has to be
10   material, correct?
11     A.   Yes, correct.
12     Q.   The example you gave, dealt with the
13   misrepresentation portion, but not the material
14   portion, am I correct?
15     A.   Yes.
16         MS. SHERER: Objection.
17     Q.   Were there any times that you overruled
18   underwriting as to the material portion?
19     A.   Yes, because again, it has to do with the
20   misrep. If they were aware of what they were
21   signing, you know, what they -- what we're saying,
22   that they had a condition. If they weren't aware of
23   that, then I would overlook the material for the
24   benefit of the insured.
25     Q.   I hear you, but would you ever say to

Regina Solomon-Stowe 38

1 underwriting that "I'm going to overrule you that
2 there was a misrepresentation, but it wasn't
3 material"?
4    A.   No.
5    Q.   That would be strictly in underwriting?
6    A.   That's an underwriting procedure and
7 guideline.
8    Q.   And would you ever say to Met Life that
9 the insured, although he signed the application, was
10 never asked the questions, so it wasn't a
11 misrepresentation?
12    A.   If we have the statement from the agent,
13 you know, usually we ask the agent, did they ask the
14 questions.  I can only go by what the agent
15 stated.
16    Q.   So you rely on what the agent says without
17 any other additional investigation?
18    A.   Unless the claimant is saying something
19 otherwise, and then that would lead to another
20 investigation.
21    Q.   Well, is -- do you know if the claimant is
22 saying otherwise in this case?
23    A.   I haven't seen anything in the claim file
24 where they're saying that the questions were not

Regina Solomon-Stowe 39

1 asked by the agent.
2    Q.   Okay.  Who was the original underwriter on
3 the case?
4    A.   I have to look at the file because I don't
5 remember off-hand.
6    Q.   Do you have it would you?
7    MS. SHERER:  Would the response to
8 interrogatories help you?
9    There's another set of interrogatories
10 where we listed that name, there's two sets.
11 This was the single and then there was a --
12    MR. DINNOCENZO:  I think they're in my
13 office, they're in the file.
14    MR. TRIEF:  Okay, we'll get them at a break
15 at some point.
16    Q.   What documents did you review to testify
17 here as a -- on behalf of the corporation as opposed
18 to yourself?
19    A.   I reviewed the claim file and our company
20 procedures when it comes to rescission of policy.
21 There was also underwriting, which was part of the
22 claim file, the policy and the application and the
23 medical records.
24    Q.   So at one time, you knew who the

Regina Solomon-Stowe 40

1 underwriter was, you forgot it until we show it to
2 you?
3    A.   Yes.
4    Q.   In order to prepare yourself, you knew who
5 the underwriter was in this particular case?
6    A.   I reviewed it, yes.
7    Q.   Did you ever communicate at all with my
8 clients, any medical personnel or the agent?
9    A.   There was a letter sent to Jean Lin, I
10 think, it's the spouse.
11    Q.   By you?
12    A.   Yes.
13    Q.   Is that the only communication that you
14 had with either the claimant, any of the medical
15 personnel or the agent, you personally, now as
16 opposed to the corporation?
17    A.   And I met with Dr. Zamarripa (Ph.
18 Spelled,) with our attorney prior to the deposition.
19    Q.   Any conversation you had with your
20 attorneys, I don't want to go into, but any
21 conversations you had with Dr. Zamarripa, I would
22 like to go into, so if we can separate that?
23    MS. SHERER:  Outside of the presence of
24 me?

Regina Solomon-Stowe 41

1    THE WITNESS:  There was none.
2    Q.   And when did you talk to Dr. Zamarripa?
3    A.   That was on Monday.
4    Q.   Was that the first time you had ever
5 spoken to him about this case?
6    A.   Yes.
7    Q.   And so the denial had already occurred
8 before you spoke to him?
9    A.   Yes.
10    Q.   Did you speak to anybody in underwriting
11 before the dialogue occurred?
12    A.   Before?  No.
13    Q.   Let me just mark this letter dated May 4,
14 2007.
15    (MARKED FOR ID:  Plaintiff's 3.)
16    Q.   Is this the one communication that you
17 referred to earlier?
18    A.   Yes.
19    Q.   Did you have any other communication,
20 other than this letter with either the claimant,
21 Mrs. Lin, any doctor or any agent?
22    A.   This is the only one, nothing else.
23    Q.   And not by phone, not by mail, not by any
24 other way?

