*Exhibit E*

```
 1                                                          1

 2   UNITED STATES DISTRICT COURT

 3   SOUTHERN DISTRICT OF NEW YORK

 4   ----------------------------------------X

 5   JEAN LIN,                              07-CV-3218

 6                   Plaintiff(s),

 7              -against-

 8   METROPOLITAN LIFE INSURANCE.

 9                   Defendant(s).

10   ----------------------------------------X

11                        150 East 58th Street

12                        New York, NY   10155

13                        December 14, 2007

14                        1:15 P.M.

15

16        EXAMINATION BEFORE TRIAL OF DR. DANIEL

17   ZAMPARRIPA, a witness on behalf of the Defendant

18   herein, taken by the Attorneys for Plaintiff, held

19   at 150 East 58th Street, New York, New York, 10155,

20   on Friday, December 14, 2007, at 1:15 O'clock P.M.

21

22

23

24

25
```

```
                                          2
 1
 2    APPEARANCES:
 3
 4    TRIEF & OLK
 5    Attorneys for Plaintiff
 6    150 E. 58th Street
 7    34th Floor
 8    New York, NY 10155
 9    BY: Ted Trief
10    BY: Eric Dinnocenzo, Esq.
11
12    TOMASITA SHERER, ESQ.
13    METROPOLITAN LIFE INSURANCE COMPANY
14    Attorneys for Defendant
15    One Metlife Plaza
16    27-01 Queens Plaza North
17    Long Island City, NY  11101
18
19
20
21              *   *   *
22
23
24
25
```

```
                                          3
 1
 2         IT IS HEREBY STIPULATED AND
 3    AGREED by and between(among) counsel for the
 4    respective parties hereto, that:
 5
 6         All rights provided by the C.P.L.R.,
 7    including the right to object to any question,
 8    except as to form, or to move to strike any
 9    testimony at this(these) examination(s), are
10    reserved, and, in addition, the failure to
11    object to any question or to move to strike
12    any testimony at this(these) examination(s)
13    shall not be a bar or waiver to make such
14    motion at, and is reserved for the trial of
15    this action;
16
17         IT IS FURTHER STIPULATED AND
18    AGREED by and between(among) counsel for the
19    respective parties hereto, that this(these)
20    examination(s) may be sworn to by the
21    witness(es) being examined, before a Notary
22    Public other than the Notary Public before
23    whom this(these) examination(s) was (were)
24
25
```

```
                                          4
 1    begun; but the failure to do so, or to return
 2    the original of this (these) examination(s)
 3    to counsel, shall not be deemed a waiver of
 4    the rights provided by Rules 3116 and 3117
 5    of the C.P.L.R., and shall be controlled
 6    thereby;
 7
 8         IT IS FURTHER STIPULATED AND
 9    AGREED by and between(among) counsel for the
10    respective parties hereto, that this(these)
11    examination(s) may be utilized for all purposes
12    as provided by the C.P.L.R.;
13
14         IT IS FURTHER STIPULATED AND
15    AGREED by and between(among) counsel for the
16    respective parties here, that the filing and
17    certification of the original of this(these)
18    examination(s) shall be and the same hereby are
19    waived;
20
21         IT IS FURTHER STIPULATED AND
22    AGREED by and between(among) counsel for the
23    respective parties hereto, that a copy of the
24
25
```

```
              Dr. Daniel Zamarippa              5
 1
 2    within examination(s) shall be furnished to
 3    counsel representing the witness(es)
 4    testifying, without charge.
 5
 6         IT IS FURTHER STIPULATED AND
 7    AGREED by and between(among) counsel for the
 8    respective parties hereto, that all rights provided
 9    by the C.P.L.R., and Part 221 of the
10    Uniform Rules for the Conduct of Depositions,
11    including the right to object to any question,
12    except as to form, or to move to strike any
13    testimony at this examination is reserved;
14    and in addition, the failure to object to any
15    question or to move to strike any testimony
16    at this examination shall not be a bar or
17    waiver to make such motion at, and is
18    reserved to, the trial of this action.
19
20
21              *   *   *
22
23
24
25
```

