*Exhibit G*

```
 1
 2     UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
 3     ------------------------------------------X
       JEAN LIN,
 4
 5                    Plaintiff,
 6
              -against-          07-CV-3218
 7                               (Judge Holwell)
 8
       METROPOLITAN LIFE INSURANCE COMPANY,
 9
10                    Defendant.
       ------------------------------------------X
11
12              DATE:   February 22, 2008
13              TIME:   10:15 a.m.
14
15              DEPOSITION of the Defendant, by
16         DENNIS W. WESTMAN, taken by the
17         Plaintiff, pursuant to a Court Order,
18         held at the offices of Trief & Olk, 150
19         East 58th Street, New York, NY 10155
20         before Chanie Berman, a Shorthand
21         Reporter and Notary Public of the State
22         of New York.
23
24
25
```

```
                    2
 1
 2   APPEARANCES:
 3
 4   TRIEF & OLK
 5       Attorneys for Plaintiff
 6       150 East 58th Street, 34th Floor
 7       New York, NY 10155
 8   BY:  TED TRIEF, ESQ.
 9        ERIC DINNOCENZO, ESQ.
10
11   METROPOLITAN LIFE INSURANCE COMPANY
12       One MetLife Plaza
13       27-01 Queens Plaza North
14       Long Island City, NY 11101
15   BY: TOMASITA SHERER, ESQ., OF COUNSEL
```

```
                    3
 1
 2        FEDERAL STIPULATIONS
 3
 4       IT IS HEREBY STIPULATED AND AGREED by
 5   and between the attorneys for the respective
 6   parties herein, that filing and sealing be and
 7   the same are herby waived.
 8
 9       IT IS FURTHER STIPULATED AND AGREED that
10   all objections, except as to the form of the
11   question, shall be reserved to the time of the
12   trial.
13
14       IT IS FURTHER STIPULATED AND AGREED that
15   the within deposition may be sworn to and signed
16   before any officer authorized to administer an
17   oath, with the same force and effect as if
18   signed and sworn to before the Court.
19            *   *   *
```

```
                    4
 1
 2   D E N N I S   W E S T M A N, called as a
 3      witness, having been first duly sworn,
 4      by a Notary Public of the State of New
 5      York, was examined and testified as
 6      follows:
 7   EXAMINATION BY
 8   MR. TRIEF:
 9      Q    What is your name?
10      A    Dennis Westman.
11      Q    What is your home address?
12      A    133 Cattell Street, #3, Easton, PA
13   18042.
14           MR. TRIEF:  Good morning, Mr.
15      Westman.  My name is Ted Trief.  I
16      represent the Lin family.  I will be
17      asking you some questions here this
18      morning.  If you know what I am asking
19      before I complete the question, will you
20      still allow me to complete the question?
21           THE WITNESS:  Yes, sir.
22           MR. TRIEF:  If you intend to
23      answer a question yes or no, will you
24      actually say the word yes or no?
25           THE WITNESS:  Yes, sir.
```

```
                WESTMAN          5
 1
 2           MR. TRIEF:  If you don't
 3      understand a question I am asking,
 4      please let me know and I will be happy
 5      to either rephrase it or repeat it but
 6      if you do answer, I'll assume you
 7      understood.
 8      Q    By whom are you employed?
 9      A    MetLife.
10      Q    For how long have you been
11   employed by MetLife?
12      A    Thirty-five years.
13      Q    What is your current title?
14      A    Senior underwriting consultant.
15      Q    What does that mean?
16      A    Just an underwriter.  Life
17   underwriter.
18      Q    What is a life underwriter?
19      A    They assess applications and
20   financially and medically and assess a
21   classification to get a premium that is
22   acceptable to the company and the client.
23      Q    Is underwriting an art or a
24   science or something in between?
25           MS. SHERER:  Objection to the
```

```
                      WESTMAN                6
   form.
       A    To me, it's just a job.
       Q    I'll get back to that in a minute.
   Have you always been an underwriter at
   Metlife?
       A    All of 35 years.
       Q    What was your first position?
