*Exhibit J*

```
 1
 2    UNITED STATES DISTRICT COURT
 3    SOUTHERN DISTRICT OF NEW YORK
      ------------------------------------------x
 4    JEAN LIN,
 5                       Plaintiff,
 6
                         -against-    Index No:
 7                                    07-CV-3218
 8
 9    METROPOLITAN LIFE INSURANCE COMPANY,
10                       Defendant.
      ------------------------------------------x
11
12
13          EXAMINATION BEFORE TRIAL of the
14    Defendant, DAVID CLAIN, M.D., taken by the
15    Plaintiff, held at the offices of Trief & Olk,
16    150 East 58th Street, 34th Floor, New York,
17    New York 10155, on May 28, 2008, at 10:05 a.m.,
18    before a Notary Public of the State of New
19    York.
20
21
22
23
24
25
```

### 2

```
 1
 2   A P P E A R A N C E S:
 3   TRIEF & OLK
            Attorneys for Plaintiff
 4        150 East 58th Street, 34th Floor
          New York, New York  10155
 5   BY:   Ted Trief, ESQ.
 6
 7   1 METLIFE PLAZA
            Attorneys for Defendant
 8        27-01 Queens Plaza North
          Long Island City, New York  11101
 9   BY:   Tomasita Sherer, Senior Counsel
            Law Department
10
11
     ALSO PRESENT:
12
     Eric Dinnocenzo
13
14
15
16
17
18
19
20
21
22
23
24
25
```

### 4

```
 1
 2   Public other than the Notary Public before whom
 3   this examination was begun, but the failure to
 4   do so or to return the original of this
 5   deposition to counsel shall not be deemed a
 6   waiver of the rights provided by Rule 3116 of
 7   the C.P.L.R. and shall be controlled thereby.
 8        The filing of the original of this deposition
 9   is waived.
10        IT IS FURTHER STIPULATED, that a copy
11   of this examination shall be furnished to the
12   attorney for the witness being examined without
13   charge.
14
15
16
17
18
19
20
21
22
23
24
25
```

### 3

```
 1
 2             STIPULATIONS
 3        IT IS HEREBY STIPULATED AND AGREED, by
 4   and between the attorneys for the respective
 5   parties hereto, that:
 6        All rights provided by the C.P.L.R.,
 7   and Part 221 of the Uniform Rules for the
 8   Conduct of Depositions, including the right to
 9   object to any question, except as to form, or
10   such other irregularity that would be waived if
11   not interposed, or to move to strike any
12   testimony at this examination is reserved.
13        The failure to object to any question,
14   or to move to strike any testimony at this
15   examination, except as to form or other
16   irregularity shall not be a bar or waiver to
17   make such motion at, and is reserved to, the
18   time of trial of this action.
19        An attorney shall not interrupt the
20   deposition for the purpose of communicating
21   with the deponent unless all parties consent or
22   the communication shall be stated clearly for
23   the record.
24        This deposition shall be sworn to by
25   the witness being examined before a Notary
```

### 5

```
 1
 2   DAVID CLAIN, M.D., the witness
 3   herein, having been first duly sworn by a
 4   Notary Public of the State of New York, was
 5   examined and testified as follows:
 6   EXAMINATION BY
 7   MR. TRIEF:
 8   Q.   State your name for the record, please.
 9   A.   Dr. David Clain.
10   Q.   State your address for the record,
11   please.
12   A.   19 Strathmore Road, Great Neck, New York
13   11023
14   Q.   Good morning.
15   A.   Morning.
16   Q.   My name is Ted Trief, and I represent
17   the Lin family.  I will be asking you some
18   questions this morning.  The first thing I want
19   to tell you is, if you intend to answer my
20   questions "yes" or "no," would you be so kind
21   as to say "yes" or "no"?
22   A.   Right.  I understand that.
23   Q.   If you understand the question before I
24   complete it, still allow me to complete it
25   before you answer it, so that we're not
```

**Page 42**

1  D. Clain, M.D.
2  other members of his family should be tested
3  and so on and so on and so on.
4      There are probably a lot of things to
5  talk about, all of which I always document when
6  I see the patient and request upon the patient,
7  and that all involves, in the case of
8  hepatitis -- are we talking about hepatitis B
9  here or just general?
10 Q.   We are talking about hepatitis B.
11 A.   In the case of hepatitis B because it's
12 a life-long infection for the rest of the
13 person's life. I tell every patient that.
14 Q.   When do you tell them that?
15 A.   At the very first visit.
16 Q.   So, at the first visit, you educate
17 them?
18 A.   Well, when I say "the first visit," the
19 first visit when I have the -- all the evidence
20 together.
21 Q.   Do you tell them the same thing in each
22 and every visit?
23 A.   Not necessarily everything at every
24 visit, but I would check out whether they had
25 followed up with some of the questions about

