UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

JEAN LIN,                                          07-CV-3218 (Judge Holwell)

                              Plaintiffs,

        - against –

METROPOLITAN LIFE INSURANCE
COMPANY,

                              Defendant.
-----------------------------------------------------------------x


AFFIDAVIT IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION *IN LIMINE* FOR
AN ORDER PRECLUDING THE EXPERT TESTIMONY OF
DANIEL ZAMARIPPA, M.D. AND DAVID CLAIN, M.D.


STATE OF NEW YORK      )
                       ) ss:
COUNTY OF NEW YORK     )


        ERIC DINNOCENZO, being duly sworn, deposes and says:

        1.      I am associated with the firm of Trief & Olk, attorneys for the plaintiff,

Jean Lin, and make this affidavit in support of plaintiff's Opposition to the defendant,

Metropolitan Life Insurance Company's ("MetLife") Motion for Summary Judgment and

in support of her Cross-Motion to Strike/*In Limine* for an order precluding: (a) MetLife's

medical director, Daniel Zamarippa, M.D. from offering expert medical opinions relating

to hepatitis B at the summary judgment stage or at trial; and (b) precluding its expert

witness, David Clain, M.D., from offering an expert opinion at the summary judgment

stage or at trial concerning the effect of hepatitis B on the mortality of Bang Lin.

INTRODUCTION

2.     On August 11, 2006, Bang Lin passed away from stomach cancer leaving a $1 million life insurance policy issued by MetLife for his wife, Jean Lin, the plaintiff-beneficiary.  As is argued here and in the accompanying memorandum of law, there is a plausible explanation for the failure to disclose Mr. Lin's history of successfully treated hepatitis B in the application due to the negligence of MetLife's agents.  Even if the Court does not so find, the omission of hepatitis B was not a material misrepresentation because it had no effect on Mr. Lin's mortality risk.  In fact, in 1999, five years prior to signing the application, Mr. Lin had been told by his treating physician that he had been cured of the disease.  In contrast, MetLife's experts do not have a sufficient scientific basis to prove that hepatitis B had an impact on his mortality and their testimony should be precluded.


BACKGROUND


3.     The plaintiff, Jean Lin, is a resident of Irvine, California and was married to Bang Lin beginning in 1995 until his death in August 2006 from stomach cancer.  *(Defendant's Exhibit C, Regina Solomon-Stowe Aff.; Exhibit A, Deposition of Jean Lin, pp. 4, 12).*  Both Mr. and Mrs. Lin were born in Taiwan.  *(Exhibit A, p. 13).*  Mrs. Lin is currently 37-years old and a high school graduate with one semester at Queens College.  She has two children from her marriage, Angus and Chelsey, who are ages 12 and 11. *(Exhibit A, p. 8, 13, 15-16).*

4.      During his lifetime, Mr. Lin owned and operated Uni Micro, a computer sales company. *(Exhibit A, p. 14).*  In November 2005, he began experiencing stomach pain and shortly later was diagnosed with stomach cancer. *(Exhibit B, Deposition of Sam Kam, M.D., pp. 77-83).*  He died on August 11, 2006 at the age of 37 as a result of the cancer. *(Defendant's Exhibit C, Regina Solomon-Stowe Aff.).*  His death was unrelated to his hepatitis B, according to his treating physician, Dr. Sam Kam, and MetLife's medical expert, Dr. David Clain, concedes that the cancer was unrelated to hepatitis B. *(Exhibit B, pp. 100-101; Ex. C, Deposition of David Clain, M.D., p. 31).*  Uni Micro is no longer in existence. *(Exhibit A, p. 14).*

## THE APPLICATION FOR THE POLICY

5.      On August 5, 2004, two years before he died, Bang Lin applied for a life insurance policy with MetLife.  The application consisted of two sections: Part I and Part II (Paramedical/Medical Exam). *(Defendant's Exhibit A, ML 00392 - 00400, Regina Solomon-Stowe Aff.).*  Part I was completed in the front office of Uni Micro with only Mrs. Lin and the MetLife agent, Judy Huang, present while Mr. Lin worked in the back office. *(Exhibit A, pp. 43-44).*   Part I was completed in Ms. Huang's handwriting. *(Exhibit D, Deposition of Judy Huang, pp. 20-21)*  She and Mrs. Lin conversed with one another in Mandarin, as they always did. *(Exhibit A, p. 47; Ex. D, pp. 23-26).*

