**Lin v. MetLife**

**07 civ. 3218**

# EXHIBIT E

# ORIGINAL

1

2  UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

3  ---------------------------------------------X

JEAN LIN,

4

5                         Plaintiff,

6

                -against-          07-CV-3218

7                                  (Judge Holwell)

8

METROPOLITAN LIFE INSURANCE COMPANY,

9

10                       Defendant.

---------------------------------------------X

11

12                      DATE:  February 22, 2008

13                      TIME:  10:15 a.m.

14

15            DEPOSITION of the Defendant, by

16            DENNIS W. WESTMAN, taken by the

17            Plaintiff, pursuant to a Court Order,

18            held at the offices of Trief & Olk, 150

19            East 58th Street, New York, NY 10155

20            before Chanie Berman, a Shorthand

21            Reporter and Notary Public of the State

22            of New York.

23

24

25

1

2      Q     What do you mean by a reference

3  tool, something you have to follow or you can

4  consider or you can reject?

5      A     When you get the requirements on

6  an exam you will look at this to see if the

7  blood pressures fall within the guidelines.

8      Q     Do you have to follow this or is

9  it just a guide?

10     A     It's just a guide.

11     Q     So you are free to accept it or

12 reject it; is that correct?

13     A     Yes.

14     Q     With respect to underwriting, even

15 if there are written criteria and this says

16 criteria, do you have a rule?

17     A     Yes.

18           MS. SHERER:  Objection to the

19           form.

20           MR. TRIEF:  What is the objection?

21           MS. SHERER:  I feel you are

22           badgering the witness.

23           MR. TRIEF:  What is the objection

24           to the form?  The witness is saying uh

25           huh and --

1

2         (At this time an off-the-record

3         discussion took place.)

4         MR. TRIEF:  Can I have the

5    question read back, please?

6         (At this point, requested portion of

7         testimony was read back.)

8    Q      Do you see Exhibit 1 has the word

9    criteria on it?

10   A      Yes.

11   Q      If an applicant does not meet

12   criteria that is set forth on Exhibit 1, are

13   you free still to write select preferred if

14   you want to?

15   A      Yes, we are.

16   Q      And so, would you agree that

17   underwriting is subjective to the

18   underwriter?

19   A      Yes, sir.

20   Q      There is underwriting when the

21   policy is initially applied for; correct?

22   A      Yes.

23   Q      If someone died within the

24   contestability period, is there also an

25   underwriting component to that?

1
2          asking questions that have been asked

3          repeatedly.

4          Q      Have you ever been involved in

5     evaluating underwriting during the

6     contestability period, upon the death of a

7     policyholder?

8          A      Yes.

9          Q      Were you asked in this case to

10    consult?

11         A      Not on the death claim.

12         Q      You are here today?

13         A      I am here today.

14         Q      At my request?

15         A      Yes, at your request.

16         Q      Correct, but I am asking when the

17    decision was made to reject the claim, were

18    you consulted before that decision?

19         A      No.

20         Q      No one asked you what you would

21    have done?

22         A      No.   These go to the medical

23    department, medical director.

24         Q      Is it the policy and procedure of

25    MetLife not to talk to the original

```
 1
 2    department.  The underwriters don't get
 3    talked to about the death claims.
 4         Q     Okay.  Did you underwrite the Bang
 5    Lin --
 6         A     Yes, I did, sir.
 7         Q     -- policy?
 8         A     (No response).
 9         Q     Were you the sole underwriter who
10    wrote it?
11         A     Yes, sir.
12         Q     Were you familiar with the
13    criteria which is listed in both Exhibit 1
14    and Exhibit 2 of today's deposition?  You
15    take your time, as long as you need, to look
16    at them.
17         A     Yes, sir.
18         Q     Did Mr. Lin meet the criteria
19    which is listed on Exhibit 1 or Exhibit 2?
20         A     Yes.
21         Q     Did Mr. Lin have any elevated
22    bilirubins?
23         A     Yes, he did, sir.
24         Q     Is that one of the criteria which
25    are listed in Exhibit 1 and Exhibit 2 of
```

1

2       A    No.

3       Q    And he had elevated bilirubin;

4  correct?

5       A    Correct, yes.

6       Q    And did you make a subjective

7  judgment to issue the policy at a rate which

8  was outside of the criteria listed in Exhibit

9  1 and Exhibit 2?

10      A    Yes, I did sir.

11      MS. SHERER:  Objection to the

12    form.

13      Q    Does he have elevated cholesterol?

14      A    No, sir.

15      Q    Did he have elevated

16  triglycerides?

17      A    Yes, sir.

18      Q    What does that mean?

19      A    It's an indication of possible

20  cardiac.

21      Q    Does the MetLife criteria indicate

22  that he should not have received the rate if

23  he had elevated triglycerides?

24      A    They weren't elevated enough that

25  I would have had a concern.

1

2       Q     That wasn't the question.  What

3   rates were available to, that is what MetLife

4   life insurance rates were available to Mr.

5   Lin, at that time?

6              MS. SHERER:  Objection to the

7         form.

8       A     They would all be substandard.

9       Q     Substandard or standard?

10      A     They would all be what we consider

11  a substandard class.  The best class

12  available would be select preferred and then

13  you would consider the rest to be a

14  substandard class.

