<u>**Lin v. MetLife**</u>

**07 civ. 3218**

# EXHIBIT M

```
 1                                                              1

 2   UNITED STATES DISTRICT COURT

 3   SOUTHERN DISTRICT OF NEW YORK

 4   ------------------------------------X

 5   JEAN LIN,                                    07-CV-3218

 6                  Plaintiff(s),

 7             -against-

 8   METROPOLITAN LIFE INSURANCE.

 9                  Defendant(s).

10   ------------------------------------X

11                       150 East 58th Street

12                       New York, NY  10155

13                       December 14, 2007

14                       1:15 P.M.

15

16        EXAMINATION BEFORE TRIAL OF DR. DANIEL

17   ZAMPARRIPA, a witness on behalf of the Defendant

18   herein, taken by the Attorneys for Plaintiff, held

19   at 150 East 58th Street, New York, New York, 10155,

20   on Friday, December 14, 2007, at 1:15 O'clock P.M.

21

22

23

24

25
```

2

APPEARANCES:

TRIEF & OLK
Attorneys for Plaintiff
150 E. 58th Street
34th Floor
New York, NY 10155
BY: Ted Trief
BY: Eric Dinnocenzo, Esq.

TOMASITA SHERER, ESQ.
METROPOLITAN LIFE INSURANCE COMPANY
Attorneys for Defendant
One Metlife Plaza
27-01 Queens Plaza North
Long Island City, NY 11101

* * *

3

IT IS HEREBY STIPULATED AND AGREED by and between(among) counsel for the respective parties hereto, that:

All rights provided by the C.P.L.R., including the right to object to any question, except as to form, or to move to strike any testimony at this(these) examination(s), are reserved, and, in addition, the failure to object to any question or to move to strike any testimony at this(these) examination(s) shall not be a bar or waiver to make such motion at, and is reserved for the trial of this action;

IT IS FURTHER STIPULATED AND AGREED by and between(among) counsel for the respective parties hereto, that this(these) examination(s) may be sworn to by the witness(es) being examined, before a Notary Public other than the Notary Public before whom this(these) examination(s) was (were)

4

begun; but the failure to do so, or to return the original of this (these) examination(s) to counsel, shall not be deemed a waiver of the rights provided by Rules 3116 and 3117 of the C.P.L.R., and shall be controlled thereby;

IT IS FURTHER STIPULATED AND AGREED by and between(among) counsel for the respective parties hereto, that this(these) examination(s) may be utilized for all purposes as provided by the C.P.L.R.;

IT IS FURTHER STIPULATED AND AGREED by and between(among) counsel for the respective parties here, that the filing and certification of the original of this(these) examination(s) shall be and the same hereby are waived;

IT IS FURTHER STIPULATED AND AGREED by and between(among) counsel for the respective parties hereto, that a copy of the

Dr. Daniel Zamarippa   5

within examination(s) shall be furnished to counsel representing the witness(es) testifying, without charge.

IT IS FURTHER STIPULATED AND AGREED by and between(among) counsel for the respective parties hereto, that all rights provided by the C.P.L.R., and Part 221 of the Uniform Rules for the Conduct of Depositions, including the right to object to any question, except as to form, or to move to strike any testimony at this examination is reserved; and in addition, the failure to object to any question or to move to strike any testimony at this examination shall not be a bar or waiver to make such motion at, and is reserved to, the trial of this action.

