UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
JEAN LIN,

                        Plaintiffs,               07-CV-3218 (Judge Holwell)

     - against –

METROPOLITAN LIFE INSURANCE
COMPANY,

                      Defendant.

-----------------------------------------------------------------x

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION *IN LIMINE* FOR AN ORDER PRECLUDING THE EXPERT TESTIMONY OF DANIEL ZAMARIPPA, M.D. <u>AND DAVID CLAIN, M.D.</u>

TRIEF & OLK

By:     */s/*_____
          Eric Dinnocenzo (ED-3430)
          Attorneys for Plaintiff
          150 East 58th Street
          New York, New York 10155
          212-486-6060

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. (iii)

PRELIMINARY STATEMENT ........................................................................... 1

FACTUAL BACKGROUND ............................................................................... 5

LEGAL ARGUMENT.......................................................................................... 5

  A.  METLIFE'S MOTION FOR SUMMARY JUDGMENT SHOULD BE
      DISMISSED BECAUSE IT DOES NOT INCLUDE A RULE 56.1
      STATEMENT OF FACTS ............................................................................ 5

  B.  CHOICE OF LAW........................................................................................ 7

  C.  THE LEGAL STANDARD UNDER CALIFORNIA LAW ................................. 7

      1.  The plaintiff meets the exception under Califonia Law to the material
      misrepresentation standard because there is a plausible explanation for the failure
      to disclose a history of hepatitis B ........................................................................ 8

      2.  Mr. Lin's history of hepatitis B would not have been material to
      the underwriting of the policy............................................................................ 15

      3.  MetLife did not follow its own underwriting guidelines and thus
      cannot rely on them here to plaintiff's detriment ................................................ 19

      4.  MetLife's Failure to properly investigate the policy application
      constitutes "waiver" ......................................................................................... 24

      5.  California law discourages the practice of post-claim underwriting ......... 28

  D.  PLAINTIFF'S CROSS-MOTION TO STRIKE/IN LIMINE FOR AN
      ORDER PRECLUDING THE EXPERT TESTIMONY OF
      DANIEL ZAMARIPPA, M.D. and DAVID CLAIN, M.D................................. 30

## TABLE OF CASES

*Amorgianos v. National Railroad Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002)............................................................................ 31,32,34,35

*Arrival Star, Inc. v. Descartes Systems Group, Inc.*
2004 WL 2496622, 04-Civ-0182 (S.D.N.Y. 2004) ........................................................ 6

*Barrera v. State Farm Mut. Auto. Ins. Co.*,
71 Cal. 2d 659; 79 Cal. Rptr. 106; 456 P.2d 674 (1969) ........................................ 25,29,30

*Berk v. St. Vincent's Hospital and Medical Center*,
380 F. Supp. 2d 334 (S.D.N.Y. 2005)................................................................................ 31

*Boggio v. California-Western States Life Ins. Co.*
108 Cal. App. 2d 597; 239 P.2d 108; Cal. App. 2d 597 .................................................... 9

*Daubert v. Merrell Dow Pharmaceuticals*
509 U.S. 579, 113 S.Ct. 2786 (1993).................................................. 2,3,18,30, 31, 32, 33

*DiPasqua v. California Western States Life Ins. Co.*,
106 Cal. App. 2d 281; 235 P.2d 64 (1951) ................................................................. 24,25

*General Electric Co. v. Joiner*,
522 U.S. 136; 118 S.Ct. 512 (1997).................................................................................. 31

*Hailey v. California Physicians' Service*
158 Cal. App. 4th 452; 69 Cal. Rptr. 3d 789 (2007) ...............................................9,14,28, 29, 30

*Holtz v. Rockefeller & Co., Inc.*
258 F.3d 62 (2d Cir. 2001)................................................................................................ 6

*Imperial Casualty & Indemnity Co. v. Sogomonian*
198 Cal. App. 3d 169, 243 Cal. Rptr. 639 (1988)............................................................. 8

*Kerr v. Metropolitan Life Ins. Co.*
995 U.S. Dist. LEXIS 19129, C-94-2440 (N.D.Ca. 1995)......................................7,18,19

*Kumho Tire Co. v. Carmichael*
526 U.S. 137,119 S.Ct. 1167 (1999)................................................................................ 31

*Lettieri v. The Equitable Life Assurance Society of the U.S.*
627 F.2d 930 (9th Cir. 1980) .................................................................................... 8,10,11

*MacDonald v. Zurich Life Ins. Co. of America*
2004 U.S. Dist. LEXIS 21391, 03-03538 (N.D. Cal. 2004) ............................................... 8

*McAuliffe v. John Hancock Mutual Life Ins. Co.*
245 Cal. App. 2d 855, 54 Cal. Rptr. 288 (1966)........................................................ 10,19

*Miller v. Republic National Life Ins. Co.,*
789 F.2d 1336 (9th Cir. 1986) ........................................................................................ 8

*Misla v. CVS Pharmacy*
2001 WL 637384, 99-Civ-9989 (S.D.N.Y. 2001) ......................................................... 6,7

*O'Riordan v. Federal Kemper Life Assurance,*
36 Cal. 4th 281, 30 Cal. Rptr. 3d 507,114 P.3d 753 (2005) ............................................... 9

*Pharmacy Inc. v. American Pharmaceutical Partners, Inc.*
511 F. Supp. 2d 324
2007 U.S. Dist. LEXIS 68347 (E.D.N.Y. 2007).................................................................. 6

*Raskin v. Wyatt Co.,*
125 F.3d 55 (2d Cir.1997)....................................................................................................31

*Rossi v. NYC Police Dept.*
1998 WL 65999, 94-Civ-5113 (S.D.N.Y. 1998) ............................................................... 6

*Ruggiero v. Warner-Lambert Co.*
424 F.3d 249 (2d Cir. 2005)................................................................................................ 32

*Rutherford v. The Prudential Ins. Co. of America*
234 Cal. App. 2d 719; 44 Cal. Rptr. 697 (1965).......................................................... 9,25

*Steinbach v. Brookman*
2006 WL 3717343 (W.D.N.Y. 2006) ........................................................................... 6,7

*Thompson v. Occidental Life Ins. Co. of California*
9 Cal. 3d 904; 109 Cal. Rptr. 473; 513 P.2d 353 (1973) ...................................... 8,10,11,19

*U.S. v. Moskowitz*
2007 WL 2962556, 00-CV-3832 (S.D.N.Y. 2007)............................................................. 6

*Viscusi v. Proctor & Gamble*
2007 WL 2071546 (E.D.N.Y. 2007).................................................................................. 32

## OTHER AUTHORITIES

Misrepresentations in Applications for Insurance
(2005) 14 U. Miami Bus. L.Rev. 103, 106 ..................................................................... 10

"Management of Hepatocellular Carcinoma," AASLD Practice Guideline..................... 35

"HBsAg Seroclearance in Chronic Hepatitis B in the Chinese: Virological, Histological,
   and Clinical Aspects," Hepatology, 2004............................................................... 17, 35

"Lamivudine for Patients with Chronic Hepatitis B and Advanced Liver Disease," New
   England Journal of Medicine, October 7, 2004. ......................................................... 36

## STATUTES

*Rule 56, Federal Rules of Civil Procedure*..................................................... 1,6

*Local Civil Rule 56.1(a) Southern District of New York*........................... 1,5,6,7

*Rule 104(a) Federal Rules of Evidence* .......................................................... 31

*Rule 702 Federal Rules of Evidence*............................................................... 30

*California Insurance Code §331* .............................................................. 29,30

*California Insurance Code §336* ................................................................... 24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
JEAN LIN,

                          Plaintiffs,          07-CV-3218 (Judge Holwell)

        - against –

METROPOLITAN LIFE INSURANCE
COMPANY,

                          Defendant.
-------------------------------------------------------------------x

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
CROSS-MOTION *IN LIMINE* FOR AN ORDER PRECLUDING
THE EXPERT TESTIMONY OF DANIEL ZAMARIPPA, M.D.
AND DAVID CLAIN, M.D.

I.      PRELIMINARY STATEMENT

        The motion for summary judgment of defendant, Metropolitan Life Insurance

Company ("MetLife") should be denied on several grounds.  First, it did not provide a

statement of material facts in violation of Local Rule 56.1 which states that: "Failure to

submit such a statement may constitute grounds for denial of the motion."  The Rule 56.1

statement is essential here given the complex factual and medical issues in this case.

There is simply no excuse for a company of the size and sophistication of MetLife to

disregard this rule.

