UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JEAN LIN,

                    Plaintiff,                    07-CV-3218 (Judge Holwell)

-against-

METROPOLITAN LIFE INSURANCE COMPANY,

                    Defendant.

---

## REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFF'S CROSS-MOTION *IN LIMINE*

METROPOLITAN LIFE INSURANCE
COMPANY

By: /S/ Tomasita Sherer
     Alvin Pasternak (AP 5085)
     Tomasita Sherer, of Counsel (TH 6072)
     Attorneys for Defendant
     One MetLife Plaza
     27-01 Queens Plaza North
     Long Island City, NY 11101
     (212) 578-3102 (Tel)

# **TABLE OF CONTENTS**

TABLE OF CONTENTS......................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. A-i

PRELIMINARY STATEMENT ...........................................................................................1

ARGUMENT..........................................................................................................................2

I.      Metlife Is Entitled To Summary Judgment Because Plaintiff Has Failed
        To Show The Existence Of A Genuine Issue Of Material Fact............................................2

        A.      MetLife's statement of material facts was fully laid out in MetLife's
                summary judgment brief and supporting affidavits ......................................3

        B.      There is no plausible explanation which excuses Decedent's
                misrepresentations...........................................................................................5

                1.      The agent and paramedical examiner read the questions on
                        the application for the Policy to the Decedent and properly
                        recorded his answers as given .........................................................6

                2.      Whether Decedent believed his status as a hepatitis B carrier
                        was insignificant does not excuse his misrepresentations .............10

                3.      None of the so-called minor inconsistencies in the application
                        for the Policy excuse the fact that material misrepresentations
                        were made ......................................................................................12

        C.      Decedent's hepatitis B history is material to the risk assumed by
                MetLife ..........................................................................................................12

                1.      Hepatitis B is material from an underwriting perspective.............13

                2.      Hepatitis B is material from a medical perspective ......................16

        D.      MetLife had no notice of Decedent's hepatitis B history until its post-
                claim investigation.........................................................................................17

II.     Plaintiff's Cross-Motion *In Limine* Must Be Denied Because Dr. Zamarripa Is A Fact
        Witness And Dr. Clain Is A Qualified Expert Witness .....................................................18

CONCLUSION.....................................................................................................................20

## TABLE OF AUTHORITIES

**Cases**

*American Gen. Life Ins. Co. v. Green*, 2008 U.S. Dist. LEXIS 39985
(E.D. Cal. May 16, 2008) ...................................................................................................... 6, 12

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................................... 6

*Arrival Star v. The Descartes Sys. Group*, 2004 U.S. Dist. LEXIS 22433
(S.D.N.Y. Nov. 5, 2004) ........................................................................................................... 4

*Cohen v. Penn Mut. Life Ins. Co.*, 312 P.2d 241 (Cal. 1957) ........................................................... 6

*D'Nelson v. Costco Wholesale Corp.*, 2006 U.S. Dist. LEXIS 16986
(E.D.N.Y. Mar. 24, 2006) ...................................................................................................... 4-5

*Daubert v. Merrell Dow Pharmaceutical, Inc.*, 509 U.S. 579 (1993) .......................................... 19

*Gilani, et al. v. GNOC Corp., et al.*, 2006 U.S. Dist. LEXIS 23397
(E.D.N.Y. Apr. 25, 2006) ...................................................................................................... 3-4

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
2008 U.S. Dist. LEXIS 37331 (S.D.N.Y. May 7, 2008) ........................................................ 19

*Ingram v. Old Line Ins. Co. of Am.*, 1999 U.S. Dist. LEXIS 9346
(N.D. Cal. Jun. 21, 1999) .............................................................................................. 2, 10, 18

*Kerr v. Metro. Life Ins. Co.*, 1995 U.S. Dist. LEXIS 19129
(N.D. Cal. Dec. 7, 1995) ........................................................................................................ 5-6

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) ............................................................ 19

*Pharmacy v. American Pharmaceutical Partners*, 511 F. Supp. 2d 324 (E.D.N.Y. 2007) ......... 4-5

*Photopaint Technologies v. Smartlens Corp.*, 335 F.3d 152 (2d Cir. 2003) .................................... 4

*Securitron Magnalock Corp. v. Schabolk*, 1994 U.S. Dist. LEXIS 8934
(S.D.N.Y. Jun. 20, 1994) ...................................................................................................... 18-19

*Taylor v. Sentry Life Ins. Co.*, 729 F.2d 652 (9th Cir. 1984) ........................................................ 13

*Thompson v. Occidental Life Ins. Co. of California*, 109 Cal. Rptr. 473 (1973) .......................... 10

*Tiffany v. EBAY*, 2007 U.S. Dist. LEXIS 85357 (S.D.N.Y. Nov. 9, 2007) .................................. 19

*Trinh v. Metro. Life Ins. Co.*, 894 F. Supp. 1368 (N.D. Cal. 1995)............................................. 12

*United States v. Moskowitz, Passman & Edelman*, 2007 U.S. Dist LEXIS 75407
(S.D.N.Y. Oct. 9, 2007)................................................................................................................. 4

*Walsh v. Suffolk County Police Dept.*, 2008 U.S. Dist. LEXIS 36465
(E.D.N.Y. May, 5, 2008) ............................................................................................................... 4

*Williams v. R.H. Donnelley, Inc.*, 199 F. Supp. 2d 172 (S.D.N.Y. 2002)....................................... 4

*Wilson v. W. Nat'l Life Ins. Co.*, 1 Cal. Rptr. 2d 157 (1991) ........................................................ 13

## Statutes

Cal. Ins. Code § 331........................................................................................................................ 6

Cal. Ins. Code § 334.......................................................................................................................13

Federal Rule of Evidence 702........................................................................................................19

## PRELIMINARY STATEMENT

In opposing MetLife's motion for summary judgment, Plaintiff simply ignores the evidence and relies solely on general conclusory statements, her own version of the facts and entirely inapplicable case law, none of which can establish a genuine issue of material fact. Plaintiff has failed to come forward with any specific facts evidencing a need for trial or otherwise proving that summary judgment should not be granted in MetLife's favor. Based upon the overwhelming and undisputed evidence – as supported by the evidence of record – there is no genuine issue of material fact, and MetLife is entitled to summary judgment.

