# EXHIBIT A

Case 1:07-cv-03218-RJH   Document 34-2   Filed 08/18/2008   Page 1 of 14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
JEAN LIN,                                                                                  07-CV-3218 (RJH)

                Plaintiff,

   - against –

METROPOLITAN LIFE INSURANCE
COMPANY,

                Defendant.
-------------------------------------------------------------------x

## DEFENDANT'S STATEMENT OF MATERIAL FACTS IN WHICH THERE IS NO GENUINE ISSUE TO BE TRIED PURSUANT TO LOCAL CIVIL RULE 56.1

Defendant, Metropolitan Life Insurance Company ("MetLife") submits this statement of material facts as to those facts which it contends there are no genuine issues to be tried, pursuant to Rule 56.1 of the Local Civil Rules for the United States District Court, Southern and Eastern Districts of New York, which are also fully set forth in Affirmation of Tomasita L. Sherer, sworn to July 3, 2008 (the *"Sherer Aff."*), Affidavit of Regina Solomon-Stowe, dated July 1, 2008 (the *"Stowe Aff."*), the Affidavit of Dr. Daniel Zamarripa, sworn to June 27, 2008 (the *"Zamarripa Aff."*), the Affidavit of Peggy Chou, sworn to April 21, 2008 (the *"Chou Aff."*), and the Statement of Facts in MetLife's Memorandum of Law in Support of its Motion for Summary Judgment:

### A.   The Application, Paramedical Examination And The Policy

1.   On or about August 5, 2004, Decedent applied to MetLife for a life insurance policy by answering certain questions contained in a MetLife application form (the "Application"). *Stowe Aff.,* ¶ 5, Exh. A, pp. ML LIN 00394-400.

2.   Question 21(d) of the Application states, "Has any person proposed for insurance EVER received treatment, attention, or advice from any physician, practitioner or health facility for, or been told by any physician, practitioner or health facility that he/she had," among other liver ailments, "hepatitis?" (emphasis in original). In response to Question 21(d), the Decedent checked, "No." *Stowe Aff.,* ¶ 6, Exh. A, p. ML LIN 00398.

3.   Questions 22(a)-(c) of the Application state, "Has any person proposed for insurance: a) In the past six months, taken any medication or been under observation or treatment? b) Scheduled any: doctor's visits; medical care; or surgery for the next six months? c) During the past five years had any: checkup; health condition; or hospitalization not revealed above?" In response to Questions 22(a)-(c), the Decedent checked, "No." *Stowe Aff.,* ¶ 7, Exh. A, p. ML LIN 00398.

4. Page 10 of the Application provides, just above the signature lines on which the Decedent executed his signature on this part of the Application, the following:

**AGREEMENT/DISCLOSURE**

> I have read this application for life insurance including any amendments and supplements and to the best of my knowledge and belief, all statements are true and complete. I also agree that:
>
> My statements in this application and any amendment(s), paramedical/medical exam and supplement(s) are the basis of any policy issued.
> \* \* \*
> This application and any: amendment(s); paramedical/medical exam and supplement(s) that become part of the application, will be attached to and become part of the new policy.
>
> Only the Company's President, Secretary or Vice-President may: (a) make or change any contract of insurance; (b) make a binding promise about insurance; or (c) change or waive any term of an application, receipt, or policy.
>
> No information will be deemed to have been given to the Company unless it is stated in this application and its supplement(s), paramedical/medical exam and amendment(s).
> \* \* \*

*Stowe Aff.,* ¶ 8, Exh. A, p. ML LIN 00400.

5. The Application was taken by MetLife Sales Representative, Judy Huang, who was deposed in this case on February 19, 2008. *Sherer Aff.,* Exh. I.

6. Ms. Huang testified that she personally met with Decedent on August 5, 2004, and asked Decedent all of the abovementioned questions in Chinese (generally using English terms for the diseases) and that he responded in Chinese. *Id.* at pp. 31, 34, 36-37.

7. In addition, Ms. Huang testified that she recorded his answers exactly as given. *Id.* at p. 36; *see also Sherer Aff.,* Exh. L, pp. ML LIN 00264-265; ML 00163-164 (agent's statement).

2

8. Finally, Ms. Huang testified that Decedent was aware that he was required to answer all of the questions truthfully and that he appeared to be honest and forthright. *Sherer Aff.*, Exh. I, p. 36.

