UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JEAN LIN,

                    Plaintiff,

        - against -

METROPOLITAN LIFE INSURANCE
COMPANY,

                    Defendant.

1:07-cv-03218-RJH

**MEMORANDUM OPINION
AND ORDER**

Richard J. Holwell, District Judge:

        Bang Lin acquired a $1 million life insurance policy from the Metropolitan Life

Insurance Co. ("MetLife"), but failed to disclose that he had been treated for Hepatitis B.

A little less than two years later, Mr. Lin passed away from other causes. When MetLife

discovered the discrepancy in his application, it refused to pay a claim on the policy on

the basis that Mr. Lin's undisclosed treatment history was material to its underwriting

decision. The policy's beneficiary, Mr. Lin's widow Jean Lin, sued.

        MetLife' actions highlight a basic dilemma in the law of insurance. On one hand,

the law recognizes that an insurer is entitled to accurate information concerning the risk it

assumes in issuing a policy. Insurance is the business of pricing risk; and it cannot

function efficiently if the insured conceals or misrepresents the risks a policy covers. On

the other hand, there is a strong equitable argument against rigid application of the law of

misrepresentation to life insurance policies. As a California court has noted, "[i]t is

patently unfair for a claimant to obtain a policy, pay his premiums and operate under the

assumption that he is insured against a specified risk, only to learn *after* he submits a

claim that he is *not* insured, and, therefore, cannot obtain any other policy to cover the loss." *Hailey v. Cal. Physicians' Serv.*, 158 Cal. App. 4th 452, 465 (2007).

This dilemma is addressed in so-called "incontestability" laws, which provide that an insurer may not rescind a policy based on the insured's concealment or misrepresentation after a fixed period, generally two years. The practical effect of such laws is to allocate the risk of concealment and misrepresentation between the insurer and the insured. During the initial "contestable" period, the insured bears the risk of concealment and misrepresentation. After that, the risk shifts to the insurer. Insurers price policies accordingly.

In this case, MetLife has moved for summary judgment, and plaintiff has cross-moved to preclude the testimony of two MetLife doctors, Daniel Zamarippa and David Clain.[1] The governing law is clear: Where an insured is aware of his condition, symptoms, or treatment, he is obliged to disclose them upon request. Cal. Ins. Code. § 332 (West 2005); *Freeman v. Allstate Life Ins. Co.*, 253 F.3d 533, 536-37 (9th Cir. 2001). If the insurer discovers the concealment within a policy's contestability period, it may challenge liability. Since Mr. Lin did not disclose his history of treatment and Ms. Lin has failed to show circumstances excusing Mr. Lin's duty to do so, MetLife's motion will be granted. Because the Court does not rely on the challenged testimony in granting MetLife's motion, plaintiff's cross-motion will be denied as moot.

---

[1] The record contains several spellings of Dr. Zamarippa's name. For the sake of consistency, the Court adopts the spelling used in plaintiff's motion.

## I.      BACKGROUND

### A.      Hepatitis B Generally[2]

Like many men who immigrate to the United States from Asia, Mr. Lin carried the Hepatitis B virus ("HBV"), and at some point developed an active Hepatitis B infection.  (Dinnocenzo Aff. ¶ 4; *see* Clain Depo. 102 (estimating that between fifteen and twenty percent of Asian immigrants have active Hepatitis B), Sherer Aff. Ex. J; Compl. ¶ 14 (alleging that "[t]he Hepatitis [Be] antigen is known to appear in people of Asian decent at a far higher rate than other racial and ethnic groups")).)  Hepatitis B is a disease that affects the liver.  (*The Merck Manual of Diagnosis and Therapy* 219-21 (18th ed. 2006) ("*Merck*"); Centers for Disease Control and Prevention, Hepatitis B FAQs for the Public, http://www.cdc.gov/hepatitis/B/bFAQ.htm (last visited Mar. 20, 2009).)  Active infections are classified as acute (short term) or chronic (long term).  (*Merck*, at 219, 227.)

In its acute form, Hepatitis B can cause anorexia, nausea, vomiting, fever, abdominal pain, and jaundice.  (*Id.* at 223.)  In its chronic form, Hepatitis B can cause malaise, anorexia, fatigue, low-grade fever, chronic liver disease, and cholestasis, a checking or failure of bile flow.  (*Id.* at 228; Lee Goldman et al., *Textbook of Medicine*, 823-24 (21st ed. 2000).)  The prognosis for chronic Hepatitis B is "highly variable." (*Merck*, at 229.)  "Without treatment, cases caused by HBV can resolve (uncommon), progress rapidly, or progress slowly to cirrhosis over decades."  (*Id.* at 228.)

---

[2] The Court takes judicial notice of certain medical background information in this section, and will stay entry of judgment thirty days to allow for objections pursuant to Federal Rule of Evidence 201(e).