Regina Solomon-Stowe 42

```
 1                Regina Solomon-Stowe        42
 2     A.  No.
 3     Q.  And again, this letter refers only to the
 4  Hepatitis B as being material, correct?
 5     A.  Correct.
 6     Q.  And you talk about underwriting here.  Do
 7  you see that in the very last paragraph of the first
 8  page?
 9     A.  Yes.
10     Q.  And you say that --
11        Well, why don't you read the first
12  sentence into the record.
13     A.  "If we had been aware of this information
14  which was material from an underwriting prospective,
15  the policy would not have been issued as applied
16  for."
17     Q.  Where did you get the information that it
18  was material from an underwriting prospective?
19     A.  The member that was signed by Dr. Z., Dr.
20  Zamarripa.
21     Q.  I'd like to say the same thing, by the
22  way.
23        Which is in the claim file.
24     Q.  Was that the sole basis?
25     A.  Yes.
```

```
 1                Regina Solomon-Stowe        43
 2        MR. TRIEF:  Can we mark that.
 3        (MARKED FOR ID:  Plaintiff's 4.)
 4        (Handing.)
 5     Q.  Is Exhibit 4, what you call the letter
 6  from Dr. Z.?
 7     A.  The memo, yes.
 8     Q.  Is there anything else that you used in
 9  order for the claim that the information was
10  material from underwriting prospective as contained
11  in Exhibit 3?
12     A.  No, this would be the only document.
13     Q.  And Dr. Zamarripa in that memo, Exhibit 4,
14  doesn't say that the policy would have been
15  declined, does he?
16     A.  No, he doesn't.
17     Q.  So the policy would have been issued, just
18  at a different rating, correct?
19     A.  Correct.
20     Q.  And so it was Met's position that if they
21  just -- they would have issued the policy, but at a
22  different rating, they didn't have to pay anything,
23  correct?
24        MS. SHERER:  Objection to form.
25     A.  It would have been different as applied
```

```
 1                Regina Solomon-Stowe        44
 2  for so, they wouldn't have paid.
 3     Q.  They would refund the premium, but they
 4  wouldn't pay any of the benefit?
 5     A.  Right.
 6     Q.  Now how do we know that's true?
 7     A.  As far as material, being material?
 8     Q.  Yeah, how does someone from the outside
 9  know that if what Dr. Zamarripa was saying is
10  true?
11     A.  We have underwriting guidelines that the
12  underwriters would review, based on the
13  conditions.
14     Q.  Do you know what those guidelines are?
15     A.  No, I'm not aware of underwriting
16  guidelines.
17     Q.  So then if I wanted to understand the
18  basis for this claim, I would then have to speak to
19  someone from underwriting?
20     A.  Correct.
21     Q.  And even though you're here on behalf of
22  the corporation, you wouldn't have that knowledge?
23     A.  Not in underwriting, no.
24     Q.  And so is it fair to say, that you're just
25  taking as true what Dr. Zamarripa is saying in
```

```
 1                Regina Solomon-Stowe        45
 2  Exhibit 4, when you're communicating with Mrs.
 3  Lin?
 4     A.  Yes, cause he's the underwriter, yes.
 5     Q.  And there's no double checking that you're
 6  doing of what he's saying?
 7     A.  No.
 8        MR. TRIEF:  Just give me a second.
 9        (Whereupon, there was a pause in the
10  proceedings.)
11        MR. TRIEF:  Well, thank you very much for
12  coming.
13        MS. SHERER:  It's only 11:00.
14        MR. TRIEF:  Well, if the witness doesn't
15  know anything about the lawsuit, I'm not
16  blaming her.
17        MS. SCHERER:  Well that's not exactly what
18  she said.
19        MR. TRIEF:  Pretty much, it's Hepatitis B,
20  I don't blame her, I'm not faulting her in
21  anyway.
22        MS. SHERER:  I mean, I just wouldn't couch
23  it that way that she knows nothing about the
24  lawsuit, but you're free to do so.
25        MR. TRIEF:  She's a lovely lady I can say
```

| | |
|---|---|
| 1           Regina Solomon-Stowe    46 | 1           Regina Solomon-Stowe    48 |

1          Regina Solomon-Stowe    46
2   that. Nice seeing you.
3       (Time noted: 11:00 A.M.)
4
5     _____
6      REGINA SOLOMON-STOWE
7
8   Subscribed and sworn to
9   before me this ____ day
10  _____, 2007
11
12  _____ _____
13    Raquel Torres
14    Notary Public
15
16
17
18
19
20
21
22
23
24
25

1          Regina Solomon-Stowe    48
2  STATE OF NEW YORK )
3              ss.
    COUNTY OF NASSAU )
4
5     I, Raquel Torres, a Shorthand Reporter
6  and Notary Public of the State of New York,
7  do hereby certify:
8
9     That, REGINA SOLOMON-STOWE, the witness,
10  whose examination is hereinbefore set forth,
11  was duly sworn, and that such examination is
12  a true record of the testimony given by such
13  witness.
14
15     I further certify that I am not related
16  to any of the parties to this action by blood
17  or marriage; and that I am in no way interested
18  in the outcome of this matter.
19
20
21  _____
22     Raquel Torres
23     Notary Public
24
25

1          Regina Solomon-Stowe    47
2           INDEX
3  EXAMINATION
4  Witness Name          Page
5  REGINA SOLOMON-STOWE
6  Direct By Mr. Trief.................... ... 6
7
8  EXHIBITS
9  Exhibit            Page
10  Plaintiff's 1 Marked for Identification -
11  Policy and Application form ................26
12
13  Plaintiff's 2 Marked for Identification -
14  Answers to Plaintiff's Interrogatories .....30
15
16  Plaintiff's 3 Marked for Identification -
17  Letter dated 5-4-07 to Mrs. Lin ............41
18
    Plaintiff's 4 Marked for Identification -
19
    Letter from Dr. Zamarripa .................43
20
21
22
23
24
25