|  |  |
|---|---|
| Dr. Daniel Zamarippa    14 | Dr. Daniel Zamarippa    16 |

```
                Dr. Daniel Zamarippa              14
 1
 2   to be accounting for mortality in a life insurance
 3   setting?
 4       A.  Yes.
 5       Q.  So the underwriting guidelines are suppose
 6   to look at someone's mortality based upon their
 7   medical condition, correct?
 8       A.  Every company has different underwriting
 9   guidelines.
10       Q.  I didn't ask that question, I understand
11   they do.  I understand that every company has
12   different underwriting guidelines, but whatever
13   company we're talking about, it's supposed to be
14   dealing with mortality, correct?
15           MS. SHERER:  Objection to form.
16       A.  Yes.
17       Q.  And if a medical condition has no bearing
18   on mortality, then it should have no bearing on
19   underwriting, would you agree?
20           MS. SHERER:  Objection to form.
21       A.  When you review the deceased, you see if
22   that deceased has an impact on mortality.
23           MR. TRIEF:  Could you read the question
24   back.
25           (Whereupon, the referred to question was
```

```
                Dr. Daniel Zamarippa              15
 1
 2   read back by the Court Reporter.)
 3       A.  Yes.
 4       Q.  When did you start in relationship to
 5   being a practicing physician with your medical --
 6   with your insurance medicine?
 7       A.  I didn't understand.
 8       Q.  You said you were the medical director for
 9   an insurance company?
10       A.  For an insurance company, yes.
11       Q.  That was what year?
12       A.  '92.
13       Q.  When did you start practicing medicine?
14       A.  Practicing medicine in '91, practicing
15   medicine you can be a doctor, you can practice
16   medicine and then during your training in cardiology
17   and internal medicine, you're practicing medicine.
18       Q.  When did you finish your cardiology
19   training?
20       A.  March of -- the exact date is, March 1990.
21       Q.  And when did you become an insurance
22   medical director?
23       A.  '92.
24       Q.  What month?
25       A.  May '92.
```

```
                Dr. Daniel Zamarippa              16
 1
 2       Q.  Would you agree that most of your
 3   professional career has been working for life
 4   Insurance?
 5       A.  Yes.
 6       Q.  Are you a hematologist?
 7       A.  No.
 8       Q.  Are you a liver specialist?
 9       A.  No.
10       Q.  Are you a Hepatitis B specialist?
11       A.  No.
12       Q.  What is Hepatitis B?
13       A.  Hepatitis B is a disease, it's a viral
14   disease.  You have an infection from a virus that
15   affects your liver.
16       Q.  Pardon me?
17       A.  That affects your liver, you have
18   infection of your liver.
19       Q.  Well does --
20       A.  A viral infection of your liver.
21           MS. SHERER:  Viral?
22       A.  Viral affection.
23       Q.  Does Hepatitis B always affect your
24   liver?
25       A.  Yes.
```

```
                Dr. Daniel Zamarippa              17
 1
 2       Q.  Does it always permanently affect your
 3   liver?
 4       A.  No.
 5       Q.  Do people clear the virus?
 6       A.  No, you always, when you have the
 7   infection, you have -- you always have -- once you
 8   have the infection, you have the infection, in two
 9   stage, you can be in acute Hepatitis and chronic
10   Hepatitis  You have the infection once in your life,
11   you have the infection forever.
12       Q.  Does chronic Hepatitis affect mortality?
13       A.  Yes.
14       Q.  Always?
15       A.  Yes.
16       Q.  What basis do you have for that
17   information?
18       A.  Medical literature.
19       Q.  What medical literature?
20       A.  I don't have the data here.
21       Q.  Where is the data?
22       A.  There's enough information on the
23   gastroenterologist journals, the New England Journal
24   of Medicine, different journals in medicine.
25       Q.  Do you have those?
```

```
                                Dr. Daniel Zamarippa      22
 2   read back by the Court Reporter.)
 3        MS. SHERER: Objection. You may not like
 4   the answer, but you have to ask a different
 5   question, and you'll get the answer to the
 6   question.
 7        MR. TRIEF: I have to get an answer to the
 8   question asked.
 9        MS. SHERER: Ask the question and he'll
10   answer it.
11        MR. TRIEF: Can you read it back.
12        (Whereupon, the referred to question was
13   read back by the Court Reporter.)
14   A.   I don't understand your question.
15   Q.   That's a fair response.
16        "Yes, no, I don't know, I don't
17   understand, I get all of those."
18        What kind of doctor treats Hepatitis B?
19   A.   Gastroenterologist.
20   Q.   Anybody else?
21   A.   There's some liver disease doctors.
22   Q.   What are they called?
23   A.   Hepatologist.
24   Q.   Anybody else?
25   A.   Internal medicine doctors.
```

```
                                Dr. Daniel Zamarippa      23
 2   Q.   Anyone else?
 3   A.   Primary care physician can treat a
 4   Hepatitis B.
 5   Q.   What is Interferon (Ph. Spelled.)
 6   A.   Interferon is a drug to treat -- it's a
 7   drug you can have Interferon in your blood, and
 8   there's production of alfa, there's a medication
 9   right now on the market.
10   Q.   Is Interferon ever introduced into a
11   patient to treat Hepatitis B?
12   A.   Interferon, the introduction of Interferon
13   was for several -- you can treat several disease
14   with Interferon. I don't know if was specifically
15   for Hepatitis B, but they started with the treatment
16   of Hepatitis with Interferon years and years ago, it
17   was only for Hepatitis B when they started.
18        MR. TRIEF: What was the question?
19        MS. SHERER: I didn't think you were
20   finished. Were you finished?
21        Can you read the questions back?
22   Q.   Can you answer the question yes or no? If