       A    I started in Tulsa, Oklahoma
   underwriting Met Series applications.
       Q    What is that?
       A    Lower amounts, 5,000 and then as
   you get experienced you move up to the larger
   amounts.
       Q    What is the largest amount that
   you can underwrite?
       A    Concurrently the largest one I
   have ever underwritten was 25,000,000.
       Q    Do you have any supervisory role
   or are you just a line underwriter?
       A    Just a line underwriter.
       Q    Have you ever had any supervisory
   duties?
       A    Off and on when I was in Tulsa I
   did underwriting plus I supervised a change
```

```
                      WESTMAN                7
   unit. It's an application that would come
   in. They maybe want to increase the payment
   amount or they then say quit smoking and then
   want a non-smoking class.
       Q    When was the last time you had a
   supervisory role?
       A    Probably 15 years ago.
       Q    Tell me about your educational
   experience.
       A    I went to Eastern Michigan for
   four years.
       Q    Did you graduate?
       A    No. I took a job with MetLife
   because I got married, had a kid and then
   when I was in Oklahoma started taking classes
   when I was working and still never --
       Q    Did you ever get a degree?
       A    Not yet.
       Q    Do you intend to?
       A    I may go back after next year.
       Q    How many credits are you short of
   a degree?
       A    Sixteen.
       Q    What was your education in; did
```

```
                      WESTMAN                8
   you have a specific subject matter?
       A    Just business, bachelors.
       Q    Do you have any medical training?
       A    Over the years, yes.
       Q    On the job?
       A    On the job.
       Q    Do you have any formal medical
   education?
       A    No, sir.
       Q    How does an underwriter
   underwrite? What does he or she use?
       A    Based on the application, we look
   at what the client provides us, and then we
   look at different guidelines that are set by
   the state, as an example, financially,
   somebody that makes a salary 50,000 a year we
   have what is called a times factor, 30 times
   50,000. They come in at that amount.
       Q    When you say we have, who is the
   we?
       A    Insurance industry.
       Q    What are you using to formulate
   your guides; are you using written material,
   are you using conversations with people, are
```

```
                      WESTMAN                9
   you using government material, MetLife
   material; what kind of material are you
   using?
           MS. SHERER:  Objection to the
   form.
       A    It's training that I have had over
   the years.
       Q    What kind of training; written
   training, oral training?
       A    We have, it's like I said, the
   times factor. It's a, I guess you could call
   it a guide that we are given.
       Q    A written guide?
       A    Well, it's just the times factor.
   When we look at someone's income we would --
       Q    I am talking more generally, Mr.
   Westman. I am asking when you are doing
   underwriting, what are you using to help you
   underwrite, if anything?
       A    If there is an impairment we would
   investigate, use the Internet, look in a
   medical book.
       Q    Do you use any written material
   provided to you by Metlife?
```

```
                    WESTMAN            10
 2    A    We have a Internet available to
 3  us.
 4    Q    Do you use any material provided
 5  to you by MetLife?
 6    A    It's, we have sources that we go
 7  to.
 8    Q    Do you use any material provided
 9  to you by MetLife?
10         MS. SHERER: Objection to the
11    form. Asked and answered.
12         MR. TRIEF: It's yes, no or I
13    don't know. Do you use any material
14    provided to you by MetLife?
15         MS. SHERER: Objection to the
16    form.
17    A    I use information that is
18  available on the Internet.
19    Q    I am not asking if you use
20  material provided on the internet. I am
21  asking do you use material provided by
22  MetLife, yes or no?
23    A    Yes.
24    Q    What material provided by MetLife
25  do you use?
```

```
                    WESTMAN            11
 2    A    It's internet availability that we
 3  can key in an impairment.
 4    Q    Do you use anything besides the
 5  internet to help you in your underwriting?
 6    A    Yes.
 7    Q    What else do you use?
 8    A    Medical books, medical dictionary.
 9    Q    What else?
10    A    And the Internet.
11    Q    Just medical books?
12    A    The internet, yes.
13    Q    Do you ever use any manuals
14  provided by MetLife?