**Page 43**

1  D. Clain, M.D.
2  their family and I would remind them to return
3  in whatever period of time was appropriate to
4  be re-tested so that all of this can be
5  re-evaluated because hepatitis B is a
6  fluctuating disease.
7  Q.   But I assume that the person who had
8  been successfully treated with hepatitis B
9  would be following with you, correct?
10 A.   If they're so told, yes.
11 Q.   Well, you would so tell them, correct?
12 A.   Of course.
13 Q.   If them listened to you, they would
14 follow with you?
15 A.   Not always, but, yes, hopefully. Most
16 of them do.
17 Q.   When they keep following with you, they
18 come every six months, every year, every two
19 years, how often?
20 A.   If they're on treatment, every four
21 months, three to four months. If they've had
22 successful treatment or never required
23 treatment, every six months.
24 Q.   I was referring to either successful
25 treatment or never required treatment, so it's

**Page 44**

1  D. Clain, M.D.
2  every six months?
3  A.   Yes.
4  Q.   Do you, then, treat them every six
5  months?
6  A.   This is an ongoing treatment, to follow
7  their disease. You could call it management or
8  treatment or whatever you'd like.
9  Q.   I'm again using what Dr. Clain uses as a
10 definition.
11 A.   I don't use such a definition.
12 Q.   Remember that instruction? Even if you
13 know my question before you're clear and you
14 should speak over me, we're going to have a
15 problem with the reporter. So, let's slow down
16 a little bit. There's no rush?
17        MS. SHERER: I just ask that you
18    allow him to finish his answer, too.
19        MR. TRIEF: Well, I did, but he
20    actually spoke over me that time.
21 Q.   Doctor, I'm asking you to talk to me in
22 terms of a patient who has been successfully
23 treated for hepatitis B and is now seeing you
24 every six months.
25        Is that something you understand, that

**Page 45**

1  D. Clain, M.D.
2  concept?
3  A.   Yes.
4  Q.   When they come back to you after
5  successful treatment every six months, is each
6  six months' visit with you something that you
7  consider treatment?
8        MS. SHERER: Objection to the
9    form. Asked and answered.
10 A.   I've answered this a number of times,
11 and I think this is a purely semantic
12 statement, whether you call it treatment or
13 management. But it's part of the treatment
14 with the patient because you treat a patient
15 who has hepatitis B forever.
16 Q.   So, the answer is you consider it
17 treatment?
18 A.   Yes.
19 Q.   Okay. That's what I need to know.
20        When you, on Page 2 of your report,
21 refer to Mr. Lin having visited Dr. Kam for his
22 continued treatment of hepatitis B after
23 completion of treatment with interferon in
24 1999, is the reference to treatment in that
25 report the follow-up visits without any

Page 90

```
                    D. Clain, M.D.
 1
 2   treated and so on, all of which are confining
 3   factors in the incidents of liver cell cancer.
 4           (Whereupon, the referred to
 5       place was read back by the Reporter.)
 6       MR. TRIEF: I move to strike the
 7   part that's not responsive.
 8       MS. SHERER: I move to renew.
 9       MR. TRIEF: Off the record.
10           (Whereupon, an off-the-record
11       discussion was held.)
12   Q.  What is the incidence of liver cancer in
13   the general public?
14   A.  I don't have a number.
15   Q.  Approximately.
16   A.  It's very low.
17   Q.  Tell me.
18   A.  I don't know.
19   Q.  One in a million, one in a thousand, one
20   in a hundred?
21   A.  I don't know. I don't know the number.
22   Q.  What is the incidence rate of liver
23   cancer for those who have been successfully
24   treated for hepatitis B without cirrhosis?
25   A.  It's a few times increased, like three
```

Page 91

```
                    D. Clain, M.D.
 1
 2   times increased. It varies in different
 3   populations, in different places. It isn't the
 4   same here and there. It depends on where the
 5   study was done, and there aren't that many
 6   studies.
 7       But there is a severalfold increase in
 8   liver cancer. I can refer you -- and I refer
 9   to that, I think, in one of my comments in the
10   report, is that, if you rook at the AASLD
11   Guidelines on the hepatocellular cancer, they
12   actually quote you papers based on their Asian
13   patients who are not cirrhotic, have no
14   activity, either treated or untreated, are
15   inactive, have an increased instance of
16   hepatocellular carcinoma.
17       They quote three or four papers. If you
18   look at this AASLD Guidelines, they're quoted
19   here, and they're listed in the paper.
20       MS. SHERER: Should we mark that
21       as an exhibit?
22       MR. TRIEF: Sure.
23   A.  If you look in the guidelines -- this is
24   the hepatocellular carcinoma guidelines, not
25   the hepatitis B guidelines. Hepatitis B on
```

Page 92

```
                    D. Clain, M.D.
 1
 2   Page 1210, which is the third page of the
 3   guidelines, on the second column, the last but
 4   one, "This is not true for Asian hepatitis B
 5   carriers without cirrhosis who remain at risk
 6   for HCC" -- hepatocellular carcinoma --
 7   "regardless of replication status."
 8       They quote you, like, five from three or
 9   four papers, and then they go on to say other
10   things which are even more than that, even
11   people who lose surface antigens are at risk.
12           (Whereupon, an AASLD Practice
13       Guide was marked as Plaintiff's
14       Exhibit 2, for identification, as of
15       this date.)
16   Q.  I don't see any reference to that
17   section on Page 1210 to successful treatment.
18   A.  I don't think there's data.
19   Q.  So, this study doesn't apply at all to
20   patients who were successfully treated,
21   correct?
22   A.  No, but they're referring to patients
23   who spontaneously got to where treated patients
24   got to.
25   Q.  I don't see that there.
```