6.      Ms. Huang had previously sold a MetLife policy to the Lins in 1999 with a face amount of $500,000. *(Exhibit A, p. 25).*  According to Mrs. Lin, when completing

3

the 2004 application, Ms. Huang did not ask any of the numerous health questions contained in Part I, and instead only asked her if anything had changed since the issuance of a 1999 policy. *(Exhibit A, pp. 48-50).* In the application there is an entry for "State/Country of Birth" in which Taiwan is entered. *(Defendant's Exhibit A, ML 00394, Regina Solomon-Stowe Aff.).*

7.      Individuals born in Asia, according to MetLife's medical expert, David Clain, M.D., have a 15% to 20% rate of hepatitis B active infection, and about 20% to 30% have at one time been infected with hepatitis B. *(Exhibit C, pp. 101-102).* Hepatitis B is often vertically transmitted from mother to child in the Asian population. *(Defendant's Exhibit M, p. 2, Tomasita Scherer Aff.).*

8.      Twice a year, Ms. Huang, who earned a commission-based salary, would periodically call Mrs. Lin to try to sell her more insurance. *(Exhibit A, pp. 45-46; Ex. E, Deposition of Dennis Westman, pp. 44-45).* At her deposition Mrs. Lin said that she had considered Ms. Huang to be her friend, noting that Ms. Huang would talk to her about both of their children and their schools. *(Exhibit A, pp. 45-47).*

9.      After completing the application, Ms. Huang then gave it to Mrs. Lin, who reads English poorly, and she signed it without reading it. *(Exhibit A, pp. 51-52).* Mrs. Lin then brought the application to her husband, who was working in the office, for his signature and he also did not read the application prior to signing it. *(Exhibit F, Affidavit*

*of Jean Lin).* The reason for not reading it, according to Mrs. Lin, was "because we trusted [Judy Huang]." *(Exhibit A, p. 52).*

10.    On August 18, 2004, when Part II of the application was completed, the only persons present were Mr. Lin and Peggy Chou, a paramedic. *(Defendant's Exhibit A, ML 00392-00393, Regina Solomon-Stowe Aff.; Ex. A, pp. 90-91).* The handwriting on the application does not belong to Mr. Lin. *(Exhibit F).* A blood test and urine sample were taken from Mr. Lin at the time. It registered elevations in bilirubin (2.3 out of normal range of 0.2-1.5) and triglycerides (189 out of normal range of 0-150). Notably, there is a blank entry on the test results for hepatitis B surface antigen (HBsAG), a marker that indicates if a person is a hepatitis B carrier, and which MetLife neglected to test despite the prevalence of hepatitis B in the Asian immigrant population. *(Defendant's Exhibit B, ML 00392-00393, Regina Solomon-Stowe Aff.).*

11.    Plaintiff retained an investigator, who was formerly an FBI agent for 26 years and has conducted thousands of interviews, who telephonically interviewed Ms. Chou on July 21, 2008. Plaintiff submits his affidavit (annexed hereto as Exhibit G) in which he attests that Ms. Chou admitted to him that she may not have a specific memory of Mr. Lin's interview in 2004. Further, in his professional opinion, "Ms. Chou has no independent and specific memory of completing Part II of the application that was signed on August 18, 2004 with Mr. Lin."

12.    As will be explained in plaintiff's memorandum of law, inconsistent answers were given within both Parts I and II of the application raising questions about the reliability of the taking of the application by Ms. Huang and Ms. Chou.

13.    On August 31, 2004, the policy was issued at a "select preferred nonsmoking" rate—the highest rate available for a MetLife policy—despite the known lab elevations. *(Defendant's Exhibit A, ML 00377, Regina Solomon-Stowe Aff.).*  The other available rates are referred to as being in a substandard class and they are in descending order: preferred, standard, and rated.[1]  *(Exhibit E, p. 41).*

## METLIFE ISSUED THE POLICY WITH AN INCORRECT RATE

14.    The MetLife medical director, Daniel Zamarippa, states in paragraph 9 of his affidavit submitted by MetLife that Mr. Lin may have been eligible for a standard rated policy if his hepatitis B had been disclosed.  According to MetLife underwriting guidelines (annexed hereto as Exhibits I, J, and K), Mr. Lin should have originally received a standard rate based on his elevated bilirubin and triglyceride levels from his blood test.  Thus, it can reasonably be concluded that the hepatitis B, if known, would not have had an impact on risk assessment for the policy.