15      Q     Preferred is substandard also?

16      A     Yes.

17      Q     Go through the rates that were

18  available.

19      A     Select, Select Preferred,

20  Preferred, Standard, Table C, Table D.

21      Q     What is the difference in rates

22  between select preferred and preferred?

23      A     The premiums.

24      Q     What difference in premium, 50%,

25  10%, 100%?

1

2       A       It would depend on the face amount

3       and stuff.  You are looking at dollars.

4       Q       Well, let's assume there was a

5       premium of $500 for Select Preferred.  How

6       much more would Preferred be?

7       A       Preferred would probably be 600.

8       Q       How much would standard be?

9       A       Probably could drop to 7, 800.

10      Q       That would be, the rate change

11      charge would be the subjective view of the

12      medical director, correct, at that point?

13      A       No, you would key into the system

14      what we call debits and it would assess the

15      premiums versus as you look on here there is

16      debits.  75150.  When you key into the

17      system, the system gives out the -- that is

18      an actuarial.

19      Q       Wouldn't the medical director have

20      discretion to put the applicant in whatever

21      category he wanted to?

22      A       Yes.

23      Q       He could choose either Standard,

24      Preferred or Select Preferred.  It was up to

25      his discretion?

1

2          A     Yes, sir.

3          Q     Would it have been significant to

4    you if the doctor who was treating Mr. Lin

5    for hepatitis B with interferon in 1999 said

6    he was cured?

7          A     Hepatitis B is not an impairment

8    that is going to be cured.  You are going to

9    be followed with that.  You are going to

10   change your eating habits and lifestyle.

11         Q     Would it have been significant to

12   you if the doctor who was treating Mr. Lin

13   and treated Mr. Lin with interferon in '99

14   said he was cured?

15              MS. SHERER:  Objection to the

16         form.  Asked and answered.

17         A     When you say cured, it's not

18   cured.  It's remission.

19         Q     Would it have been significant to

20   you if he said it was cured?

21         A     I would have assumed that it was

22   in remission.

23         Q     Then you would have referred it to

24   the medical director?

25         A     It would have gone to the medical

WESTMAN                    44

department with a recommendation with a

better scenario than some of the scenarios in

the reference table you gave me.

Q      Exhibit 3?

A      Yes.

Q      So you would have recommended

something better than is shown in Exhibit 3?

A      Yes.

Q      People who sell the policies with

MetLife, what are they called?  Are they

called salesmen?

A      Agents.

Q      Are agents the equivalent of

salesmen when it comes to life insurance

policies?

A      Yes.

Q      And it's their object to sell as

much as they can; correct?

MS. SHERER:  Objection to the

form.

A      They assess the need and purposes

of the insurance.

Q      They are paid on how much

insurance they sell; correct?

1                           WESTMAN                   45

2           A     Yes, sir.

3           Q     And they are paid a percentage of

4      the premium; correct?

5           A     Yes.

6           Q     Are you a salaried employee?

7           A     Yes, sir.

8           Q     So there is a difference in how

9      you are compensated?

10          A     Yes, sir.

11          Q     Do different salesmen, depending

12     upon volume, have different relationships

13     with underwriting?

14          A     Yes, sir.

15          Q     Can you explain the differences?

16          A     Agents that have been with the

17     company and have produced a certain volume of

18     business are with what we call the Elite and

19     Contier Service Underwriting.

20          Q     What does that mean, contier?

21          A     It's a level that the agents have

22     of business that they have sold to be with

23     this unit.

24          Q     What is the effect of being with

25     the Elite and Contier?

1
2    is issued so the applicant or client gets a
3    copy of it.
4        Q    Is Exhibit 4 and 5 together the
5    application or is it only one of the
6    exhibits, in your opinion?
7        A    In my opinion, you get the
8    application to review in the beginning and
9    this, yes, this becomes part of the
10   application when received.
11             MS. SHERER:   Can you give --
12       A    Five is the application.   Number
13   four becomes part of the application when
14   it's completed by the client.
15       Q    So when it's completed by the
16   client both 4 and 5 are the application?
17       A    Are the application.
18       Q    Okay.  Got it.  Thank you.  When
19   someone has been successfully treated for
20   hepatitis, do they have a normal life
21   expectancy?
22       A    I would say the impairment, as
23   long as they follow their physician's
24   guidance, they are going to have a normal
25   life expectancy, to some point.

1

2      Q      Someone having a normal life

3   expectancy is important in underwriting?

4      A      Yes.

5      Q      When you are underwriting you are

6   really considering whether someone has a

7   normal life expectancy or not; correct?

8      A      Yes.

9      Q      The treatments for hepatitis B has

10  changed over the years; has it not?

11             MS. SHERER:  Objection to the

12        form.

13      Q      If you know?

14      A      I would assume yes.

15      Q      In 1999 you treated hepatitis B

16  with interferon; correct?

17      A      Yes.

18      Q      In the mid 2000s, you could take a

19  pill; correct?

20             MS. SHERER:  Objection to the

21        form.

22             MR. TRIEF:  If you know.

23             MS. SHERER:  Lack of foundation.

24      Q      Are you aware of that?

25      A      I will assume there is treatment,