* * *

```
1              Dr. Daniel Zamarippa            8
2       A.   No, it was a health insurance matter.
3       Q.   Have you ever testified at trial?
4       A.   No, no.
5       Q.   Are you a medical doctor?
6       A.   Yes.
7       Q.   So let me go through your education, okay,
8            Where did you go to college?
9       A.   I went in Mexico City. I have my medical
10   degree in Mexico City, in internal medicine in the
11   Spanish Hospital, and cardiology in the Spanish
12   Hospital in Mexico City.
13      Q.   Remember, the question. The question was
14   did you go to college, where did you go to
15   college?
16      A.   Mexico City.
17      Q.   What was the name of the college?
18      A.   University -- National University of
19   Mexico.
20      Q.   And when did you graduate?
21      A.   '85.
22      Q.   What was your degree in?
23      A.   Medical doctor there. My degree was
24   medical doctor.
25      Q.   From college?
```

```
1              Dr. Daniel Zamarippa            9
2            MS. SHERER: He doesn't understand
3       "college." University?
4       A.   "University" and "college" is the same in
5    Mexico.
6       Q.   We're in the U.S., so in the U.S., you go
7    to college first, then you go to medical school
8    afterwards?
9       A.   That's different.
10      Q.   So explain it.
11      A.   That's different, you go six years to
12   medical school after high school.
13           MS. SHERER: After high school.
14      Q.   So you spent six years at a medical school
15   which includes college and medical school?
16      A.   Yes.
17      Q.   And was that the name of the place you
18   just gave us?
19      A.   Yes.
20      Q.   And you finished in what year?
21      A.   '85.
22      Q.   And then where did you go for training?
23      A.   Internal medicine, in the Spanish
24   Hospital, and that was three years -- well, two
25   years, and then cardiology in the Spanish Hospital
```

```
1        Dr. Daniel Zamarippa              10
2   in Mexico City.
3       Q.   And when did you finish cardiology?
4       A.   '90, or '91 -- '90.
5       Q.   Then where did you go?
6       A.   My private practice.
7       Q.   Your private practice in Mexico?
8       A.   In Mexico City.
9       Q.   And how long were you in private practice
10  in Mexico City?
11      A.   Ten years.
12      Q.   Until 2001?
13      A.   2000.
14      Q.   And was it continually in cardiology?
15      A.   Yes.
16      Q.   And cardiology is the study of the
17  heart?
18      A.   Yes.
19      Q.   And then where did you go?
20      A.   Well, then I went to -- well, I stopped my
21  private practice, because I stopped my private
22  practice when I was -- I started my private
23  practice, I entered into this insurance medicine in
24  Mexico City, and that's the reason I changed my
25  private practice to the insurance medicine.
```

```
1        Dr. Daniel Zamarippa              11
2       Q.   What's insurance medicine? I don't think
3   we have something like that in the U.S.
4       A.   Yes.
5       Q.   What's insurance medicine?
6       A.   Insurance medicine is -- well, I'm a
7   member of American Academy of Insurance Medicine.
8       Q.   What is that?
9       A.   Doctors who work in the insurance
10  industry.
11      Q.   For insurance companies?
12      A.   Yes.
13      Q.   You don't get Board Certified in insurance
14  medicine, do you?
15      A.   No, you only have some kind of diploma on
16  insurance medicine.
17      Q.   Well insurance medicine doesn't treat
18  patients, do they?
19      A.   No.
20      Q.   And why did you leave private practice to
21  go into insurance medicine in Mexico?
22      A.   Because I start -- when I start my private
23  practice, I was medical director for insurance
24  company, and this was my side job when I was in the
25  private practice, and then I changed my private
```

```
1        Dr. Daniel Zamarippa              12
2   practice to insurance medicine.
3       Q.   How long were you a medical director for
4   insurance medicine?
5       A.   Since '93, '92.
6       Q.   Health insurance company?
7       A.   No, life insurance.
8       Q.   And what is the job of medical director of
9   life insurance company?
10      A.   Basically underwriting, medical
11  underwriting.
12      Q.   What does that mean?
13      A.   You review the applications and you
14  determine if the client applied, is the right -- the
15  life insurance, the expected mortality --
16           When the client applied for life
17  insurance, there's some questions, some medical
18  questions, and if he has some kind of disease or
19  some kind of disease, some kind of disease, you
20  review that disease and see if that medical disease
21  has some relevance to the life expectancy.
22      Q.   I think you used the word "mortality"?
23      A.   Yes.
24      Q.   And that's life expectancy?
25      A.   That's life expectancy.
```

```
1        Dr. Daniel Zamarippa              13
2       Q.   And if his medical condition has no
3   bearing on his life expectancy, then it's
4   irrelevant, correct?
5       A.   It depends. It goes according to the
6   underwriting guidelines.
7       Q.   Well the underwriting guidelines are
8   looking at mortality expectations, correct?
9       A.   Yes.
10      Q.   And if a medical condition has no bearing
11  on morality it should have no bearing on
12  underwriting, correct?
13      A.   Let me put an example. You hit your toe
14  you have a fracture of your foot, there's no impact
15  on life expectancy or morality.
16      Q.   I understand that, but that wasn't the
17  question. The question was if the medical condition
18  has no impact on mortality, then it should have no
19  impact on underwriting?
20           MS. SHERER:  Objection to the form.  You
21      can answer.
22      A.   Depends on your underwriting guidelines.
23  Every company has different underwriting
24  guidelines.
25      Q.   The underwriting guidelines are supposed
```

```
                Dr. Daniel Zamarippa              14
 2   to be accounting for mortality in a life insurance
 3   setting?
 4       A.  Yes.
 5       Q.  So the underwriting guidelines are suppose
 6   to look at someone's mortality based upon their
 7   medical condition, correct?
 8       A.  Every company has different underwriting
 9   guidelines.
10       Q.  I didn't ask that question, I understand
11   they do.  I understand that every company has
12   different underwriting guidelines, but whatever
13   company we're talking about, it's supposed to be
14   dealing with mortality, correct?