        As is set forth below, several important facts favorable to plaintiff are not in

dispute.  First, although Mr. Lin had a history of hepatitis B, it was successfully treated

and there was no evidence that he had cirrhosis or permanent liver damage.  Second, his

treating physician had told him in 1999—over five years before the application date—

that he was "cured" of the disease. Furthermore, this condition is common among the Asian immigrant population, of which Mr. Lin was a part, affecting at one time or another approximately 20-30% of its members, and MetLife has not thus far shown with credible evidence that it causes a corresponding decreased life expectancy. Fourth, Mr. Lin's cause of death was completely unrelated to hepatitis B and instead was due to stomach cancer. Fourth, MetLife admits that it would have issued the policy even if it had known of the hepatitis B, and so the only issue is what the premium amount would have been—and plaintiff has set forth evidence that it would not have been affected.

Plaintiff, in fact, has raised triable issues of fact regarding three points under California law that each render summary judgment inappropriate:

(1) Does plaintiff have a plausible explanation for the omission of hepatitis B from the application?

(2)  Was the failure to disclose the hepatitis B in the application a material misrepresentation; that is, if it had been revealed, would it have had an impact on the assessment of Mr. Lin's mortality? and

(3)  Was there a waiver by MetLife of its right to declare the policy void?

Plaintiff has also filed a cross-motion to strike/*in limine* for an order precluding the expert testimony of Daniel Zamarippa, the medical director of MetLife, and David Clain, M.D., its retained medical expert, on the grounds that their opinions that Mr. Lin's hepatitis B, even though successfully treated, placed him at greater risk of death lacks the scientific rigor required under the U.S. Supreme Court's *Daubert* decision and its progeny of cases. As a preliminary matter, the testimony of Dr. Zamarippa should be precluded since he is not qualified to render an expert medical opinion about hepatitis B. He received his medical education and training in Mexico, where he focused on cardiology, and is not licensed to practice medicine in the U.S. He has worked directly

for insurance companies rather than treating patients for most of his career, and he has no specialized knowledge of hepatitis B. Moreover, MetLife did not disclose him as an expert witness or provide an expert report from him.

Both witnesses have provided expert opinions that liberally extend existing scientific studies beyond permissible boundaries in contravention of *Daubert*. For instance, Dr. Clain claims that Mr. Lin, even though successfully treated for hepatitis B and with no evidence of cirrhosis or liver damage, was at a greater risk of developing liver cancer than the general public. Yet at his deposition he conceded there are no studies that directly support his theory by analyzing individuals with hepatitis B who have been successfully treated and are without cirrhosis. For that matter, Dr. Clain could not provide basic information such as the rate of liver cancer in the general public or among Asian immigrants. Thus, he cannot reliably correlate Mr. Lin's condition with an increased mortality rate—mortality being the critical issue in life insurance underwriting.

What Dr. Clain relies on are articles discussing hepatitis B in individuals who already have cirrhosis or have not been successfully treated. Dr. Clain then makes a giant analytical leap to apply these articles to the facts of the instant case. But the chasm is too great and, in doing so, he violates *Daubert*.

With respect to the first factor listed above, Mr. Lin has a plausible explanation for the omission of his history of hepatitis B from his application. His wife, Jean Lin, has testified that the insurance agent completed Part I of the application without Mr. Lin present and without asking any of the health questions. Mrs. Lin gave it to her husband to sign which he did without reviewing it. With regard to Part II of the application,

which was completed with only two individuals present, Mr. Lin and Peggy Chou, a paramedical examiner, Ms. Chou attests in an affidavit submitted by MetLife that she recalls asking him all of the health questions and then dutifully recorded his answers, even though the application was taken <u>over four years ago</u>. Yet plaintiff submits an affidavit from an investigator who was an FBI agent for 26 years, in which he attests that he contacted Ms. Chou telephonically and she indicated that she may not have a memory of conducting an interview of Mr. Lin and it is his opinion that she does not. Certainly, these facts raise a triable issue about whether plaintiff has a plausible explanation for the omission of hepatitis B from the application.

Regarding the second factor, the evidence clearly indicates that Mr. Lin's history of hepatitis B had no impact on his mortality and thus was not material. His treating physician had taken him off medication for the condition in 1999, over five years prior to the application, telling him that his treatment had been successful and <u>that he was cured</u>. Plaintiff has submitted a sworn narrative report from a medical expert with a chaired faculty position at Mount Sinai School of Medicine, who has conducted research and published on hepatitis B, stating that it had no impact on Mr. Lin's mortality. In addition, the original underwriter for the policy testified at deposition that mortality is the key factor in life insurance underwriting and that it is his opinion that successfully treated hepatitis B would have no effect on mortality. Thus, this underwriter—who MetLife never consulted when it performed postclaims underwriting—has testified, in effect, that the successfully hepatitis B would not have impacted the premium rate. There is simply no way MetLife can be granted summary judgment in light of this damaging testimony.

4

Thirdly, MetLife waived its right under California law to contest the policy. The twin facts that Mr. Lin was an Asian immigrant with an elevated liver enzyme test (bilirubin) were indicators that he might have hepatitis B. Moreover, both Parts I and II of the application contained inconsistent answers to medical questions that should have indicated to MetLife that it was not taken by its agents in a reliable manner. These facts should have triggered a further investigation by MetLife into Mr. Lin's health, which would have revealed his successful treatment for hepatitis B. Because it did not take this step, MetLife waived its right to contest the policy.

II.    FACTUAL BACKGROUND

The plaintiff respectfully refers the Court to the accompanying affidavit of Eric Dinnocenzo which sets forth the pertinent facts.

III.    LEGAL ARGUMENT

A.    MetLife's Motion for Summary Judgment should be dismissed because it does not include a Rule 56.1 statement of facts.

Local Civil Rule 56.1(a) of the Southern District of New York specifically requires that for any summary judgment motion, "[T]here shall be annexed to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion." (emphasis added). In the instant case, the defendants have failed to submit a Rule 56.1 statement of material facts and thus their summary judgment motion should be denied.

The Second Circuit has held that a district court has broad discretion to dismiss a summary judgment motion because of a party's failure to comply with local court rules. *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001). Indeed, district courts have routinely denied summary judgment motions simply for the fact that the party failed to comply with Local Rule 56.1(a). *See U.S. v. Moskowitz*, 2007 WL 2962556 at *2 fn. 3, 00-CV-3832 (S.D.N.Y. 2007); *Arrival Star, Inc. v. Descartes Systems Group, Inc.*, 2004 WL 2496622 at *4, 04-Civ-0182 (S.D.N.Y. 2004); *Misla v. CVS Pharmacy*, 2001 WL 637384, 99-Civ-9989 (S.D.N.Y. 2001); *Rossi v. NYC Police Dept.*, 1998 WL 65999 at *4, 94-Civ-5113 (S.D.N.Y. 1998) ("in the absence of such a statement the Court cannot glean from Plaintiff's papers that no material factual dispute exists and that he is entitled to judgment ... as a matter of law"); *Pharmacy Inc. v. American Pharmaceutical Partners, Inc.*, 511 F. Supp. 2d 324, 330, 2007 U.S. Dist. LEXIS 68347 at *21-22 (E.D.N.Y. 2007); *Steinbach v. Brookman*, 2006 WL 3717343 at *1 (W.D.N.Y. 2006) ("Plaintiff's failure to file a Statement of Undisputed Facts is not only a procedural error, but it is a substantive one as well. Without a Statement of Undisputed Facts and a response thereto, this Court cannot determine whether any material issues of fact exist, as required by Rule 56 of the Federal Rules of Civil Procedure.").

The purpose behind Local Rule 56.1 is to save the district courts from having to search through voluminous documents without any guidance from the parties, and thereby make the process of considering of summary judgment motions more efficient. *Holtz*, 258 F.3d at 74. MetLife's failure to provide a statement of facts is especially egregious in the context of the instant motion given that the Court must grapple with complex factual issues such as the circumstances surrounding the completion of a life

6

insurance application, the underwriting assessment of the risk by MetLife, and an analysis of expert medical testimony concerning Mr. Lin's history of successful treatment for hepatitis B. Courts, in fact, have dismissed summary judgment motions for failure to include a statement of facts in cases involving much simpler facts than here. *See e.g., Misla,* 2001 WL 637384 *1 (personal injury action brought when shampoo bottles at a CVS pharmacy fell off the shelf and onto plaintiff); *Steinbach,* 2006 WL 3717343 at * 1 (motor vehicle accident).

Without the Rule 56.1 statement, this Court is now faced with the daunting task of having to sift through differing versions of the relevant facts in order to determine which points are not in dispute. A party of the size and sophistication of MetLife should not be excused for disregarding this rule. Therefore, the Court should deny MetLife's motion for summary judgment.