Plaintiff's cross-motion *in limine* is merely a desperate attempt to strike compelling evidence presented by MetLife's distinguished and renowned liver expert. It is misplaced, untimely, and unsupported by fact or law.[1]

As explained at length in MetLife's moving papers, dismissal of Plaintiff's complaint is warranted on the basis of the material misrepresentations made by Mr. Bang Lin ("Decedent") in response to questions on the life insurance application for policy no. 204 126 416 ET (the "Policy"), concerning his history of hepatitis B. Specifically, Mr. Lin was at all relevant times a hepatitis B carrier.[2] Indeed, he had a seven-year history of treatment for hepatitis B (six of those years being before he applied for the Policy), and was diagnosed as having chronic hepatitis B on

---

[1] Indeed, there are serious questions about the admissibility of Plaintiff's purported expert, Dr. Louis Aledort, as he is a hematologist (a blood disease specialist), admittedly not a liver expert, and does not treat patients with liver disease. *See* Sherer Aff., Exh. O; Exh. K, pp. 43-45 (In Dr. Aledort's own words, "Of all the people in gastroenterology the liver guy who spent his years of training in liver is the most qualified to deal with liver disease and treat it."). Furthermore, Dr. Aledort has never written about the treatment of liver disease. *See* Sherer Aff., Exh. K, p. 55 ("I have never written about the treatment of liver disease."). The fact that Dr. Aledort's HIV studies as a hematologist touch upon patients who also have hepatitis B or that he works with a "team" that includes liver specialists hardly makes him a liver expert. MetLife intends to fully raise this issue before the Court at a later more appropriate evidentiary juncture, if necessary.

[2] He also had active elevation of viral counts in the blood in 1999, 2003 and 2004. *See* Stowe Aff., Exh. E, pp. ML LIN 00110, 117. The 1999 elevations showed substantial chronic hepatitis B disease, for which he was treated with Interferon. *See* Sherer Aff., Exh. H, ML LIN 00099-00103.

March 27, 2004 (months before he applied for the Policy). These facts are undisputed and support rescission of the Policy as they are clearly material to MetLife from an underwriting standpoint. It is evident from the sworn affidavits presented by MetLife with attached exhibits, including an affidavit by MetLife's underwriter with attached underwriting guidelines, that if MetLife had known the truth of Decedent's misrepresentations, it would not have issued the Policy. Plaintiff argues in opposition utilizing nothing more than post-litigation self-serving statements, which contradict earlier statements, and misstatements of facts that are clearly stated in the record. Plaintiff also utilizes case law citations that are completely irrelevant or distinguishable, including cases dealing with medical and automobile insurance which have no bearing on the issues in this case.

Accordingly, for the reasons set forth in MetLife's moving papers and above and below, MetLife's motion for summary judgment dismissing Plaintiff's complaint in its entirety and on its counterclaim should be granted, and Plaintiff's cross-motion *in limine* should be denied.

## ARGUMENT

### I.      MetLife Is Entitled To Summary Judgment Because Plaintiff Has Failed To Show The Existence Of A Genuine Issue Of Material Fact

Even reviewing the record in a light most favorable to Plaintiff, there can be no finding of a genuine issue of material fact in dispute nor has Plaintiff presented any evidence to support such a finding. *See, e.g., Ingram v. Old Line Ins. Co. of Am.*, 1999 U.S. Dist. LEXIS 9346, *9 (N.D. Cal. Jun. 21, 1999) (granting summary judgment for insurer where perceived minor ailments were not disclosed on the application for insurance).

Plaintiff essentially argues that: (1) there is a plausible explanation that excuses Decedent's misrepresentations; (2) Decedent's history of hepatitis B is immaterial; and (3) MetLife was put on notice of Decedent's hepatitis B history because he was Asian and had

2

slightly elevated bilirubin results in his paramedical exam. However, under the language of the
Policy, the application, MetLife's underwriting guidelines, and the applicable relevant case law,
Plaintiff's arguments must fail.

## A.     MetLife's statement of material facts was fully laid out in MetLife's summary judgment brief and supporting affidavits

As an initial matter, Plaintiff argues that MetLife has failed to provide a statement of
material facts in violation of Rule 56.1, and urges the Court to deny MetLife's motion on this
basis alone. In fact, MetLife has substantially complied with Rule 56.1 in its moving papers and
has painstakingly provided citations, including bates ranges and page numbers, for each and
every fact statement provided therein. *See* Defendant's Memorandum of Law in Support of its
Motion for Summary Judgment, Statement of Facts, pp. 2-14; *see also* Affirmation of Tomasita
L. Sherer, Affidavit of Daniel Zamarripa, Affidavit of Regina Solomon-Stowe, and Affidavit of
Peggy Chou in Support of MetLife's motion for summary judgment, filed July 3, 2008. Each
affidavit (and the affirmation) provided by MetLife contains separate, short and concise
statements, in numbered paragraphs, of the facts reiterated entirely in MetLife's brief, under the
heading "Statement of Facts," along with the supporting exhibits referenced therein. *See Id.*

There is simply no basis for Plaintiff's allegation that the Court has had to "search
through voluminous documents without any guidance from the parties,"[3] and no prejudice has
resulted to Plaintiff from the fact that MetLife did not provide an additional document entitled,
"Statement of Facts," with bates ranges and page numbers, which would be a virtual cut-and-
paste of what has already been provided.[4] *See Gilani, et al. v. GNOC Corp., et al.*, 2006 U.S.

---

[3] *See* Plaintiff's Memorandum of Law in Opposition, p. 5.