9. On or about August 18, 2004, Decedent completed Part II: Paramedical/Medical Exam for the Policy by answering certain questions and submitting to a paramedical examination. *Stowe Aff.*, ¶ 9, Exh. A, pp. ML LIN 00392-393; *Chou Aff.*, ¶ 4.

10. The paramedical examination included standard testing of urine and blood. *Stowe Aff.*, ¶ 9, Exh. B, ML LIN 00340-341.

11. Question 5(d) of Part II: Paramedical/Medical Exam states, "Have you EVER received treatment, attention, or advice from any physician, practitioner or health facility for, or been told by any physician, practitioner or health facility that you had," among other liver ailments, "hepatitis?" (emphasis in original). In response to Question 5(d), the Decedent checked, "No." *Stowe Aff.*, ¶ 10, Exh. A, p. ML LIN 00392; *Chou Aff.*, ¶¶ 5,6.

12. Questions 6 through 8 of Part II: Paramedical/Medical Exam state the following:

> 6. Are you now, or within the last six months, under observation or taking medication or treatment (Including over the counter medications, vitamins, herbal supplements, etc.)?
> 7. Do you have any doctor's visits, medical care, or surgery scheduled?
> 8. Other than the above, during the past five years have you had any
>    a) Checkup; electrocardiogram; chest x-ray or medical test?
>    b) Illness; injury; or health condition not revealed above; or have been recommended to have any: treatment, hospitalization; surgery; medical test; or medication?

In response to Questions 6 through 8, the Decedent checked, "No." *Stowe Aff.*, ¶ 11, Exh. A, p. ML LIN 00393; *Chou Aff.*, ¶¶ 7-12.

13. Page 2 of Part II: Paramedical/Medical Exam further provides, just above the line on which the Decedent executed his signature, the following:

> I have read the answers to questions 2-14 before signing. They have been correctly written, as given by me, and are true and

3

       complete to the best of my knowledge and belief. There are no
       exceptions to any such answers other than as written.

*Stowe Aff.,* ¶ 12, Exh. A, p. ML LIN 00393.

  14. Part II: Paramedical/Medical Exam was taken by a MetLife approved paramedical examiner, Peggy Chou, who personally met with Decedent on August 18, 2004. Ms. Chou has stated that she asked Decedent all of the above questions in Chinese and that he responded in Chinese. *Chou Aff.,* ¶ 4.

  15. In addition, Ms. Chou has stated that she recorded his answers as given. *Id.* at ¶¶ 6, 8, 10, 12.

  16. Finally, Ms. Chou has stated that Decedent was aware that he was required to answer all of the questions truthfully and to the best of his ability. *Id.* at ¶ 13.

  17. On or about August 31, 2004, MetLife issued the Policy as a Select Preferred Nonsmoker policy on the life of Decedent in the amount of one million dollars ($1,000,000). *Stowe Aff.,* Exh. A.

  18. The Policy is a 15-Year Term Plan of Insurance with Disability Waiver of Premium Rider. *Stowe Aff.,* Exh. A.

  19. Plaintiff Jean Lin, the Decedent's wife, was the named owner and beneficiary of the Policy. *Stowe Aff.,* Exh. A.

  20. A copy of the Application, and Part II: Paramedical/Medical Exam containing the statements, representations and answers of the Decedent, and the terms of the Policy, was attached to and made a part of the Policy. *Stowe Aff.,* ¶ 13, Exh. A.

  21. In executing the Application and Part II: Paramedical/Medical Exam, the Decedent acknowledged that his statements were the basis of any policy issued and that no insurance would take effect unless: "(a) the condition of health of each person to be insured is the same as stated in the application; and (b) no person to be insured has received any medical

advice or treatment from a medical practitioner since the date of the application." *Stowe Aff.*, ¶ 14, Exh. A, p. ML LIN 00400.

### B. <u>The Claim</u>

22. On November 29, 2005, Decedent commenced a contestable claim for disability waiver of premium benefits. *Stowe Aff.*, ¶ 15.

23. Decedent subsequently died on August 11, 2006, prior to the conclusion and evaluation of our usual inquiries on a contestable disability claim. *Stowe Aff.*, ¶ 15.