Plaintiff's expert witness, Louis M. Aledort, M.D., noted that "[a]lthough the etiology [causation] of Mr. Lin's Hepatitis B is unclear," Hepatitis B "is common among the Asian population and is often vertically transmitted from mother to child." (Letter from Louis M. Aledort, M.D., to Ted Trief, Esq., at 1 (March 12, 2008) ("Aledort Letter"), Dinnocenzo Aff. Ex. O.) According to a recent review article, "[i]mmunologic tolerance to HBV established during perinatal infection is profound and lifelong, but not complete; a low level of liver injury occurs and accounts for up to a 40% lifetime risk of death from liver disease among men." (Jules L. Dienstag, *Hepatitis B Virus Infection*, 359 New Eng. J. Med. 1486, 1486-87 (Oct. 2008).)[3] In other words, a man who acquires HBV from his mother around the time of his birth faces up to a forty percent lifetime risk of death from liver disease.

**B.      Mr. Lin's Treatment History**

Although Mr. Lin carried HBV, his Hepatitis B infection was well under control in the years immediately preceding his death. In September 1998, Mr. Lin visited his doctor, Sam Kam, and tested positive for the Hepatitis Be antigen, which signals an active Hepatitis B infection. (Dinnocenzo Aff. ¶ 21.)[4] According to Dr. Kam, Mr. Lin had the chronic form of Hepatitis B. (Kam Depo. 89, Dinnocenzo Aff. Ex. B.) Dr. Kam treated Mr. Lin with interferon, an antiviral drug administered by injection. (*Id.* ¶ 22; Solomon-Stowe Aff. Ex. E, at ML LIN 00102.)

Following this treatment, "Mr. Lin showed a conversion of Hepatitis B antigen from positive to negative, demonstrating that his condition had been successfully treated

---

[3] The "perinatal" period is the period around birth.

[4] An antigen is a substance that prompts the generation of antibodies and can cause an immune response.

and he no longer had an active infection." (Aledort Letter, at 1.) Furthermore, "Mr.
Lin's lab markers showed a consistent trend of normal liver function and negative HBV
DNA results." (*Id.*) According to Dr. Aledort, this indicated that Mr. Lin's Hepatitis B
"was no longer active and thus had no impact on his longevity or survival." (*Id.*) Dr.
Kam terminated Mr. Lin's interferon treatment on February 6, 1999. He may have told
Mr. Lin, "your Hepatitis B now is cured, it's inactive." (Kam Depo. 90, Sherer Aff, Ex.
H.)[5]

Despite this positive prognosis, Dr. Kam continued to monitor Mr. Lin for
Hepatitis B over the next five years. (*Id.* ¶ 25.) In March 2004, for example, Dr. Kam
ordered an ultrasound of Mr. Lin's abdomen. (*See* Dinnocenzo Aff. ¶ 23; Solomon-
Stowe Aff. Ex. E, at ML LIN 00154.) In August 2004, Dr. Kam ordered a blood test for
alpha-feo-protein, a liver cancer marker. (Dinnocenzo Aff. ¶ 23.) And throughout this
period, Mr. Lin underwent biannual testing to verify that his Hepatitis B had not
reactivated. (*Id.* ¶ 25.)

Dr. Kam testified that if Mr. Lin's Hepatitis B did reactivate, he could have
successfully treated it. (Kam Depo. 64.) Based on this, plaintiff suggests that Mr. Lin's
Hepatitis B would have been successfully treated for the rest of his life. (Dinnocenzo
Aff. ¶ 25.)

---

[5] Dr. Kam explained that he could not be sure of what he told Mr. Lin, because the
treatment had occurred ten years earlier. (Kam Depo. 90 ("You are asking something
which go[es] back to 1998, ten years ago, okay? Ten years ago, no one can tell you what
they talk about, okay? This is unreasonable . . . ."), Ex. B. to Dinnocenzo Aff.)
Nevertheless, Dr. Kam ventured that he was "99 percent sure" that he told Mr. Lin,
"Your Hepatitis B now is cured, it's inactive." (*Id.*)

**C.      Mr. Lin's Life Insurance Application**

In August 2004, Mr. Lin applied for a $1 million life insurance with MetLife. (Dinnocenzo Aff. ¶ 5.)  The policy was Mr. Lin's second with the company.  (*Id.* ¶ 6.) Five years earlier, Mr. Lin applied for and received a $500,000 policy.  (*Id.*)  This policy was incontestable when Mr. Lin died, and MetLife has paid plaintiff's claim under it. (*Id.* ¶ 6; Solomon-Stowe Aff. ¶ 21.)[6]

The second policy's application form consisted of two sections: "Part I" and "Part II (Paramedical/Medical Exam)."  (Dinnocenzo Aff. ¶ 6.)  A MetLife agent, Judy Huang, completed Part I at Mr. Lin's office while plaintiff was present.  (*Id.*)  Question 21(d) asked, "Has any person proposed for insurance EVER received treatment, attention, or advice from any physician, practitioner or health facility for, or been told by any physician, practitioner or health facility that he/she had," among other liver ailments, "hepatitis?"  (Solomon-Stowe Aff. Ex A, at ML LIN 00398 (emphasis in original) ("Policy").)  In a box next to this question, Ms. Huang checked "No."  (*Id.*)  This answer was false.