23   you can't, you can't.
24        (Whereupon, the referred to questions was
25   read back by the Court Reporter.)
```

```
                                Dr. Daniel Zamarippa      24
 2   Q.   Could you answer that question?
 3   A.   Yes.
 4        MR. TRIEF: Just, if you can answer my
 5   questions yes or no, answer them that way,
 6   because it will speed it along, because I need
 7   to have a yes or no if it's in there. If it
 8   can be done. So I'll just repeat the question
 9   and ask it again, it just takes the deposition
10   longer.
11        MS. SHERER: And I would like to say that
12   I would like you to answer the question, to
13   best of your ability, truthfully and accurately
14   and completely to the best of your ability.
15        MR. TRIEF: Right, but I'm asking if you
16   can answer a question "yes" or "no" start with
17   the words "yes" or "no," and that's my
18   instruction, and you have to follow my
19   instruction, unless there somehow improper or
20   abusive, but I think that the questioners are
21   allowed to ask the witness to answer questions
22   with "yes" or "no" if they can.
23        MS. SHERER: There's no question pending.
24   Q.   Are there signs, when a blood test is
25   taken, that demonstrate Hepatitis B?
```

```
                                Dr. Daniel Zamarippa      25
 2   A.   Sorry, can you repeat question?
 3   Q.   Are there blood tests which can be taken
 4   which show signs of Hepatitis B?
 5   A.   Yes.
 6   Q.   And are there certain Markers of Hepatitis
 7   B in the blood?
 8   A.   Yes.
 9   Q.   What are those markers called?
10   A.   You can call them "markers" we have the
11   antigens, there's two different. Well there's
12   several Markers. One of the markers is a BS antigen
13   and BE antigen.
14   Q.   And what does those markers demonstrate?
15   A.   Infection.
16   Q.   And do they ever indicate clearing of
17   infection?
18   A.   No.
19   Q.   Well, are there positive markers and then
20   negative markers?
21   A.   Yes, there's positive markers, you can be
22   from, there's two. Can I go beyond this question?
23        MS. SHERER: Yes, you can.
24        MR. TRIEF: Please, that's inappropriate.
25   The instructions come from me. In the middle
```

```
1            Dr. Daniel Zamarippa           50
2    A.   Total bilirubin is not a measure of liver
3    enzymes. In this line, the liver enzymes includes
4    this part, liver enzymes include alkaline
5    phosphatase, and AST, ALT and GGTP, and then if you
6    have normal liver enzymes, except for Gilbert
7    syndrome.
8         MR. TRIEF: Move to strike.
9    Q.   Is Bilirubin listed as a liver enzymes in
10   that column?
11        Does the lab test show that Mr. Lin's
12   Bilirubin was elevated?
13   A.   Yes.
14   Q.   And what does that indicate, an elevated
15   bilirubin?
16   A.   Excuse me?
17   Q.   What does indicate for Mr. Lin's bilirubin
18   to be elevated?
19   A.   He can have this elevation, and there's no
20   indication that he has abnormal liver enzymes. I
21   don't understand your question.
22   Q.   What does an elevated bilirubin mean?
23   A.   Elevated bilirubin means that you can have
24   different scenarios with different bilirubin,
25   different disease could be Gilbert Syndrome.
```

```
1            Dr. Daniel Zamarippa           51
2    Q.   What is Gilbert Syndrome?
3    A.   It's the elevation of total bilirubin,
4    there's no sign of disease, there's no impact in
5    mortality with Gilbert syndrome.
6    Q.   What else?
7    A.   There's hemolytic anemia.
8    Q.   What is that?
9    A.   Destruction of the red blood cells.
10   Q.   What else?
11   A.   And you can have -- for bilirubin, you can
12   have also different stage of liver disease.
13   Q.   And he showed elevated bilirubin,
14   correct?
15   A.   2.3, yes.
16   Q.   And according to Exhibit 5, in your
17   opinion, did he meet the criteria of having no
18   elevated liver enzymes?
19        MS. SHERER: Objection to the form.
20   A.   According to this paper.
21        MS. SHERER: Exhibit 5.
22   A.   Exhibit 5, you don't qualify for preferred
23   according to the medical history.
24        MR. TRIEF: Could you read the question
25   back.
```

```
1            Dr. Daniel Zamarippa           52
2         (Whereupon, the referred to question was
3         read back by the Court Reporter.)
4    Q.   Can you answer my question?
5    A.   Yes, when you have elevated liver enzymes
6    you go the AST, ALT, GGTP, and those are liver
7    enzymes.
8    Q.   Was he tested for Hepatitis B?
9    A.   No.
10   Q.   What is the normal range of Bilirubin?
11   A.   1.5.
12   Q.   And what was his?
13   A.   2.3.
14   Q.   What's triglycerides?
15   A.   Basically, fat in your blood.
16   Q.   Is that part of cholesterol?
17   A.   It's part of the -- no, it's not part of
18   cholesterol.
19   Q.   Well, does it indicate a high
20   cholesterol?
21   A.   No.
22   Q.   What's the purpose of testing for
23   triglycerides?
24   A.   They're several disease that could be
25   related to high triglycerides.
```

```
1            Dr. Daniel Zamarippa           53
2    Q.   What disease?
3    A.   Hepatitis diabetes --
4    Q.   Anything else?
5    A.   Hyperlipidemia.
6    Q.   Does it increase the chance of a heart
7    attack, having elevated triglycerides number?
8    A.   No.
9    Q.   Does it increase the chance of
10   cardiovascular disease?
11   A.   No.
12   Q.   Was his triglycerides elevated?
13   A.   Very slightly.
14   Q.   Yes?
15   A.   Yes.
16   Q.   Does elevated bilirubin sometimes indicate
17   liver disease such as cirrhosis or Hepatitis?
18   A.   Yes.
19   Q.   And Met Life before they issued the policy
20   understood that he had elevated bilirubin,
21   correct?
22        MS. SHERER: Objection to the form.
23   A.   When he went to 2.3 bilirubin, yes.
24   Q.   When the policy was issued, Metropolitan
25   Life insurance company new he had elevated
```