15    A    We don't have a manual.
16    Q    Do you use any guidelines provided
17  to you by MetLife?
18    A    We have sources that we can go to,
19  medical department director.
20         MR. TRIEF: Can we mark these,
21    please?
22         (Plaintiff's Exhibit 1 and 2 were
23    marked for identification, as of this date.)
24    Q    I want to show you what has been
25  marked Plaintiff's 1 for identification on
```

```
                    WESTMAN            12
 2  today's date, the 22nd of February. Have you
 3  ever seen anything like this?
 4    A    Yes, I have.
 5    Q    What do you call this?
 6    A    It's a learning tool.
 7    Q    Is that what it is called, a
 8  learning tool?
 9    A    Well, it's not a learning tool.
10  It's what is given to show what is available
11  with applications for ages and then it's a,
12  just gives a guideline that you look at when
13  I receive an examination. It's got the blood
14  pressures on there.
15    Q    What do you call it?
16    A    This here?
17    Q    Yes.
18    A    It's just a reference to when
19  assessing a premium.
20    Q    You call it a reference tool in
21  assessing a premium?
22    A    It's --
23    Q    I just want to know what Mr.
24  Westman calls it.
25    A    It's just a reference tool.
```

```
                    WESTMAN            13
 2    Q    What do you mean by a reference
 3  tool, something you have to follow or you can
 4  consider or you can reject?
 5    A    When you get the requirements on
 6  an exam you will look at this to see if the
 7  blood pressures fall within the guidelines.
 8    Q    Do you have to follow this or is
 9  it just a guide?
10    A    It's just a guide.
11    Q    So you are free to accept it or
12  reject it; is that correct?
13    A    Yes.
14    Q    With respect to underwriting, even
15  if there are written criteria and this says
16  criteria, do you have a rule?
17    A    Yes.
18         MS. SHERER: Objection to the
19    form.
20         MR. TRIEF: What is the objection?
21         MS. SHERER: I feel you are
22    badgering the witness.
23         MR. TRIEF: What is the objection
24    to the form? The witness is saying uh
25    huh and --
```

```
                                    WESTMAN    14
 2        (At this time an off-the-record
 3        discussion took place.)
 4        MR. TRIEF:  Can I have the
 5   question read back, please?
 6        (At this point, requested portion of
 7        testimony was read back.)
 8   Q    Do you see Exhibit 1 has the word
 9   criteria on it?
10   A    Yes.
11   Q    If an applicant does not meet
12   criteria that is set forth on Exhibit 1, are
13   you free still to write select preferred if
14   you want to?
15   A    Yes, we are.
16   Q    And so, would you agree that
17   underwriting is subjective to the
18   underwriter?
19   A    Yes, sir.
20   Q    There is underwriting when the
21   policy is initially applied for; correct?
22   A    Yes.
23   Q    If someone died within the
24   contestability period, is there also an
25   underwriting component to that?
```

```
                                    WESTMAN    15
 2   A    Yes, sir, there is.
 3   Q    And, the contestability period is,
 4   what is meant by contestability?
 5   A    It's a time frame that the company
 6   has, that if something happens within that
 7   time frame, we can try and assess if we are
 8   going to pay the claim or not.
 9   Q    How is that judgment made?
10   A    When somebody dies and it goes to
11   the claims department they look at the
12   contestability period, the date of death, to
13   see if it's within the contestability period,
14   ask for health history.  They look at the
15   death certificate to see what the cause of
16   the death was and they determine from it if
17   they are going to investigate or not.
18   Q    Isn't this always done when
19   someone dies within the contestability time?
20   A    Not always.  It depends on what is
21   on the death certificate in regards to cause,
22   and they look at the application to see what
23   was involved and in regards to how it was
24   issued.
25   Q    And then what happened supposedly
```

```
                                    WESTMAN    16
 2   if they determine to investigate?
 3   A    They would order medical records
 4   or whatever is needed to evaluate if they are
 5   going to pay the claim or not.