Page 93

```
                    D. Clain, M.D.
 1
 2       Does it say that anywhere? I mean, is
 3   there something that says that?
 4   A.  I think there's something that says
 5   that. When you get back to Page 1210,
 6   "Similarly, the risk of hepatocellular
 7   carcinoma" -- "Similarly, the risk of
 8   hepatocellular cancer persists in long-term
 9   hepatitis B carriers from Asia" -- oh, sorry.
10   I retract. I'm reading the wrong sentence.
11   Q.  The question goes back to the fact that
12   there isn't any comparison in this study of any
13   patients who were successfully treated --
14   A.  No, not successful treatment.
15   Q.  You have to wait for me to finish.
16   A.  Sorry.
17   Q.  You would agree that there isn't
18   anything in this study that refers at all to an
19   analysis of what the incidence is of liver cell
20   cancer for patients who have been successfully
21   treated for hepatitis B, correct?
22   A.  Not in these studies, no.
23   Q.  Liver cancer in the general public, from
24   an instance level, is extraordinarily low, is
25   it not?
```

114

1  D. Clain, M.D.
2  are active hepatitis B?
3  A.  I'm quoting you two papers, which may or
4  may not represent it, but, yes, it's up there
5  somewhere.
6  Q.  You can clearly test for hepatitis B,
7  correct?
8  A.  Yes.
9  Q.  I want to show you an exhibit which has
10  been previously marked Plaintiff's Exhibit 6 at
11  the deposition of 12/04/07.
12      Would you take a look at that (handing.)
13  A.  Sure.
14  Q.  You'll see that liver function tests
15  were tested for.
16      Do you see that?
17  A.  Yes.
18  Q.  They were in the normal range, correct?
19  A.  Yes.
20  Q.  Bilirubin was tested, and that was
21  elevated, correct?
22  A.  Yes.
23  Q.  What does that indicate?
24  A.  In the context of totally normal profile
25  liver function, probably that it is a condition

115

1  D. Clain, M.D.
2  known as Gilbert's syndrome or disease -- it's
3  not really a disease -- which is an inborn
4  error of metabolism with no significance.
5  Q.  Would you still say that if I told you
6  that the patient was an immigrant Asian?
7  A.  Yes.  It's a very common finding, and
8  it's isolated.  I can't prove that.  I'm just
9  looking at this.  I see this in my office
10  frequently.  It's probably one in a hundred of
11  the population.
12      I don't know whether it's the same
13  incidence in Asians, but, certainly, you see it
14  in Asians.  You need other tests to prove that,
15  but it doesn't relate to the rest of the liver
16  function.
17  Q.  It maybe related to hepatitis B, though,
18  correct?
19  A.  No, highly unlikely.  To have a total
20  bilirubin of 2.3 would imply either that you
21  had cute hepatitis, which he doesn't have,
22  based on the other tests, or that he had
23  chronic liver disease with cirrhosis and that
24  he was decompensated, which he clearly isn't.
25      So, the answer is no, it doesn't have

116

1  D. Clain, M.D.
2  anything to do with hepatitis B.
3  Q.  Why do the other tests show that he
4  doesn't have acute hepatitis?
5  A.  Because if he had acute hepatitis, the
6  AST or the ALT would be ten to 20 times higher.
7  Q.  So, we know, at that point, that he's
8  not acute?
9  A.  Correct.
10  Q.  If you look in the testing form, there's
11  an ability to test for hepatitis B, correct?
12  There's a listing for it.
13  A.  Right.
14  Q.  We know that 15 to 20 percent of
15  immigrant Asians have active hepatitis B?
16  A.  Right.
17  Q.  We know he is an immigrant Asian?
18  A.  You're right.
19  Q.  Do you know of any reason why you would
20  not test for hepatitis B --
21      MS. SHERER:  Objection to the
22      form.
23  Q.  -- for an immigrant Asian who's applying
24  for life insurance?
25      MS. SHERER:  Objection to the

117

1  D. Clain, M.D.
2      form.
3  A.  I could think of a reason.  You know,
4  we're talking here about the test done for life
5  insurance, not in a medical office.
6  Q.  Correct.
7      What reason could you offer?  Why would
8  you not test for it?
9      MS. SHERER:  Objection to the
10      form.
11  A.  Well, first of all, I'm not an
12  underwriter.  I don't see the list.
13  Q.  I understand?
14      MS. SHERER:  Objection.  Just
15      please allow him to finish his answer.
16      Thank you.
17  A.  Medical indications for tests are the
18  same as life insurance indications for tests,
19  and life insurance have their own legal
20  requirements, which I know nothing, but I
21  understand this is not confined to hepatitis B.
22      But there are many other diseases
23  involved of profiling people in order to -- I
24  mean, I'm just talking about general knowledge
25  about profiling people according to their