---

[1] The difference in the premium rate between classes was minimal.  For instance, a $500 premium for a select preferred policy would be approximately $600 for a preferred policy and between $700 and $800 for a standard policy. *(Exhibit E, p. 42).*

A.    The Elevated Bilirubin Level

15.    MetLife underwriting guidelines absolutely prohibit the assignment

of either a select preferred or preferred rating when an applicant has an elevation of his

bilirubin level.[2] *(Exhibits I, J, and K (ML 1096)).* Dr. Zamarippa testified at deposition

that the elevated bilirubin level could have been an indicator of liver disease such as

cirrhosis or hepatitis. *(Exhibit M, Deposition of Daniel Zamarippa, M.D., p. 53).*

B.    The Elevated Triglyceride Level

16.    Mr. Lin also had an elevated triglyceride level that disqualified him from

receiving a select preferred or preferred rated policy.  According to the relevant

underwriting guideline, the level that Mr. Lin had of 189 entitled him to a +0 rating

which would warrant a standard rated policy.[3] *(Exhibit K, ML 1091).* Dr. Zamarippa

conceded at his deposition that the elevated triglyceride level could have indicated

---

[2]  An underwriting guideline entitled "Select Preferred/Elite Criteria" states at the last
sentence: "Select Preferred will not be available ... if any other criterion is not met."
Under a column entitled "Liver Enzymes," it states, "No elevations of ... bilirubin
(except for diagnosed Gilbert's Syndrome). *(Exhibit I).* Similarly, a guideline entitled
"Preferred Criteria (All Plans)" states under the "Liver Enzymes" column: "No ratable
results for ... total bilirubin." *(Exhibit J).* A third MetLife guideline (produced by
MetLife on May 16, 2008 after depositions of its employees were completed) provides a
+0 rating for a bilirubin level in the range of Mr. Lin's level; specifically, it designates a
normal range as 0.5 to 1.5 and then provides a + 0 rating for a level up to 3.5 (again, Mr.
Lin's level was 2.3). *(Exhibit K, ML 1096).*

Any interpretation of this last guideline offered by MetLife to the contrary should be
disregarded by this Court given that the document was produced only after the
completion of depositions.  It was not produced in MetLife's October 26, 2007 response
to number 3 of plaintiff's Rule 34 request which asked for: "A copy of MetLife's
underwriting manual (or any other written policies or procedures) in effect at the time of
the submission of the Application by Bang Lin to MetLife and/or its agents, servants, or
employees." *(Exhibit L).*

[3] This guideline was also produced by MetLife at the late date of May 16, 2008, and for
the reasons stated in footnote 2, MetLife should not be able to offer a contrary
interpretation of it for the purposes of the instant summary judgment motion.

hepatitis diabetes or hyperlipidemia. *(Exhibit M, p. 22)*.  Yet MetLife never further investigated either this elevation or that pertaining to bilirubin.

## THE UNDERWRITING GUIDELINES THAT METLIFE RELIES ON HERE DO <u>NOT</u> NEED TO BE FOLLOWED IN PRACTICE

17.    MetLife bases its denial of the policy on its claim that the underwriting guidelines applicable to hepatitis B require a less favorable rating for the policy than was given to Mr. Lin.  But significantly, Dennis Westman, the original underwriter for the policy *(Exhibit E, p. 19)*, testified at deposition that the underwriting guidelines need not be followed:

> Q:    Do you have to follow this or is it just a guide? (referring to Ex. I)
>
> A:    It's just a guide.
>
> Q:    So you are free to accept it or reject it; is that correct?
>
> A:    Yes.
>
> *(Exhibit E, p. 13)*.

18.    He further testified that the underwriting process is subjective in nature:

> Q:    And so, would you agree that underwriting is subjective to the underwriter?
>
> A:    Yes, sir.
>
> *(Exhibit E, p. 14)*.