15           MS. SHERER:  Objection to form.
16       A.  Yes.
17       Q.  And if a medical condition has no bearing
18   on mortality, then it should have no bearing on
19   underwriting, would you agree?
20           MS. SHERER:  Objection to form.
21       A.  When you review the deceased, you see if
22   that deceased has an impact on mortality.
23           MR. TRIEF:  Could you read the question
24   back.
25           (Whereupon, the referred to question was
```

```
                Dr. Daniel Zamarippa              15
 2   read back by the Court Reporter.)
 3       A.  Yes.
 4       Q.  When did you start in relationship to
 5   being a practicing physician with your medical --
 6   with your insurance medicine?
 7       A.  I didn't understand.
 8       Q.  You said you were the medical director for
 9   an insurance company?
10       A.  For an insurance company, yes.
11       Q.  That was what year?
12       A.  '92.
13       Q.  When did you start practicing medicine?
14       A.  Practicing medicine in '91, practicing
15   medicine you can be a doctor, you can practice
16   medicine and then during your training in cardiology
17   and internal medicine, you're practicing medicine.
18       Q.  When did you finish your cardiology
19   training?
20       A.  March of -- the exact date is, March 1990
21       Q.  And when did you become an insurance
22   medical director?
23       A.  '92.
24       Q.  What month?
25       A.  May '92.
```

```
                Dr. Daniel Zamarippa              16
 2       Q.  Would you agree that most of your
 3   professional career has been working for life
 4   Insurance?
 5       A.  Yes.
 6       Q.  Are you a hematologist?
 7       A.  No.
 8       Q.  Are you a liver specialist?
 9       A.  No.
10       Q.  Are you a Hepatitis B specialist?
11       A.  No.
12       Q.  What is Hepatitis B?
13       A.  Hepatitis B is a disease, it's a viral
14   disease.  You have an infection from a virus that
15   affects your liver.
16       Q.  Pardon me?
17       A.  That affects your liver, you have
18   infection of your liver.
19       Q.  Well does --
20       A.  A viral infection of your liver.
21           MS. SHERER:  Viral?
22       A.  Viral affection.
23       Q.  Does Hepatitis B always affect your
24   liver?
25       A.  Yes.
```

```
                    Dr. Daniel Zamarippa              22
 1
 2    read back by the Court Reporter.)
 3         MS. SHERER:  Objection.  You may not like
 4    the answer, but you have to ask a different
 5    question, and you'll get the answer to the
 6    question.
 7         MR. TRIEF:  I have to get an answer to the
 8    question asked.
 9         MS. SHERER:  Ask the question and he'll
10    answer it.
11         MR. TRIEF:  Can you read it back.
12         (Whereupon, the referred to question was
13    read back by the Court Reporter.)
14    A.   I don't understand your question.
15    Q.   That's a fair response.
16         "Yes, no, I don't know, I don't
17    understand, I get all of those."
18         What kind of doctor treats Hepatitis B?
19    A.   Gastroenterologist.
20    Q.   Anybody else?
21    A.   There's some liver disease doctors.
22    Q.   What are they called?
23    A.   Hepatologist.
24    Q.   Anybody else?
25    A.   Internal medicine doctors.
```

```
                    Dr. Daniel Zamarippa              23
 1
 2    Q.   Anyone else?
 3    A.   Primary care physician can treat a
 4    Hepatitis B.
 5    Q.   What is Interferon (Ph. Spelled.)
 6    A.   Interferon is a drug to treat -- it's a
 7    drug you can have Interferon in your blood, and
 8    there's production of alfa, there's a medication
 9    right now on the market.
10    Q.   Is Interferon ever introduced into a
11    patient to treat Hepatitis B?
12    A.   Interferon, the introduction of Interferon
13    was for several -- you can treat several disease
14    with Interferon.  I don't know if was specifically
15    for Hepatitis B, but they started with the treatment
16    of Hepatitis with Interferon years and years ago, it
17    was only for Hepatitis B when they started.
18         MR. TRIEF:  What was the question?
19         MS. SHERER:  I didn't think you were
20    finished.  Were you finished?
21         Can you read the questions back?
22    Q.   Can you answer the question yes or no?  If
23    you can't, you can't.
24         (Whereupon, the referred to questions was
25    read back by the Court Reporter.)
```

```
                    Dr. Daniel Zamarippa              24
 1
 2    Q.   Could you answer that question?
 3    A.   Yes.
 4         MR. TRIEF:  Just, if you can answer my
 5    questions yes or no, answer them that way,
 6    because it will speed it along, because I need
 7    to have a yes or no if it's in there.  If it
 8    can be done.  So I'll just repeat the question
 9    and ask it again, it just takes the deposition
10    longer.
11         MS. SHERER:  And I would like to say that
12    I would like you to answer the question, to
13    best of your ability truthfully and accurately
14    and completely to the best of your ability.
15         MR. TRIEF:  Right, but I'm asking if you
16    can answer a question "yes" or "no" start with
17    the words "yes" or "no," and that's my
18    instruction, and you have to follow my
19    instruction, unless there somehow improper or
20    abusive, but I think that the questioners are
21    allowed to ask the witness to answer questions
22    with "yes" or "no" if they can.
23         MS. SHERER:  There's no question pending.
24    Q.   Are there signs, when a blood test is
25    taken, that demonstrate Hepatitis B?
```

```
                    Dr. Daniel Zamarippa              25
 1
 2    A.   Sorry, can you repeat question?
 3    Q.   Are there blood tests which can be taken
 4    which show signs of Hepatitis B?
 5    A.   Yes.
 6    Q.   And are there certain Markers of Hepatitis
 7    B in the blood?
 8    A.   Yes.
 9    Q.   What are those markers called?
10    A.   You can call them "markers" we have the
11    antigens, there's two different.  Well there's
12    several Markers.  One of the markers is a BS antigen
13    and BE antigen.
14    Q.   And what does these markers demonstrate?
15    A.   Infection.
16    Q.   And do they ever indicate clearing of
17    infection?
18    A.   No.
19    Q.   Well, are there positive markers and then
20    negative markers?
21    A.   Yes, there's positive markers, you can be
22    from, there's two.  Can I go beyond this question?
23         MS. SHERER:  Yes, you can.
24         MR. TRIEF: Please, that's inappropriate.
25    The instructions come from me.  In the middle
```