B.    Choice of Law

Plaintiff agrees with MetLife that California law should apply to this action.


C.    The legal standard under California Law

As MetLife has rightly pointed out, California applies a "material misrepresentation" standard in life insurance disputes where it is alleged that an insured failed to disclose information concerning his health history in the application. "If a statement led an insurer to accept an application that it would 'probably and reasonably have denied based on the true medical history of an applicant,' then the statement is a material misrepresentation." *Kerr v. Metropolitan Life Ins. Co.,* 1995 U.S. Dist. LEXIS

19129 at * 4, No. C-94-2440 (N.D.Ca. 1995) quoting *Imperial Casualty & Indemnity Co. v. Sogomonian*, 198 Cal. App. 3d 169, 179, 243 Cal. Rptr. 639 (1988). However, "[a]n incorrect answer on an insurance application does not give rise to the defense of fraud where the true facts, if known, would not have made the contract less desirable to the insurer." *Thompson v. Occidental Life Ins. Co. of California*, 9 Cal. 3d 904, 916, 109 Cal. Rptr. 473, 480, 513 P.2d 353, 360 (1973). "[T]he burden of proving misrepresentation rests upon the insurer." *Thompson*, 9 Cal. 3d at 919.

> 1.  The plaintiff meets the exception under California law to the material misrepresentation standard because there is a plausible explanation the failure to disclose a history of hepatitis B.

California courts have refused to rescind life insurance policies where the plaintiff is able to "offer a plausible explanation for the falsehoods appearing in the insurance application, an explanation which the insurer then may rebut in order to avoid liability on the policy." *Lettieri v. The Equitable Life Assurance Society of the U.S.*, 627 F.2d 930, 932 (9th Cir. 1980) citing *Thompson*. According to a California federal court in 2004, once a plausible explanation is proffered by the insured for the misrepresentation, "the burden returns to the insurer negate to the satisfaction of the trier of fact the various plausible explanations." *MacDonald v. Zurich Life Ins. Co. of America*, 2004 U.S. Dist. LEXIS 21391, * 9-10, 03-03538 (N.D. Cal. 2004) quoting *Thompson*, 9 Cal. 3d at 919. Further, "there is no breach of the duty to disclose if the applicant, acting in good faith, does not understand the significance of the information he fails to disclose." *Miller v. Republic National Life Ins. Co.*, 789 F.2d 1336, 1339 (9th Cir. 1986).

In 2005, the California Supreme Court quoted the treatise Couch on Insurance for the following proposition: "If the insurer's agent construes the questions [in an insurance

8

application] either by stating what they mean or by specifically stating that certain
information is or is not required, any misrepresentations which result therefrom are
charged to the insurer, the theory being that the insurer's agent remains the insurer's
agent even though he or she is assisting the insured." *O'Riordan v. Federal Kemper Life
Assurance*, 36 Cal. 4th 281, 287, 30 Cal. Rptr. 3d 507, 511, 114 P.3d 753, 757 (2005)
(citation omitted). Further, "[w]here the insured, in good faith, makes truthful answers to
the questions contained in the applications, but his answers, owing to the fraud, mistake
or negligence of the agent filling out the application, are incorrectly transcribed, the
company is estopped to assert their falsity as a defense to the policy." *Rutherford v. The
Prudential Ins. Co. of America*, 234 Cal. App. 2d 719, 726, 44 Cal. Rptr. 697, 701
(1965).

In *Boggio v. California-Western States Life Ins. Co.*, 108 Cal. App. 2d 597, 598,
239 P.2d 144, 145-46 (1951), the agent glossed over the application while completing it
and left out material information, even though informed of it by the insured. The Court
stated that "[I]t appears that the misrepresentation upon which defendant relies occurred
through the fraud or negligence of its agent and not through any fault of the insured. To
allow the insurer under these circumstances to place the responsibility upon the insured
would not only be manifestly unjust but would allow it to profit by its own wrong." *Id.* at
599.

The California Appeals Court in *Hailey v. California Physicians' Service*, 158
Cal. App. 4th 452, 466-67, 69 Cal. Rptr. 3d 789, 800 (2007), *modified and reh'g denied,*
2008 Cal. App. LEXIS 112 (2008) has observed that applicants reasonably may not recall
prior medical conditions that have resolved:

"Most people are capable of forgetting facts at the time they apply for insurance, especially if those facts relate to a condition or event in the past which is no longer (and perhaps never was) deemed a problem by the applicant. ... [M]ost insureds probably don't expect to lose their coverage for an unintentional misrepresentation." (Quoting Ingram, *Misrepresentations in Applications for Insurance* (2005) 14 U. Miami Bus. L.Rev. 103, 106.) Given the likelihood of inadvertent error, accurate risk assessment requires a reasonable check on the information the insurer uses to evaluate the risk.

Recognizing that inaccurate answers in a life insurance application can be the fault of either party, California law takes a balanced approach by considering the circumstances surrounding the completion of the application. In contrast to other states that conclusively find misrepresentations to be the fault of the insured, California Courts probe deeper to reach a more fair and equitable result. *See Lettieri*, 627 F.2d at 931 (discussing New York law). In doing so, they explore whether the misrepresentation was the fault of the insurer or its agent, innocently made by the insured, or instead the product of intentional wrongdoing by the insured.

In *Thompson*, a widow filed suit after her husband's accidental death stemming from a fall in a bathtub to recover under his life insurance policy. 9 Cal. 3d at 909. The insurance company had contended that the policy was void because the decedent made material misrepresentations regarding the state of his health and past medical history. *Id.* Ruling in favor of the widow, the California Supreme Court discussed factors that will prevent rescission, even where technically there is a material misrepresentation, such as if the applicant lacked knowledge of the condition that was inquired about or if the applicant failed to appreciate the significance of the information related to him by his medical caregivers. *Id.* at 916; *see also McAuliffe v. John Hancock Mutual Life Ins. Co.*, 245 Cal. App. 2d 855, 54 Cal. Rptr. 288 (1966) ("The failure to mention in an application for insurance the existence of a condition of which the applicant has no knowledge or

appreciation is not misrepresentation affecting the validity of the policy.") (citation omitted).

The *Thompson* Court, in fact, searched the record to discover plausible reasons for the misrepresentations that were made. The insured had disclosed a prior vein ligation surgery in the application, but failed to inform the insurance company that he suffered from other conditions such as varicose veins and arteriosclerosis, and that he had numerous medical visits in which, among other things, he complained of chest pain and had an EKG performed. *Id.* at 915. The Court, however, speculated that the examining physician may have either intentionally or inadvertently failed to record the undisclosed health conditions, even though it was his custom and practice to record all information furnished by the applicant, seeing that he could not specifically recall what information the insured had disclosed and, with respect to the insured's condition of varicose veins, his legs bore visible scars. *Id.* at 362 fn. 5. The Court further speculated that the medical terms relating to the insured's condition such as "phlebitis," "intermittent claudication," and "chemical sympathectomy," might have been meaningless jargon to him. *Id.* at 362. In addition, the Court minimized the importance of the medical visits for chest pain and an EKG, stating that the chest pain only related to a mild bout of pneumonia and the EKG results showed no significant or abnormal tracings. *Id.* at 362.

Here, there are plausible reasons for the omission of Mr. Lin's history of hepatitis B that satisfy the exception set forth in *Lettieri* and *Thompson*. The first concerns the circumstances surrounding the completion of the application. As Mrs. Lin testified at her deposition, the agent, Judy Huang, failed to ask any of the health questions contained in the application and completed the application with only Mrs. Lin present. (*Exhibit A,*

*p.25*).[1]  Neither she nor her husband reviewed the application prior to signing it because, according to her, they trusted Ms. Huang. (*Exhibit A, p. 52*).

Furthermore, the paramedical examiner, Peggy Chou, who completed Part II of the application, has provided unreliable testimony by affidavit that raises a question of fact whether the omission of hepatitis B was the result of her negligence.  Ms. Chou was contacted by MetLife, notably a business source of her employer, and attested that she recalled asking Mr. Lin all of the health questions, even though she interviewed him four years ago.  Yet when an investigator contacted Ms. Chou telephonically on behalf of plaintiff and inquired about her memory of the interview, she indicated that she may not remember it. (*Dinnocenzo Affidavit ¶ 11*).[2]  It was the investigator's conclusion, based on 26 years experience as a former FBI agent, that she in fact did not recall the interview. (*Aff. ¶ 11*).  Also, it cannot be presumed that Mr. Lin was responsible for the omission of hepatitis B, since the application is not completed in his handwriting. (*Exhibit F*).  In any event, given these facts it should be up to a jury to determine if Ms. Chou did or did not ask Mr. Lin all of the questions contained in the application and accurately record his responses.