[4] Plaintiff states several times in her opposition papers that this case involves "complex" medical and
factual issues necessitating the filing of this extra document and implies that the Court will not be able to
make sense of the facts without it. In fact, the Court will easily see that what has now been provided
(Exhibit A attached hereto) is identical to what was provided before and the facts cannot be simpler: (1)

Dist. LEXIS 23397, *5 (E.D.N.Y. Apr. 25, 2006) ("Although the Court could properly deny the motion under Local Rule 56.1, the wiser path … is to make a determination on the record."); *Photopaint Technologies v. Smartlens Corp.*, 335 F.3d 152, 155, fn 2 (2d Cir. 2003) (noting that the District Court found that the parties failed to comply with Local Rule 56.1, however, "The court observed [] that 'the relevant facts are apparent from both parties' briefs and affidavits' and [] there was no evidence of prejudice on account of the lack of Rule 56.1 submissions.").[5]

Every case cited by Plaintiff to support its request for denial of summary judgment on this point, is distinguishable from what has occurred here.[6] The fact is, Plaintiff has not been prejudiced, MetLife did not intentionally disregard Rule 56.1, and MetLife substantially complied with the requirements of Rule 56.1 with its "Statement of Facts" section in its memorandum of law and supporting affidavits. Utilizing the Court's discretionary power, and in the interest of judicial economy, Plaintiff's request should be denied. *See D'Nelson v. Costco Wholesale Corp.*, 2006 U.S. Dist. LEXIS 16986 (E.D.N.Y. Mar. 24, 2006) (holding Courts have

_____

there was an application for insurance and a paramedical exam; (2) there was a claim made after Decedent's death, which occurred within the contestable period of the policy; (3) there were misrepresentations in the policy concerning Decedent's hepatitis history (including but not limited to the fact that he was at all times a hepatitis B carrier); and (4) the claim was denied because these misrepresentations were material from an underwriting standpoint.

[5] *See also Walsh v. Suffolk County Police Dept.*, 2008 U.S. Dist. LEXIS 36465, *4, fn 1 (E.D.N.Y. May 5, 2008) ("Here, although plaintiff did not comply with Rule 56.1, plaintiff's written submissions … cite to the relevant portions of the record upon which plaintiff is relying. Thus, both the defendants and the Court are clearly aware of the portions of the record upon which plaintiff relies … and defendants have not identified any prejudice arising from the plaintiff's failure to comply with Rule 56.1."); *Williams v. R.H. Donnelley, Inc.*, 199 F. Supp. 2d 172, 174 (S.D.N.Y. 2002) ("Plaintiff failed to submit a 56.1 statement in opposition to defendant's motion. Nonetheless, so as not to unduly prejudice plaintiff or her attorney's procedural error, we will deem the facts set forth in plaintiff's memorandum of law sufficient to satisfy Rule 56.1.").

[6] *See, e.g., United States v. Moskowitz, Passman & Edelman*, 2007 U.S. Dist LEXIS 75407, *7, fn 3 (S.D.N.Y. Oct. 9, 2007) (noting procedural deficiency under Rule 56.1 where there was no statement of material facts nor any citations to admissible evidence); *Arrival Star v. The Descartes Sys. Group*, 2004 U.S. Dist. LEXIS 22433, *10-*11 (S.D.N.Y. Nov. 5, 2004) (noting same where "The only evidence of record relied upon … is a summarily-stated declaration."); *Pharmacy v. American Pharmaceutical Partners*, 511 F. Supp. 2d 324, 332 (E.D.N.Y. 2007) (noting same where only unsupported assumptions were provided).

"broad discretion to determine whether to overlook a party's failure to comply with local court rules, and may opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement.").

Nevertheless, for ease of the Court's and Plaintiff's reference, MetLife has herein cut-and-pasted the very same statement of facts (including the headings) that appears in its summary judgment brief and supporting affidavits, in numbered paragraphs, in a separate document entitled, "Defendant's Statement Of Material Facts In Which There Is No Genuine Issue To Be Tried Pursuant To Local Civil Rule 56.1," which the Court and the parties can readily see is virtually identical to what has already been provided. *See* Exhibit A attached hereto.

## B.     There   is   no   plausible   explanation   which   excuses   Decedent's misrepresentations

Plaintiff alleges the following alternative theories to try to overcome the ample evidence supporting a finding that Decedent misrepresented his medical history on the application for the Policy and argues that there is an excusable "plausible explanation" for Decedent's misrepresentations because: (1) the agent and the paramedical examiner, on two separate occasions, failed to read the questions on the application to Decedent; (2) Decedent believed that his status as a hepatitis B carrier was an insignificant medical condition (akin to varicose veins or chest pains); and (3) there are minor inconsistencies in the application that were apparently ignored, so any material misrepresentations should also be ignored. As the evidence shows, these theories are neither plausible nor supported by applicable case law.     In addition, no evidence has been provided by Plaintiff to support these theories or to persuade a jury to return a verdict in her favor. *See Kerr v. Metro. Life Ins. Co.*, 1995 U.S. Dist. LEXIS 19129, *2 (N.D. Cal. Dec. 7, 1995) ("There is no issue for trial unless there is sufficient evidence favoring the

5

nonmoving party for a jury to return a verdict for that party.") (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

Plaintiff's theories attempt to turn the applicable law of misrepresentation on its head. Intent to deceive is simply not a requirement under California law. *See* Cal. Ins. Code § 331 ("Concealment, whether intentional or unintentional, entitles the injured party to rescind insurance."). Cases interpreting this statute support this basic principle. *See, e.g., Cohen v. Penn Mut. Life Ins. Co.*, 312 P.2d 241, 244 (Cal. 1957) ("fraudulent intent to deceive is not essential."); *see also American Gen. Life Ins. Co. v. Green*, 2008 U.S. Dist. LEXIS 39985, *19-*22 (E.D. Cal. May 16, 2008) (granting summary judgment where insured believed he did not misrepresent the truth on the application for insurance). Therefore, the whole range of arguments falling under the excuse of a "plausible explanation," do not hold weight under the law. As discussed in further detail below, these arguments also fail as a matter of fact.