24. On or about September 19, 2006, MetLife received an Individual Life Death Claim Form from Plaintiff. Plaintiff sought payment of five hundred thousand dollars ($500,000) under Policy No. 993 001 679 PR-R (the "'99 Policy"), and one million dollars ($1,000,000) under the Policy at issue based upon the death of the Decedent. The Individual Life Death Claim Form states the Insured's date of death is August 11, 2006. MetLife also received a death certificate for the Insured which confirms his date of death is August 11, 2006. *Stowe Aff.*, ¶ 16, Exh. C, p. ML LIN 00270-271.

25. The Policy provides, in relevant part, as follows:

> **Not Contestable After Two Years**
> Insurance is issued by the Company in reliance on the statements made in the Application for the insurance. ... The insurance issued under this Policy will not be contestable after it has been in force during the life of the Insured for two years from the Date of Issue, except for nonpayment of premiums.

*Stowe Aff.*, ¶ 17, Exh. A, p. ML LIN 00381.

26. Since the Insured's death occurred before the Policy was in force for two years, MetLife conducted its usual inquiries concerning the truth of the representations made by the Insured in the Application for the Policy. *Stowe Aff.*, ¶ 18.

5

### C. Misrepresentations in the Application And Paramedical Examination

27. MetLife's investigation revealed that Decedent's representations in response to Questions 21 and 22 of the application for the Policy and Questions 5, 6, 7, and 8 of Part II: Paramedical/Medical Exam for the Policy were materially false with respect to his history of hepatitis B. *Stowe Aff.*, ¶¶ 6, 7, 10, 11, Exh. A, p. ML LIN 00392, 00393, 00398; *Chou Aff.*, ¶¶ 5, 6, 7-12.

28. The investigation further revealed the same material misrepresentations in the application for the '99 Policy, which was issued on June 10, 1999. *Stowe Aff.*, ¶¶ 19-20, Exh. D, pp. ML LIN 00702-707.

29. MetLife paid the five hundred thousand dollar ($500,000) claim. *Stowe Aff.*, ¶ 21, Exh. C, p. ML LIN 00271.

30. As part of its usual inquiries, MetLife ordered Decedent's medical records. Upon receipt, MetLife learned that Decedent was seen from September 1998 until December 2005 by Dr. Sam Kam, a gastroenterologist, for treatment, attention and/or advice for his history of hepatitis B. *See, e.g., Stowe Aff.*, ¶ 22, Exh. E, pp. ML LIN 00092-155; *see also Sherer Aff.*, Exh H (Exhs. B-F marked at the deposition of Dr. Kam).

31. Interferon injections were prescribed and taken by Decedent for four months in 1998 through 1999 for a flare up of active E antigen hepatitis B virus. *Stowe Aff.*, ¶ 23, Exh. E, pp. ML LIN 00092-155.

32. Decedent visited Dr. Kam two days after signing the Application for the Policy, and eleven days before he signed Part II: Paramedical/Medical Exam for the Policy. *Id.*

33. During the past six years of his treatment with Dr. Kam, prior to the Application for the Policy, Decedent visited with Dr. Kam at least once every six months for testing, advice, and follow up. *Id.*

34. The only medical issue during these visits was Decedent's hepatitis B. *Id.*

35. Decedent did not indicate that Dr. Kam was his doctor on the Application or Part II: Paramedical/Medical Exam for the Policy. *Stowe Aff.*, Exh. A, pp. ML LIN 00392, 397.

36. Decedent at all times was and remained a hepatitis B carrier (he carried the surface antigen of hepatitis B). *Stowe Aff.*, Exh. E, pp. ML LIN 00110, 117; *Sherer Aff.*, ¶ Exh. M, p. 3; *See also Sherer Aff.*, Exh. H (Deposition of Dr. Kam, p. 64) ("He is a carrier."); *Sherer Aff.*, Exh. K (Deposition of Dr. Aledort, pp. 113) ("…he cured him of his acute infection, that he did do, but he turned him into a carrier.").

37. Decedent was monitored for active flare ups every six months, which did in fact occur in 2003 and 2004. *Id.*

38. The reason for close monitoring is that successful treatment does not eradicate the virus. *Sherer Aff.*, Exh. J, p. 3; *Sherer Aff.*, Exh. K, pp. 131.

39. If recurrence is not monitored, active disease may lead to liver damage or liver cancer. *Sherer Aff.*, Exh. M, p. 3.