Question 22 asked, "Has any person proposed for insurance: . . . a) In the past six months, taken any medication or been under observation or treatment? b) Scheduled any: doctor's visits; medical care; or surgery for the next six months? c) During the past five years had any: checkup; health condition; or hospitalization not revealed above?"  (*Id.*

---

[6] In addition to the MetLife policies, Mr. Lin obtained a $1 million life insurance policy from the John Hancock Life Insurance Company on September 17, 2004.  (*See* Sherer Aff. Ex. Q.)  John Hancock has refused to honor that policy on the ground that Mr. Lin failed to disclose his history of treatment for Hepatitis B.  (*See id.* at 2.)  According to records maintained by the Massachusetts court system, John Hancock moved for summary judgment in Ms. Lin's suit based on this policy on December 15, 2008.  The motion is pending.

(paragraph breaks omitted).)  Ms. Huang checked "No" in boxes next to each of these questions.  (*Id.*)  These answers were false.

Ms. Huang testified that before marking answers, she read "each and every" question to Mr. Lin, translating the questions from English to Mandarin, the language she and Mr. Lin normally conversed in.  (Huang Depo. 25-26, Sherer Aff. Ex. I.)  Ms. Huang also stated in a letter to MetLife's central claims office, which was sent after plaintiff filed her claim but before plaintiff filed this suit, that she asked the "applicant" all the questions on the application and recorded all the responses "as given by applicant."

(Sherer Aff. Ex. L., at 2.)

Plaintiff remembers things differently.  She testified that she sat down with Ms. Huang to fill out the form for Mr. Lin.  She also testified:

> [Ms. Huang] just came and she, you know, she filled out the application for me and she asked me [if] anything change[d] or I say nothing changed and then she said okay, you know, and then, you know, she filled out and I just signed it and then we start talking about mother things.

(Lin Depo. 48, Ex. F to Sherer Aff.)  Plaintiff additionally submitted an affidavit in which she stated:

> Ms. Huang did not ask the health questions in the application and I did not review the application before signing it.  I subsequently brought the application to my husband, who was working in another room at our business office, to sign it.  He did so without reading the application and then gave it back to me to give to Ms. Huang.

(Huang Aff. ¶ 3, Dinnocenzo Aff. Ex. F.)

On August 18, 2004, Mr. Lin went to the offices of Portamedic, a company that interviews and examines people applying for insurance, for his medical exam.  (*See* Chou Aff. ¶¶ 1, 3-4.)  Peggy Chou, a Portamedic employee, filled out Part II of the application form with Mr. Lin.  (Dinnocenzo Aff. ¶ 10.)  No one else was present.

Question 5(d) of Part II asked, "Have you EVER received treatment, attention, or advice from any physician, practitioner or health facility for, or been told by any physician, practitioner or health facility that you had," among other liver ailments, "hepatitis?" (Policy, at ML LIN 00392.) In a box next to this question, Ms. Chou checked "No." (*Id.*) Question 7 asked, "Do you have any doctor's visits, medical care, or surgery scheduled?" (*Id.* at ML LIN 00393.) Ms. Chou checked "No." (*Id.*) Question 8 asked, "Other than the above, during the past five years have you had any . . . Checkup; electrocardiogram; chest x-ray or medical test?" (*Id.*) Again, Ms. Chou checked "No." All of these answers were false.

In an affidavit, Ms. Chou stated that she asked Mr. Lin each of these questions, and that he responded "No" each time. (Chou Aff. ¶¶ 6, 8, 10, 12.) Ms. Chou also stated: "I explained to [Mr. Lin] that in signing [the form], he was stating that the answers therein were true and correct to the best of his knowledge and belief. [Mr. Lin] agreed and signed on page 2 in the box for the proposed insured." (*Id.* ¶ 13.) Plaintiff's lawyers did not depose Ms. Chou as part of this lawsuit. (Sherer Aff. ¶ 10.)

MetLife issued the policy on August 31, 2004. (Solomon-Stowe Aff. ¶ 13.) As required by law, *see* Cal. Ins. Code § 10113.5, the policy contained a clause providing that it would not be contestable after it had been in force for two years. (*See* Policy, at 8.)

## D.     Subsequent Events and Procedural History

In November 2005, Mr. Lin began to experience stomach pain and was diagnosed with stomach cancer. (Dinnocenzo Aff. ¶ 4.) On August 11, 2006, Mr. Lin died from causes unrelated to Hepatitis B. (*Id.*)

On September 19, 2006, plaintiff submitted an "Individual Life Death Claim Form" to MetLife.  (*See* Dinnocenzo Aff. Ex. C.)  Because Mr. Lin died within the policy's contestable period, the company requested his medical records before paying plaintiff's claim.  (Solomon-Stowe Aff. ¶ 18, 22.)  After discovering Mr. Lin's undisclosed treatment history, MetLife denied liability.  (*Id.* ¶ 26.)  In a letter dated February 5, 2007, the company explained:

> We have learned . . . that your husband was seen by his attending physician on several occasions from September 5, 1998 to August 7, 2004 for a condition which is serious from an underwriting standpoint. If your husband had disclosed his treatment for this condition, which was material to our acceptance of the risk, his application would not have been approved as issued.