|  |  |
|---|---|
| Dr. Daniel Zamarippa 74 | Dr. Daniel Zamarippa 76 |

Page 74:
1  Dr. Daniel Zamarippa            74
2     A. Zero. Less -- zero, yes.
3     Q. And then there's a group of people who
4  have been infected?
5     A. Yes.
6     Q. And those numbers could be many different
7  types of numbers, correct?
8     A. Yes.
9     Q. They could be fifty thousand, correct?
10    A. Millions.
11    Q. Millions. And his numbers --
12    A. Or hundreds.
13    Q. And his was hundreds, correct?
14    A. Yes.
15    Q. Not millions, hundreds, correct?
16    A. Yes.
17    Q. And is the difference between hundreds and
18 millions significant in predicting ultimate
19 mortality rates?
20    A. Based on the viral copy you need to go
21 with other tests.
22    Q. Are those numbers, the fact that they're
23 in the hundreds, as opposed to being in the
24 millions, is that significant in predicting
25 mortality?

Page 75:
1  Dr. Daniel Zamarippa            75
2     A. No, by itself, Hepatitis B has significant
3  impact on mortality.
4     Q. I didn't ask that question.
5        I'm asking whether the numbers alone, the
6  fact that they're in the hundreds versus in the
7  millions, which you could have, does that in anyway
8  impact on mortality?
9        MS. SHERER: Objection to form.
10    A. No.
11    Q. If you look at 114 --
12       MR. TRIEF: Did we mark 110?
13       Pull 114 for me.
14       MR. DINNOCENZO: (Handing.)
15       (MARKED FOR ID: Plaintiff's 10.)
16    Q. You see the date, which is I think "July
17 '03"?
18    A. Yes.
19    Q. Was he positive or negative for Hepatitis
20 B?
21    A. Based on this test, you can't say that he
22 is positive or negative for Hepatitis B. The only
23 thing that this result shows that the viral copy
24 wasn't normal, in the normal range.
25    Q. Wouldn't you say that the Hepatitis B was