 6   Q    Do you know how they evaluate?
 7   A    I am not in that department.
 8   Q    Is underwriting consulted?
 9   A    Our medical department is in that.
10   Q    Is underwriting consulted?
11   A    Yes.
12        MS. SHERER:  Objection to the
13   form.
14        MR. TRIEF:  What is the objection
15   to the form?
16        MS. SHERER:  You asked it and he
17   answered it twice.
18        MR. TRIEF:  The second time he
19   answered it and the first time he
20   didn't.  If I don't get an answer to my
21   question, I am entitled to repeat it
22   without interruption.
23        MS. SHERER:  It's my right to
24   object to the question when I feel that
25   you are a badgering the witness and
```

```
                                    WESTMAN    17
 2   asking questions that have been asked
 3   repeatedly.
 4   Q    Have you ever been involved in
 5   evaluating underwriting during the
 6   contestability period, upon the death of a
 7   policyholder?
 8   A    Yes.
 9   Q    Were you asked in this case to
10   consult?
11   A    Not on the death claim.
12   Q    You are here today?
13   A    I am here today.
14   Q    At my request?
15   A    Yes, at your request.
16   Q    Correct, but I am asking when the
17   decision was made to reject the claim, were
18   you consulted before that decision?
19   A    No.
20   Q    No one asked you what you would
21   have done?
22   A    No.  These go to the medical
23   department, medical director.
24   Q    Is it the policy and procedure of
25   MetLife not to talk to the original
```

```
                              WESTMAN         18
 2   underwriter who underwrote the policy, when
 3   deciding on whether to accept or reject a
 4   claim during the contestability period?
 5          MS. SHERER: Objection to the
 6      form. It's outside of the scope of his
 7      knowledge.
 8      A    As I said before, the death claims
 9   are generally looked at by the medical
10   directors and medical department. We don't
11   see those.
12      Q    I am not sure I understood. Let
13   me try the question in a different way. In a
14   situation in which there is a death during
15   the contestability period and it's being
16   re-evaluated as to whether or not to pay the
17   claim, is it the policy of MetLife not to
18   talk to the original underwriter about
19   whether the policy would have been
20   underwritten, had the information obtained
21   during the investigation been known to the
22   underwriter?
23          MS. SHERER: Objection to the
24      form.
25      A    They talk to the medical
```

```
                              WESTMAN         19
 2   department. The underwriters don't get
 3   talked to about the death claims.
 4      Q    Okay. Did you underwrite the Bang
 5   Lin --
 6      A    Yes, I did, sir.
 7      Q    -- policy?
 8      A    (No response).
 9      Q    Were you the sole underwriter who
10   wrote it?
11      A    Yes, sir.
12      Q    Were you familiar with the
13   criteria which is listed in both Exhibit 1
14   and Exhibit 2 of today's deposition? You
15   take your time, as long as you need, to look
16   at them.
17      A    Yes, sir.
18      Q    Did Mr. Lin meet the criteria
19   which is listed on Exhibit 1 or Exhibit 2?
20      A    Yes.
21      Q    Did Mr. Lin have any elevated
22   bilirubins?
23      A    Yes, he did, sir.
24      Q    Is that one of the criteria which
25   are listed in Exhibit 1 and Exhibit 2 of
```

```
                              WESTMAN         20
 2   today?
 3      A    It's not in those criteria.
 4      Q    Well, if you look at Exhibit 1,
 5   doesn't it say that you can't have elevated
 6   total bilirubin? Look under the liver enzyme
 7   column.
 8      A    You are correct sir but the levels
 9   that it was at is not a concern in my
10   experience.
11      Q    But again, did Mr. Lin meet the
12   criteria for liver enzymes that are listed in
13   either Exhibit 1 or 2?
14      A    In my opinion, yes.
15      Q    In your opinion, he met the
16   criteria, even though his total bilirubin
17   were elevated?
18      A    They weren't elevated
19   significantly enough that I would have any
20   concern with the, medical concern with the
21   exam and application.
22      Q    I didn't ask whether they were
23   elevated significantly.