19.    His testimony also revealed that when he initially evaluated the Lin application, he assigned it a rating that deviated from the underwriting guidelines:

> Q:    And did you make a subjective judgment to issue the policy at a rate which was outside of the criteria listed in Exhibit [I] and Exhibit [J]?

A:     Yes, I did sir.

*(Exhibit E, p. 22).*


20.     Although the select-preferred rating that Mr. Westman gave to Mr. Lin was the product of his subjective judgment, after MetLife commenced its death investigation and discovered that Mr. Lin had a history of successfully treated hepatitis B, it never again consulted with him. *(Exhibit E, p. 17).*  Instead Dr. Zamarippa applied his own underwriting judgment to declare the policy void. *(Exhibit M, p. 29-34).*


## MR. LIN'S HEPATITIS B WAS SUCCESSFULLY TREATED AND "CURED"


21.     Blood testing from Mr. Lin's first visit with Dr. Sam Kam in September 1998 showed that he tested positive for the Hepatitis Be antigen, and had elevated hepatitis B DNA and liver function tests (AST and ALT, also referred to as SGOT and SGPT). *(Defendant's Ex. E, ML  00148-00150, Regina Solomon-Stowe Aff.; Exhibit B, pp. 11, 17-18, 24).*


22.     Beginning October 3, 1998, Mr. Lin was prescribed interferon for his hepatitis B. *(Exhibit B, p. 26).*  He quickly showed improvement seeing that only three weeks later on October 27, 1998, his hepatitis Be antigen test was negative (or undetectable); on November 14, 1998, his liver function tests (AST and ALT) were normal; and on December 15, 1998, his Hepatitis B DNA test (virus count) was normal. *(Defendant's Ex. E, ML 00141, 143, 145, Regina Solomon-Stowe Aff.; Ex. C, p. 65, 67).*

9

According to Dr. Clain, the liver function tests were normal from that point on until the application date in August 2004. *(Exhibit C, p. 65).*

23.    In addition, Mr. Lin was tested for a liver cancer marker, alpha-feto-protein, on both September 5, 1998 and August 7, 2004 (00106) and each time the results were negative. *(Defendant's Exhibit E, ML 00106, 00151, Regina Solomon-Stowe Aff.; Ex. C, p. 60, 68).* Ultrasounds performed of his liver on October 2, 1998 and March 27, 2004 came back normal. *(Defendant's Exhibit E, ML 00154-155, Regina Solomon-Stowe Aff.; Ex. B, pp. 25, 69).* Dr. Kam also explained that a platelet count below 150 indicates cirrhosis, but it never dipped below this level for Mr. Lin. *(Defendant's Exhibit E, Regina Solomon-Stowe Aff.; Ex. B, pp. 21, 25, 69).* In fact, Dr. Clain testified that there was no evidence that Mr. Lin had cirrhosis. *(Exhibit C, p. 48).*

24.    Dr. Kam testified at deposition that he terminated the interferon treatment on February 6, 1999 because the hepatitis B had changed from an active to inactive state. *(Exhibit B, p. 35).* At that time, he told Mr. Lin that he had been successfully treated and, "Your Hepatitis B now is cured, it's inactive."[4] *(Exhibit B, pp. 90-91).*

25.    Over the next five years until Mr. Lin applied for his life insurance policy, he was monitored by Dr. Kam with blood testing approximately every six

---

[4] MetLife goes out of its way to mention that plaintiff is engaged in litigation against John Hancock arising from its denial to pay the claim on a policy on the life of Bang Lin. But, in that case, a brokerage manager wrote an email to the underwriter stating that Mr. Lin was unaware of any conditions that would cause an abnormal blood test and offered to undergo another blood and fluid test. This is direct evidence that Mr. Lin did not believe he had a serious health condition. *(Exhibit N).*

months as was the standard of care. *(Defendant's Ex. E, ML 00106 to 00153, Regina Solomon-Stowe Aff.; Exhibit C, pp. 57-59).* The purpose of the testing was to monitor if his hepatitis B remained inactive, which Dr. Kam said it did. *(Exhibit B, pp. 89, 92).* If Dr. Kam had believed that Mr. Lin's Hepatitis B had become active, he said that he would have resumed treatment with medication, which he did not. *(Exhibit B, p. 64, 75).* Dr. Clain, in fact, has agreed that no further treatment was necessary. *(Exhibit C, p. 57).*