Dr. Daniel Zamarippa                    26

1   
2   of my deposition, you don't instruct your
3   witness, they violate the Federal rules, please
4   don't do that.
5       MS. SHERER: Is disagree, and I will
6   defend this deposition, it's my obligation.
7       MR. TRIEF: I understand that, but
8   speaking objections, interruptions, those all
9   violate our rules, they are.
10      MS. SHERER: You can answer the
11  question.
12      MR. TRIEF: I don't need you to tell him
13  when --
14      MS. SHERER: I can make my statements on
15  the record.
16      MR. TRIEF: No, you're not suppose to make
17  any statements.
18      MS. SHERER: Absolutely I can, I totally
19  disagree.
20      MR. TRIEF: If there's a privileged
21  question, you can be involved in it, if it
22  clearly abusive, you can stop me from doing it,
23  but you can't comment on whether my questions
24  are good or bad or indifferent or whether he
25  could answer or couldn't answer it or anything

Dr. Daniel Zamarippa                    27

1   
2   like else like that. It's totally
3   inappropriate.
4       Can I have the question read back?
5       MS. SHERER: And I disagree that I did
6   that on the record.
7       MR. TRIEF: Can you read the question
8   back.
9       (Whereupon, the referred to question was
10  read back by the Court Reporter.)
11      Q.  Doctor, can you answer the question?
12      A.  Yes.
13      Q.  And what are the positive and negative
14  markers?
15      A.  You have -- when you don't have infection,
16  there's -- when you don't have infection, and you
17  never had the infection, the markers are negative.
18  If you have the infection, the markers are positive.
19  There's different markers, you can have that.
20      Q.  If you had had the infection, right, and
21  then the markers go from positive to negative, does
22  that mean anything to you?
23      A.  No, because -- no, because there's
24  again -- again, they're different markers, and you
25  can have for example, E antigen positive, and then