There are also inconsistencies within Parts I and II of the application which are a testament to the unreliability of the application as taken by Ms. Huang and Ms. Chou.  In Part I, section 19—completed on August 5, 2004, again with only Judy Huang and Mrs. Lin present—it indicates that Dr. James Huang is Mr. Lin's attending physician and that a regular checkup was scheduled for August 2004. (*Aff. ¶ 5; Defendant's Exhibit A, ML*

---

[1]  All exhibits referred to as "Exhibit ___" shall refer to exhibits submitted with the Dinnocenzo affidavit by plaintiff.

[2]  All references to the "Dinnocenzo affidavit" herein shall be referred to as "Aff. ¶ _."

*00397, Regina Solomon-Stowe Aff.* ).[3]  In fact, Dr. Huang's records indicate that Mr. Lin

had an office visit three days later on August 17, 2004. (*Exhibit H*).  Three questions

later in section 22 of Part I, it indicates that Mr. Lin had no doctor's visits scheduled for

the next 6 months. (*Defendant's Exhibit A, ML 00398, Regina Solomon-Stowe Aff.*).

With respect to Part II of the application—completed on August 18, 2004, again,

with only Ms. Chou and Mr. Lin present—it states in section 3 that Mr. Lin last consulted

with Dr. Huang in August 2004 for "skin itching." (*Aff. ¶ 10;  Defendant's Exhibit A,

ML 0039, Regina Solomon-Stowe Aff.*).  In Part 5(h) it asks if the applicant ever received

treatment for "any disease or disorder of the skin" to which the answer provided was

"No." (*Defendant's Exhibit A, ML 00392, Regina Solomon-Stowe Aff*).  These

inconsistencies in both parts of the application lead to the conclusion that it was not

completed in a careful manner, in turn raising the possibility that Ms. Huang and Ms.

Chou did not specifically ask Mr. Lin questions that would have revealed his history of

hepatitis B. [4]

---

[3] MetLife mischaracterizes Dr. Huang as being a pediatrician.  Interestingly, Judy Huang, whose daughter is a patient of Dr. Huang, and who sometimes herself is his patient, testified at her deposition that he is a family doctor. (*Defendant's Exhibit I, pp.28, 35, Tomasita Sherer Aff.*).

[4] MetLife goes out of its way to mention that Mrs. Lin is also involved in litigation against John Hancock Life Insurance Company relating to its denial of a life insurance policy on the same grounds as here, a failure to disclose hepatitis B.  Mrs. Lin asserts in that case, as she does here, that the omission was the result of the agent not asking all of the health questions contained in the application.  This is a credible explanation given that the agents in each case were Asian and conversed in Chinese with the Lins.  In fact, Ms. Huang, while testifying contrary to Mrs. Lin that she asked the health questions, claimed that she asked the questions in Chinese but said the medical terms in English. (*Defendant's Exhibit I*, pp.30-31, *Tomasita Sherer Aff.*).  This method of reciting medical questions, some of which were compound and complex, could easily lead to confusion. Indeed, Ms. Huang testified that there may be times when she misses a medical term, and she admitted that she truncates a question about whether the applicant had several

As is recited above, the California Appeals Court in *Hailey*, 158 Cal. App. 4th at 466-67 observed that most people are capable of forgetting facts relating to insignificant or resolved medical conditions.  It is reasonable for this Court to find for purposes of summary judgment that Mr. Lin did not believe that he had a condition that affected his health or life expectancy.  <u>After all, his treating physician, Dr. Kam, told him that he had been successfully treated and cured over five years before the application date</u>. (*Exhibit B, pp. 90-91*).  This is powerful evidence that Mr. Lin was not actively concealing a material medical condition and instead that Ms. Chou and Ms. Huang did not ask him all of the questions in the application.[5]

In summary, given that there is testimony that the health questions were not even asked to Mr. Lin for Part I of the application, Ms. Chou provided an inconsistent account of her interview of Mr. Lin, and that Mr. Lin may not have believed that he suffered from a medical impairment, there is a plausible explanation as a matter of law for the failure to disclose hepatitis B in the application that should preclude summary judgment.[6]

---

diseases relating to AIDS so that the question only asked about AIDS and was therefore not recited word-for-word. *(Defendant's Exhibit I, p. 33, Tomasita Sherer Aff.).*

[5] In the John Hancock case, a brokerage manager wrote an email to the underwriter that he was unaware of any conditions that would cause an abnormal blood test and offered to undergo another blood and fluid test.  This is direct evidence that Mr. Lin did not believe he had a serious health condition. (*Exhibit N*).

[6] MetLife incorrectly predicted on page 23 of its memorandum of law that plaintiff would argue that Mr. Lin "did not have to inform MetLife that he ever had [hepatitis B]." Plaintiff makes no such claim.  What plaintiff does claim, however, is that there is a plausible explanation under California law for why the hepatitis B was not disclosed.

14

2.    Mr. Lin's history of hepatitis B would not have been material to the underwriting of the policy.

Even if this Court does not find that plaintiff has raised a triable issue of fact that there is a plausible explanation for the omission of hepatitis B from the application, that condition was insignificant to Mr. Lin's mortality and thus was not a material misrepresentation. As Dennis Westman, the underwriter for the policy, and Dr. Zamarippa, the MetLife medical director, testified at their depositions, a medical impairment is only significant to the underwriting of a life insurance policy if it has a material effect on the life expectancy of the applicant. (*Exhibit E, pp. 43-44, Exhibit M, pp. 13-15*). Because Mr. Lin's history of successfully treated hepatitis B had no such effect, the fact that it was not disclosed in the application does not constitute a material misrepresentation.

To begin with, it is necessary to put Mr. Lin's hepatitis B in its proper context. According to defendant's medical expert, David Clain, M.D., hepatitis B is prevalent in the Asian immigrant population with 20 to 30% at one time having been infected and about 15 to 20% with an active infection. (*Aff. ¶ 7*). Hepatitis B is a condition that is often vertically transmitted in the population from mother to child. (*Aff. ¶ 7*). Plaintiff has submitted a sworn narrative report from Louis Aledort, M.D., a chaired professor at Mount Sinai School of Medicine who has conducted research regarding hepatitis B, in support of its opposition. (*Exhibit O*). Dr. Aledort states that a large number of Asians infected with Hepatitis B either spontaneously recover from the condition or are treated

15

successfully. *(Aff. ¶ 26).* [7] Significantly, he concludes that: "Mr. Lin's prognosis with respect to his longevity was not reduced by his successful treatment for Hepatitis B" and "[h]is death was completely unrelated to his diagnosis of Hepatitis B." *(Aff. ¶ 26).* This testimony in and of itself is sufficient to defeat summary judgment.

There is additional evidence showing that hepatitis B should not be deemed material. Mr. Lin was diagnosed with hepatitis B in September 1998, and after beginning interferon treatment in October of that year, his blood laboratory levels for hepatitis DNA and liver function tests normalized by December 15, 1998—a period of just over two months. *(Aff. ¶ 21-23).* Dr. Sam Kam stopped the interferon treatment in February 1999. *(Aff. ¶ 24).* At that time, he told Mr. Lin that he had been successfully treated and, "Your Hepatitis B now is cured, it's inactive." *(Exhibit N, pp. 90-91).* He then continued to monitor Mr. Lin with blood testing approximately every six months as was the standard of care.[8] *(Exhibit C, pp. 57-59; Defendant's Ex. E, ML 00106-00153, Regina Solomon-*

---

[7] MetLife claims that Dr. Aledort "does not treat patients with liver disease." *(Sherer Aff., ¶ 14).* This is a sleight of hand given that Dr. Aledort testified: "I manage [liver disease patients] as their overall person, or I manage the blood from that particular patients, and the treatment would come from the liver people as part of this team." *(Exhibit P, pp.43-44).* Similarly, MetLife asserts that Dr. Aledort "has never written about the treatment of liver disease." *(Sherer Aff., ¶ 14).* Dr. Aledort testified that some of his publications focused on "HIV, hep C, hep B, interrelationships on outcome of patients when they got infected, how long they are infected, when they die, how they die, the role of hepatitis as an adjunct to HIV disease, the interrelationship of HBV to HCV." *(Exhibit P, pp.53-54).*