### 1. The agent and paramedical examiner read the questions on the application for the Policy to the Decedent and properly recorded his answers as given

Judy Huang, a top MetLife Sales Representative for over a decade, took the application for the Policy on August 5, 2004. *See* Stowe Aff., Exh. A, pp. ML LIN 00394-400. Present when she took the application was Decedent as well as Plaintiff, who was a previous client and who Ms. Huang also considered a friend. *See* Exhibit B attached hereto, Deposition excerpts of Judy Huang, pp. 14-15. Ms. Huang speaks Chinese fluently and 80% of her customers speak Chinese. *Id.* at p. 6. In fact, Ms. Huang always communicated with Decedent and Plaintiff in Chinese. *Id.*

Ms. Huang testified that she personally asked Decedent all of the questions on the application relating to his medical history and in particular the question which asks whether he had "EVER received treatment, attention, or advice from any physician, practitioner or health

6

facility for," among other liver ailments, "hepatitis?" (emphasis in original). *See Id.* at pp. 34,

36, 37; Stowe Aff., Exh. A., p. ML LIN 00398. Ms. Huang further testified that Decedent

indicated that he had not ever received treatment, attention, or advice for hepatitis and she

recorded his answers as given. *See* Exh. B, pp. 36-37. The deposition testimony is clear on this

fact:

| EXAMINATION BY MS. SHERER: | EXAMINATION BY MR. TRIEF: |
|---|---|
| Q.    Do you recall asking Mr. Lin whether he had ever received treatment, attention or advice from any physician for Hepatitis?<br>[Objection]<br>A.    Yes.<br>Q.    Did you ask that question?<br>A.    I mention Hepatitis.<br>Q.    Is that one of those terms that you might have left out?<br>A.    No. | Q.    With respect to this following question, "Has any person proposed for insurance ever received treatment, attention or advice from any physician, practitioner or health facility for, or been told by any physician, practitioner or health facility that she had ulcers, colitis, hepatitis, cirrhosis, or any other disease or disorder of the liver, gallbladder, stomach or intestines," did you ask that question that way?<br>A.    Just read it, yeah.<br>Q.    Did you ask the question just the way I read it?<br>A.    Yes.<br>Q.    How did you do that? You did it in English and Mandarin, using both English terms for the diseases and Mandarin for the words?<br>A.    Yes.<br>Q.    Did you summarize it at all?<br>A.    No. |

*See* Exh. B at pp. 34, 36, 37.

In the face of this clear testimony, Plaintiff utilizes nothing more than unsupported self-

serving statements implying agent wrongdoing, blatant manipulations of the deposition

testimony given, and inapplicable case law citations that clearly involve agent wrongdoing.[7]

---

[7] It is interesting to note that Plaintiff has ultimately argued that not one – not two – but *four* individuals somehow forgot to read the questions to Decedent on the application. That is, Plaintiff has argued that MetLife's agent and paramedical examiner and John Hancock's agent and paramedical examiner (in Plaintiff's other pending lawsuit under identical facts) all somehow – on four separate occasions – did not read the application questions to Decedent. *See* Sherer Aff., Exh. Q. This theory is totally implausible, unsupported by evidence, and no reasonable jury would be persuaded to believe it.

7

Indeed, in support of Plaintiff's contention that "Judy Huang failed to ask any of the health questions contained in the application and completed the application with only Mrs. Lin present," Plaintiff cites the Deposition of Jean Lin at p. 25. *See* Plaintiff's Memorandum of Law, pp. 11-12. However, as the deposition transcript shows, no where – let alone at p. 25 – in Mrs. Lin's deposition did she state this purported fact. *See* Plaintiff's Memorandum of Law, Exhibit A. Mrs. Lin simply stated that she did not recall being asked about her husband's medical history. *See* Sherer Aff., Exh. F, pp. 50. And, in any event, Mrs. Lin agreed unequivocally that the answer in the application to the hepatitis question should have been "Yes."

EXAMINATION BY MS. SHERER:
Q.     So you would agree that Mr. Lin did in fact receive treatment, attention or advice from a physician for hepatitis; correct?
A.     Could you be more specific; explain it.
Q.     Would you agree today that Mr. Lin did receive treatment from a doctor for hepatitis?
A.     Yes.
***
Q.     And you agree that the correct answer to this question should have been yes?
A.     Yes.

*Id.* at pp. 54, 56.

Furthermore, Ms. Huang submitted her agent's statement to MetLife on October 19, 2006, prior to the litigation, at the time the claim was made which stated in response to a question, "Yes, all the questions on application asked at the time of writing the application and all answers recorded as given by applicant." *See* Sherer Aff., Exh. L, ML 00163-164. This pre-litigation statement is *prima facie* evidence and cannot be refuted by post-litigation self-serving statements to the contrary. No credible evidence has been provided by Plaintiff, that contradicts these facts. In any case, given the textual manipulations of Plaintiff's counsel, MetLife attaches an affidavit from Judy Huang removing any possible doubt on this subject. *See* Exhibit C attached hereto.

8

The paramedical examiner for the Policy was Ms. Peggy Chou. Ms. Chou interviewed Decedent on August 18, 2004, and asked him each of the questions on Part II: Paramedical/Medical Exam for the Policy. *See* Stowe Aff., Exh. A, pp. ML LIN 00392-393; Chou Aff. In her affidavit, sworn to on April 21, 2008, Ms. Chou states unequivocally that she read all of the questions to Decedent and marked down all of the responses he gave, as is her ordinary practice in a decade of doing this type of work. *See* Chou Aff., ¶¶ 4-12. In particular, Ms. Chou recalled asking Decedent question 5(d) which asks whether he had "EVER received treatment, attention, or advice from any physician, practitioner or health facility for," among other liver ailments, "hepatitis?" (emphasis in original). *Id.* at ¶ 5. She also recalled that he gave the answer, "No," and she recorded his answer as given. *Id.* at ¶ 6.

In response to this plain evidence, Plaintiff hired an investigator to contact Ms. Chou at her home and grill her about the details of her interview with Decedent. *See* Dinnocenzo Aff., Exh. G. The investigator, Mr. Henehan, then offers his "opinion," that because Ms. Chou did not recall exactly what Decedent looked like or what his home looked like, "Ms. Chou has no independent and specific memory of completing Part II of the application that was signed on August 18, 2004." *Id.* at p. 3. This purported evidence should be wholly ignored.