40. After MetLife received Decedent's medical records, the matter was referred to Daniel Zamarripa, M.D., Vice President in the Life Underwriting Division at MetLife, for his opinion regarding the materiality of Decedent's misrepresentations. Dr. Zamarripa's duties as a Vice President in Life Underwriting include the review of MetLife's underwriting and claims files. Dr. Zamarripa received his medical degree in 1985, specialized in cardiology in 1990, and worked in private practice for ten years prior to his eight years of relevant underwriting experience. *Stowe Aff.*, ¶ 24.

41. Dr. Zamarripa's conclusions regarding the materiality of Decedent's misrepresentations are contained in a Contestable Death Claim Memo that was received by

MetLife's Claims Department on or about January 23, 2007. *Stowe Aff.,* ¶ 24, Exh. F; *Zamarripa Aff.,* ¶ 4, Exh. A.

42. Upon reviewing MetLife's underwriting guidelines, Dr. Zamarripa stated that, had MetLife known of this information, it would have declined the Policy as issued. *Id.*

43. Specifically, Dr. Zamarripa indicated that according to MetLife's underwriting guidelines in effect at the time of the Application, MetLife would have issued a policy at a different rating. *Id.*

44. During his deposition, Dr. Zamarripa testified that hepatitis B always affects mortality, that Decedent never completely "recovered," as he always maintained the surface antigen, and that as such, the best policy rating he would have received would have been standard (and not preferred as he was given). *Stowe Aff.,* ¶ 25; *Sherer Aff.,* Exh. E, pp. 17, 28, 95-97.

45. In addition, Dr. Zamarripa indicated that as per MetLife's underwriting guidelines, at a minimum, where a liver biopsy was not performed and the liver enzyme levels (*i.e.,* ALT/AST) were consistently normal, Decedent would have been rated as a hepatitis B carrier. *Zamarripa Aff.,* ¶ 6, Exh. B, ML LIN 00710-718. As per the guidelines, the premium charged for a hepatitis B carrier would have been +50 debits or 50% more premium. *Id.* The guidelines state:

> **Hepatitis B Carrier**
> • Hepatitis B carriers do not completely clear the virus but liver inflammation has subsided and ALT/AST levels are normal.
> • Hepatitis B carrier state is associated with increased risk of hepatocellular carcinoma.
> • Some patients will be followed with serial liver ultrasounds and/or serum alpha-fetoprotein levels to look for evidence of hepatocellular carcinoma.

*Id.*

46.     Had MetLife known Decedent's true medical history, the Decedent would not have received the preferred policy he was given. *Zamarripa Aff.*, ¶¶ 5,6, Exhs. A, B.

**D.   Denial of the Claim**

47.     MetLife informed Plaintiff by letter dated February 5, 2007, that MetLife was denying liability on the Policy. *Stowe Aff.*, ¶ 26, Exh. G, ML LIN 00029-30.

48.     The letter informed Plaintiff that:

> We have learned, in addition to other relevant facts, that your husband was seen by his attending physician on several occasions from September 5, 1998 to August 7, 2004[1] for a condition which is serious from an underwriting standpoint. If your husband had disclosed his treatment for this condition, which was material to our acceptance of the risk, his application would not have been approved as issued.

*Stowe Aff.*, ¶ 27, Exh. G.

49.     In addition, the letter enclosed a full premium refund check (which included applicable interest). *Id.*

50.     By letter dated May 4, 2007, Ms. Stowe, a Senior Technical Claims Advisor at MetLife, wrote to Plaintiff and enclosed a copy of the application for the Policy. In Ms. Stowe's letter, she referred to some of the specific application questions quoted above and advised Plaintiff that although she thoroughly reviewed this matter, there was no basis for a change in the decision. Ms. Stowe referred to the reasons given in the earlier letter and explained that the information developed through the medical records supported the decision to void the contract and refund the premiums. *Stowe Aff.*, ¶ 28, Exh. H.

**E.   Plaintiff's Claims**

51.     On or about April 23, 2007, Plaintiff commenced the instant action by serving a Summons and Complaint. The Complaint asserts a cause of action for breach of contract. *Stowe Aff.*, ¶ 29, Exh. I; *Sherer Aff.*, ¶ 3.