(Solomon-Stowe Aff. Ex. G., at 1.)

In the course of litigation, MetLife produced four types of evidence relevant to its conclusion that Mr. Lin's treatment history was material to its underwriting decision. First, the MetLife underwriter who originally approved Mr. Lin's policy testified that there were no "flags" in Mr. Lin's medical history when he approved the policy. (Westman Depo. 29, Sherer Aff. Ex. G.)[7]  Second, MetLife produced an underwriting guideline which indicates that MetLife would have analyzed Mr. Lin's application using

---

[7]  Mr. Westman testified that "[t]here was no indication in the application that there was a reason we should not proceed as I did," (Westman Depo. 24); that "[t]here was no health history admitted in the application or exam" that would have caused him "to pursue anything," (*id.* at 25-26); that elevations in Mr. Lin's bilirubin levels were "not significant enough that I had a concern," because "[t]he application and exam had no highlights in it or flags that there is a condition that I should pursue" (*id.* at 29); and that while Hepatitis B can successfully be treated with interferon, a person who has been treated with interferon is "going to have to be followed" (*id.* at 36).  Despite the obvious relevance of Mr. Westman's views under California law, plaintiff's counsel several times moved to strike answers in which Mr. Westman testified about his assumptions in underwriting Mr. Lin's policy.  (*See, e.g.*, *id.* at 26, 37.)  The Court can discern no basis for these motions, and denies them for purposes of this motion.

different procedures had it known Mr. Lin had been treated for Hepatitis B.  The

guideline, entitled "Liver Function Tests," instructs the underwriter to "[r]ate for cause"

if a proposed insured manifests abnormal levels of bilirubin and the cause is known.

(Dinnocenzo Aff. Ex. K, at CONFIDENTIAL ML LIN 1096.)[8]  If the cause is unknown,

the guideline instructs the underwriter to assign no additional basis points, which are used

to calculate a policy's premium, provided that the proposed insured has bilirubin levels of

up to 3.5 milligrams per deciliter.  (*Id.*)  Third, MetLife produced copies of the policy's

application forms, which specifically requested information about whether Mr. Lin had

been treated for Hepatitis.  (Policy, at ML LIN 00392, ML LIN 00398.)  Finally, MetLife

produced a substantial amount of evidence generated for purposes of litigation that

purports the show the effect Mr. Lin's HBV infection had on his mortality as of the time

that MetLife approved his policy.  MetLife's medical expert, for example, stated that

"Mr. Lin was and always remained at significant risk of death from liver cell cancer after

his interferon treatment."  (Letter from David J. Clain, M.D., to Tomasita L. Sherer, Esq.,

at 5 (April 20, 2008) ("Clain Letter"), Sherer Aff. Ex. M.)  As discussed below, *see infra*

§ II.B.3, Ms. Lin has proffered evidence that is inconsistent with this conclusion.  (Letter

from Louis M. Aledort, M.D., to Ted Trief, Esq., at 2 (March 12, 2008) ("Mr. Lin's

prognosis with respect to his longevity was not reduced by his successful treatment for

Hepatitis B."), Dinnocenzo Aff. Ex. O.)

---

[8] Bilirubin, a product that results from the breakdown of hemoglobin, is measured to screen for liver or gallbladder problems.  Test results are reported in milligrams per deciliter (mg/dL).  (MedlinePlus Medical Encyclopedia: Bilirubin, http://www.nlm.nih.gov/medlineplus/ency/article/003479.htm (last visited Mar. 27, 2009).)

On April 23, 2007, plaintiff filed this action, asserting a single claim for breach of contract.  MetLife asserted a counterclaim, seeking rescission of the policy.  On July 3, 2008, MetLife moved for summary judgment.  In its motion, MetLife contends that the undisputed record evidence shows that by failing to disclose his history of treatment for Hepatitis B, Mr. Lin materially misrepresented the risk MetLife assumed in issuing the policy, and that it is entitled to rescind the policy as a matter of law.

Plaintiff does not dispute that Mr. Lin failed to disclose his treatment history.  But she contends this failure was excusable under California law, principally on the ground that MetLife's agents, Ms. Huang and Ms. Chou, did not ask Mr. Lin the questions on Parts I and II, respectively, of the application form.  As discussed below, there is no evidentiary basis for the contention that Ms. Chou did not ask, or that Mr. Lin did not answer, each question on Part II.  Plaintiff also contends that Mr. Lin's treatment history did not materially affect the risk MetLife assumed in issuing the policy, and that MetLife waived its right to rescind the policy by, for example, not conducting further medical investigations after it discovered elevated levels of bilirubin in his blood.  In a cross motion, plaintiff seeks to preclude the testimony of two MetLife witnesses, Daniel Zamarippa, M.D. and David Clain, M.D., under Federal Rule of Evidence 702.

## II.    DISCUSSION

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  At summary judgment, the moving party bears the initial burden of showing it is entitled to judgment based on facts as to which there is no genuine dispute.  *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986).  Thereafter, the party opposing summary judgment must "set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2); *Celotex*, 477 U.S. at 325.