Page 76:
1  Dr. Daniel Zamarippa            76
2  not detectible?
3     A. No, the only thing that means is, that you
4  don't viral copies in your blood.
5     Q. Well was the Hepatitis B detectible?
6     A. Based on this?
7     Q. Yes.
8     A. You can't say that.
9     Q. Could you say it was not detectible?
10    A. No. You only have low viral copies in
11 your blood --
12    Q. Do you see the notation on the bottom
13 right, it says, "copy to patient, Hepatitis B not
14 detectible"?
15    A. Yes.
16    Q. Who's handwriting is that?
17    A. I don't know.
18    Q. Comes from the record itself, correct?
19    A. Yes.
20    Q. And so that in 2003, the patient is being
21 told his Hepatitis B is not detectible, correct?
22       MS. SHERER: Objection to form.
23    A. I don't know.
24    Q. Is that what the document says?
25    A. I don't know.

Page 77:
1  Dr. Daniel Zamarippa            77
2     Q. Could you read -- are you able to read
3  that?
4     A. "Hepatitis B not detectible."
5     Q. And it says, "Copy to patient," does it
6  not? "Copy to PT," I think that's "patient" right?
7     A. "Copy to PT." It says, "Copy to PT."
8     Q. Doesn't "PT" mean "patient" in shorthand
9  for doctors?
10    A. Yes.
11    Q. Look at 118.
12       MR. TRIEF: Give it to the Reporter to
13 mark.
14       THE WITNESS: (Handing.)
15       (MARKED FOR ID: Plaintiffs' 11.)
16    Q. If you look the document number --
17    A. 118.
18    Q. Yes, but it has a sticker?
19    A. "11."
20    Q. Is that a lab test?
21    A. Yes.
22    Q. What is it testing?
23    A. Hepatitis BE antigen.
24    Q. What is that?
25    A. If he as active Or inactive Hepatitis.

```
                Dr. Daniel Zamarippa         82
 2   A.   There is -- the patient who has Hepatitis
 3   B, has increased risk of developing cirrhosis or
 4   liver Cancer risk, and if you're a young patient,
 5   you're a young person, you have more time to develop
 6   cirrhosis of liver or Hepato carcinoma, Cancer of
 7   the liver, can I go on --
 8   Q.   Well, you can say what you want, but what
 9   I'm looking for is the source of your information.
10   So what you're telling me is what your opinion is,
11   and the question was what do you base that opinion
12   on.
13        What material do you have to show me that
14   someone with Mr. Lin's numbers, did not have a
15   normal life expectancy?
16        That's the question, the source of the
17   material.
18   A.   There's medical literature about this, and
19   there's, again it's not numbers, it's negative or
20   positive.  The evidence of chronic Hepatitis B.  The
21   evidence of infection, there's enough information on
22   the medical literature.
23   Q.   So the question is not what numbers these
24   tests show, but the fact that they show anything
25   makes his mortality reduced?
```

```
                Dr. Daniel Zamarippa         83
 2   MS. SHERER:  Objection to form.
 3   Q.   Is that what you're saying?
 4   A.   I'm saying that if he had -- if the
 5   patient has evidence of chronic Hepatitis B, the
 6   mortality is different than the normal
 7   populations.
 8   Q.   Regardless of the numbers, is what you're
 9   saying?
10   A.   Regardless of the numbers.
11   Q.   And what is your source of that statement,
12   that's what I'm asking you.
13        Were do you get that information from?
14   A.   I will give you that information.  There's
15   medical literature, I said it before.  You can do
16   that search on the Internet even, and there's a lot
17   of articles, medical articles about this.
18   Q.   I'm asking you for your source of it, not
19   what I could do, but what is your source for that
20   statement.  If you have articles I'd like to receive
21   them.
22        MS. SHERER:  Objection to form.
23   A.   You will receive them.
24   Q.   So, and you base your testimony on
25   articles that you read, and your experience, in your
```

```
                Dr. Daniel Zamarippa         84
 2   training you said, correct?
 3   A.   On the medicine underwriting, yes,
 4   experience.
 5   Q.   So I'm asking for the articles that you
 6   say support that if your antigens are positive,
 7   regardless of numbers, your mortality rate is less
 8   than the general public?
 9   A.   Yes, I will do that.
10   Q.   Have you consulted with anybody --
11        MR. TRIEF:  Is this a 30B6 witness also?
12        MS. SHERER:  No, he's here as an
13   underwriter.
14        MR. TRIEF:  Based on his own personal
15   knowledge, also?
16        MS. SHERER:  Yes.
17   Q.   Did you consult with anybody besides your
18   attorney before coming here today?
19   A.   No.
20   Q.   Did you review any material, besides the
21   policy application and medical records before coming
22   here today?
23   A.   I told you, last Wednesday I just reviewed
24   some medical literature.
25   Q.   Which you mentioned earlier, I'm sorry, I
```

```
                Dr. Daniel Zamarippa         85
 2   should have included that.
 3        Have I listed all of the things that you
 4   reviewed, the medical literature last Wednesday, the
 5   policy and application and the medical records?
 6   A.   Yes.
 7   Q.   And I think you might have looked at some
 8   underwriting material?
 9   A.   The underwriting guidelines.
10   Q.   Did you look at the original underwriting
11   package?
12   A.   Yes.
13        MR. TRIEF:  Do we have the original?
14        MR. DINNOCENZO:  It should be in the file.
15   What exactly are you...
16        MS. SHERER:  It's all in the file.
17   Q.   Now, you checked off that he would have
18   been given a life insurance policy, on exhibit, I
19   believe it's this one, which is Exhibit 4?
20   A.   Yes.
21   Q.   What policy would he have been issued?
22   A.   With some extra premium, different then
23   select preferred, with extra premium and to clients
24   who have Hepatitis B and shows, according to our
25   guidelines, we can issue policies with Hepatitis B,
```