24          MS. SHERER: Objection to the
25      form.
```

```
                              WESTMAN         21
 2      A    They were elevated, yes, sir.
 3      Q    Is there anything in Exhibit 1 or
 4   2 that describes significance?
 5      A    No, sir. Just says elevated.
 6      Q    It was your subjective judgment to
 7   disregard the elevated bilirubins because you
 8   felt it was not significant elevation?
 9      A    The bilirubin might have been an
10   indication of Gilbert's Disease but it --
11      Q    Was there any diagnosis of
12   Gilbert's Disease?
13      A    No. No, sir.
14      Q    Doesn't it say it has to be
15   diagnosed?
16      A    That is why I made my ruling.
17   There was no indication or a red flag in the
18   application that would be an indication not
19   to proceed as I did.
20      Q    Was there any diagnosed Gilbert's
21   Syndrome in this case?
22      A    There was no health history at all
23   on the application or the exam.
24      Q    Was there any diagnosed Gilbert's
25   in this case?
```

```
                    WESTMAN          22
 2    A    No.
 3    Q    And he had elevated bilirubin;
 4  correct?
 5    A    Correct, yes.
 6    Q    And did you make a subjective
 7  judgment to issue the policy at a rate which
 8  was outside of the criteria listed in Exhibit
 9  1 and Exhibit 2?
10    A    Yes, I did sir.
11        MS. SHERER: Objection to the
12  form.
13    Q    Does he have elevated cholesterol?
14    A    No, sir.
15    Q    Did he have elevated
16  triglycerides?
17    A    Yes, sir.
18    Q    What does that mean?
19    A    It's an indication of possible
20  cardiac.
21    Q    Does the MetLife criteria indicate
22  that he should not have received the rate if
23  he had elevated triglycerides?
24    A    They weren't elevated enough that
25  I would have had a concern.
```

```
                    WESTMAN          23
 2    Q    I understand that. Does any of
 3  the criteria set by MetLife distinguish how
 4  elevated they have to be?
 5    A    No.
 6    Q    Did you in fact issue the policy
 7  that was different than listed in the
 8  criteria set forth in Exhibit 1 and Exhibit
 9  2?
10    A    No, sir. I issued the policy as I
11  assessed with my 35 years of experience in
12  underwriting.
13    Q    I understand that and I
14  understand -- is there a subjective component
15  to this?
16    A    It's an underwriting judgment.
17    Q    Am I correct that there is a
18  subjective component to underwriting?
19    A    Yes.
20    Q    The question is, if you looked
21  solely at criteria set forth by MetLife, Mr.
22  Lin would not have qualified for the rate he
23  received because of his elevated
24  triglyceride?
25        MS. SHERER: Objection to the
```

```
                    WESTMAN          24
 2  form.
 3    A    There was no health history
 4  admitted in the exam or the application that
 5  would have flagged me to have a concern with
 6  the minor elevation and the labs that were
 7  there.
 8    Q    If you strictly looked at the
 9  criteria set forth in Exhibits 1 and 2, would
10  you agree that based upon the criteria in
11  writing, that Mr. Lin would not have
12  qualified for the rate he received because of
13  his elevated triglycerides?
14        MS. SHERER: Objection to the
15  form. Speculation.
16    A    No, sir.
17    Q    What does it say at the top? It
18  says Preferred Criteria and Select Criteria.
19    A    It's a criteria to look at that
20  time to assess and then you look at the
21  application to get the overall picture.
22  There was no indication in the application
23  that there was a reason we should not proceed
24  as I did.
25    Q    If you would look at the bottom of
```

```
                    WESTMAN          25
 2  Exhibit 1, the very last sentence, do you see
 3  that? If you can read the paragraph to
 4  yourself first.
 5    A    What, you are talking about the
 6  bottom, "Select Preferred will not be
 7  available if both these criteria precludes
 8  the class?"
 9    Q    If you go above that, Flexibility
10  in Application of Select Preferred Criteria.
11  Do you see that? Could you read the next
12  one?
13    A    "Generally, all criteria must be
14  met to qualify for Select Preferred."