26.    Mr. Lin's course of treatment was consistent with that of a large number of Asians infected with Hepatitis B who either spontaneously recover from the condition or are treated successfully. *(Exhibit O).* Plaintiff's medical expert, Louis Aledort, M.D., has written in a sworn narrative report that: "Mr. Lin's prognosis with respect to his longevity was not reduced by his successful treatment for Hepatitis B."[5] *(Exhibit O).* This opinion in and of itself creates a question of fact as to whether the alleged misrepresentation by Mr. Lin was material in nature.

27.    MetLife claims that Dr. Aledort furnished inconsistent testimony about the risk that Mr. Lin had of developing liver cancer. *(Scherer Aff. ¶ 15).* But his testimony is clear that there was no statistically significant increased risk, and moreover, there is no data to support the contrary theory held by MetLife that an increased risk existed. *(Exhibit P, pp. 101-103, 132-34).*

---

[5] It is insignificant that Mr. Lin did not clear the HBsAg marker, indicating that a person is a hepatitis B carrier, given that seroclearance is a rare event in Chinese patients occurring at an annual incidence of about 0.1% to 0.8%. *(Defendant's Exhibit M, Sherer Aff., "HBsAg Seroclearance in Chronic Hepatitis B in the Chinese: Virological, Histological, and Clinical Aspects," Hepatology, Vol. 39, No. 6, 2004, p. 1694).*

11

28.     Significantly, treatment for hepatitis B was always available that would successfully controlled the virus going into the future. Dr. Kam testified that if Mr. Lin had not died from stomach cancer, and his hepatitis B had reactivated, there was treatment that later became available during his lifetime more advanced than interferon which would have been, "effective in suppressing the virus from an active back into inactive stage." *(Exhibit B, p. 64, 92-93).*  Dr. Clain is in agreement, testifying that the treatment for hepatitis B "almost always" works. *(Exhibit C, p. 48).*

## THE UNDERWRITER TESTIFIED THAT MR. LIN'S HEPATITIS B POSED NO RISK TO HIS MORTALITY

29.     Mr. Westman provided testimony that, considering all of the facts, the hepatitis B would not have impacted the underwriting of the policy. *(Exhibit E, pp. 43-44).*  This is because the successful treatment of hepatitis B indicated to him that there was no increased risk of mortality, which is the significant factor in life insurance underwriting: [6]

Q:      When someone has been successfully treated for hepatitis, do they have a normal life expectancy?

A:      I would say the impairment, as long as they follow their physician's guidance, they are going to have a normal life expectancy, to some point.

Q:      Someone having a normal life expectancy is important in underwriting?

A:      Yes.

---

[6] Dr. Zamarippa, also testified that if a condition does not affect mortality, it has no importance in the underwriting process. *(Exhibit M, pp. 13-15).*

Q:   When you are underwriting you are really considering whether someone has a normal life expectancy or not; correct?"

A:   Yes.

*(Exhibit E, pp. 50-51).*

30.   In light of this exchange, there is certainly a question of fact about whether the failure to disclose the hepatitis B constituted a material misrepresentation.

## THE EXPERT TESTIMONY OF DRS. ZAMARIPPA AND CLAIN

A.   Dr. Zamarippa

31.   As stated above, Dr. Zamarippa was the person who made the decision to deny the policy. In doing so, he was fully aware that he would be saving MetLife a sum of one million dollars. *(Exhibit M, pp. 33-34).*

32.   Dr. Zamarippa received his medical education at the National University of Mexico. He completed training in cardiology in 1990 or 1991, and he first began working for insurance companies as a medical director in 1992. *(Exhibit M, pp. 8-15).* Most of his professional career has been devoted to working for insurance companies. *(Exhibit M, p. 16).* He is not licensed to practice medicine in the United States. *(Exhibit M, p. 54).*

33.   MetLife has used Dr. Zamarippa in this action to provide expert medical testimony about the risk of developing liver cancer facing individuals with hepatitis B.