Dr. Daniel Zamarippa                    28

1   
2   negative for a long time. That means you have
3   active infection, active viral copies in your blood,
4   but you always have one marker that always will be
5   positive.
6       Q.  That means you've had it in the past,
7   correct?
8       A.  You've had the infection.
9       Q.  If you have -- you always have an active
10  infection once you've had Hepatitis B?
11      A.  No, you can have an inactive period,
12  process or stage.
13      Q.  And if you become inactive and you remain
14  inactive for a period of time, are you at any
15  greater risk of death than the general public?
16      A.  Yes.
17      Q.  Does Hepatitis B occur in greater numbers
18  in certain communities in this country?
19      A.  I don't have the exact numbers, but in
20  certain communities in this country, there's more --
21  there's a tendency to have more infection in the
22  Asian population.
23      Q.  So the answer is yes to that question?
24      A.  Yes.
25      Q.  Do you know how much greater Hepatitis B

Dr. Daniel Zamarippa                    29

1   
2   is in the Asian community, than it is in the
3   Caucasian community or African American community?
4       A.  I don't have the exact number.
5       Q.  Do you know what an approximate number
6   is?
7       A.  No, I only have the exact number from the
8   China -- the Chinese populations.
9       Q.  Was Mr. Lin Chinese?
10      A.  I don't know.
11      Q.  What is the number from the Chinese
12  population?
13      A.  One in every ten.
14      Q.  And is the Chinese mortality rate lower --
15  is the Chinese mortality rate lower in this country
16  than the average person?
17      A.  I don't know.
18      Q.  What's the infection rate in the general
19  public in the U.S.?
20      A.  I don't know that number.
21      Q.  Approximately?
22      A.  I don't know the number.
23      Q.  Did you speak to anybody in underwriting
24  about your conclusion that the policy would not
25  approved as issued with respect to the Mr. Lin?

```
                    Dr. Daniel Zamarippa                30
 2    A.  No.
 3    Q.  Were you the sole Judge and Jury of
 4   that?
 5    A.  Yes.
 6    Q.  Did you ever speak to anybody who
 7   originally wrote the policy?
 8    A.  No.
 9    Q.  Did you ever speak to the original
10   underwriter?
11    A.  No.
12    Q.  Who is the original underwriter?
13    A.  Dennis Westman (Ph. Spelled.)
14    Q.  How do you spell?
15    A.  W-E-S-T-M-A-N.
16    Q.  Is he still with the company?
17    A.  Yes.
18    Q.  Where is he located?
19    A.  Somerset New Jersey.
20    Q.  Same office as you?
21    A.  Yes.
22    Q.  Is he available to testify and are there
23   any reasons he can't?
24         MS. SHERER: Objection to the form.
25    A.  I don't know.
```

```
                    Dr. Daniel Zamarippa                31
 2    Q.  Do you speak to him regularly?
 3    A.  Yes.
 4    Q.  When was the last time you saw him?
 5    A.  Last week.
 6    Q.  Did he appear in good health to you?
 7    A.  I don't know. He appeared in good health,
 8   yes.
 9    Q.  That's all I asked you, I didn't ask you
10   could you guarantee his good health, just if he
11   appeared in good health?
12         MS. SHERER: Objection to the form.
13    A.  Yes.
14    Q.  And you, at anytime, did you speak to him
15   about Mr. Lin?
16    A.  No.
17    Q.  Did you think his opinion was relevant?
18    A.  No.
19    Q.  Why not?
20    A.  Because he underwrite the case and there's
21   no positive answers, so there's no yes answers on
22   the questions, so he underwrites the case
23   correctly.
24    Q.  Well, when a policy is rejected during --
25   withdrawn.
```

```
                    Dr. Daniel Zamarippa                32
 2         There is something called the
 3   "contestability period" or the incontestability
 4   period, correct?
 5    A.  Yes.
 6    Q.  And that in New York is two years,
 7   correct?
 8    A.  Yes.
 9    Q.  And if a policy is issued and the insured
10   dies within the two years, then Met Life can go back
11   and do an investigation as to whether there was any
12   misrepresentation in the policy, correct?
13    A.  That's the claim process I. Don't know
14   the claim process.
15    Q.  You don't know the answer to that
16   question?
17    A.  No, I don't know the answer.
18    Q.  During the -- do you know that this policy