[8] MetLife refers to the March 27, 2004 ultrasound report to assert that Mr. Lin "was diagnosed with chronic hepatitis B on March 27, 2004." *(Memorandum of Law, p. 7).* The report was signed by a radiologist and there is no evidence that the radiologist ever examined Mr. Lin or reviewed his chart. Moreover, the term "chronic hepatitis B" is listed in the report under "Clinical History." It is disingenuous, or at the very least careless, for MetLife to represent that a "Clinical History" is actually a diagnosis. In addition, it is telling that given the extensive records that Dr. Kam maintained regarding

*Stowe Aff.).*   The purpose of the testing was to monitor if his hepatitis B remained inactive, which Dr. Kam said it did.[9]   *(Exhibit N, pp. 89, 92).*

In addition, Mr. Lin was tested for a liver cancer marker, alpha-feto-protein, on both September 5, 1998 and August 7, 2004 and each time the results were negative. *(Defendant's Exhibit E, ML 00106, 00151, Regina Solomon-Stowe Aff.).*   Ultrasounds performed of his liver on October 2, 1998 and March 27, 2004 came back normal.[10] *(Defendant's Exhibit E, 00154-155, Regina Solomon-Stowe Aff.).*   Dr. Kam also explained that a platelet count below 150 indicates cirrhosis, but Mr. Lin's results never dipped below this level. *(Exhibit B, p. 21).*   In fact, Dr. Clain testified that there was absolutely no evidence of cirrhosis. *(Exhibit C, p. 48).*

Taken together, these test results are extremely strong indicators that Mr. Lin did not have a greater risk of death as a result of his hepatitis B.

According to Dr. Kam, if he had believed that Mr. Lin's hepatitis B had reactivated, he would have resumed treatment with medication, which he did not do. *(Exhibit N, pp. 64, 75).*   Thus, Mr. Lin did not receive any medication for his hepatitis B for a period of over five years up until the date of the 2004 application.   Dr. Clain agreed

---

Mr. Lin, MetLife has decided to cherry pick a notation in the clinical history section of an ultrasound report to support its argument.

[9] MetLife makes much of the fact that Mr. Lin retained the hepatitis B surface antigen (HBsAg).   But clearing this particular antigen is of no real significance.   The estimated annual incidence of clearance is only 0.1% to 0.8%. (*Defendant's Exhibit M, Tomasita Sherer Aff., "HBsAg Seroclearance in Chronic Hepatitis B in the Chinese: Virological, Histological, and Clinical Aspects," Hepatology, Vol. 39, No. 6, 2004, p. 1694*).

[10] MetLife claims that Mr. Lin had a flare up in 2003 and 2004 without reference to any expert medical testimony. (*Defendant's Memorandum of Law, p. 8*).   This assertion is belied by the testimony of its own expert that he would not have resumed treatment.

that no further treatment was necessary. *(Exhibit C, p. 57)*. Significantly, Dr. Kam asserted that if Mr. Lin had not died from stomach cancer, and his hepatitis B had reactivated, there was treatment that later became available during his lifetime more advanced than interferon which would have been "effective in suppressing the virus from an active back into inactive stage." *(Exhibit N, pp. 64, 92-93)*. This testimony eliminates any concern that hepatitis B put Mr. Lin at a greater risk of death. Thus, Mr. Lin's hepatitis B was a condition that was successfully treated, was controllable in the future, and did not effect his mortality.

MetLife relies on the opinions of Dr. Zamarippa, its medical director, and its expert medical doctor, Dr. Clain, to support its theory that hepatitis B caused Mr. Lin to face an increased mortality risk. Their testimony will be thoroughly discussed *infra* in relation to plaintiff's motion to strike/*in limine* their expert testimony on the grounds that it is based on an inadequate scientific foundation under the *Daubert* decision and its progeny, and that Dr. Zamarippa lacks the qualifications to give expert testimony concerning hepatitis B not to mention that MetLife failed to properly disclose him as an expert witness. In fact, Dr. Zamarippa received his medical education in Mexico, is not licensed to practice medicine in the United States, and has devoted most of his career to working for insurance companies. *(Aff. ¶ 32)*.

For now, anyway, it is sufficient that Dr. Kam testified that Mr. Lin's hepatitis B was "cured" and that Dr. Aledort opines it had no adverse impact on his mortality in order for plaintiff to survive summary judgment.

MetLife's citation to *Kerr v. Metropolitan Life Ins. Co.*, 1995 U.S. Dist. LEXIS 19129, C-94-2440 (N.D. Cal. 1995) where the life insurance policy was rescinded does

18

not change this analysis. It is true, as MetLife points out, that the decedent in that case suffered from chronic hepatitis B, but that is where the similarity ends considering that the decedent suffered from serious liver disease. *Id.* at *3. Apparently, MetLife fails to appreciate that untreated hepatitis B and treated hepatitis B do not have the same prognosis. In *Kerr*, the decedent's liver problems existed for 7 years prior to his application and were so severe that he was advised that a hernia operation would be unsafe. *Id.* In fact, his doctor described him as having "a terrible liver function disease." *Id.* at *5. The decedent ultimately died from cardiopulmonary arrest caused by liver failure. *Id.* at *3. In contrast, Mr. Lin had completely normal liver function from the time of his successful interferon treatment in 1999 until his application date in August 2004, and there was no evidence that he suffered from either liver damage or cirrhosis. (*Aff.* ¶ *22-24*).

In light of the foregoing, the Court should respectfully find that the failure to disclose hepatitis B in the application was not material as a matter of law. Clearly, MetLife has not satisfied its legal burden in this regard.

        3.    MetLife did not follow its own underwriting guidelines and thus <u>cannot rely on them here to plaintiff's detriment.</u>

"[T]he trier of fact is not required to believe the 'post mortem' testimony of an insurer's agents that insurance would have been refused had the true facts been disclosed." *Thompson*, 513 P.2d at 360 (citation omitted). In *McAuliffe*, 245 Cal. App. 2d at 857, the insured did not disclose a doctor's visit that occurred just a few days before he signed an application for the reinstatement of his lapsed life insurance policy. At that visit the doctor diagnosed that the insured "has bronchitis, nervous, admits drinking, liver enlarged, had tremor the hand, blood pressure 130 over 80, pulse 110, has wheezing with

the lungs." The court held that the testimony of the insurance company's medical examiner did not determine materiality: "The insurer's medical examiner testified that, had he known of [the diagnosis], he would have denied reinstatement. But the jury was not required to accept that post-mortem conclusion, nor did it render conclusively material the representation as to medical consultation." *Id.*

MetLife bases its claim that the failure to disclose Mr. Lin's successfully treated hepatitis B was a material misrepresentation entirely on the testimony of its own medical director (Dr. Zamarippa) and medical expert (Dr. Clain). Notably, it does not rely upon the deposition testimony of Mr. Lin's treating physician, Dr. Kam—a deposition which MetLife originally noticed but now disregards seeing that Dr. Kam testified that he told Mr. Lin he was successfully treated and cured. This Court should not grant summary judgment for MetLife based on its own self-serving testimony.

MetLife refers to the underwriting guidelines to support its position. (*Aff. ¶ 17*). The guidelines, when applied, assign various ratings to an applicant based on his or her medical condition. The range of ratings is in descending order: select preferred, preferred, standard, and rated (measured in a debit system with numerical values). (*Exhibit E, p.41*). MetLife has exhibited confusion, however, in applying its own guidelines to the instant case. At one point, it quotes Dr. Zamarippa for the proposition that if Mr. Lin's history of hepatitis B had been known, he would have received a +50 debit rating which represents 150% mortality (the rated values can escalate to +100, +150 and so on). (*Tomasita Sherer Aff. ¶ 12*). But in another part of its argument, it states that "[d]uring Dr. Zamarippa's deposition he testified that … the best policy rating [Mr. Lin] would have received would have been standard (and not Select Preferred as he was

20

given)." *(Defendant's Memorandum of Law, p. 22)*.  Because the facts must be viewed in a light favorable to the non-moving party, this Court should ignore the +50 assessment. Moreover, that MetLife cannot even consistently decide in litigation what the correct rating should be for the policy indicates that a trier of fact should make that determination.

Further undermining the significance of the underwriting guidelines is that MetLife has a history here of playing fast-and-loose with them.  The guidelines absolutely prohibit the assignment of either a select preferred or preferred rating when an applicant has an elevation of his bilirubin level. *(Exhibits I, J, and K (ML 1096))*.  That leaves "standard" remaining as the next lowest rate—one of the rates that Dr. Zamarippa indicated Mr. Lin could have received if his history of successfully treated hepatitis B had been known. *(Aff. ¶ 14)*.  Yet although Mr. Lin had an elevated bilirubin level of 2.3 (out of a normal range of 0.2 to 1.5), he was given a select-preferred rating.[11] *(Exhibit K, ML 1096)*.