Enclosed is a supplemental affidavit from Peggy Chou with respect to that telephone call, wherein she again affirms the statements made in her earlier affidavit and gives the full flavor of the intimidation tactics employed by Plaintiff's hired gun. *See* Exhibit D attached hereto. Ms. Chou has not wavered on her earlier statements, and Mr. Henehan's opinion does not change that fact. *Id.*

### 2.    *Whether Decedent believed his status as a hepatitis B carrier was insignificant does not excuse his misrepresentations*

Plaintiff argues that "most people are capable of forgetting facts relating to insignificant or resolved medical conditions," and relies heavily on the *Thompson v. Occidental* case for the proposition that Decedent's subjective opinion of the status of his medical condition (purportedly as "insignificant or resolved") should excuse his misrepresentations on the application for the Policy. *See* Plaintiff's Memorandum of Law, pp. 8-10 *(citing Thompson v. Occidental Life Ins. Co. of California*, 109 Cal. Rptr. 473 (1973) (an inapposite case dealing primarily with undisclosed varicose veins and chest pains). As discussed above and in MetLife's moving papers, however, even an innocent misrepresentation, if material, is sufficient to allow an insurer to avoid the contract of insurance. *See Ingram*, 1999 U.S. Dist. LEXIS 9346 at *9.

In addition, the facts are actually not so that Decedent or his treating physician believed that Decedent's medical condition was insignificant. Dr. Sam Kam testified with respect to his seven year history of treating and monitoring Decedent's hepatitis B on February 19, 2008. *See* Exhibit E attached hereto, Deposition excerpts of Dr. Kam, pp. 89-97; *see also* Dr. Kam's medical records, Sherer Aff., Exh. H. Some of Dr. Kam's testimony that most clearly defines the situation is as follows:

| EXAMINATION BY MS. SHERER: | EXAMINATION BY MR. ROONEY: |
|---|---|
| Q.    Would you classify him as having chronic Hepatitis B? | Q.    Why are you continuing to treat him? What is the danger to his health? |
| A.    I will.   My definition is what anyone with surface antigen positive is chronic Hepatitis B. | A.    To prevent activation and prevent cirrhosis. |
| Q.    Would you agree with the statement that whether Mr. Lin tested active or inactive he still had Hepatitis B Virus? | Q.    Okay.   Is there also a danger of carcinoma of the liver as a result of the hepatitis B Virus? |
| A.    The only statement I would agree to is Mr. Lin has, after treatment by Interferon in 1998, his Hepatitis B changed from an active stage into an inactive stage. | A.    As a result of the Hepatitis B Virus infection, **there is a slightly higher chance of carcinoma of the liver**, okay, in compared to the regular population without the Hepatitis B Surface Antigen Positive. |

10

| Q. | And he was still a Hepatitis B – |
| A. | He is still a Hepatitis B carrier. |
| Q. | Does that mean he still had the |
| virus? | |
| A. | He still has the virus. |
| *** | |
| Q. | And the entire time Mr. Lin was |
| seen by you he carried the virus, correct? | |
| A. | Yes. |

*See* Exh. E at pp. 89, 91, 93 (emphasis added). Obviously, Dr. Kam would not have continued to require liver testing and monitoring, and Decedent would not have continued to see Dr. Kam for such monitoring, if his hepatitis B was of no concern.

Plaintiff chooses to ignore all of this evidence and instead selects a snippet from Dr. Kam's deposition (whose first language is obviously Chinese) wherein he stated that as far as the Interferon treatment was concerned, Decedent was "cured." *See* Exh. E at p. 100. As explained by Dr. Kam, however, while he considered Decedent's treatment successful, and the word he would have used to describe this was "cured," the virus still persisted in his liver. *Id.* Indeed, he clearly acknowledged that Decedent would have been followed closely for the rest of his life. *Id.*

Finally, and most importantly on this point, the questions on Part I and Part II of the application for the Policy do not ask whether the proposed insured is currently suffering from hepatitis, or currently taking medication for hepatitis, or currently in an active state with hepatitis. Instead, they merely ask whether the proposed insured "EVER received treatment, attention, or advice" for hepatitis. *See* Stowe Aff., Exh. A, pp. ML LIN 00392-393; ML LIN 00398 (emphasis in original). Therefore, there is no doubt that the answer to these questions should have been "Yes," and the misrepresentations on the answers given are irrefutable.[8]

---

[8] Query how Plaintiff would explain why Decedent answered these questions, "No," on the '99 MetLife Policy application, when he was taking Interferon injections for an active hepatitis B flare up from September 1998 through early 1999. *See* Sherer Aff., Exh. H, ML LIN 00100-103. As stated in MetLife's moving papers, MetLife paid this $500,000 claim to Plaintiff as Decedent died after the contestable period expired. *See* Stowe Aff., ¶ 21, Exh. C, p. ML LIN 00271.

11

### 3.    *None of the so-called minor inconsistencies in the application for the Policy excuse the fact that material misrepresentations were made*

Plaintiff draws attention to so-called inconsistencies within Parts I and II of the application as "proof," that the application for the Policy is unreliable. *See* Plaintiff's Memorandum of Law, pp. 12-13. Essentially, Plaintiff argues that because the application admits in one part that Decedent had an appointment scheduled with Dr. Huang for "skin itching," but in another part indicates that no other medical appointments were scheduled for the next 6 months, and because he did not check the box that he had a "disease of the disorder or skin," this proves that the questions regarding hepatitis were probably not asked by Ms. Huang and Ms. Chou. *Id.* at p. 13. In essence, what Plaintiff espouses here is that since there were arguable minor inconsistencies within the application for the Policy, this should call into question the integrity of Ms. Huang and Ms. Chou, and excuse the fact that material misrepresentations were made. This theory is unsupported by fact, law or common sense. None of the so-called minor inconsistencies in the application for the Policy excuse the fact that material misrepresentations were made.