52. On or about August 14, 2007, MetLife timely served its Amended Answer, Affirmative Defenses and Counterclaim. As noted, MetLife's Counterclaim seeks rescission of the Policy based upon Decedent's material misrepresentations in response to Questions 21 and 22 of the application for the Policy and Questions 5, 6, 7, and 8 of Part II: Paramedical/Medical Exam for the Policy, concerning his failure to disclose his history of hepatitis B. *Stowe Aff.*, ¶ 30, and *Sherer Aff.*, ¶ 4, Exh. A.

53. Plaintiff replied to the counterclaim on or about August 16, 2007. *Sherer Aff.*, ¶ 5, Exh. B.

54. Subsequent to the filing of MetLife's Answer, all discovery was conducted, including the exchange of documents, interrogatory requests and answers, and multiple depositions, including expert depositions. Among the discovery requested, MetLife propounded interrogatories on or about October 26, 2007. *Sherer Aff.*, ¶ 6, Exh. C.

55. Question 14 of those interrogatories asks Plaintiff about Decedent's treatment for hepatitis B as follows:

> 14. State whether the Decedent was diagnosed with Hepatitis B, received treatment for Hepatitis B, including but not limited to prescription medication treatment and/or was diagnosed with a history of chronic Hepatitis B, and if so set forth:
>
> (a) when the diagnosis was made and/or when the treatment was given;
> (b) who gave the diagnosis and/or prescribed the medication; and
> (c) whether Decedent was ever told that he cleared Hepatitis from his system.

*Sherer Aff.*, ¶ 7, Exh. C (Defendant's First Set of Interrogatories to Plaintiff).

56. Plaintiff responded to these interrogatories on or about December 3, 2007. In response to these questions, Plaintiff refuses to answer and instead generally refers to her Rule

---

[1] In fact, Decedent continued to see Dr. Kam through December 2005. *See Sherer Aff.*, Exh. H (Exhs. B-F marked at the deposition of Dr. Kam).

10

26 automatic disclosure. *Sherer Aff.*, ¶ 8, Exh. C (Plaintiff's Responses to Defendant's First Set of Interrogatories).

57. Questions 8, 9, and 10 of MetLife's interrogatories ask about other life insurance policies applied for on the life of Decedent. *Sherer Aff.*, ¶ 9, Exh. C (Defendant's First Set of Interrogatories to Plaintiff).

58. In Plaintiff's responses, Plaintiff admits that other than the MetLife policies, there was an additional one million dollar ($1,000,000) policy applied for on the life of Decedent in 2004. *Sherer Aff.*, ¶ 9, Exh. C (Plaintiff's Responses to Defendant's First Set of Interrogatories).

59. This policy was with John Hancock Life Insurance Company and was applied for after the Policy at issue in this case. *Sherer Aff.*, Exh. P, JH 0152-173.

60. Plaintiff has brought a law suit against John Hancock in Massachusetts State court alleging breach of contract in that case as well. *Sherer Aff.*, Exh. Q.

61. Depositions in this case have taken place as follows:

| Date | Deponent | Requested by |
|---|---|---|
| 12/14/07 | Regina Solomon Stowe | Plaintiff |
| 12/14/07 | Daniel Zamarripa, M.D. | Plaintiff |
| 01/02/08 | Jean Lin | MetLife |
| 02/19/08 | Judy Huang | Plaintiff |
| 02/19/08 | Sam Kam, M.D. | MetLife |
| 02/22/08 | Dennis Westman | Plaintiff |
| 05/28/08 | David Clain, M.D. | Plaintiff |
| 06/02/08 | Louis Aledort, M.D. | MetLife |

*Sherer Aff.*, Exhs. D - K.

11

62. Part I and Part II of the Application materially misrepresented the truth; and had MetLife known the truth, the Policy would not have been issued as it was.

63. The Policy is void because it was issued on the basis of material misrepresentations and Decedent died within the Policy's two year contestable period.

Dated: August 18, 2008  
Long Island City, NY

METROPOLITAN LIFE INSURANCE COMPANY

By: _____  
Alvin Pasternak (AP 5085)  
Tomasita Sherer, of Counsel (TH 6072)  
Attorneys for Defendant  
One MetLife Plaza  
27-01 Queens Plaza North  
Long Island City, NY 11101  
(212) 578-3102 (Tel)