The crucial questions here are whether the record contains enough evidence for a rational trier of fact to conclude that (i) there is a "plausible explanation" for Mr. Lin's failure to disclose his treatment history, *see Thompson v. Occidental Life Ins. Co.*, 513 P.2d 353, 363 (Cal. 1973), (ii) Mr. Lin's failure to disclose that history was immaterial to the risk MetLife assumed in issuing the policy, or (iii) MetLife waived its power to rescind.  Before turning to those questions, the Court first addresses MetLife's prima facie case for rescission of the policy.

## A.    MetLife's Prima Facie Case for Rescission

The parties agree that MetLife's rescission claim is governed by California law. (Def.'s Opening Mem. 14, Pl.'s Opp. Mem. 7.)

Under California law, an insurer may rescind a policy when the insured has engaged in "concealment," even if it was unintentional.  *O'Riordan v. Fed. Kemper Life Assur.*, 114 P.3d 753, 756 (Cal. 2005).  The California Insurance Code defines "concealment" as "[n]eglect to communicate that which a party knows, and ought to communicate."  Cal. Ins. Code. § 330.

While intentional concealment is not required, an insurer is not entitled to rescission unless the information concealed was material.  Cal. Ins. Code § 332.  Section 334 of the Code specifies the standard for assessing the materiality of a concealed fact.  It provides: "Materiality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due, in

forming his estimate of the disadvantages of the proposed contract, or in making his inquiries."  Cal. Ins. Code § 334.  This is a subjective standard, which examines the effect truthful disclosure would have had upon the particular insurer.  *Holz Rubber Co., Inc. v. Am. Star Ins. Co.*, 533 P.2d 1055, 1065 (Cal. 1975) ("Materiality is determined by the probable and reasonable effect that truthful disclosure would have had upon the insurer in determining the advantages of the proposed contract."); *Mitchell v. United Nat'l Ins. Co.*, 127 Cal. App. 4th 457, 474 (2005) ("This is a *subjective* test; the critical question is the effect truthful answers would have had on the insurer, not on some 'average reasonable' insurer." (alterations in original omitted).)  To establish a prima facie case of rescission, then, an insurer must show (i) failure to disclose, (ii) information that the insured knows and ought to communicate that (iii) "probabl[y]" and reasonabl[y]" would have influenced the insurer in (a) forming its estimate of the disadvantages of the proposed contract, or (b) making its inquiries.

Here, there is no dispute that MetLife has demonstrated the first two elements of its claim for rescission: Mr. Lin failed to reveal that he had been treated for Hepatitis B, and MetLife specifically requested that information on its application form.  In addition, MetLife has made a prima facie showing that Mr. Lin's treatment history would have influenced it in forming its estimate of the disadvantages of the proposed policy or in making in making its inquiries, thereby establishing the materiality of the treatment history.  As already noted, MetLife's underwriter testified that he approved Mr. Lin's policy based on the (false) assumption that there were no "flags" in Mr. Lin's medical history; a MetLife underwriting guidelines called for additional analysis where a proposed insured had elevated bilirubin levels as a result of a known cause (here,

Hepatitis B); and the policy's application form specifically inquired whether Mr. Lin had been treated for Hepatitis B.  Based on this showing, the Court concludes that MetLife has carried its initial burden of showing that it is entitled to rescission.

**B.      Plaintiff's Counterarguments**

Plaintiff offers four arguments why summary judgment nevertheless may not be entered.  None of these show a genuine factual dispute for trial.

### 1.   First "Plausible Excuse:" Ms. Huang and Ms. Chou Did Not Ask Mr. Lin the Questions on the Application Form

First, plaintiff contends that the record shows that neither Ms. Huang nor Ms. Chou asked Mr. Lin the questions on the application form.  (Pl.'s Opp. Mem. 11-12.) Plaintiff therefore argues there is a "plausible explanation" for Mr. Lin's failure to disclose his treatment history, a factor that would excuse Mr. Lin's concealment under California law.  *See Thompson*, 513 P.2d at 363.[9]  In the Court's view, the evidentiary basis for this argument is too weak to preclude summary judgment.

Plaintiff's argument turns on three parts of the record.  First, plaintiff testified that Ms. Huang did not ask Mr. Lin the questions on Part I of the application.  While

---

[9] *Thompson* has been cited for the proposition that once an insured proffers a plausible explanation, the insurer must *disprove* it to be entitled to rescission.  *See MacDonald v. Zurich Life Ins. Co. of America*, No. C 03-03538 JW, 2004 WL 2326371, at *3 (N.D. Cal. Oct. 14, 2004) ("In response to allegations of material misrepresentations by an insurer, the insured is responsible for proffering 'plausible explanations' for the existence of the misrepresentations.  Upon this proffer, the burden returns to the insurer 'to negate to the satisfaction of the trier of fact the various plausible explanations.'" (citations omitted)).