---

**Dr. Daniel Zamarippa — 86**

2 not at the best rate.
3    Q.  At which rate would he have gotten it?
4    A.  He would be around plus fifty debits that,
5 means according our guidelines would be plus 150
6 percent -- 150 percent mortality. So this is plus
7 fifty debits. That means you pay your premium and
8 pay fifty percent more of the premium.
9    Q.  It would have been fifty percent more of
10 the normal premium?
11    A.  Yes.
12    Q.  But he would have been issued a policy?
13    A.  Yes.
14        MR. TRIEF: Let's take two minutes.
15        (Whereupon, there was a break in the
16 proceedings.)
17        (Whereupon, the following occurred.)
18    Q.  How do you get to that fifty percent
19 premium increase?
20    A.  It's in our underwriting guidelines.
21    Q.  Is it -- is there anything that you can
22 point to if we produce the underwriting
23 guidelines?
24        MS. SHERER: It was the first production,
25 the thin one.

---

**Dr. Daniel Zamarippa — 87**

2    Q.  Am I holding it now?
3        MS. SHERER: Can he see?
4        MR. TRIEF: Yes.
5        He's a big boy he can tell me to see it.
6 If he tells me he needs to see it, I'm not
7 going to hide it from him.
8        So let's mark this. It's bate stamp "710
9 to 718."
10        (MARKED FOR ID: Plaintiff's 13.)
11    Q.  So show me where it would be fifty percent
12 more, for Mr. Lin?
13    A.  It would be here in the second line
14 (Indicating.)
15    Q.  Yeah?
16    A.  The point is -- if he knows -- if we know
17 that he has history of Hepatitis B and he will be
18 Hepatitis B with normal liver enzymes, and we'll say
19 that he's a carrier it would be plus fifty. Do you
20 see that, "plus fifty" (Indicating.)
21    Q.  No, I see that, but you see where --
22 (Indicating.)
23    A.  There's different guidelines, different
24 points that you need to see when you -- you know
25 that he has Hepatitis B and he tests positive for

---

**Dr. Daniel Zamarippa — 88**

2 Hepatitis B.
3    Q.  What I'm referring to is, if you go -- if
4 you look at the Hepatitis B, there seems to be three
5 category; "Hepatitis B carriers, acute Hepatitis B"
6 and then "Chronic Hepatitis B."
7    A.  Yes.
8    Q.  When I looked at this, I thought he was
9 under the chronic Hepatitis B category.
10    A.  If you see "chronic Hepatitis B and liver
11 biopsy performed" --
12    Q.  Right, and I see "liver biopsy not
13 performed," and then I see "treated with
14 Interferon."
15    A.  "Liver biopsy not performed, ALT, AST,
16 normal rate" -- that is B carrier.
17    Q.  I'm looking at "treated with Interferon"
18 because that's what I thought he was.
19    A.  Well, he was treated with Interferon in
20 '98. Six years later he still had the virus.
21    Q.  If I can, I just want to point to you, it
22 says, "Treated with Interferon"?
23    A.  Yes.
24    Q.  Then it says, "Off Interferon more than
25 one year"?