15    Q    Were you familiar with that
16  sentence?
17    A    Yes, sir.
18    Q    Do you agree with that sentence?
19    A    Yes, sir.
20    Q    In this case, he did not?
21    A    It says generally.
22    Q    In this case he doesn't meet the
23  criteria?
24    A    Yes, he did. There was no health
25  history admitted in the application or exam.
```

```
                    WESTMAN         26
 2   Everything was no.  The elevations were not
 3   significant enough that you would want to
 4   pursue anything.
 5           MR. TRIEF:  Move to strike the
 6      non-responsive portions.
 7      Q    I asked whether the criteria in
 8   the form was met, not anything about the
 9   application.  Was the criteria in the form
10   met?
11           MS. SHERER:  Objection to the
12      form.
13      A    The criteria, yes, it was met.
14      Q    And so he had no elevated total
15   bilirubin?
16      A    He had elevations but in my
17   opinion they weren't significant.
18           MR. TRIEF:  I am not asking about
19      the opinion of Mr. Westman.
20           MS. SHERER:  Objection to the
21      form.
22      Q    With respect to the form itself,
23   is it your statement that he met the criteria
24   concerning total bilirubin or he didn't?
25      A    Generally, he did.
```

```
                    WESTMAN         27
 2           MS. SHERER:  Objection to the
 3      form.
 4      Q    Specifically, did he meet the
 5   total bilirubin in the form?
 6           MS. SHERER:  Objection to the
 7      form.  Asked and answered.
 8      A    Yes, he did.  There is nothing in
 9   here in regards to level stated.
10      Q    I want to show you Exhibit 6 of
11   12/14/07.  It's previously marked as an
12   exhibit.  Take a look at it.  You will see
13   it's a lab test that was in the possession of
14   MetLife and has a MetLife stamp on it, 341.
15   Do you see that, sir?
16      A    Yes, sir.
17      Q    It's the lab test for Bang Lin;
18   correct?
19      A    Yes, sir.
20      Q    And it was in your possession at
21   the time you underwrote; correct?
22      A    Yes, sir.
23      Q    Do you see that there is a total
24   bilirubin listed there?
25      A    Yes, sir.
```

```
                    WESTMAN         28
 2      Q    In the total bilirubin there is a
 3   reference range; do you see that?
 4      A    Yes, sir.
 5      Q    And the reference is the normal
 6   reference range?
 7      A    Yes, sir.  There is reference
 8   range, the Lab One points.
 9      Q    It was .2 to 1.5 that would be
10   normal; correct?
11      A    Yes, sir.
12      Q    Next to the total bilirubin you
13   will see the letter H; correct?
14      A    Yes.
15      Q    That means elevated; correct?
16      A    Yes, sir.
17      Q    His bilirubin, is it 2.3?
18      A    Yes, sir.
19      Q    And you had that in your
20   possession?
21      A    Yes, sir.
22      Q    Would you agree with respect to
23   the form that is Plaintiff's 1 or Plaintiff's
24   2, he had elevated bilirubin?
25      A    By Lab One's guidelines, yes.
```

```
                    WESTMAN         29
 2      Q    Would you agree that since he had
 3   elevated bilirubin that he did not meet the
 4   strict criteria listed in Exhibit 1 of
 5   today's date?
 6      A    He met the criteria, in my
 7   opinion.  This is Lab One's guidelines.  The
 8   elevation wasn't significant enough that I
 9   had a concern.  The application and exam had
10   no highlights in it or flags that there is a
11   condition that I should pursue on it.
12      Q    What does bilirubin show?
13      A    2.3, sir.
14      Q    What is the significance of an
15   elevated bilirubin?
16      A    Could mean Gilbert's Syndrome.
17      Q    What else?
18      A    Could be some gallbladder, renal.
19      Q    What else could it mean?
20      A    That is pretty much it.
21      Q    Could it mean hepatitis B?
22      A    I would not think so because there
23   was no elevation in the liver enzyme.
24      Q    Could it be cirrhosis of the
25   liver?