13

As plaintiff will argue in her accompanying memorandum of law, Dr. Zamarippa is not qualified to offer such a medical opinion, and, moreover, he should be precluded from doing so because MetLife did not disclose him as a medical expert for the purposes of trial nor did it produce a report from him.

B.    Dr. Clain

34.    Dr. Clain is a gastroenterologist who was retained by MetLife in this action. The scientific foundation and rigor of his opinion is insufficient to clear the bar set by the Daubert decision and its progeny.

35.    At his deposition, he conceded that Mr. Lin's interferon treatment was successful, he had normal liver function, and never had any evidence of cirrhosis, liver cancer, or permanent liver damage. *(Exhibit C, pp. 48, 65, 67-68, 74-75).*

36.    To begin with, Dr. Clain lacked basic knowledge of highly relevant statistics that would necessarily form the basis of his opinion. He could not identify the rate of liver cancer in the general public except to say that it was very low. *(Exhibit C, pp. 90, 93-94).* Nor could he even give an approximation of its incidence in the Asian immigrant male population here in America. *(Exhibit C, pp. 96-97).* Without having a grasp of that basic knowledge, it is difficult to see how he could accurately asses the increased risk of liver cancer Mr. Lin supposedly faced compared to the general public.

37.    Predictably, Dr. Clain was unable to provide any reliable statistics or

cite to any published studies suggesting that Mr. Lin was at an increased risk of developing liver cancer. In fact, he was specifically asked if there was any data comparing patients who were successfully treated for hepatitis B and did not have cirrhosis with the general public as it relates to the risk of developing liver cancer. He answered that there was data, but he could not identify its source. *(Exhibit C, p. 87).*

38.    Later in his deposition he was unable to quantify the difference in the risk that he says exists:

Q:    Is there any significant difference in mortality between a successfully treated hepatitis B patient than the general public?

A:    Yes, there is a difference between the two.

Q:    Do you know what it is?

A:    I don't know.

*(Exhibit C, pp. 120-121).*

39.    The most precise that he could get was to say that the increased risk of liver cancer in hepatitis B patients like Mr. Lin, who are successfully treated and without cirrhosis, was: "A few times increased, like three times increased. It varies in different populations, in different places. It isn't the same here and there. It depends on where the study was done, and there aren't that many studies." *(Exhibit C, pp. 90-91).* Yet he testified that there are no relevant studies to support even that opinion:

Q:    Do you know the name of any study that would give me approximate risk of death from liver cell cancer for successfully treated –

A:    Not for successfully. I don't think there is any data on successfully treated patients. That group we talked about previously, I don't believe that there are any long-term studies on that.

Q:    So, with respect to Mr. Lin, are there any studies which would indicate what his risk of death from liver cell cancer would be?

A:    Precisely, no.

Q:    Approximately.

A:    No. I don't think anyone can give you a number.

*(Exhibit C, p. 111).*

40.    He further flatly conceded that: "we don't know what the effect is of treatment [for hepatitis B] in preventing liver cancer." *(Exhibit C, pp. 105-106).*

41.    Dr. Clain further was asked about the blank entry for hepatitis B on the blood test result. "In my medical office," he testified, "if someone was an Asian immigrant, if I was a primary care doctor, I would test them for hepatitis B." *(Exhibit C, p. 118).* Likewise, MetLife, knowing that Mr. Lin was an Asian immigrant with an elevated bilirubin level, it should have tested him for this marker.

WHEREFORE, Plaintiff respectfully request that this Court deny the defendant's Motion for Summary Judgment and grant plaintiff's Cross-Motion to Strike/*In Limine* for an order precluding: (a) MetLife's medical director, Daniel Zamarippa, M.D. from offering expert medical opinions relating to hepatitis B at the summary judgment stage or at trial; and (b) precluding its expert witness, David Clain, M.D., from offering an expert opinion at the summary judgment stage or at trial concerning the effect of hepatitis B on the mortality of Bang Lin.

_____
ERIC DINNOCENZO

Sworn to before me this
1st day of August, 2008

_____
Notary Public

Randi Yerman
Notary Public, State of New York
No. 01YE4723089
Qualified in Queens County
Commission Expires September 30, 2010