19   involves someone who died during the contestability
20   period?
21    A.  Yes.
22    Q.  Who asked you to issue an opinion in this
23   case, who was the person?
24    A.  Shelby Lyons.
25    Q.  And who is Shelby Lyons?
```

```
                    Dr. Daniel Zamarippa                33
 2    A.  She's from the Warrick Department (Ph.
 3   Spelled.)
 4    Q.  What's her title?
 5    A.  I don't know.
 6    Q.  How did she communicate with you?
 7    A.  She sent me the file with this page
 8   (Indicating.)
 9    Q.  Did you know the policy was during the
10   contestability period?
11    A.  Yes.
12    Q.  And did you know if you -- if you said
13   that there was a material misrepresentation, Met
14   Life wouldn't pay on the policy?
15    A.  Yes.
16    Q.  And did you know if you said it was not
17   material, then they would pay on the policy?
18         MS. SHERER: Objection to the form.
19    A.  Yes.
20    Q.  And did you know that your opinion
21   concerning that, would effect whether Met Life paid
22   a million dollars?
23    A.  To pay, yes, to pay the claim, that Mr.
24   Lin has.
25    Q.  It was a million dollars, correct?
```

```
                                    Dr. Daniel Zamarippa          34
 2     A.  Yes.
 3     Q.  So a million dollars was riding on your
 4  review as to whether Hepatitis B was a material or
 5  not, correct?
 6         MS. SHERER:  Objection to the form.
 7     A.  Yes.
 8     Q.  And you work for Met Life, correct?
 9     A.  Yes.
10     Q.  And you consulted with no one else,
11  correct?
12     A.  No one else.
13     Q.  Now you indicated before that if there was
14  a misrepresentation -- withdrawn.
15         Are all misrepresentations on the
16  application material in your opinion?
17     A.  Yes.
18     Q.  So if you have a misrepresentation, it is
19  therefore material, correct?
20         MS. SHERER:  Objection to the form.
21     A.  Yes.
22         MR. TRIEF:  Can I have that blood test.
23         Can I have the underwriting page.
24         Can you mark that.
25         (MARKED FOR ID:  Plaintiff's 5.)
```

```
                                    Dr. Daniel Zamarippa          35
 2         (Handing.)
 3         These are the first underwriting documents
 4  provided and these are marked.
 5     Q.  Doctor if you would look at Exhibit 5, we
 6  marked 4 exhibits with the last witness.  So
 7  that's why you have Number 5 for today, but if you
 8  would look at it, are you familiar with this
 9  particular document?
10     A.  Yes.
11     Q.  And what is it?
12     A.  This is the guidelines to qualify for
13  select preferred elite policy.
14     Q.  And is that the policy that Mr. Lin got?
15     A.  Yes.
16     Q.  And is this a record kept in the ordinary
17  course of business of Met Life?
18     A.  Sorry?
19     Q.  Is this a record kept in the ordinary
20  course of business of Met Life?
21     A.  Yes.
22     Q.  And is it in the ordinary course of
23  business to keep such a record, correct?
24     A.  Yes.
25     Q.  And could you explain what is contained
```

```
                                    Dr. Daniel Zamarippa          36
 2  this document?
 3     A.  This document states if anything -- well,
 4  this document is a document that the underwriter
 5  goes to check.  If there's no positive answers on
 6  the application and he qualifies according to these
 7  guidelines, because these are the guidelines to
 8  select for a best class policy, he will go to this
 9  document, these guidelines, and see if he can
10  qualify for a preferred consideration or elite
11  consideration.
12     Q.  Now, if you look at the last line, it says
13  "select preferred will not be available if both of
14  these criteria preclude the class or if any other
15  criterion is not met," do you see that?
16     A.  Yes.
17     Q.  What does that mean?
18     A.  That means you can have -- if you have any
19  impairment or if you have any kind of impairment
20  that doesn't qualify for preferred, for preferred
21  consideration, you can qualify for this, this type
22  of policy, the elite policy.
23     Q.  I'm not sure I understand.  Let me try it
24  a different way.
25         If you look, it refers to both of these
```

```
                                    Dr. Daniel Zamarippa          37
 2  criteria.  I think that means weight and
 3  cholesterol, am I correct you can read the whole
 4  paragraph and take your time?
 5         MS. SHERER:  Are you asking him what the