---

[11]   The evidence that neither select-preferred or a preferred rating should have been given is considerable.  A MetLife underwriting guideline entitled "Select Preferred/Elite Criteria" provides that: "Select Preferred will not be available … if any other criterion is not met."  Under a column entitled "Liver Enzymes," it states, "No elevations of … bilirubin (except for diagnosed Gilbert's Syndrome). *(Exhibit I)*.  Similarly, a guideline entitled "Preferred Criteria (All Plans)" states under the "Liver Enzymes" column: "No ratable results for … total bilirubin." *(Exhibit J)*.  A third MetLife guideline provides a +0 rating for a bilirubin level in the range of Mr. Lin's level; specifically, it designates a normal range as 0.5 to 1.5 and then provides a + 0 rating for a level up to 3.5. *(Exhibit K, ML 1096)*.

Any interpretation of this third guideline offered by MetLife to the contrary should be disregarded.  The guideline was produced on May 16, 2008 after the completion of depositions during which plaintiff may have inquired about it.  For unexplained reasons, it was not produced in its October 26, 2007 response to number 3 of plaintiff's Rule 34 request for: "A copy of MetLife's underwriting manual (or any other written policies or

Similarly, Mr. Lin's elevated triglyceride level should also have disqualified him from receiving either a select preferred or preferred rate. *(Aff. ¶ 16)*. According to the relevant guideline, the triglyceride level that Mr. Lin had of 189 entitled him to a +0 rating which would warrant a standard rated policy.[12] *(Exhibit K, ML 1091)*. In short, MetLife has turned to the guidelines in order to deny the claim for the policy, but when selling the policy in 2004 it chose to ignore them. How, then, can the issue of materiality be decided without an evaluation of the trial testimony?

The Court should also consider that underwriting is a subjective process and the guidelines are just that—*guidelines*—that do not need to be strictly followed. There is no mechanical process by which an insurance company—or at least MetLife—matches up a medical impairment with a set of guidelines to obtain a definite rating for a policy. This aspect of underwriting compels that a determination of materiality should not be made by an appeal to the guidelines, but rather by the jury after examining them in the context of the other evidence in the case.

Dennis Westman, the original underwriter for the policy, testified as follows at his deposition:

Q:    And so, would you agree that underwriting is subjective to the underwriter?

A:    Yes, sir.

*(Exhibit E, p. 14)*.

---

procedures) in effect at the time of the submission of the Application by Bang Lin to MetLife and/or its agents, servants, or employees." *(Exhibit L)*.

[12] This guideline was also produced by MetLife at the late date of May 16, 2008, and for the reasons stated in the previous footnote, MetLife should not be able to offer a contrary interpretation of it.

He further stated that the guidelines can be accepted or rejected by the underwriter:

> Q:    Do you have to follow this or is it just a guide? (referring to *Exhibit I*)
>
> A:    It's just a guide.
>
> Q:    So you are free to accept it or reject it; is that correct?
>
> A:    Yes.
>
> *(Exhibit E, p. 13).*

He also admitted that in 2004 he assigned a rating to the Lin policy that deviated from the guidelines:

> Q:    And did you make a subjective judgment to issue the policy at a rate
>       which was outside of the criteria listed in Exhibit [H] and Exhibit [I]?
>
> A:    Yes, I did sir.
>
> *(Exhibit E, p. 22).*

It is significant that even though underwriting is a subjective process, MetLife never consulted with Mr. Westman once it engaged in postclaims underwriting. (*Exhibit E, p. 17*). Instead Dr. Zamarippa acting alone applied his own individual judgment to declare the policy void. *(Exhibit M, pp. 29-34).* When making this determination, he was fully aware that he would be saving MetLife $1 million. (*Exhibit M, pp. 33-34*). In effect, MetLife had one procedure that it used to underwrite the policy at the time of sale, and then it used an entirely different procedure during postclaims underwriting. Notably, at the time of sale it disregarded the underwriting guidelines, and during postclaims underwriting it strictly applied them to the detriment of the consumer.

It is significant that MetLife did not involve Mr. Westman at the postclaims

underwriting stage given that his testimony, in sum and substance, was that Mr. Lin's

successful treatment for hepatitis B indicated that he had no increased risk of death:

> Q:    When someone has been successfully treated for hepatitis, do they have a normal life expectancy?
>
> A:    I would say the impairment, as long as they follow their physician's guidance, they are going to have a normal life expectancy, to some point.
>
> Q:    Someone having a normal life expectancy is important in underwriting?
>
> A:    Yes.
>
> Q:    When you are underwriting you are really considering whether someone has a normal life expectancy or not; correct?"
>
> A:    Yes.

*(Exhibit E, pp. 50-51).*

Thus, it is reasonable to conclude that, if Mr. Westman had known about Mr.

Lin's successfully treated hepatitis B in 2004 when he intially evaluated the application,

it would not have changed his assessment of the risk.

> 4.    MetLife's failure to properly investigate the policy application constitutes "waiver."

Under California law an insurance company has waived its right to declare a

policy void based on the failure to disclose a medical impairment if it disregards

information that should put it on notice thereof. *See DiPasqua v. California Western*

*States Life Ins. Co.*, 106 Cal. App. 2d 281, 284, 235 P.2d 64, 66 (1951). *California*

*Insurance Code § 336* provides:

> The right to information of material facts may be waived, either (a) by the terms of insurance or (b) by neglect to make inquiries as to such facts, where they are distinctly implied in other facts of which information is communicated.

24

Further, "[t]he rule is well established that the means of knowledge is equivalent to knowledge, and that a party who has the opportunity of knowing the facts constituting the fraud of which he complains cannot be supine and inactive, and afterwards allege a want of knowledge that arose by reason of his own laches or negligence." *Barrera v. State Farm Mut. Auto. Ins. Co.*, 71 Cal. 2d 659, 669 fn. 7, 79 Cal. Rptr. 106, 113, 456 P.2d 674, 681 (1969) (citations omitted).

In *DiPasqua*, 106 Cal. App. 2d at 284, the insured underwent two medical examinations conducted by the insurance company, and at each one, stated that he had not been a patient in a hospital except for an appendectomy many years ago, when, in fact, he had been a patient in two hospitals within the past year. Prior to both examinations, the insurance company had in its possession a report from its investigator revealing that the information given by the insured was not true. *Id.* Ruling in favor of the plaintiff on the grounds of waiver, the California Appeals Court found that the insurance company was put on notice that the answers of the insured could not be reasonably relied upon. The Court further stated that the insurance company "had in its possession an authorization signed by the insured to obtain any medical information pertaining to him. It would not have been unreasonable or difficult for the company to have contacted the [hospital] and thus would have ascertained the truth." *Id.*; *see also Rutherford*, 234 Cal. App. 2d at 735 (where insurer possessed information indicating that answers in the medical questionnaire did not disclose the insured's heart disease and alcoholism, the insurer waived the deficiencies in the application by failing to make further inquiries).

25

Dr. Zamarippa testified at deposition that Mr. Lin's elevated bilirubin level could have been an indicator of liver disease such as cirrhosis or hepatitis. (*Exhibit M, Deposition of Daniel Zamarippa, M.D., p. 53*). He further stated that the elevated triglyceride level could have indicated hepatitis diabetes or hyperlipidemia. (*Exhibit M, p. 22*). Yet MetLife never further investigated either of these elevations, and not only did it proceed to issue a $1 million life insurance policy to Mr. Lin, but it did so at the best available rate. (*Aff. ¶ 16*).

Ironically, MetLife claims that it was significant to Mr. Lin's mortality that he was positive for the hepatitis B surface antigen (HBsAg), yet it did not test for this marker although it was an available entry on the blood test it performed. (*Aff. ¶ 10*). When Dr. Clain was asked about the failure to perform this particular test, he testified, "In my medical office, if someone was an Asian immigrant, if I was a primary care doctor, I would test them for hepatitis B." *(Exhibit C, p. 118)*. This raises the question of why this test was not performed on an Asian immigrant such as Mr. Lin, who is a member of a population where 1 in 5 would test positive for hepatitis B, especially given that he had an elevated bilirubin level and was applying for a $1 million policy.

MetLife claims that it did not know that Mr. Lin was Asian. But how did it view the name "Bang Lin" in conjunction with the answer of "Taiwan" in the application where it asks for place of birth? (*Defendant's Exhibit A, ML 00394, Regina Solomon-Stowe Aff.*). Moreover, Judy Huang, a MetLife employee, certainly knew that Mr. Lin was Asian.