### C.    Decedent's hepatitis B history is material to the risk assumed by MetLife

Plaintiff argues that Decedent's history of hepatitis B is not material because it is insignificant to mortality and our underwriting guidelines should thus be ignored. Again, as with the question of misrepresentation, Plaintiff either misunderstands or chooses to ignore the applicable law. Under California law, "Materiality is determined by the probable and reasonable effect that truthful disclosure would have had on the insurer in determining the advantages of the proposed contract." *American Gen.*, 2008 U.S. Dist. LEXIS 39985 at *21 (*citing Trinh v. Metro. Life Ins. Co.*, 894 F. Supp. 1368, 1372 (N.D. Cal. 1995)).

Where the insurance company proves that the misrepresentation was material to its acceptance of the risk, no further inquiry is required.[9] *Id.*; *see also Wilson v. W. Nat'l Life Ins. Co.*, 1 Cal. Rptr. 2d 157, 163 (1991) ("the critical question is the effect truthful answers would have had on [the insurer] not some 'average reasonable' insurer"); Cal. Ins. Code § 334 ("Materiality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due, in forming his estimate of the disadvantages of the proposed contract, or in making his inquiries."). Evidence of the practice of the insurer with respect to similar risks is the appropriate manner in which to determine materiality. *See Taylor v. Sentry Life Ins. Co.*, 729 F.2d 652, 655 (9th Cir. 1984).

Plaintiff argues that Decedent's misrepresentations on the application were immaterial because: (1) MetLife purportedly did not follow its own underwriting guidelines; and (2) MetLife's underwriting guidelines should be ignored in any event because hepatitis B is not material from a medical perspective. As discussed above and in MetLife's moving papers, both of these arguments must fail as a matter of law. As discussed below, both of these arguments also fail as a matter of fact.

### 1.    *Hepatitis B is material from an underwriting perspective*

Plaintiff contends that "MetLife has exhibited confusion" in applying its own guidelines to the instant matter. *See* Plaintiff's Memorandum of Law at p. 20. Therefore, Plaintiff argues, "this Court should ignore" them and a trier of fact should decide what MetLife's underwriting guidelines are or should be. *Id.* at p. 21. As "proof" that MetLife has exhibited confusion with respect to its underwriting guidelines, Plaintiff states that Dr. Zamarripa, MetLife's medical director, contradicted his deposition testimony, but has not provided a coherent example of the

---

[9] Contrary to Plaintiff's allegations, it is not a necessary requirement that Decedent passed away due to the misrepresented medical condition. For example, it would still be a material misrepresentation if a

alleged contradiction.[10]  *Id.*  In addition, Plaintiff claims that Decedent's paramedical blood test results warranted a lower rating than what was given.  *Id.* at pp. 21-22.  As is further described below, however, neither of these allegations are in fact true or supported by the evidence.

First, with regard to MetLife's underwriting guidelines, as Dr. Zamarripa testified, they provide that where there is an indication of hepatitis B surface antigen, a liver biopsy was not performed, and the liver enzyme levels (i.e., ALT/AST) were consistently normal – as was the case here – Decedent would have been rated as a hepatitis B carrier.  *See* Sherer Aff., Exh. E, pp. 91-92.  The status of Decedent as a hepatitis B carrier would have qualified him for, at best, a premium charge of +50 debits or 50% more premium than he was charged.  *Id.* at p. 86; *see also* Zamarripa Aff., ¶ 10, Exh. B, ML LIN 00710-718.  Therefore, if Decedent had answered the application questions truthfully and had MetLife known during the application process, what it found out during the claims investigation process, it would not have issued the Policy as it did.  *See* Zamarripa Aff., ¶ 5, Exh. A.  Thus, it is evident that hepatitis B is material from an underwriting perspective.  Plaintiff has provided no evidence to contradict these facts.

---

proposed insured omitted cancer history but died in a car accident within the contestable period.
[10] Plaintiff also implies that there is some sort of sinister reason that MetLife asked Dr. Zamarripa, its Medical Director, to review this case. *See Id.* at p. 23 ("It is significant that even though underwriting is a subjective process, MetLife never consulted with Mr. Westman (the initial underwriter) once it engaged in postclaims underwriting."). This insinuation is completely preposterous as it is Dr. Zamarripa's function at MetLife to review medical records received during the course of a contestable claims investigation. *See* Zamarripa Aff., ¶ 3. In point of fact, during Mr. Westman's deposition he testified that what occurred was part of the normal process within MetLife:

EXAMINATION BY MR. TRIEF:
Q.    No one asked you what you would have done?
A.    No. These go to the medical department, medical director.
Q.    Is it the policy and procedure of MetLife not to talk to the original underwriter …
[Objection]
A.    As I said before, the death claims are generally looked at by the medical directors and medical department. We don't see those.

*See* Sherer Aff., Exh. G, pp. 17-18. The hypothetical questions posed by Plaintiff's counsel afterwards and his responses thereto, quoted in snippets in Plaintiff's Memorandum of Law, thus clearly have no bearing on this case whatsoever.

14

With regard to the paramedical blood test results, Plaintiff argues that because Decedent had slightly elevated bilirubin results and slightly elevated triglycerides, MetLife should not have issued Decedent a Select Preferred policy to begin with. And, Plaintiff argues, since MetLife did, it should now be estopped from relying on any other guidelines it has with respect to the misrepresented medical condition.

As MetLife's underwriting guidelines show, minor bilirubin and triglyceride elevations, would warrant a +0 rating – in other words, it would not impact the underwriter's evaluation and no additional premium would be charged. Using the example in our case, Decedent's paramedical blood test results showed that he had 189 for triglycerides (and the reference range was 0-150) and 2.3 for bilirubin (and the reference range was $0.2 - 1.5$). *See* Stowe Aff., Exh. B, ML LIN 00341. As per the guidelines, any triglyceride rating of $\leq 400$ and any bilirubin rating of up to 3.5 would warrant a +0 rating. *See* Dinnocenzo Aff., Exh. K, CONFIDENTIAL ML LIN 1091, 1096. Thus, it is clear that the Policy was rated properly.