The *Thompson* court, however, limited its consideration to "the particular facts of this case," in which neither the insured (who was dead) nor the insurance company's examining doctor (who was unavailable) offered evidence.  *Thompson*, 513 P.2d at 355, 362.  Here, the Court need not decide whether "plausible excuse" is an element of the insurer's prima facie case or an affirmative defense.  However classified, a jury could not rationally conclude on the basis of the admissible evidence proffered by plaintiff that Ms. Chou failed to ask Mr. Lin the questions on Part II of the application form.

plaintiff's deposition testimony is not entirely consistent, its general thrust is that Ms. Huang filled out the application in a rush, with no input from the Lins.  (*See* Lin. Depo. 48-52.)[10]  With respect to this issue, the Court agrees with plaintiff that there is a factual dispute, if a weak one, about how Part I of the application was filled out.

This does not hold true for Part II of the application.  Here, plaintiff relies on an affidavit offered by a retired FBI agent, Michael Henehan.  (*See* Henehan Aff. ¶ 1, Dinnocenzo Aff. Ex. G.)  Mr. Henehan recites that on July 21, 2008, he contacted Ms. Chou by phone and attempted to question her about Mr. Lin, and particularly whether she remembered Part II of Mr. Lin's application.  (*See id.* ¶¶ 3-5.)  Mr. Henehan found Ms. Chou's answers—such as "[w]e ask; they sign; we sign" and "[e]very time, we do same way"—evasive.  He concludes that "Ms. Chou has no independent and specific memory of completing Part II of the application that was signed on August 18, 2004 with Mr. Lin."  (*Id.* ¶ 6.)

Mr. Henehan's affidavit is entirely inadmissible, and thus does not affect the summary judgment analysis.  *See, e.g.*, *Major League Baseball Props., Inc. v. Salvino,*

---

[10]     For context, this passage of plaintiff's deposition reads as follows:

Q:     . . . I am just trying to get a sense of how the application came to be filled out.  Did she ask you a question and then write it out?

A:     No. She just filled out it [sic] at once.

Q:     She just filled out the whole application and didn't ask you a single question?

A:     She asked me to get my husband's driver's license and I knew his social security number, so, yes.  That is the only thing.

Q:     Do you recall her asking questions about health and medical?

A:     No, I don't.

Q:     You don't recall her asking you a single question about that?

A:     (No response.)

(Lin Depo. 49.)

*Inc.*, 542 F.3d 290, 310 (2d Cir. 2008); *LaSalle Bank Nat'l Assoc. v. Nomura Asset Capital Corp.*, 424 F.3d 195 (2d Cir. 2005).  Expert testimony is only admissible if it is the product of reliable principles and methods, and helpful to the trier of fact.  Fed. R. Ev. 702.  Plaintiff, however, has made no showing that Mr. Henehan, a self-styled truth expert, will offer testimony that meets either standard.  Rather, "somewhat in the manner of the oath-helpers of an earlier day," Mr. Henehan proposes to testify that Ms. Chou is not telling the truth.  Fed. R. Evid. 704, Advisory Committee Note, 28 U.S.C.A. Rule 704, at 270 (2001); *see United States v. Shay*, 57 F.3d 126, 131 (1st Cir. 1995).  If plaintiff's counsel had doubts about Ms. Chou's testimony, they could have deposed her.

Finally, plaintiff notes that the application form contains two minor inconsistencies which, she contends, show that Ms. Huang and Ms. Chou failed to complete the form carefully.  In Part I of the application, Mr. Lin stated both that he had a regular checkup scheduled in August 2004, and that he had not scheduled any doctor's visits for the next six months.  (Policy, at ML LIN 00397 to ML LIN 00398.)  In Part II, Mr. Lin stated that he had visited a doctor for "skin itching," yet also reported that he had not been treated for "[a]ny disease or disorder of the skin."  (Policy, at ML LIN 00392.)  But of course, the form itself does not show who is to blame for the inconsistencies, nor does it show that Ms. Chou failed to faithfully transcribe Mr. Lin's answers.

The factual dispute over Mr. Lin's failure to disclose his treatment history, then, reduces to this:  Two MetLife agents specifically stated that they asked Mr. Lin the questions on the application form and recorded his answers.  One of those agent's testimony is inconsistent with plaintiff's testimony, but the other's is uncontested for purposes of this motion.  There are minor inconsistencies in Mr. Lin's application form.

But they have no probative value, since no party has offered evidence as to who's to blame for them.  And in any event, the inconsistencies hardly give rise to the inference critical to plaintiff's argument—that Ms. Chou did not accurately record Mr. Lin's answers.

Perhaps giving plaintiff every benefit of the doubt, a jury could accept Ms. Lin's testimony that her husband was not in the room when Ms. Huang filled out Part I.  But there is no evidentiary basis for contesting Ms. Chou's sworn statement that she asked Mr. Lin each of the questions on Part II of the application and recorded his answers. Accordingly, the Court rejects plaintiff's argument that factual disputes about how the application form was filled out preclude summary judgment.

### 2. Second "Plausible Excuse:" Mr. Lin Misapprehended the Seriousness of his Condition

Citing Dr. Kam's "you're cured" statement, plaintiff next argues that Mr. Lin's failure to disclose his treatment history is excusable because Mr. Lin did not appreciate the significance of his status as an HBV carrier.  Pl.'s Opp. Mem. 14; *see Miller v. Republic Nat'l Life Ins. Co.*, 789 F.2d 1336, 1339 (9th Cir. 1986) ("*Miller II*") ("[T]here is no breach of the duty to disclose if the applicant, acting in good faith, does not understand the significance of the information he fails to disclose.").