---

**Dr. Daniel Zamarippa — 89**

2    A.  Yes.
3    Q.  He was treated with Interferon and he's
4 off Interferon for more than one year, correct?
5    A.  Yes.
6    Q.  And then it says, "Refer to medical
7 director," correct?
8    A.  Yes.
9    Q.  That's you, correct?
10    A.  Yes.
11    Q.  So what is -- what guidelines are you then
12 using, as a medical director, to determine what to
13 do with that request?
14    A.  When -- on the underwriting process, he
15 was off Interferon six years ago.
16    Q.  Right.
17    A.  And according -- well, after I reviewed
18 the claim, well the claim, and we have all the
19 medical records, and we don't have it at that
20 moment, after six years, you only go by the history
21 that Hepatitis B, because according to the
22 Interferon, he was treated with Interferon, but even
23 he was treated with the Interferon, you need to
24 clear the virus, and he didn't clear the virus.
25    Q.  We disagree with that, but I understand

---

```
                                    Dr. Daniel Zamarippa                90
 2    that's your position, but that wasn't my question.
 3         My question is, doctor, if you look at Met
 4    Life 710 bates number in that series of documents
 5    that we just marked, you'll see there's a category
 6    that says, "treated with Interferon," and then "off
 7    Interferon with one year"?
 8         A.   If you can see --
 9         Q.   Correct, is it there?
10         A.   Correct, it's here.
11         Q.   And does that apply to Mr. Lin?
12         A.   No, because if you see, you have E, BE
13    antigen negative, and he has after the treatment
14    with Interferon, he has positive BE antigen.  Can
15    you see that?  Successfully treatment, E antigen,
16    and after the treatment, he has E antigen
17    positive.
18         Q.   Okay, let's assume you're wrong, just
19    assume, and he had successful treatment and he was
20    off Interferon for more than one year, that would be
21    then be referred to the medical director, correct?
22              MS. SHERER:  Objection to the form.
23         A.   In your assumption?
24         Q.   Yes.
25         A.   In your assumption, if he has E antigen
```

```
                                    Dr. Daniel Zamarippa                91
 2    negative before, and he told us that he had
 3    Hepatitis B, and he was in treatment for Hepatitis
 4    B, this case would be referred to a medical
 5    director.
 6         Q.   And in that case, what guidelines does the
 7    medical director then use?
 8         A.   Basically in this case, if he has E
 9    antigen positive and normal liver enzymes, he would
10    treat it as Hepatitis B carrier, as I mentioned
11    before, --
12         Q.   How do we know that?  Is there anything in
13    the underwriting documents that says if he was
14    treated with Interferon successfully and he was off
15    Interferon for more than one year, he would be
16    charged a fifty percent premium; is there anything
17    in the underwriting that shows that?
18              MS. SHERER:  Objection.
19         A.   If he has E antigen positive that's not
20    successful treatment according to this statement.
21         Q.   Doctor, I'm asking you to assume that he
22    was successfully treated.  Assume that, and assume
23    that he was off Interferon for more than one year?
24         A.   Yes.
25         Q.   What records, if any, would show that he
```

```
                                    Dr. Daniel Zamarippa                92
 2    would be issued a policy at a fifty percent increase
 3    in premium?
 4              MS. SHERER:  Objection to form.
 5         A.   Basically, this is according -- our
 6    judgment, underwriting judgment, he would be
 7    Hepatitis B carrier.
 8         Q.   How do I know that; is that purely
 9    judgment or is there a document that supports
10    that?
11         A.   You have that, here.  This is the only
12    page that we have, because if you go to next page,
13    he will be ABS antigen positive.  If we assume that
14    he has successful treatment or at that point he was
15    inactive, he would be E antigen negative, and then
16    would be -- you can see, FHDB DNA positive and
17    negative, he would be rated as a B carrier, and then
18    if you go back, it would be plus fifty debits.
19    That's Page 711.  You can see, and then you can see
20    antigen positive and antigen negative, and then you
21    can see that according to this, he would be a B
22    carrier, simple.
23         Q.   I'm not seeing it that way, but maybe I'm
24    confused.
25              What is the immunized category on Page
```

```
                                    Dr. Daniel Zamarippa                93
 2    711?
 3         A.   There's no immunized -- well, you have
 4    anti HBS.
 5         Q.   If you go to 711, is there a column called
 6    "immunized"?