```

|  | WESTMAN 30 |
|---|---|
| 2 | A    Possibly. |
| 3 | Q    Could it mean an alcoholic? |
| 4 | A    It could be a lot of things but |
| 5 | when I made my assessment there was nothing |
| 6 | in the application that would flag me to want |
| 7 | to pursue it any further and the elevations |
| 8 | weren't significant enough that I would want |
| 9 | to do anything different than what I did. |
| 10 | Q    Would you agree that the elevation |
| 11 | is at least 50% higher than the range, it |
| 12 | could even be 100% higher than the range; |
| 13 | would you agree? |
| 14 | A    I wouldn't say 50%. |
| 15 | Q    No; okay. What would you say? |
| 16 | A    I would just say it's an elevation |
| 17 | but what I had to assess with, it wasn't any |
| 18 | concern to me. |
| 19 |        MR. TRIEF: Move to strike. |
| 20 |        MS. SHERER: I object. |
| 21 | Q    Do you see the triglycerides? |
| 22 | A    Yes, sir. |
| 23 | Q    On the lab, you can turn it around |
| 24 | if you want to, do you see the range for |
| 25 | normal? |

|  | WESTMAN 31 |
|---|---|
| 2 | A    Yes, sir. |
| 3 | Q    What is the range for normal? |
| 4 | A    0 to 150. |
| 5 | Q    What was his number? |
| 6 | A    189. |
| 7 | Q    Do you see the H next to it? |
| 8 | A    Yes. |
| 9 | Q    Does that mean high? |
| 10 | A    Yes. |
| 11 | Q    Why did you test for |
| 12 | triglycerides? |
| 13 | A    It's an indication that there |
| 14 | could be a cardiac issue so you would look at |
| 15 | it and if there is something admitted in the |
| 16 | application, you might pursue it then. |
| 17 | Q    But if there is nothing admitted, |
| 18 | you wouldn't pursue? |
| 19 | A    Not at this level. I wouldn't |
| 20 | look at getting an ap unless -- |
| 21 | Q    Is there anything in writing that |
| 22 | says this? |
| 23 | A    No, it's -- we have classes |
| 24 | periodically and they will say that you are |
| 25 | going to see elevations periodically but if |

|  | WESTMAN 32 |
|---|---|
| 1 | there is no health history admitted, you |
| 2 | won't want to pursue anything unless it was |
| 3 | above 500. |
| 4 | Q    Is that all in writing or is there |
| 5 | anything in writing? |
| 6 | A    No. It's pretty much an oral |
| 7 | class. We have monthly classes on different |
| 8 | impairments periodically. |
| 9 | Q    Is there anything you can show me |
| 10 | in writing that tells me that you don't have |
| 11 | to consider a bilirubin of 2.3 in doing any |
| 12 | further testing or you don't have to consider |
| 13 | a triglyceride at 189? |
| 14 | A    I don't have anything in writing, |
| 15 | sir. |
| 16 | Q    Do you have anything in writing? |
| 17 | A    We can go into the Internet and |
| 18 | key in impairments. |
| 19 | Q    Other than doing an Internet |
| 20 | search, something published by MetLife? |
| 21 | A    I don't have anything. |
| 22 | Q    Is there anything published by |
| 23 | MetLife? |
| 24 | A    There is the guide we look at. If |

|  | WESTMAN 33 |
|---|---|
| 1 | something is admitted in the application, we |
| 2 | would pursue it. |
| 3 | Q    What do you mean by there is a |
| 4 | guide? |
| 5 | A    The elevations here. |
| 6 | Q    What is the word there? |
| 7 |        MS. SHERER: Objection to the |
| 8 | form. |
| 9 |        MR. TRIEF: What do you mean? |
| 10 |        MS. SHERER: Allow him to finish |
| 11 | his answers. |
| 12 | A    Of the lab results, you would look |
| 13 | at this and compare it to what had been |
| 14 | admitted on the application to see if you |
| 15 | would need to pursue anything further. |
| 16 | Q    So the lab results are just a |
| 17 | guide? |
| 18 | A    Yes, sir. |
| 19 | Q    And the criteria is just a guide? |
| 20 | A    It's a reference to look at it. |
| 21 | Q    So you don't have to necessarily |
| 22 | follow the criteria that is Plaintiff's 1 and |
| 23 | 2 of today and you don't necessarily -- |
| 24 | A    You follow. |

```
 1              WESTMAN             34
 2      Q    You have to let me finish.  We
 3   can't talk over each other.  Am I correct to
 4   understand that Exhibits 1 and 2, which are
 5   called criteria, and Exhibit 6 of 12/14/07,
 6   which are the lab tests, would be followed or
 7   not followed at the discretion of the
 8   underwriter?