 6  "both" means?
 7         MR. TRIEF:  I don't answer questions.
 8     Q.  Can you read the paragraph to yourself and
 9  see if you can help me there?
10         MS. SHERER:  What's the question?
11         MR. TRIEF:  Read it back.
12         (Whereupon, the referred to question was
13  read back by the Court Reporter.)
14         MS. SHERER:  Do you understand the
15  question?
16     A.  You want me to read this.
17     Q.  I believe in the last line, the word
18  "both" refers to weight and cholesterol, am I
19  correct?
20     A.  Weight and cholesterol, yes.
21     Q.  And so if you failed to qualify because of
22  weight or cholesterol it will not be available if
23  both of them exist, and it won't be available if any
24  one of the other items exist, correct?
25     A.  Correct.
```

```
                Dr. Daniel Zamarippa                    50
 2      A.   Total bilirubin is not a measure of liver
 3   enzymes.  In this line, the liver enzymes includes
 4   this part, liver enzymes include alkaline
 5   phosphatase, and AST, ALT and GGTP, and then if you
 6   have normal liver enzymes, except for Gilbert
 7   syndrome.
 8          MR. TRIEF:  Move to strike.
 9      Q.   Is Bilirubin listed as a liver enzymes in
10   that column?
11          Does the lab test show that Mr. Lin's
12   Bilirubin was elevated?
13      A.   Yes.
14      Q.   And what does that indicate, an elevated
15   bilirubin?
16      A.   Excuse me?
17      Q.   What does indicate for Mr. Lin's bilirubin
18   to be elevated?
19      A.   He can have this elevation, and there's no
20   indication that he has abnormal liver enzymes.  I
21   don't understand your question.
22      Q.   What does an elevated bilirubin mean?
23      A.   Elevated bilirubin means that you can have
24   different scenarios with different bilirubin,
25   different disease could be Gilbert Syndrome.
```

```
                Dr. Daniel Zamarippa                    51
 2      Q.   What is Gilbert Syndrome?
 3      A.   It's the elevation of total bilirubin,
 4   there's no sign of disease, there's no impact in
 5   mortality with Gilbert syndrome.
 6      Q.   What else?
 7      A.   There's hemolytic anemia.
 8      Q.   What is that?
 9      A.   Destruction of the red blood cells.
10      Q.   What else?
11      A.   And you can have for bilirubin, you can
12   have also different stage of liver disease.
13      Q.   And he showed elevated bilirubin,
14   correct?
15      A.   2.3, yes.
16      Q.   And according to Exhibit 5, in your
17   opinion, did he meet the criteria of having no
18   elevated liver enzymes?
19          MS. SHERER:  Objection to the form.
20      A.   According to this paper.
21          MS. SHERER:  Exhibit 5.
22      A.   Exhibit 5, you don't qualify for preferred
23   according to the medical history.
24          MR. TRIEF:  Could you read the question
25   back.
```

```
                Dr. Daniel Zamarippa                    52
 2          (Whereupon, the referred to question was
 3   read back by the Court Reporter.)
 4      Q.   Can you answer my question?
 5      A.   Yes, when you have elevated liver enzymes
 6   you go the AST, ALT, GGTP, and those are liver
 7   enzymes.
 8      Q.   Was he tested for Hepatitis B?
 9      A.   No.
10      Q.   What is the normal range of Bilirubin?
11      A.   1.5.
12      Q.   And what was his?
13      A.   2.3.
14      Q.   What's triglycerides?
15      A.   Basically, fat in your blood.
16      Q.   Is that part of cholesterol?
17      A.   It's part of the -- no, it's not part of
18   cholesterol.
19      Q.   Well, does it indicate a high
20   cholesterol?
21      A.   No.
22      Q.   What's the purpose of testing for
23   triglycerides?
24      A.   They're several disease that could be
25   related to high triglycerides.
```

```
 1              Dr. Daniel Zamarippa                    53
 2      Q.   What disease?
 3      A.   Hepatitis diabetes --
 4      Q.   Anything else?
 5      A.   Hyperlipidemia.
 6      Q.   Does it increase the chance of a heart
 7   attack, having elevated triglycerides number?
 8      A.   No.
 9      Q.   Does it increase the chance of
10   cardiovascular disease?
11      A.   No.
12      Q.   Was his triglycerides elevated?
13      A.   Very slightly.
14      Q.   Yes?
15      A.   Yes.
16      Q.   Does elevated bilirubin sometimes indicate
17   liver disease such as cirrhosis or Hepatitis?
18      A.   Yes.