MetLife also defends itself by stating that even if it had been aware of Mr. Lin's race or ethnicity, it would have been immaterial since it cannot treat applicants differently

26

on the basis of race. Its own expert has testified that between 15% to 20% of Asian immigrants have an active hepatitis B infection, and about 20% to 30% have at one time been infected. (*Exhibit C, pp. 101-102*). If MetLife chooses to turn a blind eye to this common and predictable condition among Asian immigrants during the application process, it should not later at post-claims underwriting stage suddenly argue that it poses a mortality risk so that it can deny a claim. If successfully treated hepatitis B, even where the subject has no cirrhosis, is really a significant medical condition, as MetLife claims, and it is very common in the Asian immigrant population, as MetLife agrees, it should include it in the blood test of applicants like Mr. Lin who indicate they were born in Asia. It especially should have tested for it here where Mr. Lin had elevated bilirubin and triglyceride levels. MetLife tested for 17 markers in its blood test of Mr. Lin. (*Defendant's Exhibit B, Regina Solomon-Stowe Aff.*). Why not make hepatitis B the eighteenth when it is already a blank entry on the test results?[13]

As stated above, there are inconsistencies within Parts I and II of the application which are a testament to its unreliability. In short, Part I gives contradictory answers about whether Mr. Lin had medical appointments scheduled in the future. (*Defendant's Exhibit A, ML 00394-00400, Regina Solomon-Stowe Aff.*). In Part II, it states in one place that Mr. Lin treated for "skin itching," but then in another says that he never received treatment for "any disease or disorder of the skin." (*Defendant's Exhibit A, ML 00392-00393, Regina Solomon-Stowe Aff.*). These inconsistent answers should have been

---

[13] Asian immigrants are a particularly vulnerable population group here. MetLife will, of course, argue here that it is sufficient that the application inquires about hepatitis B. But it is foreseeable that a portion of the Asian immigrant population will lack fluency of the English language, and that agents may not be scrupulous in making sure that they understand each question contained in the application and carefully review their answers.

detected by MetLife, whereupon it should have further investigated the reliability of the application. Because it did not do so, it alone should bear the burden for any omissions or misrepresentations.

In summary, MetLife's failure to investigate Mr. Lin's elevated lab results, test him for hepatitis B given both these results and his Asian ancestry, and its failure to investigate the reliability of the application together raise a triable question of fact as to whether it waived its right to contest the validity of the Lin policy.

### 5.  California law discourages the practice of post-claim underwriting.

In 2007 the California Court of Appeals in *Hailey v. California Physicians' Service, supra*, issued a strong critique of the practice of postclaims underwriting. In *Hailey*, a woman applied for a health insurance policy but incorrectly believed that the application only requested her health information and not that of other family members. 158 Cal. App. 4th at 460. After her husband was involved in an automobile accident that left him disabled, Blue Shield cancelled the family's insurance coverage retroactively on the grounds that a misrepresentation was made in the application. *Id.* at 461. Concededly, *Hailey* addressed the rescission of a health insurance policy, which is governed under its own statutory framework explicitly forbidding postclaims underwriting except where the insured made a willful misrepresentation in the application, but still, this decision is relevant here.

In a section extending over 5 pages in the California Reporter, the Court neatly summarized the harm that results from post claims underwriting:

28

The harm from postclaims underwriting is manifest. As one court observed: "An insurer has an obligation to its insureds to do its underwriting at the time a policy application is made, not after a claim is filed. It is patently unfair for a claimant to obtain a policy, pay his premiums and operate under the assumption that he is insured against a specified risk, only to learn *after* he submits a claim that he is *not* insured, and, therefore, cannot obtain any other policy to cover the loss. The insurer controls when the underwriting occurs. ... If the insured is not an acceptable risk, the application should [be] denied up front, not after a policy is issued. This allows the proposed insured to seek other coverage with another company since no company will insure an individual who has suffered serious illness or injury." (original italics) (citation omitted).

*Hailey*, 158 Cal. App. at 465.

MetLife, of course, with respect to the denial of the Lin policy, is not governed by the health insurance laws of California discussed in *Hailey*. Instead it cites a confluence of other relevant statutes that apply to life insurance policies, including *Cal. Ins. Code § 331* which states: "Concealment, whether intentional or unintentional, entitles the injured party to rescind insurance."

But the *Hailey* Court, in ruling that the insurance company could not rescind coverage, observed that its result would have been the same if section 331 applied. *Id.* at 470. In support the Court referred to the California Supreme Court decision of *Barrera v. State Farm Mut. Automobile Ins. Co.*, 71 Cal. 2d 659, in which a third party injured in a collision sued the insurer to collect a judgment against the insured. The *Barrera* Court likewise described the harm that can result from postclaims underwriting:

With respect to an insurance policy voidable under [section 331 of] the Insurance Code, if an automobile liability insurer can perpetually postpone the investigation of insurability and concurrently retain its right to rescind until the injured person secures a judgment against the insured and sues the carrier, then the insurer can accept compensation without running any risk whatsoever. Such a rule would permit an automobile liability insurer to continue to pocket premiums and take no steps at all to probe the verity of the application for the issued policy unless and until the financial interest of the insurer so dictated. Furthermore, under such a

29

rule, the carrier would be permitted to deal with the insured as though he were insured, and thus to lead him to believe that he was in fact insured."

*Barrera*, 456 P.2d at 682.

Granted, the *Barrera* Court noted that automobile insurance is of a quasi-public nature, since drivers rely on other drivers having insurance to protect them from loss. *Id.* at 680-81, 683. This does place it on a slightly different footing than a life insurance dispute where there is a relationship between the insured and the beneficiary. However, *Barrera* did integrate § 331 into its analysis. Further, the strong critique of postclaims underwriting in *Hailey*, issued within the past year, is a signal of an emerging trend in California to discourage postclaims underwriting.

> D.    Plaintiff's cross-motion to strike/*in limine* for an order precluding the expert testimony of Daniel Zamarippa, M.D. and David Clain, M.D.

Plaintiff moves to strike the expert testimony of the MetLife medical director, Daniel Zamarippa, and of David Clain, M.D., a proposed expert gastroenterologist, on the grounds that the former lacks proper qualifications and that both of their opinions about the effect of hepatitis B on the life expectancy of Mr. Lin lack the scientific rigor required under the U.S. Supreme Court's *Daubert* decision and its progeny.

Rule 702 of the Federal Rules of Evidence states, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." According to the Supreme Court decision of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 592-93, 113 S.Ct. 2786 (1993), in order for expert testimony to be admissible under Rule 702, a district court must make "a preliminary assessment of

whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."

*Daubert* provides a list of factors to guide the district courts in their role as the gatekeepers of expert testimony which includes: (1) whether the theory has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) the known or potential rate of error; (4) standards controlling the technique's operation; and (5) the general acceptance of the theory or technique in the scientific community. *Id.* at 593-594; *see also, Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167, 1174 (1999) (extending *Daubert* to apply to all expert testimony regardless of whether the expert has scientific knowledge).

"To warrant admissibility, … it is critical that an expert's analysis be reliable at every step … In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. National Railroad Passenger Corp.,* 303 F.3d 256, 267 (2d Cir. 2002); *see also General Electric Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 519 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

Rule 104(a) of the Federal Rules of Evidence places the burden on the advocate of expert testimony to prove by a preponderance of the evidence that the testimony should be admissible. *See also Berk v. St. Vincent's Hospital and Medical Center,* 380 F. Supp. 2d 334, 350-351 (S.D.N.Y. 2005), *citing Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir.

1997) (it is appropriate for district courts to rule at the summary judgment stage that expert testimony is inadmissible).

In *Amorgianos v. National Railroad Passenger Corp.*, 303 F.3d at 260, the plaintiff claimed that he suffered harm from exposure to xylene, an organic solvent contained in paint, when he was at a job site spray painting a bridge. The Court excluded the plaintiff's expert medical testimony on the topic of causation under a *Daubert* analysis because there was too great an "analytical gap" between the articles cited by the expert and her conclusion that the plaintiff was harmed by xylene. All of the articles involved individuals who were exposed to a variety of solvents, many of which were not contained in the paint that plaintiff used. *Id.* at 270.; *see also Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 254 (2d Cir. 2005) (expert physician could not point to studies or other reliable information suggesting that there was a causal connection between the medication Rezulin and cirrhosis); *Viscusi v. Proctor & Gamble*, 2007 WL 2071546 at *6, 05-CV-01528 (E.D.N.Y. 2007) (excluding expert testimony when it is "speculative or conjectural").