In addition, even though the initial underwriter, Mr. Westman, testified that he made a subjective determination utilizing the guidelines it's important to see the Q&A that appears before the snippet chosen by Plaintiff's counsel to get a full flavor of what was said:

| |
|---|
| EXAMINATION BY MR. TRIEF: |
| Q.    Did Mr. Lin meet the criteria which is listed on Exhibit 1 or Exhibit 2? |
| A.    Yes. |
| Q.    Did Mr. Lin have any elevated bilirubins? |
| A.    Yes, he did, sir. |
| Q.    Is that one of the criteria which are listed in Exhibit 1 and Exhibit 2 of today? |
| *** |
| A.    You are correct sir but the levels that it was at is not a concern in my experience. |

*See* Sherer Aff., Exh. G, pp. 19-20. Thus, despite repeated badgering by Plaintiff's counsel, Mr. Westman never indicated that the Policy was improperly rated as a Select Preferred policy, as is clear from the selection quoted below:

15

Case 1:07-cv-03218-RJH    Document 34    Filed 08/18/2008    Page 20 of 24

---

EXAMINATION BY MR. TRIEF:

Q.      The question is, if you looked solely at the criteria set forth by MetLife, Mr. Lin would not have qualified for the rate he received because of his elevated triglyceride?

[Objection]

A.      There was no health history admitted in the exam or the application that would have flagged me to have a concern with the minor elevation and the labs that were there.

Q.      If you strictly looked at the criteria set forth in Exhibits 1 and 2, would you agree that based upon the criteria in writing, that Mr. Lin would not have qualified for the rate he received because of his elevated triglycerides?

[Objection]

A.      No sir.

*Id.* at pp. 23-24.

### 2.    *Hepatitis B is material from a medical perspective*

As discussed above, Plaintiff attempts to skirt the real issue (MetLife's underwriting guidelines), and minimize the significance of Decedent's hepatitis B history throughout its opposition papers. In doing so, Plaintiff utilizes nothing more than conjecture from a purported expert – who is admittedly not a liver doctor, let alone a liver specialist, who does not treat patients for hepatitis B – Dr. Aledort (a hematologist). *See* Sherer Aff., Exh. O. Plaintiff states that Dr. Aledort has said that Decedent "was not a chronic hepatitis B carrier," and that there is no increased risk of liver cancer for hepatitis B carriers. Both of these statements are completely false, unsupported, and run contrary to the evidence provided including Decedent's medical records, the testimony of Decedent's treating physician, Dr. Kam, the testimony of Dr. Aledort, and the compelling testimony and evidence provided by MetLife's expert, Dr. David Clain – a noted, distinguished and highly experienced liver specialist.[11]  *See, e.g.,* Sherer Aff., Exh. H (Deposition of Dr. Kam), p. 64 ("He is a carrier."); Exh. K (Deposition of Dr. Aledort), p. 113 ("...he cured him of his acute infection, that he did do, but he turned him into a carrier.").

---

[11] Over the past decade, Dr. Clain, a Professor of Clinical Medicine at the Albert Einstein College of Medicine, Yeshiva University, has seen hundreds of patients for the treatment of hepatitis B. Dr. Clain is also the Interrim Chief of Division of Digestive Diseases for Beth Israel Medical Center and the head of the Liver Division of Digestive Services therein. In addition to almost 40 years of teaching experience on

16

Although Dr. Aledort apparently now will claim that there is no increased risk of liver cancer for hepatitis B carriers, he would do so without any evidence to support that opinion, and in the face of his conflicting testimony on the subject, where at first he testified that there was no increased risk, then later testified that there was a "minor" increased risk, and finally testified that he did not know whether there was an increased risk. *See* Sherer Aff., ¶ 15 (*citing* Deposition of Dr. Aledort, pp. 101, 126, 134).

Both Dr. Kam and Dr. Clain have testified at length with respect to the effect of the hepatitis B virus on the liver. *See* Sherer Aff., Exhs. H, J. And, both acknowledge what is commonly known throughout the profession – and that is, hepatitis B (even at a carrier or inactive stage) puts a patient at a greater risk of developing liver cancer. *See* Sherer Aff., Exh. M ("The incidence of liver cancer was 100 times greater in men carrying the hepatitis B virus."); Dr. Kam's deposition testimony cited above on p. 10 of this brief. There is simply nothing controversial about this opinion.

Not a single shred of credible evidence has been provided that a reasonable jury could believe proves that hepatitis B is insignificant from a medical perspective.

**D.    MetLife had no notice of Decedent's hepatitis B history until its post-claim investigation**

As discussed in MetLife's moving papers, Plaintiff's theory of waiver, is based upon the following two faulty assumptions: (1) MetLife should have known Decedent had hepatitis B because he was Asian; and (2) MetLife should have known Decedent had hepatitis B because he had slightly high bilirubin results on his paramedical exam. As explained in detail in MetLife's moving papers, these allegations have no basis in law or fact and MetLife had no notice of Decedent's hepatitis B history until its post-claim investigation. *See* MetLife's Memorandum of

_____

the subject, Dr. Clain was also the past President of the New York Gastroenterological Association and a

Law pp. 23-24; *Ingram*, 1999 U.S. Dist. LEXIS at \*6 ("There can be no waiver of a right to charge fraud or misrepresentation, except where there is an intention to relinquish a known right.").

## II.   Plaintiff's Cross-Motion *In Limine* Must Be Denied Because Dr. Zamarripa Is A Fact Witness And Dr. Clain Is A Qualified Expert Witness

Plaintiff's last ditch effort at avoiding summary judgment is with a cross-motion *in limine* which is untimely,[12] and based on unsupported allegations that: (1) MetLife has proffered Dr. Zamarripa, its Medical Director, as an expert in this case, and (2) that Dr. Clain is somehow not qualified to give opinions with respect to hepatitis B.