Mr. Lin's beliefs about his present medical condition, however, did not excuse his failure to disclose his treatment history, a fact that, the record shows, had independent significance to MetLife.  Part II of the application asked whether "any person proposed for insurance EVER received treatment . . . for . . . hepatitis."  (ML LIN 00398).  Yet Mr. Lin failed to disclose that he had a five-year history of treatment for Hepatitis B—a history that included treatment with interferon, biannual blood tests, and an ultrasound of

his abdomen.  If Mr. Lin believed in good faith that he was not infected with Hepatitis B, his treatment history nonetheless was relevant to MetLife's underwriting decisions, if only so that MetLife could verify that he was "cured."

Miller II, cited by plaintiff, is not to the contrary.  There, the insured began to have strange thoughts after he applied for a life insurance policy.  789 F.2d at 1337-38.  Before the policy was issued, the insured was diagnosed with a brain tumor, and the insurer attempted to rescind.  Id. at 1338.  The Ninth Circuit first held that the insurer had the burden of showing that the insured was uninsurable when he applied for the policy.  Miller v. Republic Nat'l Life Ins. Co., 714 F.2d 958, 961 (9th Cir. 1983).  The court then held that the insured had no duty to disclose his strange thoughts unless, acting in good faith, he believed they were material.  Miller II, 789 F.2d at 1340.  In contrast to this case, the insured had received no treatment for his brain tumor when he applied for a life insurance policy.  Id. at 1337-38.  Thus, the significance of a history of treatment for a serious known (but latent) disease was not before the court.

   3.   Materiality

Citing a variety of evidence, plaintiff next argues that Mr. Lin's treatment history was not material.  (See Pl. Opp. Mem. 15-19.)  According to plaintiff's medical expert, a large number of Asians infected with Hepatitis B either spontaneously recover or are successfully treated.  (Aledort Letter, at 1.)  Mr. Lin's blood tests showed normal liver function by December 1998, less than three months after he first saw Dr. Kam for treatment for his Hepatitis B.  (Dinnocenzo Aff. ¶ 21-23, and sources cited.)  Mr. Lin tested negative for liver cancer in September 1998 and August 2004.  (Dinnocenzo Aff. ¶ 23 and sources cited.)  And ultrasounds of Mr. Lin's liver taken in October 1998 and

March 2004 came back normal.  (*Id.*)  Plaintiff contends, therefore, that Mr. Lin did not

have a greater risk of death as a result of his Hepatitis B.  (Pl.'s Opp. Mem. 15, 17.)

    MetLife vigorously disputes this contention.  Its medical expert testified that Mr.

Lin always had a higher risk of death due to his status as an HBV carrier.  (*See* Clain

Letter 5.)  And, Dr. Aledort admitted it is impossible to specify with any precision the

effect Mr. Lin's latent HBV had on his mortality.  (Aledort Depo. 134.)[11]

    If the question before the Court was whether a reasonable insurer would have

offered a policy to Mr. Lin on the same terms as the policy that MetLife ultimately

issued, the materiality of Mr. Lin's concealment would be a close question, particularly at

summary judgment.  Yet that is the wrong question under California law.  Section 334 of

the Insurance Code provides, by its terms, that materiality is determined by its "probable

and reasonable" effect on MetLife in forming its estimate of the disadvantages of the

proposed contract, or in making its inquiries.

    The Ninth Circuit's decision in *Freeman v. Allstate Life Ins. Co.*, 253 F.3d 533

(9th Cir. 2001), illustrates this distinction well.  There, the insured innocently failed to

disclose that she had been treated for epilepsy.  *See id.* at 535.  After the insurer rescinded

the policy, the beneficiary, like plaintiff here, argued that "because his wife's epilepsy

was controlled with medication, it was not life-threatening and was therefore an

---

[11] The cited page of Dr. Aledort's deposition contains the following exchange:

Q:    Now, I did hear you say that you felt that [the risk of death from
      inactive Hepatitis B] was exaggerated, but what I'm trying to
      figure out from you is whether you think there is any additional
      risk or not?

A:    And I made it clear that no one is sure.

Q:    So you don't know?

A:    No one knows.

insubstantial condition that did not need to be disclosed." *Id.* at 536-37.  The Ninth

Circuit disagreed, and held that "[w]here an insured is aware of her condition, symptoms,

or treatment, she is obliged to disclose them upon request." *Id.* at 537.[12]  Although not

expressly stated, court's *ratio decidendi* is easy to discern: even if the insured's treated

epilepsy would not have affect the policy's premium, treatment for epilepsy is relevant to

the inquiries the insurer reasonably and probably would have made before issuing the

policy.  *See id.* at 537 (quoting § 334 in full).[13]

       Viewing the record in light of the appropriate standard, there is no serious dispute

that at a minimum, Mr. Lin's treatment history would have had a substantial effect on

MetLife's decisionmaking process.  Mr. Westman's evaluation of Mr. Lin's application

was premised on his assumption that Mr. Lin had not been treated for Hepatitis B; and

MetLife's internal guideline called for Mr. Westman to "rate for cause" if he knew why

---

[12] As the Court of Appeals most familiar with California law, the Ninth Circuit's understanding of that law is entitled to substantial deference within the federal system. *See Bishop v. Wood*, 426 U.S. 341, 346 n.10 (1976) (collecting cases).