 7         A.   Yes.
 8         Q.   What does that mean?
 9         A.   That means that you had vaccine for
10    Hepatitis B.
11         Q.   For what?
12         A.   Vaccine for Hepatitis B.
13         Q.   And what does "chronic infection mean"?
14         A.   "Chronic infection" means that you have
15    active Hepatitis B, more than six months.
16         Q.   And what does "carrier" mean?
17         A.   Means that you have your virus in your
18    blood.
19         Q.   And what does "recovery" mean?
20         A.   "Recovery" means that you don't have virus
21    after the infection, you have complete recovery of
22    the disease.
23         Q.   Is that different than "carrier" and
24    "chronic"?
25         A.   Can you repeat?
```

```
 1           Dr. Daniel Zamarippa              94
 2     Q.   Is "recovery" different than "carrier" and
 3   "chronic"?
 4     A.   Yes.
 5     Q.   And "recovery" means you had the disease
 6   and you no longer have it?
 7     A.   "Recovery" means you had a the acute
 8   infection.
 9     Q.   Had the acute infection?
10     A.   Had the acute infection, and you recovered
11   from that acute infection.
12     Q.   And is recovery listed on Page 710?
13     A.   No.
14     Q.   Why not?
15     A.   Because you have recovery in the
16   infection, you have in the past, the recovery of the
17   infection, there's no evidence that you have this,
18   (Indicating) according to this (Indicating)
19   Hepatitis B.
20     Q.   And if you had recovery, would you be at a
21   normal rate?
22     A.   That's underwriting judgment.
23     Q.   Well, is that what that means; would you
24   then have an ordinary rate if you recovered?
25     A.   If you recovered, yes.
```

```
 1           Dr. Daniel Zamarippa              95
 2     Q.   And so if Mr. Lin had recovered, then he
 3   would have been at an ordinary rate, correct?
 4     A.   I need to say that if Mr. Lin was
 5   recovered, he will be, but you know, according of
 6   the guidelines, he has ABS antigen, he never was
 7   recovered.
 8        MR. TRIEF:  I move to strike the portion
 9        that's not responsive.
10        MS. SHERER:  Of course we disagree.
11     Q.   So would you agree that the issue is
12   whether he recovered or not, correct?
13        MS. SHERER:  Objection to the form.
14     Q.   If according -- if he never recovered,
15   then he would have been rated at fifty percent, had
16   you known this information, correct?
17        MS. SHERER:  Objection to the form.
18     A.   Yes.
19     Q.   And if he had recovered, he would have
20   been rated at the rate he was rated at, correct?
21     A.   No.
22     Q.   Would he have been rated at a different
23   rate if he had recovered?
24     A.   If you have recovered, it would not be a
25   best class.
```

```
 1           Dr. Daniel Zamarippa              96
 2     Q.   What rate would it have been?
 3     A.   There's different categories for that.
 4   Best class means that you have the best life
 5   expectancy.
 6     Q.   I didn't ask that.  The question was at
 7   what rate, if he was recovered at what rate would he
 8   have been issued the policy?
 9        MS. SHERER:  Objection to form.
10     A.   Probably standard rate.
11     Q.   What rate is that?
12     A.   Standard rate means plus one hundred
13   debits, there's no best premium, not the best
14   premium.
15     Q.   Well you said if he was chronic, he would
16   have gotten fifty percent, correct.
17     A.   Yes, B carrier would be fifty percent.
18     Q.   But if he recovered he would be plus a
19   hundred?
20     A.   Plus zero, means --
21     Q.   Plus zero?  So he would have been at the
22   ordinary rate, correct?
23        MS. SHERER:  Objection to form.
24     A.   The ordinary rate, not the way the policy
25   issued.
```

```
 1         Cross - Dr. Zamarippa               97
 2     Q.   He was rated better than ordinary?
 3     A.   Better than that.
 4     Q.   How much more is the ordinary rate than
 5   the rate he was given?
 6     A.   I don't know the number.
 7     Q.   How do I know that that's so?
 8        Is there anything in the underwriting
 9   which says that, as far as someone who recovered?
10     A.   No underwriting judgement.
11     Q.   The medical director's judgement?
12     A.   Yes.
13     Q.   And that's based on mortality, correct?
14     A.   Yes.  But can I go on?
15     Q.   Sure.
16     A.   But to show recovery, you need to show
17   these two antigens, antibodies to show that you have
18   recovered, that Mr. Lin doesn't have, doesn't show.
19        MR. TRIEF:  Move to strike the part
20        that's not responsive.
21        I'd like, if I can, I want -- this has
22        been a very short deposition, I think.  The
23        witness has been here only I would say a little
24        more than two hours, would that be fair.
25        MS. SHERER:  Yes.
```