 9           MS. SHERER:  Objection to the
10       form.
11      A    Yes, sir.
12      Q    And there is nothing that you have
13   in writing that explains how you use that
14   discretion; is that correct?
15      A    There is nothing in writing.  You
16   look at this, you look at the application to
17   see what is admitted on the application and
18   then you look at your rates in regards to
19   labs and what is on the exam to see if you
20   need to pursue any further to change the
21   classification or premium in the product.
22      Q    Have you seen the testimony of the
23   medical director in this particular case?
24      A    No, sir.
25      Q    Are you aware that he indicated
```

```
 1              WESTMAN             35
 2   that had he known of Mr. Lin's condition, Mr.
 3   Lin would have received a policy but just at
 4   a different rate?
 5      A    No, sir.
 6      Q    Are you familiar with hepatitis B?
 7      A    Yes, sir.
 8      Q    Does hepatitis B affect Asians at
 9   different rates than it affects caucasians?
10      A    I don't know that, sir.
11      Q    Are there different types of
12   hepatitis B?
13      A    No, sir.  There is hepatitis A, B
14   and C.
15      Q    I am referring specifically to
16   hepatitis B.  Are there different types of
17   hepatitis B?
18      A    I am not sure what you are
19   meaning.  You have hepatitis B and you have a
20   carrier and then an individual who has the
21   hepatitis B.  That is my knowledge of it, if
22   you are talking about types.
23      Q    Is there hepatitis B that had been
24   successfully treated and hepatitis that has
25   not been successfully treated?
```

```
 1              WESTMAN             36
 2      A    Hepatitis B is an impairment that
 3   once you have been diagnosed with it, you
 4   have, you are going to be followed all
 5   through your life.
 6      Q    Is there hepatitis B that has been
 7   successfully treated and hepatitis that has
 8   not been successfully treated?
 9      A    Hepatitis B can successfully be
10   treated with interferon and put in remission
11   but then you are going to have to be
12   followed.
13      Q    If you are successfully treated
14   with interferon, how do you measure if you
15   have been successfully treated with
16   interferon?
17      A    By your labs.  Your liver enzymes
18   go back to normal, which, the applicant in
19   this case his liver enzymes were normal so he
20   would have been successfully treated, if he
21   was in fact diagnosed with hepatitis B.
22      Q    If you had known he was treated
23   with interferon for hepatitis B, you would
24   have considered him successfully treated upon
25   his enzymes?
```

```
 1              WESTMAN             37
 2      A    You would look at his enzymes and
 3   order an A.P.S. to see if he was a carrier or
 4   just hepatitis B and the classification could
 5   be from standard to all the way up to
 6   substandard product.
 7      Q    Again, the question was if his
 8   liver enzymes were normal, would you have
 9   considered him successfully treated?
10           MS. SHERER:  Objection to the
11       form.  Asked and answered.
12      A    The liver enzymes being normal
13   just means that it's under control and in
14   remission.  If he had been diagnosed with
15   hepatitis B, I had no knowledge that he had,
16   until this proceeding.
17           MR. TRIEF:  Move to strike.
18           MS. SHERER:  Objection.
19           MR. TRIEF:  I am not asking that
20       question.
21           MS. SHERER:  I would just like to
22       state for the record I object to your
23       moving to strike every answer that Mr.
24       Westman is giving because you don't like
25       the answer being given.
```