19      Q.   And Met Life before they issued the policy
20   understood that he had elevated bilirubin,
21   correct?
22          MS. SHERER:  Objection to the form.
23      A.   When he went to 2.3 bilirubin, yes.
24      Q.   When the policy was issued, Metropolitan
25   Life insurance company new he had elevated
```

```
                    Dr. Daniel Zamarippa                    54
 2   bilirubin?
 3       A.   2.3, yes, 2.3.
 4       Q.   The answer is "yes"?
 5            MS. SHERER:  Objection to the form.
 6       Q.   The answer to my question is "yes"?
 7       A.   2.3.
 8       Q.   That's elevated, correct?
 9       A.   Yes.
10       Q.   And he was not only issued a policy, but
11   issued a policy for select preferred, correct?
12       A.   Yes.
13       Q.   Are you licensed to practice medicine in
14   the U.S.?
15       A.   No.
16       Q.   Have you ever sat for a medical exam in
17   the U.S.?
18       A.   No.
19       Q.   Have you ever had your license suspended
20   or revoked in Mexico?
21       A.   No.
22       Q.   Or in any other place?
23       A.   No.
24       Q.   Have you ever been convicted of a crime?
25       A.   No.
```

```
                    Dr. Daniel Zamarippa                    55
 2       Q.   Is your salary or bonus ever affected or
 3   do you receive a bonus?
 4       A.   Yes.
 5       Q.   And is that based on any criteria?
 6       A.   Yes, the criteria is basically the
 7   performance of the company.
 8       Q.   Is it solely based on the company's
 9   performance or your performance?
10       A.   The whole performance of the company as an
11   officer.
12       Q.   Is your performance at all relevant to
13   your bonus?
14       A.   Yes.
15       Q.   Tell me what, how your performance is
16   measured?
17       A.   Basically, according to how many hours you
18   work, the work load that you have, if you are a
19   speaker outside of Met Life, and daily work.
20       Q.   Is any record kept of how many claims Are
21   rejected or accepted?
22       A.   I don't know.
23       Q.   You don't know the answer to that
24   question?
25       A.   I don't know the answer.
```

```
                    Dr. Daniel Zamarippa                    56
 2            MR. TRIEF:  Anytime you want to take a
 3   break.  I'm going to try to break at 1:15 for
 4   lunch, would that be okay?
 5            MS. SHERER:  Yeah, that sounds good.
 6            MR. TRIEF:  So if we're still going, then
 7   we will break.
 8            MS. SHERER:  Is that good for you?
 9            THE WITNESS:  Yes.
10            MR. TRIEF:  If we finish, we can finish.
11   I'm not trying to keep you here any longer.
12            Can you give me this page in here
13   (Indicating.)
14            Can you mark that.
15            (MARKED FOR ID:  Plaintiff's 7.)
16            (Handing.)
17       Q.   Have you ever seen that document before?
18       A.   Yes.
19       Q.   And you recognize it to be a portion of
20   Mr. Lin's medical records?
21       A.   Yes.
22       Q.   If you go probably three quarters of the
23   way down, you'll see there's a number "981128."  Do
24   you see that?
25       A.   Yes.
```

```
                    Dr. Daniel Zamarippa                    57
 2       Q.   To the right of that, do you know what
 3   that reads, what it says?
 4       A.   Here?  (Indicating) "The Hepatitis B
 5   antigen and from negative to positive 98," yeah.
 6       Q.   From negative to positive or positive to
 7   negative?
 8       A.   From positive to negative because he was
 9   in treatment.
10       Q.   I think earlier you said from negative to
11   positive, so you want to correct that?
12       A.   From positive to negative, yes, 98.
13       Q.   And what does that mean to have Hep B go
14   from positive to negative?
15       A.   You want me to go explain that?
16       Q.   What does it mean for something to go --
17   for Hep B antigens to go from positive to
18   negative?
19       A.   That means you have Hepatitis B in the
20   first instance, and when you, for example, in this
21   case, that you have Alpha Interferon, you go from
22   positive antigen, you don't have virus in your blood
23   stream, and then you go to negative stage, and you
24   don't have virus, but you have Hepatitis B, you have
25   the virus.
```

Barrister Reporting Service, Inc.   120 Broadway, New York, N.Y. 10271          (212) 732-8066

15 (Pages 54 to 57)