In the instant case, the expert testimony of both Drs. Zamarippa and Clain are inadmissible under *Daubert* and its progeny. They each theorize that Mr. Lin was at an increased risk of death as a result of his history of hepatitis B, even though it was successfully treated and he did not have cirrhosis. But they simply do not have a valid and reliable scientific basis to support their opinions.

Preliminarily, Dr. Zamarippa is not qualified to render such an opinion. He received his medical education at the National University of Mexico, completed training in cardiology in 1990 or 1991, and first began working for insurance companies in 1992

as a medical director in Mexico. *(Exhibit M, pp. 8-15)*. Most of his professional career has been devoted to working for insurance companies. *(Exhibit M, p. 16)*. He is not licensed to practice medicine in the United States and therefore is not qualified to deem himself a medical doctor in this country. *(Exhibit M, p. 54)*. Moreover, there is no evidence that he has any experience treating hepatitis B patients or studying the epidemiology of the disease. Quite obviously, he lacks the proper qualifications to give expert medical testimony at trial. In addition, MetLife has neither disclosed him as an expert witness nor provided a report from him despite its obligations to do so under F.R.C.P. 26. In light of the foregoing, he should clearly be precluded from providing expert testimony regarding the alleged impact of hepatitis B on Mr. Lin's mortality.

Dr. Clain's expert opinion—and along with it, that of Dr. Zamarippa if the Court deems him to be a qualified witness, since his testimony essentially follows that of Dr. Clain—is fatally deficient because it lacks a proper scientific foundation. At his deposition, Dr. Clain admitted that there are no studies showing that Asian immigrants with hepatitis B who have been successfully treated and do not have cirrhosis are at a higher risk of developing liver cancer than the general public. *(Exhibit C, p. 111)*. Therefore, the defendant's experts' opinion does not satisfy the first prong of *Daubert* because it has not been tested. It also does not meet the second prong given that it has not been the subject of peer review or publication.

Dr. Clain also fails to show that his theory has been generally accepted by the scientific community. In fact, Dr. Clain flatly conceded at his deposition that the medical community does not know the effect of treatment for hepatitis B in preventing liver cancer: "we don't know what the effect is of treatment [for hepatitis B] in preventing

liver cancer." (*Exhibit C, pp.105-106*). Because Mr. Lin was successfully treated for hepatitis B, Dr. Clain has no reliable basis to claim that Mr. Lin was at an increased risk of liver cancer. Moreover, Dr. Clain was not even aware of especially pertinent statistics such as the rate of liver cancer in the general public or the rate of liver cancer among Asian immigrants living in the U.S. (*Aff.* ¶ *36*). Therefore, he has absolutely no basis to compare the likelihood of liver cancer developing in an Asian immigrant compared to the general public.

MetLife also does not address another key factor in assessing Mr. Lin's mortality risk which is the overall mortality of Asian immigrants versus other racial and ethnic groups. MetLife assumes that hepatitis B, even if successfully treated, has a negative impact on life expectancy. Yet given the prevalence of hepatitis B in Asian immigrants, MetLife has not demonstrated that they have an overall lower life expectancy. But this is critical information that must be taken into account. Said another way, if this population does not have a lower life expectancy than other racial and ethnic groups, then even if hepatitis B is prevalent within it, the condition should not be material for underwriting purposes.

Assuming *arguendo* that the studies Dr. Clain relies on are scientifically valid, they simply do not apply to the facts of this case. In other words, there exists too much of a gap between the studies and the conclusion he reaches. Again, Dr. Clain has concluded that Mr. Lin had an increased risk of death from liver cancer because of his history of hepatitis B, even though it was successfully treated. Similar to the experts in *Amorgianos*, Dr. Clain bases his conclusion not on his own studies, but on articles written by others, and in both that case and the instant action the articles reported studies where

the control factors differed from the relevant facts at issue. In *Amorgianos*, the studies involved individuals exposed to solvents that were not contained in the paint to which the plaintiff was exposed. In the instant case, the studies relied on by Dr. Clain did not test Asian immigrants like Mr. Lin who were successfully treated for hepatitis B and did not have cirrhosis. Dr. Clain simply extends studies that have a different focus and different control factors than are involved in the instant case without any scientific support.

The studies he relies on (annexed as Exhibit M to the Affidavit of Tomasita Scherer) will each be addressed in turn:

> A. Management of Hepatocellular Carcinoma, AASLD Practice
> Guideline.

This publication does not indicate whether the subjects of the studies referenced therein were ever treated with interferon or any other medication. Dr. Clain admitted as much in his deposition:

> Q:    You would agree that there isn't anything in this study that refers at all to an analysis of what the incidence is of liver cell cancer for patients who have been successfully treated for hepatitis B, correct?
>
> A:    Not in these studies, no.

(*Exhibit C, p. 93*).

Because this study addresses individuals with untreated hepatitis B, rather than just those with hepatitis B that was successfully treated, it is not relevant to this action.

> B. HBsAg Seroclearance in Chronic Hepatitis B in the Chinese:
> Virological, Histological, and Clinical Aspects, HEPATOLOGY, 2004

This particular study is irrelevant because it concerns a different subject matter than what is at issue in this case and it focused on patients who were significantly different than Mr. Lin. The study was conducted between August 1975 and October

2001 that involved 3,843 chronic hepatitis B patients in Hong Kong. *(Defendant's Exhibit M, p. 1695, Tomasita Sherer Aff.).*  Mr. Lin, however, was not a chronic carrier, according to Dr. Aledort. *(Exhibit P, pp. 94, 159).*  Further, only 6 patients had interferon treatment like Mr. Lin had. *(Defendant's Exhibit M, p. 1695, Tomasita Sherer Aff.).*  Ninety-two patients cleared the hepatitis B surface antigen (HBsAg), which is a marker that defines if an individual is a hepatitis B carrier. *(Defendant's Exhibit M, p. 1695, Tomasita Sherer Aff.).*  Mr. Lin did not clear this antigen.[14]  The study then focused on these 92 patients which obviously is a different classification than Mr. Lin.

The study is also irrelevant since its objective, as stated on page 1694, was to determine the significance of the clearance of the hepatitis B surface antigen (HBsAg) in Chinese hepatitis B patients. *(Defendant's Exhibit M, Tomasita Sherer Aff.).*  The issue in this case is quite different—whether a successfully treated patient with hepatitis B has an increased risk of death from liver cancer.

      C.     "Lamivudine for Patients with Chronic Hepatitis B and Advanced Liver Disease," New England Journal of Medicine, October 7, 2004.

As the title of this article indicates, the authors conducted a study that involved patients who not only had hepatitis B but also advanced liver disease. *(Defendant's Exhibit M, p. 1521, Tomasita Sherer Aff.).*  In fact, on page 1529 it states: "In summary, this multicenter, prospective, randomized, double-blind, placebo-controlled trial of lamivudine in patients with chronic hepatitis B and cirrhosis or advanced fibrosis showed

---

[14] Dr. Aledort noted that the surface antigen is only eliminated in five percent of cases treated successfully and it did not alter his opinion that Mr. Lin did not have a reduced life expectancy. *(Exhibit P, pp. 75, 132-34).*

that lamivudine decreased progression of the disease, thereby reducing clinically important complications." (*Defendant's Exhibit M, Tomasita Sherer Aff.*).

Quite obviously, the fact that the patients had advanced liver disease and were treated with lamivudine make this study irrelevant to the instant action. Plaintiff claims here that his hepatitis B did not affect Mr. Lin's life expectancy because he did not suffer from liver damage. To analyze his condition based on other hepatitis B patients with liver damage misses the point.

WHEREFORE, Plaintiff respectfully request that this Court deny the defendant's Motion for Summary Judgment and grant plaintiff's Cross-Motion to Strike/*In Limine* for an order precluding: (a) MetLife's medical director, Daniel Zamarippa, M.D. from offering expert medical opinions relating to hepatitis B at the summary judgment stage or at trial; and (b) precluding its expert witness, David Clain, M.D., from offering an expert opinion at the summary judgment stage or at trial concerning the effect of hepatitis B on the mortality of Bang Lin.

Dated:    New York, New York
          August 1, 2007

                                        TRIEF & OLK

                              By:    _____
                                     Eric Dinnocenzo, Esq.  (ED 3430)
                                     *Attorneys for Plaintiff*
                                     *Jean Lin*
                                     150 East 58th Street
                                     34th Floor
                                     New York, New York 10155
                                     (212) 486-6060