First, MetLife has not proffered Dr. Zamarripa as a medical expert in this case. Dr. Zamarripa, who is an M.D. (as many Medical Directors at insurance companies are), is a Vice President in the Life Underwriting Division at MetLife, where it is his duty to review MetLife's underwriting and claims files. *See* Zamarripa Aff., ¶¶ 1-3. Dr. Zamarripa was asked by the claims department to review this particular file in January 2007 and concluded, after reviewing the medical records obtained and MetLife's underwriting guidelines, that had MetLife known the truth of Decedent's hepatitis history at the time of the initial underwriting, it would not have issued the Policy as it did. *See* Zamarripa Aff., ¶ 4, Exh. A. The fact is, at Dr. Zamarripa's deposition, Plaintiff's counsel asked Dr. Zamarripa his opinions with regard to hepatitis B. *See, e.g.,* Sherer Aff., Exh. E, pp. 16-17 ("Q. Does Hepatitis B always affect your liver?  A. Yes."). Because Plaintiff does not like the answers Dr. Zamarripa gave therein, she now seeks to exclude those opinions.

---

Fellow of the American Gastroenterological Association. *See* Sherer Aff., Exh. N.

[12] A motion *in limine* is not the proper procedural device to obtain the relief in the nature of partial summary judgment. *See Securitron Magnalock Corp. v. Schabolk*, 1994 U.S. Dist. LEXIS 8934, \*1-\*2 (S.D.N.Y. Jun. 20, 1994) ("A motion *in limine* is not the appropriate means to narrow, limit, or fix the issues for trial.").

Second, it is hard to imagine anyone more qualified that Dr. Clain to give an expert opinion with regard to hepatitis B.    Some of the highlights of Dr. Clain's impressive qualifications are discussed in footnote 11 herein and are summarized in his *curriculum vitae*. *See* Sherer Aff., Exh. N.

Pursuant to Rule 702 of the Federal Rules of Evidence ("FRE"), expert testimony is permitted if it "will assist the trier of fact to understand the evidence or to determine a fact in issue."  FRE 702.  In *Daubert v. Merrell Dow Pharmaceutical, Inc.*, 509 U.S. 579 (1993), the Supreme Court illuminated the broad admissibility standard of Rule 702.  *See, e.g., In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 2008 U.S. Dist. LEXIS 37331 (S.D.N.Y. May 7, 2008) (denying motion *in limine* to exclude two experts where their opinions were sufficiently well-grounded in fact).  In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 151-152 (1999), the Supreme Court expressly recognized that opinions can be experience-based. While *Daubert* sets forth considerations that may bear on the trial judge's inquiry into reliability,[13] it is clear that the gatekeeping function that the Court plays is not meant to replace the traditional safeguard of cross-examination.  *See, e.g., Tiffany v. EBAY*, 2007 U.S. Dist. LEXIS 85357 (S.D.N.Y. Nov. 9, 2007) (denying motion *in limine* to exclude expert where contentions go to the weight, but not the admissibility of the testimony).  In fact, rejection of expert testimony, is still "the exception rather than the rule." FRE 702 advisory committee's note.

Utilizing the *Daubert* considerations, the Court can readily appreciate that Dr. Clain is a qualified witness under FRE 702.  There is no challenge to Dr. Clain's qualifications, and his

---

[13] Those considerations include (but are not a definitive checklist): (a) Whether a theory or technique can be tested; (b) Whether it has been subject to peer review and/or publication; (c) Whether a technique has a high rate of error, and; (d) Whether the technique or theory is widely accepted in the relevant scientific community. *Daubert*, 509 U.S. at 594.

19

opinions are sufficiently reliable and backed by over 40 years of relevant experience, peer-reviewed journal articles and industry guidelines.[14] Dr. Clain has a reliable basis for all of his opinions with regard to hepatitis B, including but not limited to the fact that hepatitis B puts a patient at a greater risk of developing liver cancer.[15] Dr. Clain's opinions are confirmed by the articles and guidelines[16] he cites in his expert report and also by Decedent's treating physician, Dr. Kam. *See* Sherer Aff., Exh. M; *see also* Dr. Kam's deposition testimony cited above on p. 10 of this brief. Finally, there is no doubt that Dr. Clain's testimony would assist the trier of fact in understanding the hepatitis B virus and what it does to the liver. In short, Plaintiff's assertion that Dr. Clain does not have adequate expertise to provide expert testimony is utterly baseless.

## CONCLUSION

In view of the foregoing, it is respectfully submitted that MetLife's motion for summary judgment dismissing Plaintiff's complaint in its entirety and on its counterclaim should be granted, and Plaintiff's cross-motion *in limine* should be denied.

---

[14] Plaintiff's entire argument is that the illustrative articles and guidelines provided by Dr. Clain do not directly address the exact circumstances of Decedent's condition, and that they are therefore useless and unreliable. *Id.* at p. 33. This hypothesis is not medically or factually valid, as the articles *do* address patients who are hepatitis B carriers, which is what Decedent was after being successfully treated for active hepatitis B. *See, e.g.*, Sherer Aff., Exh. M, AASLD Practice Guideline, p. 1210 ("hepatitis B carriers were 100 times more likely to develop HCC than the uninfected") (referring to a well-known Taiwanese study). Moreover, Dr. Clain's opinions are not merely based on these examples in a vaccuum, but on 40 years of relevant experience. Indeed, Dr. Clain has stated that he can point to numerous sources of evidence in the medical literature in support of his opinions. *See* Sherer Aff., Exhs. J, M.

[15] *See, e.g.*, Sherer Aff., Exh. M, AASLD Practice Guideline, p. 1210. As Dr. Clain testified, this is the consensus of the entire liver specialist community. *See* Sherer Aff. Exh. J, pp. 91-93.

[16] Plaintiff's pithy dismissal of the AASLD guidelines bears addressing as it is the American Association for the Study of Liver Disease guidelines – considered the "Bible" of conservative consensus on the subject. In addition, the Hepatology journal article cited by Dr. Clain in his expert report – which is one of the most important clinical papers in the field – comes from the premier journal of liver disease and it is also the official journal of the AASLD. The New England Journal of Medicine is without a doubt considered the leading journal among all general medical journals.