[13] The California Supreme Court's decision in *Thompson* is not inconsistent with the understanding of California law reflected in *Freeman*.  Although the *Thompson* court stated that "[a]n incorrect answer on an insurance application does not give rise to the defense of fraud where the true facts, if known, would not have made the contract less desirable to the insurer," 513 P.2d at 360, it did so immediately after citing § 334 of the Insurance Code.

       In any event, even assuming *Thompson* interpreted the "inquiry" prong out of § 334—an act that would exceed the authority of any court interpreting a statute absent constitutional considerations—the California Supreme Court held two years later that "[m]ateriality is determined by the probable and reasonable effect that truthful disclosure would have had upon the insurer in determining the advantages of the proposed contract." *Holz Rubber Co., Inc. v. American Star Ins. Co.*, 533 P.2d 1055, 1065 (Cal. 1975).  This holding both reaffirms the primacy of the statutory test for materiality, and confirms that materiality can be demonstrated through a showing that, had an insurer known of a risk, it would have conducted a substantially different analysis of the proposed insured's application.  *See id.* ("Essentially, we must decide whether the insurer was *misled into accepting the risk* or fixing the premium of insurance." (emphasis added)).

Mr. Lin had elevated bilirubin levels.  None of the evidence proffered by plaintiff calls into doubt the conclusion that follows—that, had MetLife known of Mr. Lin's treatment history, it would have demanded more information from Mr. Lin and engaged in a substantially different underwriting process.

Although the Court need go no further, any doubt as to the materiality of Mr. Lin's treatment is removed by the policy's application form, which specifically inquired whether Mr. Lin had received treatment for Hepatitis.  (Policy, at ML LIN 00392, ML LIN 00398.)  "The fact that the insurer has demanded answers to specific questions in an application for insurance is in itself usually sufficient to establish materiality as a matter of law."  *Thompson*, 513 P.2d at 360.  This rule makes good sense.  While both the insurer and the insured have a direct financial interest in misrepresenting the importance of a particular fact *ex post*, the questions an insurer asks on its application form reasonably reflect the facts it views as important *ex ante*.  The rule is not only more administrable than a standard that invites the parties to reconstruct the insurer's before-the-fact thinking, but more likely, all other things being equal, to get at the truth.

Here, MetLife's application form specifically inquired whether Mr. Lin had been treated for Hepatitis.  And none of the circumstances that have prompted courts to conduct a more searching review of whether a fact was material to an insurer are present. *See Burns v. Prudential Ins. Co. of Am.*, 201 Cal. App. 2d 868, 872 (1962) (reviewing cases and noting that searching review has been applied "[w]here the insurance company concedes or the evidence shows that the company would not have been influenced by full and truthful answers").  Plaintiff, therefore, has not demonstrated a genuine factual dispute as to the materiality of Mr. Lin's treatment history.

*4.  Waiver*

Finally, plaintiff argues that MetLife waived its power to rescind by, for example, failing to investigate inconsistencies in Mr. Lin's application, and failing to perform additional testing after discovering purportedly elevated levels of bilirubin in Mr. Lin's blood.  The Court, however, cannot conclude that any of the evidence cited by plaintiff "distinctly implied" that Mr. Lin had been treated for Hepatitis B, as required by California law.  *See* Cal. Ins. Code § 336(b).  The inconsistencies in Mr. Lin's application had nothing to do with Hepatitis.  And MetLife's underwriting guideline provides that, so long as the cause is unknown, an applicant may have a bilirubin level of up to 3.5 mg/dL without any adverse effect on the policy's premium.  (Dinnocenzo Aff. Ex. K, at CONFIDENTIAL ML LIN 1096.)  Fairly read, the guideline demonstrates that Mr. Lin's bilirubin level was not so high as to imply, on its own, that Mr. Lin had been treated for Hepatitis B.

For the record, the Court notes plaintiff's frequently-repeated argument that MetLife should have subjected Mr. Lin's application to an extra degree of scrutiny because he was Asian.  (*See, e.g.*, Pl.'s Opp. Mem. 5, 15, 26.)  MetLife's response to this argument—that it could not have done so consistently with California anti-discrimination law—is sound.

## III.    CONCLUSION

MetLife's motion for summary judgment **[21]** is granted.  Because the Court has

not relied on the testimony of Drs. Zamarippa and Clain for any purpose within Federal

Rule of Evidence 702, plaintiff's cross-motion in limine **[32]** is denied as moot.  For the

reasons stated in note 2, *supra*, the Clerk is directed not to enter judgment until April 30,

2009.

SO ORDERED.

Dated: New York, New York
       March __**30**__, 2009

Richard J. Holwell
United States District Judge